IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

**PERSONS IN STATE CUSTODY APPLICATION FOR
HABEAS CORPUS UNDER 28 U.S.C. SECTION 2254**

Name:  John Middleton

Prison Number:  CP-134

Place of Confinement:  Potosi Correctional Center

United States District Court, Eastern District of Missouri

Case No: No. 4:03-CV-543-CDP

JOHN MIDDLETON,                                              PETITIONER

v.

DON ROPER,

THE PROSECUTION.

## **Table of Contents**

Cover ...................................................................................................i

Table of Contents ................................................................ ii

Table of Authorities ......................................................... xxii

Petition Form ....................................................................1

Statement of the Case ..........................................................7

      The Petitioner    7

      The Offense      14

      The State Court Proceedings....................................17

      The Callaway County Case ......................................33

Grounds for Relief...........................................................35

I.    Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner's state-appointed counsel failed to call employer and family mitigation witnesses Charles Webb, Vern Webb, Virginia Webb, Ruby Smith, Sylvia Purdin, and Glenn Williams to testify about (A) the petitioner's impaired cognitive abilities which preceded his heavy drug use, and thereby offered an explanation for why he may have become involved in drugs; (B) his work-ethic and diligence, which would demonstrate why he would be a good, hard-working inmate; and (C) his mother's inhalant abuse, which might have explained why as a child he was cognitively impaired.  These failures denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent counsel would have investigated and called these witnesses, and the petitioner suffered prejudice from the failure to do so, because under the circumstances of the case there is a reasonable probability if the jury had heard their testimony, it would have returned a punishment verdict other than death. ..................................................................50

II.      Respondent's custody over the petitioner violates the
         Constitution of the United States in that counsel failed to
         call the petitioner's Iowa corrections counselor, Jake
         Noonan, and to introduce his Iowa corrections file in the
         penalty phase to support a sentence other than death,
         because this would have established that the petitioner
         had been a well-behaved and well-adjusted prisoner in
         Iowa, and therefore could be expected to be equally
         successful if sentenced to life imprisonment without
         parole rather than to death.  This failure denied the
         petitioner the rights to the effective assistance of counsel,
         to be free from cruel and unusual punishment, and to due
         process of law, as guaranteed by the Sixth, Eighth, and
         Fourteenth Amendments.  Reasonably competent counsel
         would have investigated and presented this evidence,
         and the petitioner suffered prejudice because under the
         circumstances of the case there is a reasonable probability
         if the jurors had heard this evidence, they would have
         returned a punishment verdict other than death..............58

III.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court allowed the prosecution to present, over objection, expert testimony vouching for the credibility of Douglas Stallsworth.  Stallsworth was a key prosecution witness, in that there were no eyewitnesses to the killing for which the petitioner was on trial, but Stallsworth testified to alleged statements by the petitioner which inculpated him in the offense and provided the grist for two of the statutory aggravating factors.  Stallsworth had a substantial, undisputed history of mental illness.  Trial counsel sought Stallsworth's mental-health records in order to allow them to crossexamine the prosecution mental-health expert who vouched for Stallsworth's credibility, but the trial court denied the defense's attempts to obtain these records.  The trial court's admission of the expert's testimony violated the petitioner's right to confront and crossexamine witnesses and to due process of law, in violation of the Sixth and Fourteenth Amendments.  Its refusal to allow trial counsel access to these records rendered trial counsel involuntarily ineffective notwithstanding her subjective diligence, also in violation of the Sixth and Fourteenth Amendments.  Because the trial judge denied trial counsel an opportunity to preclude unlawful, prejudicial testimony in the penalty phase, the error violated the Eighth Amendment and the petitioner is at least entitled to a new penalty phase in light of *Tuggle v. Netherland*....69

IV.    Respondent's custody over the petitioner violates the
       Constitution of the United States in that the prosecution
       failed to disclose deals made with John Thomas in
       exchange for Thomas's testimony.  This prosecutorial
       misconduct denied the petitioner the rights to confront
       the witnesses against him, to be free from cruel and
       unusual punishment, and to due process of law, as
       guaranteed by the Sixth, Eighth, and Fourteenth
       Amendments.  The prosecution gave its witness favorable
       dispositions of charges brought against him in exchange
       for his testimony, he affirmatively represented otherwise,
       and the prosecutor argued there were no deals, thus
       misleading the jury. .............................................................78

V.     Respondent's custody over the petitioner violates the
       Constitution of the United States in that the state trial
       court erred in overruling the petitioner's motion to
       dismiss the charge of murder in the first degree, in that
       the element of "deliberation" in this offense is so poorly
       defined as to prevent the petitioner from obtaining proper
       notice of the charge against him and effective assistance
       of counsel, in derogation of his rights guaranteed by the
       Apprisal and Assistance of Counsel Clauses of the Sixth
       Amendment and in the Due Process Clause of the
       Fourteenth Amendment.....................................................108

VI.    Respondent's custody over the petitioner violates the
       Constitution of the United States in that the state trial
       court overruled the petitioner's motion to dismiss the
       information due to unconstitutional discretion of the
       prosecutor, because the unreviewable discretion of the
       prosecutor in deciding whether to seek the death penalty
       renders the imposition of that penalty arbitrary and
       capricious in violation of the defendant's right to due
       process of law and to be free from cruel and unusual
       punishment as guaranteed by the Eighth and Fourteenth
       Amendments.........................................................................112

VII.   Respondent's custody over the petitioner violates the
       Constitution of the United States in that the trial court
       denied trial counsel's requests for relief because of an
       article published in the *Kirksville Daily Express*—the only
       local newspaper in the county of the trial—in the Sunday
       paper the day before trial, in that the article created a
       substantial and unjustifiable risk that the petitioner
       would be tried based on preconceptions and emotions
       rather than on the evidence adduced at trial, in violation
       of his rights to a fair and impartial jury and to due
       process of law as guaranteed by the Sixth and Fourteenth
       Amendments.........................................................................114

VIII.  Respondent's custody over the petitioner violates the
       Constitution of the United States in that the trial court
       denied a continuance where the defense team
       demonstrated that they were not prepared and were
       prejudiced by lack of time to prepare and by late
       disclosure of witnesses and evidence to be offered by the
       prosecution, in violation of the petitioner's rights to the
       effective assistance of counsel as guaranteed by the Sixth
       and Fourteenth Amendments. ...........................................122

IX.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted, over trial counsel's objection, evidence seized in the search of the petitioner's home (specifically "State's Exhibits" 11, 17, 29 & 59), in that the admission of this evidence violated the petitioner's right to be free of unreasonable searches and seizures and the exclusionary rule as guaranteed by the Fourth and Fourteenth Amendments.........................................................................133

X.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted, over trial counsel's objections, "evidence" which state actors had "seized" in the search of the petitioner's pickup truck (specifically "State's Exhibit 21") and the testimony of Kathleen Green concerning this exhibit, because the admission of this thing violated the petitioner's right to be free of unreasonable searches and seizures and the exclusionary rule as guaranteed by the Fourth and Fourteenth Amendments. ..............................143

XI.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court overruled the petitioner's motion to quash the petit jury panel because it excluded persons under the age of twenty-one and over the age of eighteen, in that the exclusion of these citizens from jury service deprived the petitioner of a jury of his peers, in violation of the Sixth and Fourteenth Amendments. ...........................................146

XII.    Respondent's custody over the petitioner violates the
        Constitution of the United States in that the trial court
        sustained the prosecution's objection to trial counsel's
        questioning of prospective jurors, including venire
        members Gray and Bailey—who served on the jury—
        concerning their attitudes about the justice system and
        the death penalty, in violation of the petitioner's rights to
        a fair and impartial jury, to the effective assistance of
        counsel, and to due process of law as guaranteed by the
        Sixth and Fourteenth Amendments. ................................149

XIII.   Respondent's custody over the petitioner violates the
        Constitution of the United States in that the trial court
        sustained the prosecution's challenge for cause of venire
        members Vinyard and Schnirch because of their
        responses concerning the death penalty, in violation of
        the defendant's rights to a fair and impartial jury, to be
        from cruel and unusual punishment, and to due process
        of law, as guaranteed by the Sixth, Eighth, and Fourteenth
        Amendments........................................................................158

XIV.   Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner was denied the effective assistance of counsel when trial counsel failed to move to strike for cause, or peremptorily strike, juror Holt, who testified she did not know whether she could consider mitigating evidence of substance abuse, because this omission denied the petitioner's rights to the effective assistance of counsel, freedom from cruel and unusual punishment, and due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent counsel would have so acted when their mitigation strategy was built around the petitioner's having suffered from a methamphetamine induced psychosis.  Petitioner suffered obvious prejudice because the actual trial jury contained at least one person whom everyone in the courtroom knew could not take account of trial counsel's main theory of defense. ......................................................163

XV.   Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner lacked the mental state required for a conviction for first-degree murder, and counsel failed to call in the guilt phase Drs. Murphy, Lipman, and Daniel to support the defense that the petitioner was not guilty by reason of mental disease or defect—or suffered from a diminished capacity—as each of these witnesses would have testified at trial in the guilt phase that he was psychotic at the time of the offenses so as to have supported these defenses. This failure denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.  Reasonably competent counsel would have called these witnesses in the guilt phase to testify about his psychosis to support these defenses.  Petitioner suffered prejudice from the failure to call these witnesses because under the circumstances of the case there is a reasonable probability that but for this omission, he would not have been convicted of first degree murder or at minimum not sentenced to death..................................171

XVI.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court allowed the prosecution to present the identification testimony of Wesley Booth over trial counsel's motion to suppress, because the pretrial identification procedures were so suggestive as to create an impermissible likelihood of misidentification, in violation of the Due Process Clause of the Fourteenth Amendment...............194

XVII. Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted a crime scene videotape and a still photograph showing the decedent's partially decomposed body, and actual fragments of his bone and teeth, because their probative value was marginal, and their prejudicial impact was extremely high—thus depriving the petitioner of his right to a fair trial in violation of the Sixth and Fourteenth Amendments. ..........................................200

XVIII.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted "expert opinion" evidence to the effect that fragments of leather, fragments of sunglasses, and a dashboard clock matched other evidence, because these questions were not a proper subject for expert opinion testimony, and the attempt to qualify it as such impermissibly bolstered the testimony in violation of the petitioner's rights to a fair trial, to the confrontation of witnesses, and to due process of law as guaranteed by the Sixth and Fourteenth Amendments. .................................206

XIX. Respondent's custody over the petitioner violates the Constitution of the United States in that the prosecutor's closing argument, to which trial counsel objected, misstated the evidence and drew impermissible inferences in violation of the petitioner's right to due process of law. ....................................................................208

XX.   Respondent's custody over the petitioner violates the
Constitution of the United States in that the trial court
refused to modify the reasonable doubt instruction
because the instruction, as given, depreciated the
prosecution's burden of proof in violation of the
petitioner's right to due process of law as guaranteed by
the Due Process Clause of the Fourteenth Amendment.211

XXI.  Respondent's custody over the petitioner violates the
Constitution of the United States in that the trial court
allowed the prosecution to question defense penalty-
phase mental-health witness Dr. Murphy—over
objection—about whether he *believed* the petitioner's
denials of the murders of Stacey Hodge and Randy
Hamilton (decedents in the Callaway County trial),
because these questions were improper opinion evidence
on credibility, in violation of the petitioner's right to due
process of law as guaranteed by the Due Process Clause
of the Fourteenth Amendment. .........................................215

XXII. Respondent's custody over the petitioner violates the Constitution of the United States in that (A) trial counsel failed to object to Paul Oglesbee's testimony that he thought the phrase "sell this address" in a letter from the petitioner meant that the petitioner was placing "a hit" on Oglesbee and his wife.  This nonexpert's opinion, which was not corroborated in any way, gave the jury the false impression that the petitioner would be a lethal threat to citizens outside the Department of Corrections if he were not executed.  (B) The trial court allowed the prosecution to introduce this exceptionally prejudicial and, as presented, *false*, evidence in violation of his right to notice of nonstatutory aggravating circumstances, because the prosecution did not disclose the letter until the day Oglesbee testified.  This misconduct violated the petitioner's rights to be free from cruel and unusual punishment and to due process of law as guaranteed by the Eighth and Fourteenth Amendments, in that had timely disclosure been made counsel could have called Fifer to testify accurately about the meaning of the phrase, which would have created a reasonable probability that the jury would have returned a punishment verdict other than death.  The failure to object to Oglesbee's testimony or put the quoted phrase in context denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. Reasonably competent counsel would have objected to this erroneously speculative nonexpert opinion, and the petitioner suffered prejudice from it, because the phrase is not a threat, and there is a reasonable probability if the jurors had not heard this testimony (or heard it without explanation or refutation), they would have returned a

punishment verdict other than death.  (C) In addition or in the alternative, trial counsel failed to call an available witness, Brian Fifer, to testify that a prisoner using this expression means that the prisoner no longer intends to write a person because that person had not written back to him, and that it does not constitute a threat.  Assuming the trial court would not have heeded a proper objection to Oglesbee's testimony, reasonably competent counsel would have presented such evidence from Fifer. Petitioner suffered prejudice from this second omission by trial counsel, because there is a reasonable probability that if the jurors had heard this evidence explaining the phrase in the context which it appeared, they would have imposed a punishment other than death.  (D) In the alternative, direct-appeal counsel was constitutionally ineffective for failing to raise on appeal the objections trial counsel *did* make to the prosecution's use of the letter, because reasonably competent appellate counsel would have raised this matter, and there is a reasonable probability the state supreme court would have reversed the petitioner's death sentence...........................................218

XXIII.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court allowed the prosecution to introduce in the penalty phase of the Adair County trial a videotape of the crime scene where the bodies of the decedents in the Callaway County trial, Stacey Hodge and Randy Hamilton, were found, and a picture of Hodges' body, in that this video and this still photograph were so gruesome as to inflame the passions of the jury, and—because the prosecution offered this "evidence" in connection with a collateral crime—their prejudicial effect greatly outweighed any pretended probative value. ................................................232

XXIV.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted into evidence the speech and conduct of the decedent's mother in the penalty phase when she broke down crying on the stand, and eight of the decedent's other relatives were crying in the gallery, because this display was inflammatory and prejudicial to the petitioner—sweeping beyond the "quick glimpse" of the decedent's life that the Supreme Court of the United States has allowed death prosecutors to present consistently with the Eighth Amendment, and violating the petitioner's right to due process of law as guaranteed by the Fourteenth Amendment..........................................236

XXV. Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted at the penalty phase a photograph of the decedent with his young daughter, in that this exhibit was irrelevant to any issue before the jury, and had a high potential to inflame the passions of the jury, sweeping beyond the "quick glimpse" of the decedent's life that the Supreme Court of the United States has allowed death prosecutors to present consistently with the Eighth Amendment, and violating the petitioner's right to due process of law as guaranteed by the Fourteenth Amendment. ........................................................239

XXVI.   Respondent's custody over the petitioner violates the Constitution of the United States in that trial counsel failed to object and/or otherwise request appropriate relief in response to evidence, argument, and instruction during penalty when the prosecution (A) relied on matters relating to the deaths of the decedents in the Callaway County trial; (B) argued matters outside the evidence; (C) asked defense mental-health expert, Dr. Lipman, to express an opinion on whether the petitioner was truthful in his denial of having committed the homicide offenses he was charged with committing; (D) submitted Instruction 15 without the mental state of "knowingly" as an aggravating factor.  These failures denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent counsel would have raised and preserved the grievances, and the petitioner suffered prejudice from the failure to do so, because under the circumstances of the case there is a reasonable probability if the trial court had granted relief on any or all of them, the jurors would have returned a punishment verdict other than death, or, failing that, the state supreme court would have reversed the death sentence..............................................................241

XXVII.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court denied trial counsel's motion for a directed verdict of life without parole when juror Gray was excused from the jury after the guilt verdict but before the end of the penalty phase, in that this action deprived the petitioner of his right to have his punishment assessed by the same jury which determined guilt...............................................262

XXVIII.   Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court refused to submit trial counsel's requested penalty phase instructions A, B, D, E, and E, in that these instructions were necessary to give the petitioner the opportunity to have the jury consider fully the mitigating evidence before it; the trial court's failure to give these instructions violated the petitioner's right to be free of cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments. ...................................................265

XXIX.   Respondent's custody over the petitioner violates the Constitution of the United States in that trial counsel failed to present evidence to challenge the penalty-phase jury instructions on the grounds that they fail to properly guide the jury; those instructions denied the petitioner the right to an impartial jury, to be free from cruel and unusual punishments, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that the evidence presented to the trial court in the state PCR proceeding established that jurors do not understand the instructions; trial counsel unreasonably failed to present evidence to support a challenge; and the petitioner suffered prejudiced because the less jurors understand about what the law from the Supreme Court of the United States expects of jurors in a capital case, the more likely they are to return a punishment verdict of death. ..............................................268

XXX. Respondent's custody over the petitioner violates the Constitution of the United States in that the death sentence against this petitioner must be set aside because it is disproportionate to the punishment imposed in other similar cases. ..........................................................................284

XXXI.   Respondent's custody over the petitioner violates the Constitution of the United States in that the death sentence in this case is unconstitutional and must be vacated because Mo. Rev. Stat. § 565.035.3(3) and the state supreme court's cases construing it provide no guidance to the petitioner for directing the same court's attention to its duty to conduct proportionality review, in violation of the petitioner's rights to the effective assistance of counsel and to due process of law, as guaranteed by the Sixth and Fourteenth Amendments. ...................................................290

XXXII.   Respondent's custody over the petitioner violates the Constitution of the United States in that the state did not provide the petitioner with a record of the trial court proceedings which was sufficient to permit him to exercise his right to appellate review of his conviction, in violation of his rights to the effective assistance of counsel, to be free from cruel and unusual punishments, and to due process of law as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. .............................299

XXXIII.   Respondent's custody over the petitioner violates the
Constitution of the United States in that direct appeal
counsel was ineffective for failing to raise two grievances:
(A) the trial court erred in denying the motion that sought
dismissal or alternatively exclusion of certain witnesses
because attorneys who had represented the petitioner
also had represented prosecution witnesses on charges
against them; and (B) the claim that instruction 15, the
penalty verdict director, omitted the "knowingly" mental
state requirement from one aggravator the jury found,
because the petitioner was thereby denied his rights to
effective assistance of counsel, to freedom from cruel and
unusual punishments, and to due process of law, as
guaranteed by the Sixth, Eighth, and Fourteenth
Amendments, in that reasonably competent appellate
counsel would have raised these claims, and there is a
reasonable probability the petitioner's conviction or
sentence would have been reversed...................................307

XXXIV.   Respondent's custody over the petitioner violates the
Constitution of the United States in that Missouri's
clemency process violates the Eighth Amendment's
guarantee against cruel and unusual punishments and
the Fourteenth Amendment's guaranties of due process
of law and the equal protection of the laws, in that the
clemency process is wholly arbitrary and capricious
because triple murderer Darrell Mease was granted
clemency not on the merits of his case, but because of the
Pope's "direct and personal" appeal................................321

Conclusion...........................................................................................327

Verification..........................................................................................328

Certificate of Service ........................................................................330

## Table of Authorities

### Constitutional Provisions

Mo. Const. art. I, § 18(a) (state constitutional guaranty of assistance of counsel)..................................................................................... 298

Mo. Const. art. I, § 18(a) (state constitutional requirement of notice of accusation) ............................................................................... 111

U.S. Const. amend. VI (Assistance of Counsel Clause)......................... passim

U.S. Const. amend. VI (Confrontation Clause)........................................ 69, 93

U.S. Const. amend. VIII (Cruel & Unusual Punishments Clause)........ passim

U.S. Const. amend. XIV, § 1 (Due Process Clause) ................................ passim

### Statutes

28 U.S.C. § 2254....................................................................................... passim

Mo. Rev. Stat. § 213.055 ............................................................................... 148

Mo. Rev. Stat. § 485.050 ............................................................................... 301

Mo. Rev. Stat. § 494.425 ............................................................................... 146

Mo. Rev. Stat. § 494.485 ......................................................................... 263, 264

Mo. Rev. Stat. § 552.010 ............................................................................... 189

Mo. Rev. Stat. § 552.030 ............................................................................... 172

Mo. Rev. Stat. § 562.016 ............................................................................... 109

Mo. Rev. Stat. § 565.020 .......................................................................... 108, 109

Mo. Rev. Stat. § 565.021 ............................................................................... 109

Mo. Rev. Stat. § 565.030 ................................................................... 263

Mo. Rev. Stat. § 565.035 ............................................ 284, 291, 293

Mo. Rev. Stat. ch. 552 .................................... 70, 173, 184, 189

## Rules

Mo. S. Ct. R. 29.15 ............................................... 31, 32, 52, 180

Mo. S. Ct. R. 30.20 ................................................................... 309

Mo. S. Ct. R. 4-3.8 & Official Comment ........................... 107

Special Rules Following 28 U.S.C. § 2254 (Habeas Rules) 5 ....................... 299

## Cases

*Andresen v. Maryland*, 427 U.S. 463 (1976) .................................... 137

*Arizona v. Hicks*, 480 U.S. 321 (1987) ................................. 141

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ........................... 298

*Barber v. Ponte*, 772 F.2d 982, 988 (1st Cir. 1985) .......................... 147

*Berger v. United States,* 295 U.S. 78 (1935).................................. 89, 256

*Black v. Bell*, 181 F.Supp.2d 832 (M.D. Tenn. 2001)......................... 121

*Bland v. Califomia*, 20 F.3d 1469 (9th Cir. 1994)............................ 186

*Boyde v. California*, 494 U.S. 370 (1990)..................................... 282

*Brady v. Maryland*, 373 U.S. 83 (1963).......................................85

*Buchanan v. Angelone*, 522 U.S. 269 (1998) ....................... 282

*Burdine v. Johnson*, 262 F.3d 336 (5th Cir.2001) (en banc), *cert. denied*, 535 U.S. 1120 (2002) ............................................................. 130

*Burns v. Gammon*, 260 F.3d 892 (8th Cir. 2001) (*Burns II*) .................... 136, 153

*Cage v. Louisiana*, 498 U.S. 39 (1990) ................................................ 213

*California v. Brown*, 475 U.S. 1301 (1986) ........................................... 237

*Clemons v. Mississippi*, 494 U.S. 738, 749 (1990) ................................ 121

*Coleman v. Kemp*, 778 F.2d 1487 (11th Cir. 1985) ............................... 118

*Coleman v. Thompson*, 501 U.S. 722 (1991) ........................................ 131

*Commonwealth v. Strong*, 761 A.2d 1167 (Pa. 2000) ..................................... 87, 89

*Cuyler v. Sullivan*, 446 U.S. 335 (1980)............................................... 131

*Davis v. Alaska*, 415 U.S 308 (1974) ....................................................93

*Davis v. Georgia*, 429 U.S. 122 (1976) ................................................ 162

*Duren v. Missouri*, 439 U.S. 357 (1979) .............................................. 147

*Duvall v. Keating*, 162 F.3d 1058 (10th Cir.), *cert. denied*, 525 U.S. 1061 (1998) ............................................................................ 323

*Eddings v. Oklahoma*, 455 U.S. 104 (1982).......................................... 38, 267, 282

*Evitts v. Lucey*, 469 U.S. 387 (1985) .................................................. 131, 291, 308

*Foster v. California*, 394 U.S. 440 (1969) ............................................ 198

*Franklin v. State*, 24 S.W.3d 686 (Mo. 2000) (en banc).................................. 319

*Fuentes v. Shevin*, 407 U.S. 67 (1972)................................................ 298

*Furman v. Georgia*, 408 U.S. 238 (1972)............................................. 283, 291, 306

*Geders v. United States*, 425 U.S. 80, 91 (1976) ................................. 131

*Gideon v. Wainwright*, 372 U.S. 335 (1963) ........................................................ 317

*Giglio v. United States*, 405 U.S. 150 (1972) ..........................................................89

*Glasser v. United States*, 315 U.S. 60 (1942) ....................................................... 317

*Godfrey v. Georgia*, 446 U.S. 420 (1979) ............................................. 120, 121, 269

*Goeke v. Branch*, 514 U.S. 115 (1995) (per curiam) ........................................... 303

*Gray v. Mississippi*, 481 U.S. 648 (1987) ............................................................ 162

*Hadley v. Groose*, 97 F.3d 1131 (8th Cir. 1996) ................................................. 130

*Hamling v. United States*, 418 U.S. 87 (1974) .................................................... 147

*Handy v. United States*, 375 U.S. 277 (1964) ...................................................... 304

*Harris v. Blodgett*, 853 F.Supp. 1239 (W.D. Wash 1994), *aff'd*, 64 F.3d 1432
        (9th Cir. 1995) ............................................................................................. 292

*Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1985) ................................................. 118

*Haynes v. State*, 937 S.W.2d 199 (Mo. 1996) (en banc) ..................................... 285

*Herring v. New York*, 422 U.S. 853 (1975) .......................................................... 131

*Hewitt v. Helms*, 459 U.S. 460, 471-72 (1982) .................................................... 291

*Hicks v. Oklahoma*, 447 U.S. 343 (1980) ....................................................... passim

*Illinois v. Gates*, 462 U.S. 213 (1983) ................................................................. 137

*Illinois v. Somerville*, 410 U.S. 458 (1973) ......................................................... 264

*In re Winship*, 397 U. S. 358 (1970) ............................................................ 213, 253

*Irvin v. Dowd*, 366 U.S. 717 (1961) ..................................................................... 169

*ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854
        S.W.2d 371 (Mo. 1993) (en banc) ...............................................................52

*Jackson v. State*, 514 S.W.2d 532 (Mo. 1974) ...................................................... 304

*Jackson v. Virginia*, 443 U.S. 307 (1979) ............................................................ 287

*Jordan v. State*, 786 So.2d 987 (Miss. 2001) ........................................................ 121

*Joyce v. State*, 684 S.W.2d 553 (Mo. Ct. App. E.D. 1984) ................................. 189

*Julian v. State*, 134 Ga. App. 92, 215 S.E.2d 496 (1975) .................................... 147

*Kenley v. Armontrout*, 937 F.2d 1298 (8th Cir. 1991) ........................................ 221

*Kirby v. Illinois*, 406 U.S. 682 (1972) .................................................................. 197

*Koehn v. Director of Revenue*, 813 S.W.2d 363 (Mo. Ct. App. 1991) .............. 305

*Lance v. State*, 560 S.E.2d 663 (Ga. 2002) .......................................................... 121

*Lankford v. Idaho*, 500 U.S. 110 (1991) ............................................................... 237

*Lee v. Kemna*, 122 S.Ct. 877 (2002) .....................................................................53

*Lockett v. Ohio*, 438 U.S. 586 (1978) .............................................. 38, 267, 270, 281

*Longshore v. Norville*, 93 S.W.3d 746 (Mo. Ct. App. E.D. 2002)........................52

*Manson v. Brathwaite*, 432 U.S. 98 (1977) ......................................................... 197

*McGurk v. Stenberg*, 163 F.3d 470 (8th Cir. 1998)............................................. 169

*Mills v. Maryland*, 486 U.S. 367 (1988)............................................................... 270

*Mooney v. Holohan*, 294 U.S. 103 (1935) (per curiam)........................................89

*Morris v. State*, 772 S.W.2d 11 (Mo. Ct. App. 1989)......................................... 305

*Moss v. State*, 10 S.W.3d 508 (Mo. 2000) (en banc) ........................ 232, 309, 318

*Murphy v. Carron*, 536 S.W.2d 30 (Mo. 1976) (en banc)...................................52

*Napue v. Illinois*, 360 U.S. 264 (1959)..................................................................86

*Neil v. Biggers*, 409 U.S. 188 (1972) ............................................................ 199, 200

*Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272 (1998)........................ 323

*Paciona v. Marshall*, 359 N.Y.S.2d 360 (App. Div.), *aff'd*, 35 N.Y.2d 289 (1974)
............................................................................................................................. 147

*Parker v. Dugger*, 498 U.S. 308 (1991) ..................................................... 121, 306

*Payne v. Bell*, 194 F.Supp.2d 739 (W.D. Tenn. 2002) ...................................... 121

*Payne v. Tennessee*, 501 U.S. 808 (1991) ........................................... 237, 239, 240

*Payton v. New York*, 445 U.S. 573 (1980)......................................................... 139

*Penry v. Lynaugh*, 492 U.S. 302 (1989) ............................................... 38, 267, 282

*People v. Fujita*, 43 Cal.App.3d 454, 117 Cal.Rptr. 757 (1974), *cert. denied*, 421
U.S. 964 (1975) ................................................................................................. 147

*Pointer v. Texas*, 380 U.S. 400 (1965) ...................................................................93

*Powell v. Alabama*, 287 U.S. 45 (1932) ............................................................ 323

*Powers v. Ohio*, 489 U.S. 400 (1991).................................................................. 148

*Presley v. State*, 750 S.W.2d 602 (Mo. Ct. App. S.D. 1988) ............................. 169

*Rideau v. Louisiana*, 373 U.S. 723 (1966) ...................................................... 3, 117

*Roberts v. Louisiana*, 428 U.S. 325 (1976) ...........................................................38

*Roe v. Delo*, 160 F.3d 416 (8th Cir. 1998) ........................................................ 320

*Ross v. Kemp*, 393 S.E.2d 244 (Ga. 1990)......................................................... 186

*Rust v. Hopkins*, 984 F.2d 1486, 1493 (8th Cir. 1993) ...................................... 291

*Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).................................................. 186

*Skipper v. South Carolina*, 476 U.S. 1 (1986)................................................passim

*Snell v. Lockhart*, 14 F.3d 1289 (8th Cir. 1993)..................................................... 118

*State ex rel. McNary v. Stussie*, 518 S.W.2d 650 (Mo. 1974)............................ 148

*State v. Bannister*, 680 S.W.2d 141 (Mo. 1984) (en banc)................................ 294

*State v. Beal*, 966 S.W.2d 9 (Mo. Ct. App. W.D. 1997) ...................................... 285

*State v. Blake*, 620 S.W.2d 359 (Mo. 1981) (en banc) ....................................... 129

*State v. Blankenship*, 830 S.W.2d 1 (Mo. 1992) (en banc)................................ 148

*State v. Bolder*, 635 S.W.2d 673 (Mo. 1982) (en banc) ..................................... 293

*State v. Brown*, 690 S.W.2d 161 (Mo. Ct. App. 1985)....................................... 305

*State v. Brown*, 836 S.W.2d 530 (Tenn. 1992) .................................................... 110

*State v. Byrd*, 676 S.W.2d 494 (Mo. 1984) (en banc)........................................ 293

*State v. Candela*, 929 S.W.2d 852 (Mo. Ct. App. E.D. 1996) ........................... 258

*State v. Chaney*, 967 S.W.2d 47 (Mo. 1998) (en banc) .................... 288, 295, 297

*State v. Childers*, 852 S.W.2d 390 (Mo. Ct. App. E.D. 1993)........................... 129

*State v. Clements*, 849 S.W.2d 640 (Mo. Ct. App. 1993).................................. 203

*State v. Crawford*, 416 S.W.2d 178 (Mo. 1967)................................................. 119

*State v. Davidson*, 941 S.W.2d 732 (Mo. Ct. App. E.D. 1997).......................... 287

*State v. Davis*, 814 S.W.2d 593 (Mo. 1991) (en banc) ...................................... 294

*State v. Day*, 866 S.W.2d 491 (Mo. Ct. App. 1993) ........................................... 203

*State v. Deck*, 994 S.W.2d 527 (Mo.) (en banc), *cert. denied*, 528 U.S. 1009
     (1999)................................................................................................................ 275

*State v. Finsten*, 963 S.W.2d 414 (Mo. Ct. App. 1998)...................................... 305

*State v. Futo*, 932 S.W.2d 808 (Mo. Ct. App. E.D. 1996).................................. 287

*State v. Hicklin*, 969 S.W.2d 303 (Mo. Ct. App. 1998)...................................... 285

*State v. Hornbuckle*, 769 S.W.2d 89 (Mo. 1989) (en banc)............................... 197

*State v. Johnson*, 968 S.W.2d 686 (Mo. 1998) (en banc).......................... 132, 153

*State v. Jones  (Alphonso)*, 959 S.W.2d 829 (Mo. Ct. App. E.D. 1997)............. 286

*State v. Jones (Craig)*, 955 S.W.2d 5 (Mo. Ct. App. W.D. 1997) ....................... 286

*State v. Kreutzer*, 928 S.W.2d 854 (Mo. 1996) (en banc), *cert. denied*, 519 U.S. 1083 (1997)..................................................................................... 153

*State v. Link*, 25 S.W.3d 136 (Mo 2000) (en banc) ........................................... 258

*State v. Littleton*, 649 S.W.2d 225 (Mo. 1983) (en banc).................................. 199

*State v. McIlvoy*, 629 S.W.2d 333 (Mo. 1982) (en banc) ................................... 297

*State v. Mease*, 842 S.W.2d 98 (Mo. 1992) (en banc), *cert. denied*, 508 U.S. 918 (1993).................................................................................................. 324

*State v. Middleton*, 995 S.W.2d 443 (Mo.) (en banc), *cert. denied*, 528 U.S. 1054 (1999)...................................................................................................31

*State v. Nicklasson*, 967 S.W.2d 596 (Mo 1998) (en banc) .............................. 189

*State v. Petary*, 790 S.W.2d 243, 246 (Mo. banc 1970)(en banc).................... 161

*State v. Pinkus*, 550 S.W.2d 829 (Mo. Ct. App. S.D. 1977) ............................. 203

*State v. Preston*, 673 S.W.2d 1 (Mo.) (en banc), *cert. denied*, 469 U.S. 893 (1984) ..................................................................................................... 189

*State v. Ramsey*, 864 S.W.2d 320 (Mo. 1993) (en banc) .................................. 293

*State v. Risinger*, 546 S.W.2d 563 (Mo. Ct. App. S.D. 1977)............................ 317

*State v. Robinson*, 835 S.W.2d 303 (Mo. 1992) (en banc) ..................................85

*State v. Schneider*, 736 S.W.2d 392 (Mo. 1987) (en banc)................................ 119

*State v. Sempsrott*, 587 S.W.2d 630 (Mo. Ct. App. 1979) ............................... 203

*State v. Silvey*, 894 S.W.2d 662 (Mo. 1995) (en banc)...................................... 214

*State v. Skillicorn*, 944 S.W.2d 877 (Mo.) (en banc), *cert. denied*, 522 U.S. 999 (1997).................................................................................................................. 152

*State v. Sloan*, 756 S.W.2d 503 (Mo. 1988) (en banc)...................................... 293

*State v. Smith*, 966 S.W.2d 1 (Mo. Ct. App. W.D. 1997) ................................. 286

*State v. Stevenson*, 852 S.W.2d 858 (Mo. Ct. App. 1993) ................................ 204

*State v. Storey*, 901 S.W.2d 886 (Mo 1995) (en banc) ..................... 211, 227, 256

*State v. Taylor*, 663 S.W.2d 235 (Mo. 1984) (en banc) ............................ 216, 217

*State v. Terry*, 928 S.W.2d 879 (Mo. Ct. App. E.D. 1996) ................................ 287

*State v. Thompson*, 985 S.W.2d 779 (Mo. 1999) (en banc)............................... 222

*State v. Vinson*, 800 S.W.2d 444 (Mo. 1990) (en banc) ................................... 197

*State v. Whitfield*, 837 S.W.2d 503 (Mo. 1992) (en banc)................................ 129

*State v. Whitmill*, 780 S.W.2d 45 (Mo. 1989) (en banc) ................................. 216

*State v. Williams (Gale)*, 951 S.W.2d 332 (Mo. Ct. App. S.D. 1997) ............... 286

*State v. Williams*, 812 S.W.2d 518 (Mo. Ct. App. E.D. 1991).......................... 189

*State v. Williams*, 858 S.W.2d 796 (Mo. Ct. App. 1993) ................................. 216

*State v. Williams*, 897 S.W.2d 631 (Mo. Ct. App. E.D. 1995).......................... 287

*State v. Zeitvogel*, 707 S.W.2d 365 (Mo. 1986) (en banc)................................ 293

*Stovall v. Denno*, 388 U.S. 293 (1967) ............................................................. 198

*Strickland v. Washington*, 446 U.S. 668 (1984) ........................................ 35, 44, 45

*Strickler v. Greene,* 527 U.S. 263 (1999). ...........................................................89

*Teague v. Lane*, 489 U.S. 288 (1989) ......................................................46

*Toney v. Gammon*, 79 F.3d 693 (8th Cir. 1996) .................................... 162

*Trejo v. Keller Industries, Inc.*, 829 S.W.2d 593 (Mo. Ct. App. W.D. 1992)..... 203

*Tuggle v. Netherland*, 516 U.S. 10 (1995) (per curiam)........................ 70, 77, 217

*United States ex rel. Free v. Peters*, 806 F.Supp. 705 (N.D.Ill.1992), *rev'd*, 12 F.3d 700 (7th Cir. 1993)........................................................... 275

*United States ex rel. Miller v. Myers*, 253 F.Supp. 55 (E.D.Pa. 1966) ............ 317

*United States v. Bagley*, 473 U.S. 667 (1985)...........................................85

*United States v. Bloeth*, 313 F.2d 364 (2d Cir. 1963)......................... 119

*United States v. Cook*, 464 F.2d 251 (8th Cir.), *cert. denied,* 409 U.S. 1011 (1972) ............................................................................. 198

*United States v. Dailey*, 524 F.2d 911 (8th Cir. 1975) ........................ 198

*United States v. Dunn*, 480 U.S. 294 (1987)......................................... 139

*United States v. Gambrill*, 449 F.2d 1148 (1971) ................................ 198

*United States v. Leon*, 468 U.S. 897 (1984)......................................... 138

*United States v. Mineral*, 176 F.Supp.2d 424 (W.D. Pa. 2001)........................ 121

*United States v. Nixon*, 418 U.S. 683 (1974) ..........................................73

*United States v. Ramsey*, 999 F.2d 348 (8th Cir. 1993) .................................... 197

*United States v. Sanchez*, 988 F.2d 1384 (5th Cir. 1993) ................................. 196

*United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *vacated*, 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied*, 527 U.S. 1024 (1999) .................93

*United States v. Triplett*, 104 F.3d 1074 (8th Cir. 1997) .................................... 197

*Victor v. Nebraska*, 511 U.S. 1 (1994) ............................................................ 213, 214

*Wainwright v. Witt*, 469 U.S. 412 (1985) ......................................................... 3, 160

*Weems v. United States*, 217 U.S. 349 (1910) ...................................................... 291

*Wiggins v. Smith*, 123 S.Ct. 2527 (2003) ..............................................................35

*Wilkins v. Bowersox*, 933 F.Supp. 1496 (W.D. Mo. 1996), *aff'd*, 145 F.3d 1006
    (8th Cir. 1998), *cert. denied*, 512 U.S. 1094 (1999)........................... 162, 292

*Williams v. Taylor (Terry)*, 529 U.S. 362 (2000) ............................................ 35, 36

*Witherspoon v. Illinois*, 391 U.S. 510 (1968) ....................................................... 283

*Wong Sun v. United States*, 371 U.S. 471 (1963) ................................................. 138

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ......................................... 38, 322

*Zant v. Stephens*, 462 U.S. 862 (1983) ......................................................... 121, 237

## Other Authorities

Acker and Lanier, *Statutory Measures for More Effective Appellate Review of
    Capital Cases*, 8 STATE COURT JOURNAL 211 (1984) ............................... 297

AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND
    PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ......... 41, 47

AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE (2d ed.1980)
    ........................................................................................................... 40, 47

American Psychiatric Association, Diagnostic & Statistical Manual of
    Mental Disorders (4th ed. 1994) (DSM-IV) ........................................... 190

*Ashcroft v. White*, 106th Cong., 1st Sess., CONG. REC. S11871-74 (Oct. 4, 1999)
    & S11917-19 (Oct. 5, 1999).........................................................................72

C. TORCIA, WHARTON'S CRIMINAL LAW (14th ed. 1979) ............................... 111

Catholic Church in United States of America, Statistics by Province,
available August 18, 2003, at *http://www.catholic-
hierarchy.org/country/spcus4.html* ........................................................... 326

FEDERAL JUDICIAL CENTER, PATTERN CRIMINAL JURY INSTRUCTIONS 17-18
(1987).............................................................................................. 214

J. GALLIHER & D. KEYS, Department of Sociology, University of Missouri–
Columbia, REPORT TO THE OFFICE OF THE MISSOURI PUBLIC DEFENDER
ON PROPORTIONALITY IN SENTENCING IN DEATH-ELIGIBLE CASES (1994)
.......................................................................................................... 113

M. LENZA ET AL., THE PREVAILING INJUSTICES IN THE APPLICATION OF THE
DEATH PENALTY IN MISSOURI (1978-1996),
http://www.umsl.edu/divisions/artscience/forlanglit/mbp/Lenza1.ht
ml. ..................................................................................................... 113

MAI-CR3D 300.02.................................................................................. 212

MAI-CR3D 302.04.................................................................................. 212

MAI-CR3D 325.04.................................................................................. 261

SORENSEN AND WALLACE, *Capital Punishment in Missouri:  Examining the
Issue of Racial Disparity*, 13 BEHAVIORAL SCIENCES AND THE LAW 61, 75
(1995)................................................................................................ 113

Zeigler, *Young Adults as a Cognizable Group in Jury Selection*, 76 MICH.L.REV.
1045 (1978).......................................................................................... 147

**Petition Form**


IN THE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

1.      Name and location of court which entered the judgment of conviction under attack:  Circuit Court of Adair County, Kirkville, Missouri

2.      Date of judgment of conviction:  April 14, 1997

3.      Length of sentence:  Death

4.      Nature of offense involved (all counts):  the prosecution charged that the petitioner killed Alfred Pinegar, a methamphetamine dealer, by shooting him.

5.      What was your plea?  (Check one)

        (a)  Not guilty            _____√____
        (b)  Guilty                _____
        (c)  Nolo contendere       _____

If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:  N/A

6.      Kind of trial: (Check one)  (a) Jury __√__   (b) Judge only ___

7.      Did you testify at the trial?  Yes [  ]   No [√ ]

8.      Did you appeal from the judgment of conviction Yes [ √ ]No [  ]

9.      If you did appeal, answer the following:

        (a)  Name of court:  Missouri Supreme Court
        (b)  Result:  Affirmed
        (c)  Date of result:  June 29, 1999; rehearing denied, August 3, 1999.

10.     Other than a direct appeal from the judgment of conviction and
        sentence, have you previously filed any petitions, applications or
        motions with respect to this judgment in any court, state or federal?

        Yes  [ √ ]     No  [ ]

11.     If your answer to 10 was "yes," give the following information:

        (a)     (1)     Name of court:  Supreme Court of the United States
                (2)     Nature of proceeding:  Petition for certiorari from
                        affirmance on direct appeal (November 1, 1999)
                (3)     Grounds raised:
                        I.      Introduction into evidence of an identification
                                obtained after an impermissibly suggestive
                                identification procedure violated the
                                petitioner's right to due process of law, and
                                the Missouri Supreme Court's decision on this
                                grievance was conflict with the decisions of
                                the Supreme Court in *Kirby v. Illinois*, 406 U.S.
                                682 (1972), and *Neil v. Biggers,* 409 U.S. 188,
                                199-200 (1972), and of the ***Alabama*** Supreme
                                Court in *Ex parte Frazier*, 729 So. 2d 253 (Ala.
                                1998).
                        II.     The trial judge's refusal to instruct the jury on
                                the statutory mitigating factor of duress or
                                substantial domination by another violated
                                the petitioner's rights to be free from cruel
                                and unusual punishments and to due process
                                of law, and the Missouri Supreme Court's
                                affirmance of this refusal was in conflict with
                                the Supreme Court's decisions in *Penry v.
                                Lynaugh,* 455 U.S. 104, 110, 112-17 (1982), and
                                *Buchanan v. Angelone,* 522 U.S. 269 (1998).
                        III.    The trial judge's refusal to grant a continuance
                                or a change of venue—or even to allow
                                individual voir dire of venire members—after

- 2 -

an article appeared in the local newspaper on the eve of trial, referring to the petitioner's having been charged with two other murders besides the one for which he was on trial, violated the petitioner's right to due process of law, and thereby conflicted with the Supreme Court's enforcement of that guaranty in *Rideau v. Louisiana*, 373 U.S. 723, 726 (1966).

IV.   The trial court's striking venire members who, though opposed to the death penalty, testified that they would be willing to set their beliefs aside and follow the law violated the petitioner's rights to be free from cruel and unusual punishments and to due process of law, and the Missouri Supreme Court's affirmance of this refusal was in conflict with the Supreme Court's decisions in *Wainwright v. Witt*, 469 U.S. 412, 421 (1985), and *Lockhart v. McCree*, 476 U.S. 162, 176 (1986).

(4)   Did you receive an evidentiary hearing on your petition, application, or motion? Yes [ ] No [√]

(5)   Result:  Denied

(6)   Date of result:  December 6, 1999

(b)   As to any second petition, application, or motion give the same information:

(1)   Name of court:  Circuit Court of Adair County

(2)   Nature of proceeding:  State post-conviction relief motion (October 29, 1999)

(3)   Grounds raised:  see Appendix A (listing grounds in amended state PCR motion, pages 6-102 of the motion, pages 40-136 of the Adair County PCR legal file)

(4)   Did you receive an evidentiary hearing on your petition, application, or motion? Yes [ √ ] No [  ]

    (5)    Result:  Relief denied

    (6)    Date of result:  August 30, 2001

(c)    As to any third petition, application, or motion give the same information:

    (1)    Name of court:  N/A

    (2)    Nature of proceeding:  N/A

        (3)    Grounds raised:  N/A

        (4)    Did you receive an evidentiary hearing on your petition, application, or motion?  Yes [ ] No [ ] N/A

        (5)    Result:  N/A

        (6)    Date of result:  N/A

(d)    Did you appeal to the highest state court having jurisdiction the result of the action taken on any petition, application or motion?

    (1)    First petition, etc.        Yes [ ]  No [ ]   N/A

    (2)    Second petition, etc.      Yes [ √ ]   No [ ]

    (3)    Third petition, etc.       Yes [ ]  No [ ]   N/A

(e)    If you did <u>not</u> appeal from the adverse action on any petition, application, or motion, explain why you did not:

    N/A

13.    See following two sections for grounds for relief.

14.    Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?   Yes [ ]   No [ √ ]

15.    Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:

- 4 -

(a)     At preliminary hearing:  Janice S. Zembles, Assistant Public
        Defender, 3402 Buttonwood Drive, Columbia, Missouri 65201-
        3723

(b)     At arraignment and plea:  Janice S. Zembles, Assistant Public
        Defender, 3402 Buttonwood Drive, Columbia, Missouri 65201-
        3723

(c)     At trial:  Janice S. Zembles, Assistant Public Defender, 3402
        Buttonwood Drive, Columbia, Missouri 65201-3723; Chris
        Slusher, 305 East McCarty Street, Suite 201, Jefferson City,
        Missouri 65101; and Donna Holden, Assistant Public Defender,
        505 East Elm, Suite 102, Lebanon, Missouri 65536

(d)     At sentencing:  Janice S. Zembles, Assistant Public Defender,
        3402 Buttonwood Drive, Columbia, Missouri 65201-3723; Chris
        Slusher, 305 East McCarty Street,77 Suite 201, Jefferson City,
        Missouri 65101; and Donna Holden, Assistant Public Defender,
        505 East Elm, Suite 102, Lebanon, Missouri 65536

(e)     On appeal:  Elizabeth Unger Carlyle, 200 S.E. Douglass Street,
        Suite 200, Lee's Summit, Missouri 64063

(f)     In any post-conviction proceeding:  Pete Carter and J. Gregory
        Mermelstein, Assistant Public Defenders

(g)     On appeal from any adverse ruling in a post-conviction
        proceeding  William J. Swift, Assistant Public Defender, 3402
        Buttonwood Drive, Columbia, Missouri 65201-3723

16.   Were you sentenced on more than one count of an indictment, or on
      more than one indictment, in the same court and at approximately
      the same time?  Yes  [ √ ]  No  [ √ ]

17.   Do you have any future sentence to serve after you complete the
      sentence imposed by the judgment under attack?  Yes [  ]  No  [ √ ]

(a)     If so, give name and location of court which imposed sentence
        to be served in the future:

        N/A

(b)     And give date and length of sentence to be served in the future:

- 5 -

N/A

(c)    Have you filed, or do you contemplate filing any petition attacking the judgment which imposed the sentence to be served in the future?  Yes  [  ]  No  [  ]  N/A

## **Statement of the Case**

### The Petitioner

John Middleton was born to Janice Middleton.  Her brother, Glenn Williams, recalled that when John's mother was growing up, she had a serious habit of removing the gas cap from the family tractor and inhaling the fumes.[1]  Her sister, Sylvia Purdon, also remembered that as a child Janice had a habit of inhaling gasoline fumes and then passing out.[2]

Janice recounted medical complications associated with her carrying John, and medical problems he experienced immediately following his birth.[3]  When John was five years old, he sustained a head injury that required medical treatment.[4]  Both Janice and her children suffered abuse from John's alcoholic father and from one of her boyfriends, Ken Harding.[5]

--------

[1]Ex. 26 at 11-12.

[2]Ex.31 at 16-17.

[3]Adair TT 3302-06 & 3309-11.

[4]Adair T.Tr.33 12-13.

[5]Adair TT 3317-28, 3331 & 3334-63.

Janice was involved in relationships with about three men when John was growing up in her household.[6]  One of those men was Ken Harding, the other abuser besides John's biological father.[7]  Before Harding was sent to prison, he took John to bars.[8]

Glenn Williams was John's uncle and his mother Janice's brother.[9] He remembered that as a child John was mentally slow.[10]  John was also a follower.[11]

Sylvia Purdin is John's aunt and his mother's sister.[12]  Ms. Purdin would see John as a young child, because he, his mother, and his sister, stayed with her when his mother went to visit her paramour and abuser Harding at the Anamosa Penitentiary.[13]

---

[6]Ex.26 at 12.

[7]Ex.26 at 12.

[8]Ex.26 at 13.

[9]Ex.26 at 3-4.

[10]Ex.26 at 5-6.

[11]Ex.26 at 6.

[12]Ex.31 at 3-4.

[13]Ex.31 at 4 & 8-9.

When Ms. Purdin babysat John, he was quiet and reserved.[14]  He had difficulty as a child expressing himself.[15]  He did not play with the other children, but isolated himself.[16]  As a child, John acted like he was "in a daze" and would sit and stare at things.[17]  It was common for Ms. Purdin to notice John displaying "a blank expression."[18]  When John did play with other children, he was a follower and not a leader.[19]

Vern Webb, his wife Virginia, and their son Charles ran the Leon Sale Barn in Leon, Iowa, from 1955-60 and again from 1966-83.[20]  The Leon Sale Barn was a livestock auction that dealt in cattle, hogs, and sheep.[21]  John worked for the Webbs for a little more than two years until the sale barn

---

[14]Ex.31 at 9-10 & 13-15.

[15]Ex.31 at 10.

[16]Ex.31 at 10-11.

[17]Ex.31 at 11-12.

[18]Ex.31 at 12.

[19]Ex.31 at 12.

[20]Ex.23 at 2-5 & 10; Ex.24 at 4-6; Ex.25 at 3-4 & 6.

[21]Ex.24 at 4-5; Ex.23 at 5.

closed in 1983.[22]  John was the only full-time employee, and the Webbs paid the minimum wage or close to minimum wage with no benefits.[23]

John's work was limited to doing manual labor that included cleaning pens, hauling manure, feeding, working, delivering, and castrating cattle.[24]  The Webbs limited John to doing these types of activities because he was not very bright and was intellectually low-functioning.[25]  Charles had nicknamed the petitioner "John Boy" because of the similarity of his character to the television character by that name.[26]  John was simply not mentally equipped to be able to run the business's computer.[27]

John was an excellent worker who did work up to his fullest potential.[28]  John was quiet and reserved.[29]  He was very dependable and

---

[22]Ex.25 at 7; Ex.23 at 10.

[23]Ex.24 at 8; Ex.23 at 5.

[24]Ex.23 at 6-7; Ex.24 at 9 & 11; Ex.25 at 9 & 11.

[25](Ex.23 at 6; Ex.24 at 10-11; Ex.25 at 9.

[26]Ex.24 at 8.

[27]Ex.24 at 10-11.

[28]Ex.23 at 6 & 9-10; Ex.25 at 7-9.

[29]Ex.25 at 8.

followed orders.[30]  He would do what he was asked, but lacked the ability to act independently without direction on a job.[31]  He had a good work ethic, so that the Webbs never had to worry about him sitting around doing nothing.[32]  Charles once said that if they had told John to move the barn, he would have done his best to move it.[33]

John was definitely a follower.[34]  That manifested itself particularly in his relationship with his girlfriend, Teresa, who displayed the same level of intelligence, and for whom he did whatever she wanted.[35]

Vern and Virginia Webb had so much confidence in John that they co-signed a note and advanced money for him to purchase a pickup truck.[36]  The Webbs never did that for any other employee.[37]  Mr. and Mrs.

---

[30]Ex.25 at 7; Ex.24 at 13.

[31]Ex.24 at 12; Ex.23 at 9.

[32]Ex.23 at 9.

[33]Ex.24 at 10.

[34]Ex.24 at 12; Ex.23 at 7; Ex.25 at 8.

[35]Ex.23 at 7-9; Ex.25 at 10.

[36]Ex.23 at 11; Ex.25 at 12-13.

[37]Ex.23 at 11; Ex.25 at 13.

Webb helped John purchase the pickup because John tried to please them and they wanted to help him.[38]

Ruby Smith owned Smith Feeder Supply Elevator.[39]  John worked for the Supply Elevator at the same time he worked for the Leon Sale Barn.[40] He bagged grain, cracked corn, ground feed, and loaded feed on customers' pickup trucks.[41]  John's duties were limited to these chores because he had to be supervised in all the details of his work.[42]  In particular, if Ms. Smith asked him to load chicken feed she would have to tell him to take the package with the picture of the baby chickens, or if feed was needed for hens she had to tell him it was the bag with the big hen.[43] John would wait at the counter until given directions as to what to do.[44] His intellectual abilities were limited so that he was incapable of handling

---

[38]Ex.25 at 13.

[39]Ex.22 at 3.

[40]Ex.22 at 4.

[41]Ex.22 at 5.

[42]Ex.22 at 5.

[43]Ex.22 at 5).

[44]Ex.22 at 7.

matters that required he write out customer sales tickets.[45]  Ms. Smith could rely on John to come to work on time and do what he was asked to do and never to argue about doing his job.[46]  John presented the appearance of someone who was "removed from reality" and who required "a wake-up call" to tell him what you wanted him to do.[47]  Ms. Smith considered John to be someone who was "a space cadet" whom one had to bring back by speaking to him directly.[48]

While he worked for Ms. Smith, John drove a pickup one could have entered in an "ugly pickup contest."[49]  At her supply elevator, they called the petitioner "Sale Barn John."[50]  This nickname was attached to him because he would work at the supply elevator with manure from the sale barn on his pant legs and shoes.[51]

---

[45]Ex.22 at 8.

[46]Ex.22 at 5-6 & 8.

[47]Ex.22 at 10.

[48]Ex.22 at 10.

[49]Ex.22 at 8-9.

[50]Ex.22 at 6-7.

[51]Ex.22 at 7.

## The Offense

Richard Purdun, an acquaintance of the petitioner's in Davis City, Iowa, testified for the prosecution that the petitioner visited him on June 22 or 23, and told him that he had a "hit list" of snitches, and that Al Pinegar was on it.[52]  Two days later, the petitioner returned to Purdun's home driving a white Chevrolet pickup truck.  Purdun testified that the petitioner told him he was going to take Al Pinegar fishing.[53]

Ronald Craig, a friend of the decedent's, testified that he had seen the decedent on the evening of June 22, 1995.[54]  He and Pinegar made plans to go fishing together the next day, but Pinegar did not appear.[55]  Instead, Pinegar's girlfriend, Priscilla Hobbs, came and asked Craig whether he had seen Pinegar.[56]  Hobbs herself testified that she last saw the decedent the morning of June 23, 1995.[57]  As she returned to her home later that day, she

---

[52]Adair TT XI:2024.

[53]Adair TT XI:2025.

[54]Adair TT XI:2032.

[55]Adair TT XI:2034.

[56]Adair TT XI:2038.

[57]Adair TT XI:2053.

saw the petitioner and a woman drive by in a white pickup.[58]  When she

arrived at home, she found that the yard had been partially mowed, and

noticed that Pinegar, his money, and his pistol-grip shotgun were

missing.[59]  On the afternoon of approximately June 23, Randall Hagen

observed several weapons in the white pickup the petitioner was driving,

including a pistol-grip shotgun.[60]  Gerald Parkhurst found petitioner and

Margaret (Maggie) Hodges stranded in the white pickup by the side of the

road.  He gave them a ride to a house in Spickard, Missouri.  They brought

with them several weapons and some ammunition.[61] John Thomas testified

that on June 25, 1995, the petitioner showed him a pistol-grip shotgun

which he said was Al Pinegar's, but that Pinegar would no longer need it.[62]

Dennis Rickert testified that the petitioner visited him and brought with

him several weapons, among them a pistol-grip shotgun.  Rickert agreed to

---

[58]Adair TT XI:2056.

[59]Adair TT XI:2057.

[60]Adair TT XI:2163.

[61]Adair TT XII:2223-38.

[62]Adair TT XII:2309.

keep the weapons for him.[63]  Rickert testified that the petitioner

subsequently called him from jail and asked him to get rid of "the short

one," by which Rickert understood the pistol-grip shotgun.[64]  Rickert threw

the gun into a pond, where it was later recovered.[65]

Decedent's body was found in a pasture in Harrison County,

Missouri on June 26, 1995.[66]  He had suffered three shotgun wounds, one to

the left side of his face, one to the upper right side of his back, and one to

the left side of his back.[67]  Based on the insects found on the body, an

entomologist estimated the time of death to be no later than early on

Saturday, June 24, 1995.[68]  Officers found a piece of leather in the general

vicinity.[69]  They collected a dashboard clock.[70]  They found shotgun shells

at the scene.[71]

---

[63]Adair TT XIV:2699.

[64]Adair TT XIV:2700.

[65]Adair TT XIV:2701 & 2711-13.

[66]Adair TT XIII:2382.

[67]Adair TT XIII:2407.

[68]Adair TT XIII:2584-85.

[69]Adair TT XIII:2387-89 & 2450.

Petitioner was arrested on June 28, 1995, along with his girlfriend and eventual co-defendant Maggie Hodges.[72]  Law-enforcement officers searched home, vehicle, and yard.[73]  In a vehicle on the premises, officers found a leather jacket.[74]  While moving around the area, officers located the white Chevrolet pickup stuck near a pond.[75]  They observed a white adhesive square in the center of the dashboard, where something had apparently been mounted.[76]

The State Court Proceedings

The Adair County case went to trial on February 24, 1997.[77]

Jury Selection

---

[70]Adair TT XIII:2458.

[71]Adair TT XIII:2452.

[72]Adair TT XIV:2661.

[73]Adair TT XIV:2661.

[74]Adair TT XIV:2662-64.

[75]Adair TT XIV:2676.

[76]Adair TT XIV:2684.

[77]*State v. Middleton*, 995 S.W.2d at 452.

Trial counsel filed several pretrial motions pertaining to jury selection.  They included a motion to quash the petit jury panel because it did not include persons between the ages of 18 and 21 years, which the trial judge overruled,[78] and a motion to videotape voir dire, which he also overruled.[79]  Trial counsel also moved for a continuance of the trial setting on several occasions, but the trial judge always overruled the motions.[80]

On the day jury selection began, trial counsel brought to the trial judge's attention the fact that a prominent article had been published in the *Kirksville Daily Express* the day before.[81]  The defense urged that various forms of relief were necessary.  The trial judge denied all their requests.  When the first panel of prospective jurors were asked whether they had seen the article, ninety percent of them raised their hands.[82]  The defense then moved for a change of venue, for the panel to be quashed, and for

---

[78]Adair TT, I:88-90, VI:1004; Adair DALF I:41.

[79]Adair TT I:155-160 & VI:1009, Adair DALF I:86

[80]Adair TT IV:594-615, IV:662-81, IV:709-758, V:886-98, VI:1007; Adair DALF III:358, 372, 444, 464, & 522; IV:564 & 573.

[81]Adair TT VI:980-90; Defendant's Exhibit A.

[82]Adair TT VI:1038.

individual, sequestered voir dire on the issue—all of which the trial judge denied.[83]

During the jury selection phase, trial counsel attempted to ask prospective jurors about their feelings and opinions on various issues, including the judicial system, the defendant's right not to testify, and the death penalty.  The trial judge sustained the prosecution's objections to these questions.

Trial counsel objected to the granting of the prosecution's challenge for cause as to prospective jurors Vinyard[84] and Schnirch.[85]

<u>Guilt Phase</u>

The prosecution presented, and the Missouri Supreme Court relied on, testimony that on June 23, 1995, the petitioner, his girlfriend Margaret Hodges, and the decedent drug-dealer went to the Wal*Mart in Bethany, Missouri; that at Wal*Mart, the group purchased some gun ammunition; that the group left Wal*Mart and drove several miles to the town of Ridgeway where they parked in a field; and that at the field, the petitioner

---

[83]Adair TT VI:1039 & VII:1295-96.

[84]Adair TT VIII:1572

[85]Adair TT IX:1695-98.

shot the decedent three times.[86]  It also presented testimony that the ammunition which the petitioner, Ms. Hodges, and the decedent purchased at Wal*Mart corresponded to the ammunition found at the crime scene.[87]

In the guilt phase, John Thomas testified that he was among those arrested on June 10, 1995, for drug offenses.[88]  Thomas reported that on June 25, 1995, he went to the petitioner's house to alert him that he had sold methamphetamine to Billy Worley and he thought Worley was the confidential informant who caused him to get arrested.[89]  Thomas represented that the petitioner said that he had the decedent's shotgun and that the decedent would not need it anymore.[90]  Thomas testified that the charges against him were pending, that no promises were made to him, and he did not expect leniency.[91]

---

[86]*State v. Middleton*, 995 S.W.2d at 451.

[87]Adair TT XI:2094-2139.

[88]Adair TT 2296.

[89]Adair TT 2304-06.

[90]Adair TT 2308-09.

[91]Adair TT 2314.

Thomas was charged by complaint on June 8, 1995, by the Harrison County prosecutor with the class B felony sale of a controlled substance, methamphetamine, alleged to have occurred on August 23, 1994.[92]  Thomas testified against the petitioner at the Adair trial on March 4, 1997, and March 11, 1997.[93]  On guilt-phase cross-examination, Thomas testified that even though he was charged in 1995, his case had never gone to a preliminary hearing.[94]  Thomas testified that he was told his case would be dealt with "[a]fter these trials"[95]  and "[a]fter all of [the trials]."[96]  It was "their decision" to allow Thomas's case to sit around even though he was charged in June, 1995.[97]

On February 27, 1998, Thomas appeared in Harrison County court.[98] The docket entry from that date includes:  "state advises delay in

---

[92]Exs. 1 and 18.

[93]Adair TT 2291-2376 & 3159-71.

[94]Adair TT 2355.

[95]Adair TT 2355.

[96]Adair TT 2356.

[97]Adair TT 2356.

[98]Ex.1.

prosecution due to Δ's participation as witness in companion proceedings."[99]  On March 31, 1998, Thomas testified for the prosecution at petitioner's Callaway County trial.[100]

Three weeks later, on April 27, 1998, Thomas pled guilty to an amended information with a reduced charge of the class C felony of an attempt to sell methamphetamine.[101]  On September 10, 1998, the court considered the PSI and recommendations made, suspended imposition of sentence, and placed Thomas on five years probation.[102]

The Missouri Highway Patrol Confidential Narcotics report, contained in the Harrison County prosecutor's file, stated that Confidential Informant 1352 had "purchased the methamphetamine from John Thomas in Thomas's shop near Thomas's residence for three hundred dollars ($300.00)".[103]  Also in the prosecutor's file was a handwritten statement signed by Billy Worley, dated August 23, 1994, stating that he had

---

[99]Ex. 1.

[100]Callaway TT, vol. I at iv.

[101]Exs. 1 and 18.

[102]Exs.1 and 18.

[103]Ex.18 and page 1 of report.

purchased the methamphetamine from Thomas.[104]  The Highway Patrol's Forensic Laboratory Report, contained in the prosecutor's file, identified what Thomas had sold as methamphetamine.[105]  During his PSI interview, Thomas admitted he had sold methamphetamine to an undercover agent.[106]

Ms. Zembles and Ms. Holden testified that the prosecution represented to them that no deals had been made with Thomas.[107]  When Ms. Holden asked the Harrison County prosecutor why Thomas's case was allowed to remain pending in Associate Circuit Court for two years, she was not given an answer.[108]

The trial court denied trial counsel's pretrial motion to suppress evidence, and admitted all the evidence seized in the searches of the petitioner's home, vehicle, and yard over trial counsel's objections.  The prosecution presented testimony that the piece of leather found at the scene

---

[104]Ex. 18.

[105]Ex. 18.

[106]Ex.18, PSI at 1.

[107]Adair EHT 487,573.

[108]Adair EHT 487-88 & 493-94.

could have come from the jacket found in the vehicle at the petitioner's home, and that the clock found at the scene matched the adhesive from the dashboard of the pickup.[109]

The prosecution presented the testimony of a jailhouse snitch suffering from bipolar disorder, Douglas Stallsworth, to the effect that he was confined in the Harrison County Jail along with the petitioner in September 1995.[110]  Stallsworth was being held in the Harrison County Jail in 1995 on a forgery charge for which he was found not guilty by reason of insanity.[111]  When Stallsworth testified against the petitioner, he was in the State mental hospital in St. Joseph.[112]  The trial court not only allowed Stallsworth to testify, but allowed an expert witness to testify that he wasn't too incompetent to testify against the accused in a capital case.[113]  Stallsworth testified that the petitioner said he had killed the decedent.[114]

_____

[109]Adair TT XIV:2755-56.

[110]Adair TT 2871.

[111]Adair TT 2874-75.

[112]Adair TT 2878.

[113]Adair TT XV:2863.

[114]Adair TT 2871-74.

Stallsworth also testified that the petitioner had said that the decedent had been on his "hit list," and that he killed the decedent because he was afraid that the decedent would snitch on him about his methamphetamine involvement.[115]  Stallsworth claimed to have heard the petitioner say these things on September 11, 1995, and informed his parole officer of these statements on September 18, 1995, then met with Sheriff Martz on September 19, 1995, to discuss what he said he had heard.[116]

Trial counsel did not present any guilt phase evidence.[117]  During the guilt-phase closing argument, trial counsel argued the petitioner was not guilty, and that the prosecution's evidence was not credible enough to satisfy its burden of proof.[118]

Penalty phase

During the penalty phase, the prosecution presented evidence that the petitioner had murdered Stacey Hodge and Randy (Happy) Hamilton, and that these charges were pending.  In presenting this additional murder

---

[115]Adair TT 2874.

[116]Adair TT 2880-83.

[117]Adair TT 2891.

[118]Adair TT 2919-60.

case—arising out of charges in another county—the prosecution included a crime-scene videotape and videotaped testimony from the physician who performed the autopsies on these persons.[119]

In the penalty phase, Thomas claimed that he was at the petitioner's house and there was a small black box that belonged to Hamilton on the coffee table.[120]  Thomas represented that he had asked the petitioner how he came to have Hamilton's box, and the petitioner allegedly said that the person it belonged to would not need it anymore.[121]

It adduced even more testimony from Stallsworth, to the effect that the petitioner had admitted the murders of Hodges and Hamilton.[122]  It recalled Stallsworth to testify that on September 11, 1995, the petitioner allegedly made admissions to killing "Happy" Hamilton and Stacey Hodge.[123]  Stallsworth also represented that petitioner had said that he

---

[119]Adair TT XVI:3157, State's Exhs. 105 & 202.

[120]Adair TT 3160.

[121]Adair TT 3161.

[122]Adair TT XVI:3179-82.

[123]Adair TT 3 178-82.

killed Hamilton and Hodge because he was afraid Hamilton would snitch on him for selling methamphetamine.[124]

The prosecution adduced evidence of the petitioner's prior conviction for possession of methamphetamine.[125]  It put on a victim-impact testimony from the decedent drug-dealer's mother, during which she broke down crying and had to be escorted from the witness stand; several other family members of the decedent were in the gallery and started crying as well.[126] The prosecution put on testimony that while he was in custody, the petitioner was at one point discovered within the courthouse where the county put its jail, but outside the locked area of the jail.[127]

Trial counsel presented penalty phase showing the petitioner's good adjustment in custody.  They also adduced some evidence of his difficult childhood and his drug use resulting in methamphetamine psychosis, but did not adduce the evidence set forth in this statement of the case at pages 7-13.  The penalty-phase defense focused on presenting that as a result of

---

[124]Adair TT 3 179,3182.

[125]Adair TT XVI:3127.

[126]Adair TT XVII:3216-21.

[127]Adair TT XVII:3196-3200.

methamphetamine use the petitioner was suffering from a

methamphetamine psychosis.  After arguing in the guilt phase that the

petitioner did not commit the charged acts, trial counsel called in the

penalty phase Drs. Murphy and Lipman.  Dr. Murphy is a

neuropsychologist.[128]  Dr. Murphy found that the petitioner suffers from an

organic paranoid thought disorder and brain damage that were associated

with his drug use.[129]  Dr. Murphy also found that at the time the decedent

was killed, the petitioner was suffering from extreme mental or emotional

disturbance and the petitioner was substantially impaired as to his ability

to appreciate the criminality of his conduct or to conform his conduct to the

requirements of law.[130]

Dr. Lipman is a neuropharmacologist.[131]  He found that the petitioner

suffers from a substance induced (methamphetamine) psychotic disorder

with delusions and hallucinations and has organic brain damage.[132]  Dr.

---

[128]Adair TT 3409.

[129]Adair TT 3423-25 & 3532-33.

[130]Adair TT 3537-38.

[131]Adair TT 3607.

[132]Adair TT 3656-57.

Lipman found that at the time in question, the petitioner was under the influence of extreme mental or emotional disturbance and the petitioner was substantially impaired as to his ability to appreciate the criminality of his conduct or to conform it to the requirements of law.[133]

Dr. Murphy would have testified in guilt that at the time of this offense, the petitioner could not form the requisite mental state for first degree murder and was unable to coolly reflect.[134]  Dr. Lipman would have testified in guilt that the petitioner could not have coolly reflected or deliberated because of his chronic state of methamphetamine psychosis, paranoia, and delusions.[135]

Even though the penalty-phase defense was focused on the petitioner's suffering from a methamphetamine psychosis, counsel failed to move to strike for cause or peremptorily strike juror Holt.  During voir dire, Ms. Holt testified that she did not know whether she would be able to consider drug and alcohol use as mitigating evidence.[136]

---

[133]Adair TT 3707-08.

[134]Ex.2 at 100-01.

[135]Ex.2 at 28-31.

[136]Adair TT  1553-57.

The jury never heard any mitigating evidence from former employers Charles Webb, Vern Webb, Virginia Webb, and Ruby Smith.  The jury also never heard any evidence from the petitioner's relatives Sylvia Purdin and Glenn Williams.  The Webbs could have testified about having employed the petitioner at their livestock auction, the Leon Sale Barn, and his diligence as an employee, despite his cognitive impairments.[137]  Ruby Smith, who owned Smith Feeder Supply Elevator and had employed the petitioner, could have testified in a similar manner.[138]  Petitioner's uncle, Glenn Williams, and his aunt, Sylvia Purdin, could have testified about how as a young child the petitioner was mentally slow (Ex.26 at 5-6; Ex.3 1 at 10-12).

During the case in mitigation, the trial court excused juror Gray, who had been the jury foreman, for personal reasons; trial counsel objected and moved for a mistrial, which the trial court denied.[139]

---

[137]Exs.23,24, and 25.

[138]Ex.22.

[139]Adair TT XVIII:3395-99.

<u>Conviction, Appeal, and PCR Action</u>

Petitioner was convicted of one count of first-degree murder and

sentenced to death.[140]  Petitioner appealed, and the Missouri State Public

Defender System appointed outside counsel, Elizabeth Unger Carlyle, to

represent him.  Mrs. Carlyle raised twenty-six points on direct appeal.

The Missouri Supreme Court affirmed the conviction and sentence;

on December 6, 1999, the Supreme Court of the United States denied

certiorari.[141]  On October 29, 1999—actually before his petition for certiorari

had been filed—the petitioner filed a state post-conviction relief motion

under Mo. S. Ct. R. 29.15.[142]  On January 31, 2000, appointed counsel from

the Missouri State Public Defender System filed a an amended motion.[143]

The Rule 29.15 pleadings included allegations that the prosecution

failed to disclose deals it had made with Thomas.[144]  The pleadings also

averred that trial counsel was ineffective for failing to move to strike for

---

[140]Adair DALF 23..

[141]*State v. Middleton*, 995 S.W.2d 443, 451-52 (Mo.) (en banc), *cert. denied*, 528 U.S. 1054 (1999).

[142]Adair PCRLF 4-19.

[143]Adair PCRLF 35-175.

[144]Adair PCRLF 170 & 173-74.

cause or peremptorily remove venire member and later trial juror, Ms. Holt.[145]  They pleaded that trial counsel should have called Drs. Murphy and Lipman to testify in the guilt phase in order to support a defense of not guilty by reason of mental disease or defect, or, in the alternative, a diminished capacity defense to first-degree murder.[146]  They pleaded that trial counsel were ineffective for failing to present mitigating evidence through the petitioner's family members and former employers.[147]

Another judge of the trial court held an evidentiary hearing, but denied all of the petitioner's PCR claims.[148]  Proceeding under subdivision (k) of its own Rule 29.15, under which even conclusions of law, and rulings on the application of law to fact, are only appealable for "clear error," the Missouri Supreme Court affirmed the denial of state post-conviction relief.[149]

---

[145]Adair PCRLF 80-82 & 161-62.

[146]Adair PCRLF 40-42, 47-48, 137-39 & 147-49.

[147]ADAIR PCRLF42-45 & 139-46.

[148]Adair PCRLF 276-304.

[149]*Middleton v. State*, 103 S.W.3d 726 (Mo. 2003) (en banc).

<u>The Callaway County Case</u>

After his trial in Adair County for the Harrison County murder of Alfred Pinegar, the petitioner was convicted of two counts of first-degree murder and sentenced to death on each count in a trial in Callaway County for the Mercer County murders of Randy Hamilton and Stacey Hodge,[150] an offense the prosecution alleged to have occurred on June 11, 1995.[151] The Callaway case went to trial on March 30, 1998, approximately one year after the trial resulting in the conviction and sentence at issue in this federal habeas corpus petition.[152]  The prosecution used the Adair County case about the Harrison County homicide of Pinegar as an aggravator in the Callaway County case about the Mercer County homicide of Hamilton and Hodge.  The same judge who conducted the trial also denied state post-conviction relief, and the Missouri Supreme Court, again bound by subdivision (k), affirmed the denial.[153]

---

[150]*State v. Middleton*, 998 S.W.2d 520, 523 (Mo 1999) (en banc), *cert. denied*, 528 U.S. 1167 (2000).

[151]*See* Callaway DALF 382-83.

[152]Callaway DALF I:vi.

[153]*Middleton v. State*, 80 S.W.3d 799 (Mo. 2002) (en banc).

- 33 -

Petitioner filed a petition for a writ of habeas corpus in the United States District Court for the Western District of Missouri to attack the Callaway County conviction and sentence, as Callaway County is within the territorial jurisdiction of the latter district court.  Appointed counsel for the petitioner in the action before this Court are also appointed counsel for the petitioner in the other action.

## **Grounds for Relief**

### *Pretrial Preparation*

In *Wiggins v. Smith*,[154] announced at the end of its previous term, the

Supreme Court built on its decisions in *Strickland v. Washington*[155] and

*Williams v. Taylor[156]* to emphasize the existence of certain norms for

deciding claims of ineffective assistance of counsel and to hold that these

norms do not reflect new rules of law.  Under the law the Supreme Court

set forth—authoritatively construing the Sixth and Fourteenth

Amendments in the context of another capital federal habeas corpus case—

this petitioner is entitled to relief on account of the failure of trial counsel to

develop and present available evidence in mitigation.

*Strickland v. Washington* was not just the case in which the Supreme

Court articulated the general test for ineffective assistance of counsel under

the Sixth and Fourteenth Amendments.  It was also a case about the

presentation of mitigation evidence in a capital case after *Gregg v.*

---

[154]123 S.Ct. 2527 (2003).

[155]*Strickland v. Washington*, 466 U.S. 668 (1984).

[156]529 U.S. 362 (2000) (Terry rather than Michael Williams).

*Georgia,*[157] in that Mr. Washington pleaded guilty, and there was no guilt

phase to his trial.[158]  The omissions that created the specific issues in his

habeas corpus case not only ***included*** inadequacies of preparation for a

capital-sentencing; such inadequacies were the ***focus*** of the precise dispute

before the Court.

In *Williams v. Taylor*[159] trial counsel did present mitigating evidence

through the defendant's mother, his friends, and a psychiatrist.  Mr.

Williams's counsel failed to conduct investigation that would have

uncovered extensive evidence of his abusive and deprived childhood.  The

jury did not hear that Mr. Williams was borderline mentally retarded and

that his mental impairments were likely organic in origin.[160]  The Supreme

Court concluded that the omissions denied Mr. Williams the effective

assistance of counsel guaranteed by the Sixth and Fourteenth

Amendments.[161]

---

[157]428 U.S. 153 (1976).

[158]466 U.S. at 672.

[159]529 U.S. 362, 369 (2000).

[160]*Id.* at 370 & 395-98.

[161]*Id.* at 396-98.

Even before *Wiggins*, courts recognized that the mere fact that trial counsel had presented a case in mitigation did not prevent a court from holding that the representation was constitutionally ineffective.  In *Jermyn v. Horn*[162] the federal courts granted habeas corpus relief on the basis of defense counsel's failure to present penalty mitigating evidence.  The prosecution there had argued that the petitioner's trial counsel was not ineffective by characterizing the challenge as one of trial counsel's failure to present all available mitigating evidence.[163]  Rejecting this argument a sister United States District Court reasoned: "[p]resentation of some mitigating evidence does not excuse the failure to provide evidence of different mitigating circumstances."[164]  The same is true here:  appointed counsel failed to present evidence of different mitigating circumstances.  That has to be the rule:  only someone bent on refusing to enforce the Supreme Court's clear mandates in *Gregg v. Georgia*,[165] its companion cases,[166] and its

---

[162]1998 WL 754567 at *8-*17 (M.D.Pa. Oct.27, 1998), *aff'd*, 266 F.3d 257, 303-12 (3rd Cir. 2001).

[163]1998 WL 754567 at * 17.

[164]*Id*.

[165]428 U.S. at 206 ("The new Georgia sentencing procedures . . . focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant").

progeny such as *Lockett v. Ohio*,[167] *Eddings v. Oklahoma,*[168] and *Penry v. Lynaugh*[169]—would adopt a rule that defense counsel has provided the effective assistance of counsel in a death penalty case if they have presented "any evidence at all."

The facts in *Wiggins* are significant for this case for at least two reasons:  first, although no two cases are exactly alike, the facts in *Wiggins* were no worse than the facts here; second, they were enough like the facts in *Williams* that the Supreme Court evidently perceived that courts like the state supreme court here had not gotten the message in *Williams* to require a second decision to signal that it was serious.

Mr. Wiggins was accused of murdering a 77-year-old lady by drowning her in her bathtub, and of robbing her.  He had a bench trial on guilt, and was convicted.  As Maryland procedure allowed, he elected to have a jury trial for sentencing.

---

[166]*E.g., Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality opinion); *Roberts v. Louisiana*, 428 U.S. 325 (1976) (plurality opinion).

[167]*Lockett v. Ohio,* 438 U.S. 586, 604 (1978) (opinion of BURGER, C.J., joined by STEWART, POWELL, and STEVENS, JJ.)

[168]455 U.S. 104, 110, 112-17 (1982).

[169]492 U.S. 302, 319 (1989).

Counsel sought a bifurcated trial on sentencing, in which they would first argue that Mr. Wiggins had not personally drowned the victim, and, if they lost at that stage, they would present "psychological reports and expert testimony demonstrating Wiggins' limited intellectual capacities and childlike emotional state on the one hand, and the absence of aggressive patterns in his behavior, his capacity for empathy, and his desire to function in the world on the other;" they did not proffer any evidence of his "life history or family background."[170]  When the trial judge denied their motion for a bifurcated sentencing trial, they did not present the evidence in mitigation that they had proffered to the judge, but concentrated on the point that Mr. Wiggins was not personally responsible for the murder, while also calling "a criminologist to testify that inmates serving life sentences tend to adjust well and refrain from further violence in prison."[171]  The jury sentenced Mr. Wiggins to death.

Mr. Wiggins's counsel had not failed to prepare a case in mitigation. They arranged for a psychologist to test him.  The psychologist found that Mr. Wiggins "had an IQ of 79, had difficulty coping with demanding

---

[170]123 S.Ct. at 2532.

[171]*Id.* at 2538.

situations, and exhibited features of a personality disorder."  The psychologist did not deal with Mr. Wiggins's social history.  In addition, counsel had a pre-sentence investigation report; it included their client's reference to having suffered "misery as a youth" and having "spent most of his life in foster care," and describing his background as "disgusting."  Counsel also obtained a Baltimore City Social Services report corroborating his account of foster-care placements.[172]

They had not conducted a social history of their client.  If they had, they would have found, inter alia, that his mother had forced his hand against a hot stove burner as punishment, and that after he was placed in foster care he was sexually abused.[173]  The Supreme Court held that the failure to investigate this social history violated the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE.[174]  It held that counsel in a capital case must investigate "all reasonably available mitigating

---

[172]123 S.Ct. at 2536.

[173]*Id.* at 2533.

[174]*Id.* at 2536-37, citing AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE 4-4.1, commentary, p. 4- 55 (2d ed.1980).

evidence," including "family and social history."[175]  It cited *Williams* as having established an "obligation to conduct a thorough investigation of the defendant's background."[176]

*Wiggins* held that trial counsel's decision to limit their investigation into a capital client's social history was unreasonable.  Citing *Strickland*, it reiterated that "strategy" is not a reasonable basis not to conduct a thorough mitigation investigation including a social history:

> Even assuming [Mr. Wiggins's trial counsel] limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.[177]

The Eighth Circuit had anticipated this holding for years by ruling that failure to interview witnesses or discover mitigating evidence relates to trial preparation and not "strategy."[178]  Regardless how commonly it is

---

[175]*Id.*, citing ABA GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES 11.4.1(C) at 93 (1989).

[176]123 S.Ct. at 2535, *quoting* 529 U.S. at 396.

[177]*Id.* at 2538.

[178]*Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8thCir.), *cert. denied sub nom. Delo v. Kenley*, 502 U.S. 964 (1991).

used as a magic word for rejecting constitutional challenges to attorney errors no judge would tolerate in his or her own case, that is not what "strategy" means according to the Supreme Court.

Although hiring a psychologist or psychiatrist to render an opinion is normally a part of capital defense counsel's job, the mental-health professional may well be shooting in the dark when counsel has not provided them a social history. The latter is more time-consuming and frequently more expensive to gather, but usually reveals facts necessary for the mental-health professional to render a reliable diagnosis. In light of *Williams* and *Wiggins* and the ABA standards they enforce, such a history is constitutionally obligatory when the sovereign seeks to kill one of its own citizens in cold blood. Frequently the mental-health professional can put together the testimony of occurrence witnesses such as family and employers on whom he or she relied in addition to more clinical work.

When counsel has not investigated the accused citizen's social history and followed the leads in the investigation they have conducted, they are no more in a position to advise their client of the need to present the fruits of investigation still undone than they would be to present it to the jury. Under these circumstances, statements attributed to the accused which

indicate an unwillingness to have counsel present any or all of the potential

mitigation evidence are not a knowing, intelligent, and voluntary waiver of

the known right to present mitigation evidence to the sentencer.

*Wiggins* repeats the general teaching of *Strickland* and the specific,

emphatic, outcome-determinative doctrine of *Williams*, that in assessing

prejudice from trial counsel's omissions, prosecutors and prosecution-

oriented courts cannot "divide and conquer" the respective claims of

ineffective assistance of counsel and hold that because no one of them

would have made a difference, the whole lot do not count:

> had the jury been confronted with this considerable
> mitigating evidence, there is a reasonable
> probability that it would have returned with a
> different sentence.  In reaching this conclusion, we
> need not . . . make the state-law evidentiary
> findings that would have been at issue at
> sentencing.  Rather, we evaluate the totality of the
> evidence—"both that adduced at trial, *and the*
> *evidence adduced in the habeas proceeding[s]*."  *Williams*
> *v. Taylor*, 529 U.S., at 397-398 . . . .[179]

*Williams v. Taylor* did more than reject the idea that presenting some

evidence in the penalty phase will discharge defense counsel's duty, such

that they cannot be held ineffective for failing to present more.  It also

---

[179]*Id.* at 2543 (emphasis by the *Wiggins* Court).

emphasized what it had already said in *Strickland v. Washington*,[180] that a court considering the acts and omissions of counsel must view them not in isolation but must take into account "the totality of the evidence before the judge or jury."[181]  *Williams v. Taylor* makes clear that in determining *Strickland* prejudice, a court must consider the cumulative effect of the errors.[182]  It emphasized with approval that the state trial judge, who had granted relief, relied on "his assessment of the totality of the omitted evidence."[183]  It held that the Virginia Supreme Court had erred in reversing the trial judge's grant of relief, in part, by "fail[ing] to evaluate the totality of the available mitigation evidence."[184]  It rested its own decision on "the entire postconviction record, viewed as a whole and cumulative of mitigation evidence presented originally."[185]

---

[180]446 U.S. 668 (1984)

[181]*Id.* at 695.

[182]*Id.* at 397-99.

[183]*Id.* at 397.

[184]*Id.*

[185]*Id.* at 399.

Once more rejecting the "divide and conquer" gambit, the *Wiggins* Court made it explicit that "[w]e thus conclude that the available mitigating evidence, *taken as a whole*, 'might well have influenced the jury's appraisal' of Wiggins' moral culpability."[186]

In evaluating this ground for relief, therefore, the Court must look not at each piece of mitigation evidence that trial counsel failed to present, but to the entire picture.  It must not look at this ground alone, but must view it alongside the other grounds detailing evidence that trial counsel had and didn't use, or could have found but didn't.  When this petition refers to "the circumstances of the case," it is a reminder that *Williams v. Taylor* makes this insight an integral part of applying *Strickland*.

*Wiggins* makes clear that the test of prejudice is not what an entire death-qualified jury would do but for the omissions of trial counsel, but what there is a reasonable probability **one** juror would have done:  "Had the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance."[187]

---

[186]123 S.Ct. at 2544, *citing Williams*, 529 U.S., at 398 (emphasis supplied).

[187]123 S.Ct. at 2531.

Although the petitioner does not intend to anticipate every defense or objection which the the prosecution might raise, he observes that the Supreme Court itself has already told us the the prosecution cannot avoid *Wiggins* by citing *Teague v. Lane*[188] and its progeny.  The Supreme Court discussed the requirement of 28 U.S.C. § 2254(d) that a federal court may not grant relief in habeas corpus from a state conviction or sentence unless the state courts' decision denying relief on the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[189]  The Supreme Court explained that *Strickland* had provided the "clearly established Federal law" necessary to the resolution of Mr. Wiggins's claim, and that *Williams v. Taylor* "is illustrative of the proper application of these standards."[190]  It explained that it had "therefore made no new law in resolving Williams' ineffectiveness claim."[191]  This repudiation of an

---

[188]288 (1989) (plurality opinion).

[189]123 S.Ct. at 2534-37.

[190]*Id.* at 2535.

[191]*Id.* ("See *Williams,* 529 U.S., at 390 . . . (noting that the merits of Williams' claim 'are squarely governed by our holding in *Strickland*'); see also *id.,* at 395 . . . (noting that the trial court correctly applied both components of the *Strickland* standard to petitioner's claim and

overweening attempt to allow subsection (d) to deny the petitioner

independent judicial review of his federal constitutional grievances applies

not just to the principles from *Strickland* and *Williams* themselves, but also

to the application of ABA GUIDELINES as establishing the standard of care

for defense counsel in capital cases.[192]  In respect to this portion of the ratio

decidendi in *Williams*, the Court in *Wiggins* explained that the application

ABA Guidelines to Mr. Wiggins's case was not a "new" rule:

> While *Williams* had not yet been decided at the time
> the Maryland Court of Appeals rendered the
> decision at issue in this case . . . , Williams' case was
> before us on habeas review.  Contrary to the
> dissent's contention . . . , we therefore made no new
> law in resolving Williams' ineffectiveness claim.
> See *Williams*, 529 U.S., at 390 . . . (noting that the
> merits of Williams' claim "are squarely governed by
> our holding in *Strickland*"); see also *id.*, at 395, 120
> S.Ct. 1495 (noting that the trial court correctly
> applied both components of the *Strickland* standard
> to petitioner's claim and proceeding to discuss

---

proceeding to discuss counsel's failure to investigate as a violation of *Strickland's* performance
prong").

[192]*Id.* ("In finding Williams' ineffectiveness claim meritorious, we applied *Strickland* and
concluded that counsel's failure to uncover and present voluminous mitigating evidence at
sentencing could not be justified as a tactical decision to focus on Williams' voluntary
confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough
investigation of the defendant's background.'  529 U.S., at 396 . . . (citing 1 ABA STANDARDS FOR
CRIMINAL JUSTICE 4-4.1, commentary at 4-55 (2d ed.1980))").

counsel's failure to investigate as a violation of
*Strickland's* performance prong).[193]

In this petitioner's case, the the prosecution's state supreme court did
not decide the relevant appeal (the only state-court appeal in which its
rules allowed the petitioner to raise claims of ineffective assistance of
counsel) until April 1, 2003, and this decision did not become final—as
other state courts and the United States Supreme Court treat Missouri
appellate judgments—until the Missouri Supreme Court denied rehearing
on May 27, 2003.[194]  Petitioner's PCR appeal brief invoked *Williams*.  At 41,
as the state's brief had done in the Callaway County case, the state relied
on (1) the element of Mr. Williams's trial attorneys' delay in commencing
their mitigation preparation, and (2) the fact that the attorneys did not
investigate records of a "nightmarish childhood," and (3) failed to return
the phone call of a volunteer witness, as distinguishing *Williams*.  As
*Wiggins*—citing *Williams*—authoritatively articulates the law, however, the
way the system of precedent works in Anglo-American law, one case need
not be a carbon copy of another for it to be binding on a court deciding a
subsequent case:

---

[193]123 S.Ct. at 2536.

[194]*Middleton v. State*, 103 S.W.3d 726 (Mo. 2003) (en banc).

> a federal court may grant relief when a state court
> has misapplied a 'governing legal principle' to 'a set
> of facts different from those of the case in which the
> principle was announced.'  *Lockyer v. Andrade,*
>  . . . 123 S.Ct. 1166, 1175 . . . (2003) (citing *Williams v.
> Taylor, supra,* at 407 . . . ).[195]

This state supreme court had a complete opportunity to follow *Williams.*
Whereas in the petitioner's Callaway County PCR appeal, it picked on the
descriptive distinctions that the state cited to avoid doing so, in this appeal
it didn't even cite *Williams* or *Wiggins.*  Granting relief on the basis of the
portions of *Williams* that *Wiggins* discusses, and the dominant principles of
both—which relate back to *Strickland*—is no violation of *Teague* or 28 U.S.C.
§ 2254(d)(1).

In evaluating whether the petitioner received the effective assistance
that the Constitution promised him, especially in the context of the penalty
phase of a capital trial after *Gregg v. Georgia,* one must look at all of the
evidence relevant to the guilt phase and the penalty phase—what was
introduced at trial, what was suppressed at trial, and what trial counsel
failed to discover and present.  In doing so one must bear in mind the

---

[195]123 S.Ct. at 2535.

constitutional violations which produced this array, such as the prosecution's hiding its deals with its witnesses.

I.        **Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner's state-appointed counsel failed to call employer and family mitigation witnesses Charles Webb, Vern Webb, Virginia Webb, Ruby Smith, Sylvia Purdin, and Glenn Williams to testify about (A) the petitioner's impaired cognitive abilities which preceded his heavy drug use, and thereby offered an explanation for why he may have become involved in drugs; (B) his work-ethic and diligence, which would demonstrate why he would be a good, hard-working inmate; and (C) his mother's inhalant abuse, which might have explained why as a child he was cognitively impaired.  These failures denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent counsel would have investigated and called these witnesses, and the petitioner suffered prejudice from the failure to do so, because under the circumstances of the case there is a reasonable probability if the jury had heard their**

**testimony, it would have returned a punishment verdict other than death.**

Petitioner's counsel in the state courts presented this grievance in Point III of the opening brief on state PCR appeal.

Subdivision (k) of Mo. S. Ct. R. 29.15 says that the standard of review on appeal from a Missouri trial court's denial of post-conviction relief is "clearly erroneous"—the traditional standard of review for errors of fact. Insofar as the Missouri Supreme Court did not take in vain the language the rule *it* promulgated, this standard of review prescribes that some errors of law—for which the traditional standard of review is de novo—will go uncorrected.  Counsel have yet to see a Missouri appellate opinion in which the reviewing court specifies whether a decision of the court below was erroneous but not clearly erroneous, so there is no way to tell when the Missouri appellate courts have affirmed an erroneous denial of relief because of the foregoing limitation on appellate review.  A Missouri appellate decision in a PCR case is like a dishwasher full of dishes that one is told are mostly clean:  one does not know, in advance, which dishes are clean and which are dirty; the machine cannot be presumed to have done its job.  On this ground for relief and on each of the other grounds for relief

that the petitioner's PCR counsel raised in his Rule 29.15 motion, the petitioner is therefore entitled to the presumption that the Missouri Supreme Court did not engage in de novo review of questions of law or to questions of the application of law to facts, such as whether a person received ineffective assistance of counsel, on which the normal standard of review is de novo.[196]  Any Missouri PCR action is bench-tried (unless the trial judge denies an evidentiary hearing), and a denial of relief in a bench trial in any Missouri case other than PCR would be reversed when it "erroneously declares the law, or [] erroneously applies the law."[197]

In theory the State of Missouri could abolish state PCR altogether, but it cannot claim deference to appellate decisions on questions of law when federal constitutional rights are at stake under a standard of review less comprehensive than the same courts would apply to an appeal over a few head of cattle.  This treatment of questions of law only in cases where federal constitutional rights of accused citizens are at issue demonstrates an unwillingness to enforce the United States Constitution which should

---

[196]*E.g., ITT Commercial Finance Corp. v. Mid-America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo.1993)(en banc) (summary judgment).

[197]*Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.1976)(en banc); *Longshore v. Norville*, 93 S.W.3d 746, 751 (Mo.Ct.App.E.D.2002).

receive no purchase in federal habeas corpus, and in fact shows why the federal courts must remain vigilant to guard these rights guaranteed by the Constitution.[198]

To establish ineffective assistance of counsel under the Sixth Amendment, as applied against the states through the Fourteenth Amendment, a person convicted of a crime must demonstrate (1) that defense counsel failed to exercise the customary skill and diligence which reasonably competent counsel would have exercised and (2) resulting prejudice, *i.e.*, a reasonable probability that but for the errors of counsel, the outcome would have been different as to either the finding of guilt or the selection of punishment.[199]  Sentencing someone to death constitutes cruel and unusual punishment if that punishment is imposed arbitrarily and capriciously.[200]  Both the trial and sentencing phases of a capital case must

---

[198]*See, e.g., Lee v. Kemna,* 122 S.Ct. 877, 885-91 (2002); *White v. Bowersox*, 206 F.3d 776, 780-82 (8th Cir.), *cert. denied*, 531 U.S. 917 (2000).

[199]*Strickland v. Washington*, 466 U.S .668, 687 (1984).

[200]*Furman v. Georgia*, 408 U.S. 238 (1972).

satisfy the requirements of the Due Process Clause of the Fourteenth Amendment.[201]

Grounds 8(E) of the amended PCR motion pleaded that trial counsel were ineffective for failing to call former employers Charles Webb, Vern Webb, Virginia Webb, and Ruby Smith.[202]  Grounds 8(C) & 8(D) pleaded that trial counsel were ineffective for failing to call the petitioner's aunt, Sylvia Purdin,[203] and his uncle, Glenn Williams.[204]

The PCR trial-court judge found as to the failure to call family members and employers, there was no reasonable probability that the evidence that could have been presented would have altered the outcome.[205]  As to the former employers the PCR trial-court judge found that their testimony would have been "counterproductive" because it

---

[201]*Gardner v. Florida*, 430 U.S. 349, 358 (1977).

[202]Adair PCRLF 44-45 & 141-46.

[203]Ground 8(C) (Adair PCRLF 42-43 & 139-40).

[204]Ground 8(D) (Adair PCRLF 43-44 & 140-41).

[205]Adair PCRLF 287.

would have shown the petitioner could conform his conduct to the requirements of law for extended periods of time.[206]

In so holding the PCR trial-court judge failed to apply the rules the Supreme Court has laid out for enforcing the Sixth Amendment in respect to preparation for a penalty phase since *Strickland*.[207]  It is not enough that trial counsel presented "any evidence at all" in support of life.  Here, as in *Wiggins*, *Williams*, and *Jermyn*, trial counsel failed to present evidence of **different** mitigating circumstances.

Counsel did not contact any of the witnesses whose testimony the petitioner summarizes at pages 7-13, *supra*.[208]  These witnesses would have presented evidence that from the time the petitioner was a young child—and prior to his extensive involvement in drugs at the time of this offense—he had displayed limited cognitive abilities.  Those limited cognitive abilities came out in the testimony that his employers regarded the petitioner's having done the work which he did—such as shoveling cow

---

[206]Adair PCRLF 287.

[207]See pages 35-48, *supra*.

[208]Adair EHT 358-59 & 553-555.

- 55 -

manure—as his having worked to his fullest intellectual capacity and ability.

In making its punishment decision, it was important for the jury to understand that the petitioner's intellectual capacity was already severely limited before his extensive drug use and not solely the product of that drug use. Petitioner's preexisting limited intellectual abilities also would have offered an explanation for why he had drifted into the extensive drug use that surrounded this offense. Also, it was important for the jury to have heard evidence that while the petitioner was intellectually limited, he still was a conscientious and diligent worker at the jobs he was assigned, and therefore, could be expected to perform that way in the penitentiary where he would be drug-free. Additionally, evidence of the petitioner's mother's inhalant use would have offered the jury an explanation for why he was cognitively impaired as a child and before he became extensively involved in drugs. This is a case where counsel failed to present evidence of different mitigating circumstances—as in *Jermyn*,[209] anticipating *Williams* and *Wiggins*—and requires the relief those petitioners received.

---

[209]*See* pages 37-38, *supra.*

Evidence that the petitioner was a good worker would not have been "counterproductive" as the PCR trial-court judge found.[210]  Although the petitioner was a good worker, he was also an extremely limited, cognitively impaired one.  It was critical for the jury to hear about the petitioner's limited cognitive ability.  That the petitioner was a good worker when he was not extensively abusing drugs—which would be the situation in prison—would have highlighted for the jury that he could be expected to do well in the prison setting, and thus, supported life.

Reasonably competent counsel under similar circumstances would have investigated and called all of these witnesses.  In light of all the facts and circumstances of the case, the petitioner suffered prejudice because there is a reasonable probability that if the jury had heard all of this evidence, the petitioner would have received a punishment other than death.

---

[210]Adair PCRLF 287.

II.      Respondent's custody over the petitioner violates the Constitution of the United States in that counsel failed to call the petitioner's Iowa corrections counselor, Jake Noonan, and to introduce his Iowa corrections file in the penalty phase to support a sentence other than death, because this would have established that the petitioner had been a well-behaved and well-adjusted prisoner in Iowa, and therefore could be expected to be equally successful if sentenced to life imprisonment without parole rather than to death.  This failure denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. Reasonably competent counsel would have investigated and presented this evidence, and the petitioner suffered prejudice because under the circumstances of the case there is a reasonable probability if the jurors had heard this evidence, they would have returned a punishment verdict other than death.

Petitioner's counsel in the state courts presented this grievance in Point IV of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of

law or mixed questions of law and fact, such as claims of ineffective

assistance of counsel, insignificant except as showing state's failure to

enforce federal constitutional rights).

Grounds 8(K) and 8(L) of the amended motion pleaded that trial

counsel were ineffective for failing to present the petitioner's Iowa prison

records and failing to call Mr. Noonan because this evidence was relevant

mitigation under *Skipper v. South Carolina*.[211]  Trial counsel should have

presented this evidence because it demonstrated the petitioner's past good

adjustment to incarceration, and therefore, he could have been expected to

adjust-well to incarceration for life.[212]

Mr. Noonan was the treatment services director for the Iowa

Department of Corrections at Anamosa State Penitentiary.[213]  His duties

include chairing the classification committee, overseeing institutional

transfers, and making parole board recommendations.[214]  He is also

responsible for an in-patient therapeutic community program, an out-

---

[211]Adair PCRLF 57-5 8,153-55, *citing* 476 U.S. 1 (1986).

[212]Adair PCRLF 57-58 & 153-55.

[213]Ex.27 at 4 & 8.

[214]Ex.27 at 8.

patient program at Anamosa, an out-patient program at Luster Heights, and grant writing for the State of Iowa.[215]

In his counseling duties, Mr. Noonan has supervised 800-900 inmates, including the petitioner.[216]  Petitioner was cooperative and took advantage of available opportunities.[217]  He obtained his G.E.D., completed substance abuse programs, and attended substance abuse groups.[218] During the petitioner's confinement he did not have any disciplinary reports.[219]  Petitioner was initially confined at Anamosa and transferred to Luster Heights.[220]  Luster Heights was a live-out camp without any fence.[221] Petitioner could not have been transferred to Luster Heights any sooner because he had a mandatory minimum sentence for a drug conviction.[222]

---

[215]Ex.27 at 8.

[216]Ex.27 at 9-10.

[217]Ex.27 at 12.

[218]Ex.27 at 12.

[219]Ex.27 at 13.

[220]Ex.27 at 14.

[221]Ex.27 at 13-14.

[222]Ex.27 at 14.

Petitioner was sent to Luster Heights because his attitude, behavior, and adjustment were good and he needed substance abuse treatment.[223] Petitioner was eligible for transfer to Luster Heights because he had not had any violent episodes or escapes at Anamosa.[224]  Petitioner was quiet and had a good attitude.[225]  He had an above average adjustment to incarceration and above average work reports.[226]  Because the petitioner had a particularly good custody level that made him low-risk, he was allowed to work outside the prison.[227]

Petitioner's Iowa Corrections records contained similar impressions.[228]  Those records included a psychological report that concluded the petitioner had a *low* potential for institutional violence.[229]

---

[223]Ex.27 at 15-16.

[224]Ex.27 at 17.

[225]Ex.27 at 17.

[226]Ex.27 at 17-18 & 26.

[227]Ex.27 at 17-18.

[228]Ex.28.

[229]Ex.28.

Another judge of the trial court ruled that trial counsel exercised reasonable strategy in not presenting this evidence.[230]  That strategy was reasonable, he said, because attorneys' focus in the penalty phase was to corroborate Drs. Murphy's and Lipman's diagnoses of methamphetamine induced psychosis.[231]  He considered presenting evidence of other confinements was viewed as an unsound strategy.[232]

Ms. Zembles was primarily responsible for investigating mitigation evidence.[233]  Ms. Zembles testified that defendants do not understand what constitutes mitigating evidence.[234]  She was uncertain whether the defense team had obtained the petitioner's Iowa corrections records.[235]  Ms. Zembles only would not have wanted to utilize the petitioner's Iowa prison

---

[230]Adair PCRLF 293-94.

[231]Adair PCRLF 293-94.

[232]Adair PCRLF 293-94.

[233]Adair EHT 553.

[234]Adair EHT 551.

[235]Adair EHT 568.

records if those records contained unfavorable materials about the petitioner.[236]  Ms. Zembles was unfamiliar with Mr. Noonan.[237]

In the penalty phase, trial counsel called Adair County Sheriff Randall Forquer.  He testified that the petitioner had not made any attempts to escape while being held in Adair County.[238]  This elected sheriff recounted that while held in Adair County, the petitioner had not been disruptive and never assaulted anyone.[239]

During the prosecution's penalty phase opening statement, it apprised the jury that it would present evidence regarding the petitioner's Iowa conviction for possession of amphetamine with the intent to manufacture or deliver.[240]  In the same opening statement the prosecutor told the jurors that they would hear evidence that the petitioner had attempted to "escape" from the Harrison County Jail.[241]  The prosecution

---

[236]Adair EHT 569.

[237]Adair EHT 569.

[238]Adair TT 3240.

[239]Adair TT 3240-41.

[240]Adair TT 3021.

[241]Adair TT 3021.

introduced in penalty evidence documenting the petitioner's Iowa

conviction for possession of amphetamine with intent to manufacture or

deliver.[242]

In the penalty phase the prosecution called Highway Patrol Officer

Forck to testify about the alleged attempted "escape" from the Harrison

County Jail by the petitioner.  The men's and women's cells are located on

separate sides of the third floor of the courthouse.[243]  Petitioner's girlfriend

was a codefendant who was being held in the women's area.[244]  Forck

heard a noise on the third floor and found the petitioner standing outside

the locked area.[245]  Forck had the petitioner handcuffed and returned to the

men's locked area because he was in an area where prisoners were not

allowed to be.[246]  Corrections professionals would have categorized this

incident as an "out of bounds" conduct violation rather than an "escape."

---

[242]Adair TT 3039-43 & 3126-27.

[243]Adair TT 3194 & 3197.

[244]Adair TT 3197.

[245]Adair TT 3198.

[246]Adair TT 3198-99 & 3212.

In *Skipper v. South Carolina*[247] JUSTICE POWELL concurred that the petitioner's jail conduct should have been admitted:  that conduct, he would have held, was relevant not as mitigating evidence, but rather to rebut prosecution evidence introduced and argument offered against Mr. Skipper.  Justice Powell reasoned that a person awaiting trial or sentencing in a capital case could be expected to behave flawlessly in hope that the sentencing authority would not impose death.[248]  But when the prosecution argues the accused citizen is mean or violent or inhuman, it opens the door to rebuttal by way of jail and prison staff who, as here, know otherwise about the individual accused.  When this petitioner was in the Iowa prison system, he was not subject to the qualification Justice Powell would place on the *Skipper* holding.

Reasonably competent counsel under similar circumstances would have investigated and presented evidence of the petitioner's Iowa incarceration through Mr. Noonan and the petitioner' s Iowa Corrections records.[249]  This evidence was crucial because not only would it have

---

[247]476 U.S. 1, 9, 14-15 (1986) (POWELL, J., concurring).

[248]*Id.* at 14-15.

[249]Exh. 40.

apprised the jury of the petitioner's ability to adjust well to incarceration, but also to show that when he was held in particular Iowa facilities where escape would have been easy, he had not attempted to escape.  This evidence would have countered the prosecutor's focus on the petitioner's alleged attempted "escapes" from Harrison County and the successful escape that had occurred at Potosi by someone other than the petitioner. This evidence was more persuasive than the evidence the jury heard for the reasons Justice Powell identified in *Skipper*.  When the petitioner was confined in Iowa, he did not have any incentive to be well-adjusted in order to hope to persuade a sentencer to not impose death.  In contrast, while the petitioner was being housed at Potosi, awaiting trial in Callaway County, the incentive Justice Powell identified existed and made the evidence presented through Mr. Pettis and Ms. Weber not as compelling.  It was critical to present evidence of the petitioner' s adjustment in Iowa correctional facilities to counteract the jury learning from the prosecutor about these prior Iowa convictions.

Petitioner suffered prejudice from these omissions because under all the facts and circumstances of the case there is a reasonable probability had

the jury heard this evidence it would have returned a punishment verdict other than death.

The trial court's "reasonable strategy" finding is clearly erroneous. As *Williams* and the Eighth Circuit's decision in *Kenley v. Armontrout*[250]—predating it by nearly ten years—recognize, the failure to discover mitigating evidence relates to trial preparation and not strategy. There was nothing bad in the petitioner's Iowa prison records, so there was no reasonable strategy for failing to present them. Although counsel's strategy of presenting evidence to corroborate Drs. Murphy and Lipman may itself be reasonable, it does not excuse the failure to investigate and present Mr. Noonan and the petitioner's Iowa prison records. Any finding that presenting evidence of other confinements is not sound strategy is simply contrary to the holding in *Skipper*. It was "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,"[251] or "an

---

[250]937 F.2d 1298, 1304 (8th Cir. 1991).

[251]28 U.S.C. § 2254(d)(1).

unreasonable determination of the facts in light of the evidence presented

in the State court proceeding,"[252] or both.

---

[252]28 U.S.C. § 2254(d)(2).

III.        Respondent's custody over the petitioner violates the
Constitution of the United States in that the trial court allowed the
prosecution to present, over objection, expert testimony vouching for the
credibility of Douglas Stallsworth.  Stallsworth was a key prosecution
witness, in that there were no eyewitnesses to the killing for which the
petitioner was on trial, but Stallsworth testified to alleged statements by
the petitioner which inculpated him in the offense and provided the grist
for two of the statutory aggravating factors.  Stallsworth had a
substantial, undisputed history of mental illness.  Trial counsel sought
Stallsworth's mental-health records in order to allow them to
crossexamine the prosecution mental-health expert who vouched for
Stallsworth's credibility, but the trial court denied the defense's attempts
to obtain these records.  The trial court's admission of the expert's
testimony violated the petitioner's right to confront and crossexamine
witnesses and to due process of law, in violation of the Sixth and
Fourteenth Amendments.  Its refusal to allow trial counsel access to these
records rendered trial counsel involuntarily ineffective notwithstanding
her subjective diligence, also in violation of the Sixth and Fourteenth
Amendments.  Because the trial judge denied trial counsel an

**opportunity to preclude unlawful, prejudicial testimony in the penalty phase, the error violated the Eighth Amendment and the petitioner is at least entitled to a new penalty phase in light of *Tuggle v. Netherland*.**

Petitioner's counsel in the state courts presented this grievance as Point II of the opening brief on direct appeal.

When the prosecution endorsed jailhouse snitch Douglas Stallsworth, who was at the time in a state mental hospital, trial counsel moved the trial court for production of the mental-health records on Stallsworth, and to have Stallsworth's testimony excluded because he was incompetent to testify.[253]  The trial judge held a hearing outside the presence of the jury on Stallsworth's competence, but refused the relief trial counsel had sought, though it agreed to review the record of the state's 1995 examination of Stallsworth under Mo. Rev. Stat. chapter 552, *i.e.*, the state-law process for determining competence to proceed in criminal cases and assessing defenses of mental disease or defect.[254]  The trial judge refused to order the production of the records trial counsel had sought, which included the records of the hospitalization Stallsworth was undergoing in the

---

[253]Adair DALF II:293 & 367-78.

[254]Adair TT IV:633 & 662; Adair DALF III:443.

Department of Mental Health at the very time the prosecution was tendering him as a witness in a capital case.[255]

The evidence at the trial judge's hearing on Stallsworth's competence included the testimony of Dr. Sam Parwatikar—a highly experienced forensic psychiatrist working for the state—that at the very time Stallsworth was supposed to have "heard" inculpatory statements from the petitioner, Stallsworth was suffering from bipolar disorder.[256]  Dr. Parwatikar expressed the opinion that despite this fact, Stallsworth was not "psychotic" and was "capable of appreciating reality and oriented."[257]

The prosecution offered the testimony of Stallsworth's then-current state psychiatrist, Deja Suthikant, concerning his mental condition at the time of trial.[258]  Trial counsel objected, noting that she could not attempt to refute or attack this testimony without access to the documentation on which it was based.[259]  She requested that Stallsworth's trial testimony be

---

[255]Adair TT V:965-70.

[256]Adair TT XV:2812.

[257]Adair TT XV:2803.

[258]Adair TT XV:2843-52.

[259]Adair TT XV:2857-59.

excluded.[260]  At the close of the hearing, the trial court found that Stallsworth was competent to testify.[261]  Stallsworth went on to testify at both phases of the trial, claiming that the petitioner had confessed to the Pinegar murder and to the murders of Hamilton and Hodge.[262]

The trial judge's refusal to allow trial counsel to review the records on Stallsworth flawed the process by which he decided that Stallsworth was competent.  The restrictions on counsel's access to these mental health records prevented the defense from meaningfully testing his competence and from adequately confronting and crossexamining the witnesses who testified concerning in favor of it.

When there was no impetus to uphold a death sentence,[263] even the Missouri courts have recognized the appropriateness of the disclosure trial counsel sought.  In *State v. Newton*[264] the court found that the trial judge

---

[260]Adair TT XV:2859.

[261]Adair TT XV:2863.

[262]See pages 24-25.

[263]*See Ashcroft v. White*, 106th Cong., 1st Sess., CONG. REC. S11871-74 (Oct. 4, 1999) & S11917-19 (Oct. 5, 1999) (denunciation of state supreme court judge nominated for federal bench as "procriminal" by then-Sen. Ashcroft, followed by straight party-line vote to deny confirmation, when the judge's box score was "only" 72% pro-death).

[264]925 S.W.2d 468, 471 (Mo. Ct. App. E.D. 1996) (*Newton I*).

had erred in quashing a defense subpoena for mental-health records of a

witness whose competence was in dispute:

> In *U[nited States] v. Nixon*, 418 U.S. 683 . . . (1974),
> the United States Supreme Court addressed the
> issue of whether a constitutionally-based or
> statutorily-based privilege overrides a defendant's
> right to have relevant and material evidence
> produced through discovery.  In *Nixon*, the Court
> recognized the importance of privileges in
> protecting confidentiality, but held that such
> privileges are not expansively construed because
> they are in derogation of the search for truth.
> *Nixon*, 418 U.S. at 709-710 [43].
>
> The Court further held:  "The right to the
> production of all evidence at a criminal trial
> similarly has constitutional dimensions.  The Sixth
> Amendment explicitly confers upon every
> defendant in a criminal trial the right 'to be
> confronted with the witnesses against him' and 'to
> have compulsory process for obtaining witnesses in
> his favor.'  Moreover, the Fifth Amendment also
> guarantees that no person shall be deprived of
> liberty without due process of law.  It is the
> manifest duty of the courts to vindicate those
> guarantees, and to accomplish that it is essential
> that all relevant and admissible evidence be
> produced.  [T]he allowance of the privilege to
> withhold evidence that is demonstrably relevant in
> a criminal trial would cut deeply into the guarantee
> of due process of law and gravely impair the basic
> function of the courts."  *Nixon*, 418 U.S. at 711-
> 712[45,46] . . .   The Court concluded by holding that

- 73 -

> when the ground for asserting a privilege as to
> subpoenaed materials sought for use in a criminal
> trial is based only on the generalized interest in
> confidentiality, it cannot prevail over the
> fundamental demands of due process of law in the
> fair administration of criminal justice.  *Nixon*, 418
> U.S. at 713[47,48] . . .  The generalized assertion of
> privilege must yield to the demonstrated, specific
> need for evidence in a pending criminal trial.  *Id.*

Based on this authority, *Newton* rejected the prosecution's assertion of

the witness's physician-patient privilege as a rationale for refusing to

produce her records.  As in this petitioner's case, the records were not a

part of the appellate record because the trial judge refused to order their

production.  The state appellate court therefore remanded the cause to the

trial court, ordering it to have the records produced and to review them in

camera.  The Supreme Court of the United States had suggested the in-

camera review procedure in *Nixon* to protect the interest of the witness

against needless disclosure of information that was not actually relevant to

the case on trial.

Following the in camera review, the trial judge in *Newton* found that

the records were not relevant to the issue of the witness's competence to

testify, and reaffirmed its earlier finding that she was competent.  The state

appellate court then affirmed the decision of the trial judge without

reviewing the records.[265]  The case was then transferred to the state

supreme court, which directed the trial judge to forward the records to the

Missouri Court of Appeals, and ordered the latter court to review the

records.  Only after conducting this review was the conviction finally

affirmed.[266]

Here, the trial judge refused to order the production of records either

for disclosure to the defense or for in camera review.  Trial counsel did not

fail to discharge their burden to bring them before the state courts.  As in

*Newton I*, the Missouri Supreme Court should—at the very least—have

directed the trial court to obtain the records and to review them to

determine whether they contain material which would be germane to the

determination of Stallsworth's competence.  If the trial judge had

determined that the records were not relevant to the issue, the Missouri

Supreme Court should have ordered him to send it the records under seal

for its own determination on this issue.  If the trial court had determined

that the records did contain such material, it should have disclosed them to

---

[265]*State v. Newton*, 1997 Mo. App. LEXIS 184, Nos. 63939, 68569 (Mo. Ct. App. E.D. Feb. 11, 1997) (*Newton II*).

[266]*State v. Newton*, 963 S.W.2d 295 (Mo. Ct. App. E.D. 1997) (*Newton III*).

defense counsel, and it should have held a new hearing on Stallsworth's competence.  If the trial judge found Stallsworth competent after trial counsel had a fair opportunity to crossexamine the experts vouching for his competence, the petitioner should have had an opportunity to appeal such a resolution to the state supreme court.

On the other had, if a properly conducted competence hearing had yielded the conclusion that Stallsworth was not competent to testify, the petitioner's conviction and sentence would have had to be reversed.  The prejudice from Stallsworth's testimony was overwhelming.  No eyewitness testimony was offered concerning this crime.  Petitioner's alleged confession to Stallsworth was therefore extremely prejudicial.  Without it, there is a reasonable possibility that the jury would have found the petitioner not guilty of the murder of Alfred Pinegar.  There would have been no penalty phase in which Stallsworth testified about Hamilton and Hodge.  Outside of Stallsworth's testimony, the evidence concerning the two statutory aggravating circumstances was scanty.  In particular, the circumstance that petitioner killed Pinegar as part of a plan to kill more than one person and thereby exhibited a callous disregard for human life[267]

---

[267]Adair DALF IV:615.

depended largely on the testimony of Stallsworth that the petitioner had admitted killing "Happy" Hamilton and Stacey Hodge as part of a plan to eliminate snitches from among his coterie of petty drug dealers.[268]  Where a finding as to an aggravating circumstance is based on the jury's consideration of inadmissible evidence, the Eighth Amendment requires a new penalty phase is required even if there is one proper statutory aggravating circumstance.[269]  Under the circumstances of the case, therefore, the trial judge's refusal of trial counsel's motions for disclosure violated the Eighth Amendment.

---

[268]Adair TT XV:2874 & XVI:3179.

[269]*Tuggle v. Netherland*, 516 U.S. 10, 12-14 (1995) (per curiam).

**IV.      Respondent's custody over the petitioner violates the Constitution of the United States in that the prosecution failed to disclose deals made with John Thomas in exchange for Thomas's testimony.  This prosecutorial misconduct denied the petitioner the rights to confront the witnesses against him, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.  The prosecution gave its witness favorable dispositions of charges brought against him in exchange for his testimony, he affirmatively represented otherwise, and the prosecutor argued there were no deals, thus misleading the jury.**

Petitioner's counsel in the state courts presented this grievance in Point I of the opening brief on state PCR appeal.  But see *supra*, pages 51- 53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Before Thomas testified in the guilt phase, trial counsel Chris Slusher objected to the prosecution's calling Thomas on the grounds that there was

an undisclosed deal.[270]  In support of excluding Thomas's testimony, Mr.

Slusher informed the trial judge that at Thomas's deposition, Thomas had

testified that his Harrison County charges were to remain in Harrison

County associate circuit court until after he testified in the petitioner's

Adair County case.[271]  The trial judge overruled the objection.[272]

On direct examination in the guilt phase, Thomas testified that he

was charged with distributing methamphetamine and admitted he had

sold methamphetamine.[273]  Thomas reported that on June 25, 1995, he went

to the petitioner's house to warn him that he had sold methamphetamine

to Billy Worley, and that he thought Worley was the confidential informant

who caused Thomas to be charged.[274]  Thomas testified that the petitioner

said that he had Pinegar's shotgun, and that Mr. Pinegar would not be

needing it any more.[275]  Thomas testified that the charges against him were

---

[270]Adair TT 2290-91.

[271]Adair TT 2290-91.

[272]Adair TT 2290-91.

[273]Adair TT 2299-2300.

[274]Adair TT 2304-06.

[275]Adair TT 2308-09.

pending, that no promises had been made to him, and he had no expectations of leniency.[276]

On guilt-phase crossexamination, Thomas testified that even though he was charged in 1995, his case had never gone to a preliminary hearing.[277]  Thomas denied any promises of favorable treatment were made to him, and represented that he did not expect any lenient treatment for testifying.[278]  Thomas alternatively testified that he was told his case would be dealt with "[a]fter *these* trials"[279] and "[a]fter all of [the trials]."[280]  It was "their decision" to allow Thomas's case to sit around even though he was charged in June of 1995.[281]  Thomas maintained that he had not asked for any deal and none had been offered.[282]

---

[276]Adair TT 23 14.

[277]Adair TT 2355.

[278]Adair TT 2354-55 & 2364.

[279]Adair TT 2355 (emphasis added).

[280]Adair TT 2356 (emphasis added).

[281]Adair TT 2356.

[282]Adair TT 2356.

During the prosecution's initial guilt-phase argument, it relied on

Thomas's testimony that the petitioner allegedly said that the guy whose

shotgun he had would not need it anymore.[283]  The prosecution's

additional argument included:

> John Thomas — had extensive cross-examination of
> Mr. Thomas regarding the fact that he's facing 10 to
> 20 years and he may expect something in return.
> Well, the evidence was clear that he was promised
> nothing.  He says he doesn't expect anything, but
> does he hope to get something?  He probably does
> — he's facing 10 to 20 years — he probably does
> expect to get something back.  But he is testifying
> against the defendant in order not to go to prison;
> but compare him to the defendant who murdered
> Al Pinegar to avoid going to prison.
>
> And when you evaluate Mr. Thomas's testimony
> and his potential bias or his motive, think about Mr.
> Thomas.  If he's going to make up a story in order
> to get a deal from the State, wouldn't he come up
> with something better than he gave us?  I mean,
> what he gave us was good. I mean, he said, yeah, he
> was there, he saw a shot gun, and the defendant
> said whose shot gun it is won't be needing it
> anymore.  But if he was making up a story,
> wouldn't he come up with something better than
> that — like Middleton said he did it, he confessed to
> me?  That's not a made-up story.  In addition, note
> the fact that he told the police about the petitioner's
> statement before Mr. Pinegar's body was even

---

[283]Adair TT 2907.

identified.  So how would he know to make up a story?[284]

In the penalty phase, Thomas reported that he was at the petitioner's house, and there was a small black box that belonged to Hamilton, one of the decedent drug-dealers in the Callaway County case, on the coffee table.[285]  According to Thomas, he asked the petitioner how he came to possess Hamilton's box and the petitioner allegedly said that the person it belonged to would not need it anymore.[286]

PCR counsel presented evidence of the prosecution's deals with John Thomas:

---

[284]Adair TT 2910-11.

[285]Adair TT 3160.

[286]Adair TT 3161.

TABLE 1

| DATE | TRANSACTION | CITATION |
|---|---|---|
| June 8, 1995 | Harrison County Complaint filed, charging Thomas with Class B felony sale of a controlled substance, methamphetamine, alleged to have occurred August 23, 1994, and made to a "confidential informant" | Exhs. 1 & 18 |
| March 4, 1997, and March 11, 1997 | Thomas testifies for prosecution at the petitioner's Adair County trial (in both guilt and penalty phases) | Adair TT 2291-2376 & 3159-3171 |
| February 27, 1998 | Harrison County Docket entry:  "Δ appears with counsel, Mr. Garry Allen, and waives preliminary hearing in open court.  State appears by Ms. Chris Stallings, and state advises delay in prosecution due to Δ's participation as witness in companion proceedings.  Δ band [sic] over to Div. I and to appear at 9 a.m., March 17, 1998 and file to be certified to said division." | Exh. 1 |
| March 16, 1998 | Information filed against Thomas on same charge as complaint | Exhs. 1 & 18 |
| March 31, 1998 | Thomas testifies for the prosecution at the petitioner 's Callaway County trial | Callaway TT I:iv |
| April 27, 1998 | Amended information decreasing charge of Thomas to class C felony of an attempt to sell methamphetamine is filed, and Thomas pleads guilty | Exhs. 1 & 18 |
| September 10, 1998 | Docket entry: "State appears by Pros. Atty. Defendant appears in person by atty.  PSI is considered and recommendations are made. Court suspends imposition of sentence and places defendant on probation for a period of five (5) years under supervision rules and regulations.  The court[']s regular special conditions [illegible] #1-6 [illegible]." | Exhs. 1 & 18 |

Cui bono?

- 83 -

In response to the petitioner's attempt to litigate these issues on state post-conviction relief, the trial judge found the documentary exhibits offered on Thomas's case failed to establish there was any undisclosed deal.[287]  He also relied on Thomas's trial testimony itself as refuting any claim of a deal![288]

Trial counsel Jan Zembles testified that the prosecution repeatedly represented no deals had been made with Thomas.[289]  Ms. Zembles would have wanted to impeach Thomas with his probation disposition.[290]

Trial counsel Donna Holden testified that the prosecution represented to her that there were no deals for Thomas.[291]  When Ms. Holden asked the Harrison County Prosecuting Attorney why Thomas's case was allowed to remain pending in associate circuit court for two years, she was not given an answer.[292]  Ms. Holden would have wanted to

---

[287]Adair PCRLF 282-83.

[288]Adair PCRLF 283.

[289]Adair EHT 573.

[290]Adair EHT 576.

[291]Adair EHT 487.

[292]Adair EHT 487-88 & 493-94.

impeach Thomas with the reduced charge he pled guilty to which resulted in a probation disposition.[293]  Ms. Holden would have wanted to impeach Thomas with evidence of a deal.[294]

The Due Process Clause of the Fourteenth Amendment requires that the prosecution disclose to the defense favorable evidence which is material either to guilt or to punishment.[295]  For purposes of the Due Process Clause, there is no distinction between exculpatory and impeachment evidence.[296]  Nondisclosure of *Brady* evidence violates due process "irrespective of the good faith or bad faith of the prosecution."[297]  Under *Brady*, the focus is whether the petitioner suffered prejudice.[298]

In *Giglio v. United States*[299] a prosecutor promised the defendant's co-conspirator that he would not be charged in the case.  The co-conspirator

---

[293]Adair EHT 500.

[294]Adair EHT 531-32.

[295]*Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[296]*United States v. Bagley*, 473 U.S. 667, 676-78 (1985).  *State v. Robinson*, 835 S.W.2d 303, 306 (Mo. 1992) (en banc).

[297]*Brady v. Maryland*, 373 U.S. at 87.  *See also United States v. Agurs*, 427 U.S. 97, 110 (1976).

[298]*State v. Whitfield*, 837 S.W.2d 503, 508 (Mo. 1992) (en banc).

[299]405 U.S. 150, 150-53 (1972).

testified against Mr. Giglio while representing there were no deals, and a different prosecutor argued that the prosecution had made no promises to the co-conspirator.[300]  The failure to disclose that promise violated due process.[301]  It did not matter different prosecutors were involved in the promise of leniency and the trial because "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government."[302]

In *Napue v. Illinois*[303] a co-participant in a charged homicide testified no promises had been made in exchange for his testimony.  In fact, the prosecutor had promised the co-participant that he would recommend a sentence reduction.[304]  The prosecution allowed that testimony to go uncorrected.[305]  The Supreme Court held that this ***omission*** violated Mr. Napue's right to due process.[306]  The Court reasoned that "[t]he jury's

---

[300]*Id.* at 151-52.

[301]*Id.* at 154-55.

[302]*Id.* at 154.

[303]  360 U.S. 264, 265-67 (1959)

[304]*Id.* at 265-67.

[305]*Id.* at 265-67.

[306]*Id.* at 269-70.

estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend."[307]

In *Hayes v. State*[308] the the prosecution's state supreme court granted post-conviction relief because the prosecution failed to disclose to defense counsel that it had agreed to dismiss charges against a co-participant in exchange for snitch testimony.  While so ruling, the state supreme court reasoned the deal "related directly to the quality and substance of [the co-participant's] trial testimony."[309]

In *Commonwealth v. Strong*[310] the Pennsylvania Supreme Court overturned a death sentence on post-conviction relief.  The prosecutors had represented that no deal had been made with the co-defendant, and the co-defendant testified there were no deals; after testifying for the prosecution at Mr. Strong's trial, the co-defendant pled guilty and was sentenced to

---

[307]*Id.* at 269.

[308]711 S.W.2d 876, 877 (Mo. 1986) (en banc).

[309]*Id.* at 879.

[310]761 A.2d 1167 (Pa. 2000)

forty months in prison rather than the death penalty or a longer prison term.[311]  The evidence at the Pennsylvania PCR proceedings indicated there were discussions about a deal for the co-defendant before Mr. Strong's trial, but the postconviction court rejected the failure to disclose a deal claim finding "there was no actual deal struck . . . ."[312]

The Pennsylvania Supreme Court agreed with the finding that there was no deal struck, but still reversed:  it held relief to be required because the record established the existence of "an understanding" that the co-defendant would be treated with leniency in exchange for his testimony.[313]  The Pennsylvania Supreme Court went on to indicate it is unnecessary for there to be "an ironclad agreement" in order to impose a due process duty to disclose under *Brady* and *Giglio*.[314]  It reasoned that in circumstances where there is no binding agreement, disclosure is *even more* critical because when a deal is only contingent and dependent on the prosecution's satisfaction with the final result, the witness has a greater motive to testify

---

[311]*Id.* at 1170.

[312]*Id.*

[313]*Id.* at 1174.

[314]*Id.* at 1174-75.

favorably for the prosecution.[315]  "The fact that the stake was not guaranteed through a promise or binding contract, but was expressly contingent on the Government's satisfaction with the end result, served only to strengthen any incentive to testify falsely in order to secure a conviction."

This case is like the most recent decision of the Supreme Court of the United States, *Banks v. Dretke*,[316] in that the prosecution cultivated favorable testimony from a prosecution witness, yet allowed him to testify falsely that the basis of his motive to fabricate in favor of the prosecution did not exist without correcting that testimony.  Yet *Banks* broke no new ground in applying the principle that prosecutors cannot do that, as its citations to *Mooney v. Holohan*,[317] *Berger v. United States*,[318] *Giglio v. United States*,[319] and *Strickler v. Greene*[320] make clear.[321]

---

[315]*Id.* at 1175, citing *United States v. Bagley*, 473 U.S. at 683 (BLACKMUN AND O'CONNOR, JJ.).

[316]124 S.Ct. 1256 (2004).

[317]294 U.S. 103, 112 (1935) (per curiam) .

[318]405 U.S. 150, 153 (1972).

[319]295 U.S. 78, 88 (1935) .

[320]527 U.S. 263, 284 (1999) .

The evidence as to Thomas is also like that presented in *Strong*. Thomas was first charged on June 8, 1995.[322] The docket entry from February 27, 1998, indicates that the "state advises delay in prosecution due to Δ's participation as witness in companion proceedings."  See page ***, *supra*.  This docket entry reflects that there was "an understanding" that Thomas would be treated with leniency.  That "understanding" is further evidenced by Thomas' trial testimony that his case would be dealt with after all of the trials involving the petitioner were completed.[323]  The "understanding" is also evidenced by Thomas's testimony that it was "their decision" to allow Thomas's case to sit around despite him having been charged in June of 1995.[324] In fact, less than one month after Thomas testified in the petitioner's second and final trial—the one in Callaway County—an amended information reducing Thomas's charges from the class B felony of sale of a controlled substance to the class C felony of an

---

[321]124 S.Ct. at 1274.

[322]Exs. 1 and 18.

[323]Adair TT 2355-56.

[324]Adair TT 2356.

attempted sale was filed on April 27, 1998, and he pled guilty.[325] While

there is not evidence of "an ironclad agreement," there still was a duty

under *Brady* to disclose the understanding.

Thomas received a very good deal.  The Missouri Highway Patrol

Confidential Narcotics Report, contained in the prosecutor's file, recounted

that Confidential Informant 1352 had "purchased the methamphetamine

from John Thomas in Thomas's shop near Thomas's residence for three

hundred dollars ($300.00)."[326] The prosecutor's file also contained a

handwritten statement signed by Billy Worley dated August 23, 1994,

stating that he had purchased the methamphetamine from Thomas.[327]

Worley testified as a penalty phase witness for the prosecution.[328] The

Highway Patrol's Forensic Laboratory Report, again contained in the

prosecutor's file, identified what Thomas had sold as methamphetamine.[329]

Thomas admitted during his PSI interview that he sold methamphetamine

---

[325]Exs. 1 and 18.

[326]Ex.18 and page 1 of report.

[327]Ex. 18.

[328]Adair TT 3058-65.

[329]Ex. 18.

to an undercover agent.[330]  Even though Thomas actually sold

methamphetamine, he pled guilty to an attempted sale and was placed on

probation.[331]  Counsel would have wanted to impeach Thomas with this

especially good disposition.[332]  Attacking Thomas' credibility was critical,

and under *Giglio*, *Napue*, and the rest of the body of precedent we associate

with *Brady*, the petitioner was entitled to the undisclosed information to

use for that purpose.

The prosecution's failure to disclose these matters was especially

harmful because Thomas testified he had no deals.[333]  The prosecution's

silence when it had a duty to speak ripened into ratification of a lie as the

prosecutors sat with their hands folded while Thomas perjured himself

about the deals they and their privies had made for his substantive

testimony.  Not only did this misconduct besmirch the prosecutors and

mislead the jurors, but it interfered with the petitioner's and his attorneys'

ability to crossexamine Thomas about the deal he received, in violation of

---

[330]Ex. 18, PSI at 1.

[331]Exs. 1 and 18.

[332]Adair EHT 500, 531-32 & 576.

[333]Adair TT 23 14.

the petitioner's right to confront the witnesses against him.  The Sixth Amendment guarantees an accused citizen the right to confront the witnesses against them.[334]  A primary interest the Confrontation Clause secures is the right of crossexamination.[335]  One of the most valuable forms of crossexamination for the accused in a criminal case is to show the jury the incentives the prosecution has given others of a less than savory reputation to tell the jury what the prosecution wants it to hear.  In light of the courts' backing away from directly penalizing the prosecution for purchasing inculpatory testimony with the twenty-first century equivalent of thirty pieces of silver,[336] impeachment is the only way defense counsel can even hope to counteract the practical ability a prosecutor's office has to drum up testimony to fill any conceivable gap in the "evidence" once a hapless citizen has fallen into the maws of the criminal law.

Here, as in *Banks v. Dretke*, the prosecutors exacerbated the prejudice of their own nondisclosure by arguing that there was no deal, and thus

---

[334]*Pointer v. Texas*, 380 U.S. 400, 406 (1965).

[335]*Davis v. Alaska*, 415 U.S 308, 315 (1974)

[336]*United States v. Singleton*, 144 F.3d 1343 (10th Cir. 1998), *vacated*, 165 F.3d 1297 (10th Cir.) (en banc), *cert. denied*, 527 U.S. 1024 (1999).

mislead the jury.[337]  This went beyond the constitutional violation in *Napue* of failing to correct misinformation on a deal.  From a practical point of view, the prejudice from this nondisclosure was especially severe because it precluded counsel from fully presenting their defense that the petitioner was not guilty of the crime charged.

Although no one could be so naïve as to believe that what happened in respect to Thomas's testimony in this trial was an accident or a coincidence, the petitioner presents what happened in the Callaway County case in respect to Thomas and another witness to show that the prosecutors knew exactly what they were doing.  In the remainder of this ground for relief, the abbrevation "TT" refers to the Callaway County trial transcript, and "DALF" and "PCRLF" refer to the Callaway County direct-appeal and post-conviction relief legal files, all of which are exhibits in the federal habeas corpus action challenging the Callaway County convictions and death sentences.

In the Callaway County case, the prosecution presented the testimony of John Thomas and Dan Spurling without having disclosed deals it made with them in exchange for their testimony.  Both of these

---

[337]Adair TT XV:2910-11.

prosecution witnesses received favorable disposition of charges brought against them in exchange for their testimony, they both affirmatively represented otherwise, and the prosecutor argued there were no deals.

Grounds 8(S) (PCRLF 59-60 & 174-76) of the amended Callaway County PCR motion pleaded that the prosecution failed to disclose sentencing consideration in exchange for helpful testimony which it had made with John Thomas.  Ground 8(U) (PCRLF 61-62 & 178-80) of the Callaway County amended motion pleaded analogous misconduct in respect to prosecution witness Dan Spurling.

The acts in question in the Callaway County trial were alleged to have occurred on June 11, 1995.  (DALF 382-84.)  The prosecution initiated the case against the petitioner by filing a complaint on July 21, 1995. (DALF 1.)  Trial commenced March 30, 1998.  (TT Vol. I at iii.)

On direct examination in the prosecution's case, John Thomas testified he was arrested on June 10, 1995, for delivering methamphetamine.  (TT 556.)  When Thomas testified, that sale charge was still pending, and he represented he had not made any kind of deal.  (TT 559.)

On crossexamination, Thomas admitted he was one of those who were arrested on June 10, 1995, for drug violations; he testified he was arrested for selling methamphetamine.  (TT 560.)  Thomas testified this drug charge had been pending from 1995, and was still pending when he testified in 1998.  (TT 563-64.)  During that time, except for four days he spent in jail, Thomas was out on bail.  (TT 561-64 & 574.)  Thomas attributed the fact he was out free for three years with a pending drug charge to the prosecutor having postponed his case.  (TT 573.)

Thomas reported he went to the petitioner's house on June *25*, 1995, to warn the petitioner that Billy Worley had snitched him out.  (TT 557.)  Thomas reported that he saw Hamilton's "stash box" at the petitioner's house.  (TT 558.)  Thomas claimed that when he asked the petitioner about the box, he told Thomas that the guy who owned the box would not need it anymore.  (TT 558.)  According to Thomas, the petitioner said that he thought that Hamilton had snitched on him and something had to be done.  (TT 558-59.)  Again according to Thomas, the petitioner made statements that Hamilton and Mr. Pinegar, the decedent in the Adair County case, needed to be taken care of.  (TT 580.)

The prosecutor called Dan Spurling in the guilt phase.  (TT 528.)
Spurling testified on direct and redirect that he had neither sought nor
received any deals.  (TT 528 & 552-53.)

Spurling testified on cross-examination that in approximately August
1995, he picked up Missouri charges for the sale of marijuana and pled
guilty a year later.  (TT 540-44.)  At that same time, Spurling also pled
guilty to child endangerment.  (TT544.)  Spurling testified he was originally
charged with assault and armed criminal action.  (TT 544-45.)  On these
cases, Spurling entered an open plea, *i.e.*, one in return for which the
prosecution did not make a public recommendation as to punishment.  (TT
545.)  Instead of going to prison for fifteen years, Spurling went to a
treatment program for 120 days.  (TT 546.)  Spurling stated that when he
completed the program that he was released on probation.  (TT 546.)

Spurling testified that the petitioner had admitted to him killing
Hamilton and Stacey Hodge.  (TT 553-54.)  According to Spurling, the
petitioner asked him what he should do with their bodies.  (TT 534.)
Spurling reported that when the petitioner made those admissions,
Spurling had observed blood on his shirt.  (TT 534.)  According to Spurling,
the petitioner suggested burning the bodies in Hamilton's old house (TT

534 & 549.)  Spurling reported that he saw the petitioner the next day, and the petitioner had a car stereo that belonged to Hamilton.  (TT 538.) Spurling represented that the same day the petitioner also said that "they were really going to freak out when they found those two."  (TT 538.)

In the prosecutor's initial guilt-phase argument, she told the jury there were "no deals with any of these witnesses."  (TT 802.)  In the prosecutor's guilt-phase rebuttal argument, she told the jury that the defense had not exposed any benefit anyone had gotten for their testimony. (TT 829.)  The prosecutor told the jury that the only deals that existed were "in the defense attorney's imagination."  (TT 830.)  The prosecutor told the jury that Spurling had not gotten any deal.  (TT 830-31.)  She repeatedly argued to the jury that the prosecution witnesses were not getting deals for their testimony.

At the state PCR evidentiary hearing, however, the petitioner's counsel presented evidence of John Thomas's Harrison County deal.  The following tables sets forth that evidence in summary form.

## TABLE 2

CHARGES AGAINST THOMAS THAT THE PROSECUTION DISMISSED
AFTER CHARGING PETITIONER WITH KILLING HAMILTON AND
HODGE IN THE CALLAWAY COUNTY CASE

| DATE | OCCURRENCE | EXHIBIT NUMBER OR RECORD CITATION |
|---|---|---|
| June 8, 1995 | Harrison County Complaint filed - charging Thomas with Class B felony sale of a controlled substance, methamphetamine, alleged to have occurred August 23, 1994, and made to a confidential informant | 17, 42 |
| February 27, 1998 | Docket entry: "Δ appears with counsel, Mr. Garry Allen, and waives preliminary hearing in open court. State appears by Ms. Chris Stallings, and state advises delay in prosecution due to Δ's participation as witness in companion proceedings.  Δ band over [sic] to Div. I and to appear at 9 a.m., March 17, 1998 and file to be certified to said division." | 42 |
| March 16, 1998 | Information filed against Thomas - same charge as complaint. | 17, 42 |
| March 31, 1998 | Thomas testifies for prosecution at the petitioner's Callaway trial. | Vol. I TT at iv. |
| April 27, 1998 | Amended Information decreasing charge of Thomas to Class C felony of an attempt to sell methamphetamine is filed and Thomas pleads guilty. | 17, 42 |
| September 10, 1998 | Docket entry: "State appears by Pros. Atty. Defendant appears in person by atty. PSI is considered and recommendations are made. Court suspends imposition of sentence and places defendant on probation for a period of five (5) years under supervision rules and regulations. The court[']s regular special conditions [illegible] #1-6 [illegible]" | 17,42 |

The Harrison County prosecutor dismissed six cases against Spurling

after he first charged the petitioner in the Hamilton and Hodge matters on

July 21, 1995 (DALF 1 ), and before the petitioner's trial commenced on

March 30, 1998.  Table 3 summarizes them.

<u>TABLE 3</u>

CHARGES AGAINST SPURLING THAT THE PROSECUTION
DISMISSED AFTER CHARGING PETITIONER WITH KILLING
HAMILTON AND HODGE IN THE CALLAWAY COUNTY CASE

| Cause No. | Offense Date | Charge Date | Dismissal Date | Charge | Exhibit No. |
|---|---|---|---|---|---|
| CR495-243FX | 11/4/95 | 11/6/95 (complaint); 2/6/96 (information) | 3/31/97 | unlawful use of a weapon, a Class D (information) Felony | 4, 11 |
| CR495-244FX | 11/4/95 | 11/6/95 (complaint) 2/6/96 (information) | 3/31/97 | Assault in the second degree, a class C felony | 5,10 |
| CR496-144FX | 3/19/96 | 4/[illegible]/96 (complaint) 6/10/96 (information) | 3/31/97 | Delivery of a controlled substance (morphine), a class A felony | 9,15 |
| CR496-194FX | 5/17/96 | 5/17/96 (complaint) 2/6/96 (information) | 9/5/96 | Assault in the second degree (pointing a firearm at Penny Whitt and her unborn child) | 7, 16 |
| CR496-344FX | 5/17/96 | [illegible] (complaint) 11/26/96 (information) | 3/31/97 | Armed Criminal Action | 14 |
| CR496-195FX | 5/17/96 | 5/17/96 (complaint) 6/27/96 (information) | 9/5/96 | Armed Criminal Action | 8 |

Exhibits 6 & 12 from the state PCR record reflect that Spurling also had some Harrison County charges disposed of, but not dismissed, before the petitioner's case was tried.  In April 1996 the Harrison County Prosecuting Attorney filed a complaint in CR496-143FX charging that on March 16, 1996, Spurling sold more than 5 grams of marijuana, a Class A felony; on June 10, 1996, the same prosecutor filed a one count information charging the same offense.  On January 27, 1997, Spurling pled open to one count of the Class B felony of sale of a controlled substance and the Class D felony of first degree endangering the welfare of a child.  This prosecutor had originally charged witness Spurling with two counts of Class A felony of sale of a controlled substance and first degree assault.  Based on "a plea recommendation," state actors reduced the drug charge to the Class B felony of sale of a controlled substance.  The prosecutor dismissed the assault charge.  On July 21, 1997, the state court placed Spurling on *probation*.  The record suggests that these were the same charges about which Spurling testified at trial.  In addition to these inducements to testify in a manner that would please the prosecution, Spurling received a $1000 "relocation" fee through George Martz on the day of the preliminary

- 102 -

hearing in the Callaway County case against the petitioner, but never "relocated."

The state death-sentencing judge "found" that the documentary exhibits offered on Thomas's and Spurling's cases failed to establish there were any undisclosed deals.  (PCRLF 523 & 531-32.)

At the state PCR evidentiary hearing, appointed counsel Turlington testified that she recalled that it was the prosecution's position and its witnesses' position that they had been given no deals.  (EHT 285-86.)  Ms. Turlington did not recall obtaining any information about cases involving Spurling other than the two he testified about in court.  (EHT 286.)  Ms. Turlington did not go to Harrison County to look for charges pending against Spurling.  (EHT 286.)

At the same hearing appointed counsel Davis testified that the prosecution continually represented that none of its witnesses were getting deals in exchange for testimony.  (EHT 341 & 344.)  Ms. Davis would have wanted to crossexamine and impeach Thomas about his case ultimately being amended from a class B felony to a class C felony with a probation recommendation.  (EHT 343.)  Davis was aware that while the prosecution's case against the petitioner was pending, Spurling had

pending files in Harrison County; but she was unaware that several of those files were dismissed.  (EHT 344-45.)  If she had known several of Spurling's cases had been dismissed, then she would have wanted to impeach him with those facts.  (EHT 345.)

The prosecution failed to disclose the deals Thomas and Spurling received in exchange for their testimony.  This failure denied the petitioner's trial counsel the opportunity to challenge these witnesses' credibility on cross-examination.

Once more, the evidence about Thomas was like the evidence in *Commonwealth v. Strong*.  Thomas was first charged on June 8, 1995.  The docket entry from February 27, 1998 indicates that the "state advises delay in prosecution due to A's participation as witness in companion proceedings."  This docket entry reflects that there was "an understanding" that Thomas would be treated with leniency.  While there is not evidence of "an ironclad agreement" there still was a duty under *Brady* to disclose the understanding.  After Thomas testified for the prosecution, the prosecution amended the charge against him from the class B felony of sale of a controlled substance to the class C felony of an attempted sale.

Thomas then received a sentence of probation rather than any term in the Department of Corrections.

Thomas received a very good deal. The Missouri Highway Patrol Confidential Narcotics Report, contained in the prosecutor's file, recounted that Confidential Informant 1352 had "purchased the methamphetamine from John Thomas in Thomas's shop near Thomas's residence for three hundred dollars ($300.00)." (Exh. 17 and page 1 of report.) The prosecutor's file also contained a handwritten statement signed by Billy Worley dated August 23, 1994, stating that he had purchased the methamphetamine from Thomas. (Exh. 17.) Worley testified as a penalty phase witness for the prosecution. (TT905-22.) The Highway Patrol's Forensic Laboratory Report, again contained in the prosecutor's file, identified what Thomas had sold as methamphetamine. (Exh. 17.) Thomas admitted during his PSI interview that he sold methamphetamine to an undercover agent. (Exh. 17; PSI at 1.) Even though Thomas actually sold methamphetamine he was allowed to plead guilty to an attempted sale and placed on probation.

Defense counsel would have wanted to impeach Thomas with this especially good disposition. Attacking Thomas's credibility was critical,

and under *Giglio* and *Napue* the petitioner was entitled to the undisclosed information to use for that purpose.

Spurling was the beneficiary of six cases against him being dismissed. Defense counsel would have wanted to impeach Spurling with these dismissals which were not disclosed, and *Giglio* and *Napue* required the disclosure.

The prosecution's failure to disclose these matters was especially harmful because both Thomas (TT 559) and Spurling (TT 528 & 552-53) testified they had no deals.[338]  Counsel was precluded from crossexamining Thomas and Spurling about the deals they received in violation of the petitioner's right to confront the witnesses against him which *Pointer* and *Davis* recognize.  The prejudice of the nondisclosures was exacerbated because the prosecutor repeatedly argued there were no deals. (TT 802, 829 & 830-31.)  Not only did the prosecutor fail to correct a false statement by one of its snitches, as in *Napue*, but trumpeted the lie as an officer of the

---

[338]*See Giglio* and *Napue*

court whom the jurors—and this Court—had a right to expect to behave as a "minister of justice."[339]

Petitioner's counsel in the state courts presented this ground in Point III in his brief on PCR appeal, *i.e.*, the appeal from the death-sentencing judge's denial of post-conviction relief concerning his Callaway County convictions and sentences.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

---

[339]Mo. S. Ct. R. 4-3.8 & official comment ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate").

*Constitutional Violations in Pretrial Proceedings and Rulings*

**V.        Respondent's custody over the petitioner violates the Constitution of the United States in that the state trial court erred in overruling the petitioner's motion to dismiss the charge of murder in the first degree, in that the element of "deliberation" in this offense is so poorly defined as to prevent the petitioner from obtaining proper notice of the charge against him and effective assistance of counsel, in derogation of his rights guaranteed by the Apprisal and Assistance of Counsel Clauses of the Sixth Amendment and in the Due Process Clause of the Fourteenth Amendment.**

Petitioner's counsel in the state courts presented this grievance in Point XXIII of the opening brief on direct appeal.

Prior to trial, defense counsel filed a motion to dismiss the charge of murder first degree.[340]  The trial judge overruled the motion.[341]  The motion contended that as construed by the Missouri courts and MAI-CR3D 313.02, the element of "deliberation" required under Mo. Rev. Stat. § 565.020 for

---

[340]Adair DALF II:149.

[341]Adair DALF II:306.

the offense of first-degree murder has lost meaning to the extent that it makes first-degree and second-degree murders indistinguishable.

The instruction, given in this case as Instruction 6,[342] says that deliberation "means cool reflection upon the matter for any length of time no matter how brief."  As the state supreme court defined it in *State v. Gray*:[343]  "To prove deliberation there must be some evidence that the defendant made a decision to kill the victim prior to the murder."

Under Mo. Rev. Stat. § 565.020.1, "A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter."  Mo. Rev. Stat. § 565.021.1 provides, "A person commits the crime of murder in the second degree if he . . . knowingly causes the death of another person . . . ."  Mo. Rev. Stat. § 562.016.3 defines the culpable mental state of "knowingly":

> A person "acts knowingly," or with knowledge,
>
> (1)   With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or

---

[342]Adair DALF IV:603.

[343]887 S.W.2d 369, 376 (Mo. 1994) (en banc).

(2)     With respect to a result of his conduct when
        he is aware that his conduct is practically
        certain to cause that result.

In common sense terms, it is difficult to see how a person could

perform an act which causes the death of another while aware of the nature

of his conduct and that his conduct is practically certain to cause the death

*without* having "made a decision to kill the victim prior to the murder."

Thus, the addition of the element of "deliberation," as defined by the state

supreme court and its applicable pattern jury instruction, does not impose

a higher burden on the prosecution in obtaining a conviction for first-

degree murder.

In *State v. Brown*[344] the Tennessee Supreme Court explained the

history of the element of "deliberation," noting that "deliberation requires

some period of reflection, during which the mind is 'free from the influence

of excitement or passion."[345]  WHARTON'S CRIMINAL LAW defines it as

requiring not some instantaneous spark or short-circuit in the brain, but a

"careful weighing" and a reflection on the consequences for the actor:

        [D]eliberation is the process of carefully weighing
        such matters as the wisdom of going ahead with the

---

[344]836 S.W.2d 530 (Tenn. 1992).

[345]*Id.* at 539 (citation omitted).

> proposed killing, the manner in which the killing
> will be accomplished, and the consequences which
> may be visited upon the killer if and when
> apprehended.  "Deliberation" is present if the
> thinking . . . is being done in such a cool mental
> state, under such circumstances, and for such a
> period of time as to permit a "careful weighing" of
> the proposed decision.[346]

When a jurisdiction qualifies the definition of "deliberation" or "cool

reflection" by the phrase "no matter how brief," it leaches the requirement

of "deliberation" of its significance.  Under those circumstances, a potential

defendant is denied notice of when his conduct will subject him to the

greater sanctions applicable to first-degree murder.  Notice of the nature

and cause of the accusation against an accused citizen is guaranteed both

by the Apprisal Clause of U.S. Const. amend. VI and by Mo. Const. art. I,

§ 18(a) (state constitutional requirement of notice of accusation).  By

binding itself to afford a person this procedural protection, the State of

Missouri created a liberty interest that its agents cannot deny an accused

citizen without thereby also violating the Due Process Clause of the

Fourteenth Amendment.[347]

---

[346]C. TORCIA, WHARTON'S CRIMINAL LAW § 140 (14th ed. 1979)

[347]*Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)..

**VI.      Respondent's custody over the petitioner violates the Constitution of the United States in that the state trial court overruled the petitioner's motion to dismiss the information due to unconstitutional discretion of the prosecutor, because the unreviewable discretion of the prosecutor in deciding whether to seek the death penalty renders the imposition of that penalty arbitrary and capricious in violation of the defendant's right to due process of law and to be free from cruel and unusual punishment as guaranteed by the Eighth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point XXV of the opening brief on direct appeal.

Petitioner filed a pretrial motion to dismiss the information due to the unconstitutional discretion of the prosecutor in seeking the death penalty, which the trial judge of course denied.[348]  Whereas courts have tinkered since 1972 to render the death-sentencing process fairer and more rational, the decision whether to seek the death penalty belongs to the prosecutor.  Given the resources the sovereign can bring to bear against any individual—especially against a member of the groups against whom

---

[348]Adair DALF II:215..

prosecutors usually choose to seek the death penalty—and the difficulty of

obtaining relief once the feeding frenzy has been initiated, the critical

decision resulting in arbitrariness is committed to a political actor who may

well care less about votes in the Supreme Court than he does about votes in

the trailer courts.  This discretion results in various types of disparities

between the cases in which the death penalty is sought and those in which

it is not.[349]

The Eighth Amendment requires that the sentence of death not be

imposed in an arbitrary or capricious manner.[350]  Because the statute

provides no guidance to a prosecutor in determining whether to seek the

death penalty, the danger of arbitrariness is great, and requires vacatur of

the sentences of death imposed here.

---

[349]See, e.g., M. LENZA ET AL., THE PREVAILING INJUSTICES IN THE APPLICATION OF THE DEATH PENALTY IN MISSOURI (1978-1996), http://www.umsl.edu/divisions/artscience/forlanglit/mbp/Lenza1.html.; SORENSEN AND WALLACE, *Capital Punishment in Missouri: Examining the Issue of Racial Disparity*, 13 BEHAVIORAL SCIENCES AND THE LAW 61, 75 (1995); J. GALLIHER & D. KEYS, Department of Sociology, University of Missouri–Columbia, REPORT TO THE OFFICE OF THE MISSOURI PUBLIC DEFENDER ON PROPORTIONALITY IN SENTENCING IN DEATH-ELIGIBLE CASES (1994) (Attachment B).

[350]*Furman v. Georgia,* 408 U.S. 238 (1972).

**VII.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court denied trial counsel's requests for relief because of an article published in the *Kirksville Daily Express*—the only local newspaper in the county of the trial—in the Sunday paper the day before trial, in that the article created a substantial and unjustifiable risk that the petitioner would be tried based on preconceptions and emotions rather than on the evidence adduced at trial, in violation of his rights to a fair and impartial jury and to due process of law as guaranteed by the Sixth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point XIV of the opening brief on direct appeal.

On the first day of jury selection, before voir dire began in the small town of Kirksville, Missouri, trial counsel brought to the trial judge's attention the fact that the local newspaper, the *Kirksville Daily Express*, had published a six-column, front-page article about the case the day before the trial, which was a Sunday.[351]  The trial judge was elected on a partisan ballot, and was from Edina, Missouri, in Knox County, *i.e.*, not from Adair

---

[351]Adair TT VI:981; Def. Exh. A.

County.  The article included information on the entomological findings connected with the case (bugs eating up the decedent drug-dealer's body), the autopsy report, and the two homicides of other drug-dealers with which the petitioner had then been charged and for which he was subsequently convicted.

Trial counsel immediately requested several forms of relief:  a change of venue, a continuance to allow for the development of evidence relevant to the change of venue and for a hearing on the issue, a continuance to allow the effect of the article to dissipate, or individual sequestered voir dire on the issue of publicity.[352]  The trial judge denied any relief, and went ahead with jury selection.[353]

When the first panel of prospective jurors was asked to raise their hands if they had seen the article in the Sunday paper, ninety percent of them did so.[354]  Trial counsel again moved for a change of venue or to quash the panel; the trial judge denied the motion.[355]  Asked as a group,

---

[352]Adair TT VI:985-86.

[353]Adair TT VI:1007.

[354]Adair TT VI:1038.

[355]Adair TT VI:1039.

most indicated that they could put aside any information received from the article, or other publicity about the case.[356]  Individually, they also stated that they could put any opinions aside.[357]

When the second panel of prospective jurors was questioned on the second day of trial, they were asked about not only the Sunday article but also another article which had been in the paper on the first day of jury selection.  The trial judge again denied trial counsel's request for sequestered voir dire.[358]  Forty-four of the panel members had read the article in the Sunday paper, and twenty-two had read the Monday article. Several of the jurors indicated that they had formed opinions based on the articles.

In response to a prosecutor's question, one prospective juror said—in the hearing of the rest of the panel—that "public hanging is going to be too good."[359]  Not only did the Assistant Attorney General doing voir dire at that point say he "appreciate[d]" the fact that the all this venire member

---

[356]Adair TT VI:1045.

[357]Adair TT VII:1207-32.

[358]Adair TT VII:1295-96.

[359]Adair TT VI:1122.

had to know about the case was that it involved drugs—when on the

prosecution's theory, the petitioner removed three drug-dealers from the

face of the earth, and was himself looking at life imprisonment without

eligibility for parole on a best-case scenario.  He used this response as a

springboard for his next question!  Trial counsel remained silent, and the

trial judge allowed the voir dire to continue in the polluted panel as if

nothing had happened.

Others venire members admitted that the article had caused them to

form opinions about the petitioner's guilt, but which only one admitted he

could not set aside.[360]  Ten of the fifteen jurors impaneled came from the

first panel.[361]

Because a person has a right to be tried in court rather than in the

media, the Due Process Clause will not tolerate a trial before a jury that is

tainted by pervasive pretrial publicity.  In *Rideau v. Louisiana*,[362] the

Supreme Court found that because the community had been given the

opportunity to try the defendant in the press, "Any subsequent court

[360]Adair TT VII:1298.

[361]Adair TT VI:1019-21 & X:1824.

[362]  373 U.S. 723, 726 (1966).

proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality."[363]  When the publicity is sufficiently pervasive, an accused citizen need not demonstrate actual prejudice by showing that biased jurors were seated in order to be entitled to relief.[364]

The Missouri Supreme Court's truncated analysis and rejection of this grievance is not only contrary to or an unreasonable application of *Rideau*, but also at odds with that of the Eleventh Circuit in *Coleman v. Kemp*.[365]  There, the court analyzed pretrial publicity in a small Georgia community and found that the denial of a change of venue required reversal.  Although the publicity in *Coleman* was more extensive, the publicity here had a great impact because of its timing.  The fact that the pretrial publicity contained the fact, inadmissible in the guilt phase, that the petitioner had been charged with other murders of drug dealers, made the prejudice especially egregious and the state actors' refusal to heed or

---

[363]*See also Harris v. Pulley*, 885 F.2d 1354 (9th Cir. 1985).

[364]*Cf. Snell v. Lockhart*, 14 F.3d 1289 (8th Cir. 1993) (prejudice not presumed where an extended "cooling off period" had occurred prior to defendant's trial).

[365]778 F.2d 1487 (11th Cir. 1985).

effectually recognize *Rideau* especially important in calling for federal-court relief.[366]

In *State v. Schneider*[367] the state supreme court affirmed the denial of relief, noting that Schneider's case was tried in a major metropolitan area (St. Louis), and that in the three months prior to trial, the coverage was limited to "routine pretrial matters."  Less than half of the jury panelists had heard of the offense.  In *State v. Crawford*[368] the court held that it was not error to deny a motion to *dismiss* based on pretrial publicity where the motion was based on three articles which the court characterized as "brief, conservative, objective reports, without bold, glaring headlines and are more or less buried on the front page as compared with other news articles."  The court further noted that the only relief requested was dismissal of the charge.

Here, on the contrary, the case was tried in a small community.  Very recent, prominent coverage focused on substantive aspects of the trial,

---

[366]*See United States v. Bloeth*, 313 F.2d 364 (2d Cir. 1963) (noting that among the inflammatory statements in the pretrial publicity were allegations that Mr. Bloeth had committed other crimes).

[367]736 S.W.2d 392 (Mo. 1987) (en banc)

[368]416 S.W.2d 178, 184 (Mo. 1967)

including potentially inflammatory and inadmissible evidence.  The majority of the prospective jurors had been exposed to the publicity.  The articles were prominent, and were neither brief nor "conservative, objective reports."  They were published immediately before the trial, in a newspaper that people would have been more likely to read because it arrived on a leisure day.  Under these circumstances, the facile denials of the jury panelists of any prejudice cannot be sufficient to overcome a presumption of bias.

Petitioner has a right, under the Due Process Clause, to be tried in court and not in the press.  The state denied him that right here.

From *Gregg v. Georgia*[369] forward, the Supreme Court has required "meaningful appellate review" as a means to ensure the death penalty is not imposed in an arbitrary or irrational manner.  In *Godfrey v. Georgia*[370] the Court discussed three independent criteria as indispensable to a finding that a particular capital sentencing scheme effectively and

---

[369]428 U.S. at 187 & 198.

[370]446 U.S. 420 (1979).

constitutionally channeled the sentencing authority's discretion.[371]  Among

these bedrock requirements was the availability of "meaningful appellate

review" of the "process for imposing a sentence of death."[372]  In *Zant v.

Stephens*[373] the Court explained that its original approval of Georgia's

capital sentencing procedure in *Gregg* had rested "primarily on two

features of the scheme: that the jury was required to find at least one valid

statutory aggravating circumstance and to identify it in writing, and that

the State Supreme Court reviewed the record of every death penalty

proceeding to determine whether the sentence was arbitrary or

disproportionate."[374]  In *Clemons v. Mississippi*,[375] it said, "this Court has

repeatedly emphasized that meaningful appellate review of death

sentences promotes reliability and consistency."[376]  In *Parker v. Dugger*,[377]

---

[371]*See also Coleman v. Mitchell*, 268 F.3d 417, 442-43 (6th Cir. 2002);  *Lance v. State*, 560 S.E.2d 663 (Ga. 2002).

[372]446 U.S. at 428.

[373]462 U.S. 862, 874, 876 (1983).

[374]*See also, Jordan v. State*, 786 So.2d 987 (Miss. 2001); *United States v. Mineral*, 176 F.Supp.2d 424 (W.D. Pa. 2001).

[375]494 U.S. 738, 749 (1990).

[376]*See also Black v. Bell*, 181 F.Supp.2d 832 (M.D. Tenn. 2001); *Payne v. Bell*, 194 F.Supp.2d 739 (W.D. Tenn. 2002).

the Court once again emphasized the importance of meaningful appellate review in determining the constitutionality of a death penalty scheme: "We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally."

In this case, the Missouri Supreme Court's refusal to grant relief was a failure the shoulder the burden the Supreme Court placed on state appellate courts when it limitedly authorized the resumption of the death penalty.

**VIII.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court denied a continuance where the defense team demonstrated that they were not prepared and were prejudiced by lack of time to prepare and by late disclosure of witnesses and evidence to be offered by the prosecution, in violation of the petitioner's rights to the effective assistance of counsel as guaranteed by the Sixth and Fourteenth Amendments.**

---

[377]498 U.S. 308, 321 (1991).

Petitioner's counsel in the state courts presented this grievance in Point XXI of the opening brief on direct appeal.

Trial in this case began on February 24, 1997.[378]  Trial counsel first brought to the trial judge's attention their need for a continuance in a motion filed January 30, 1997.[379]  In the January 30 motion, trial counsel noted that the judge had granted one previous continuance, and pleaded that they "cannot be prepared to try this case by February 24, 1997."  They timely advanced four sets of reasons:

(1)    The unexpected length of depositions and the difficulty of coordinating the schedules of the various counsel, arising from or complicated by the fact that the prosecution intended to introduce evidence of three homicides although the trial only concerned one and the distance (requiring over three hours driving time) between the deposition location and the office of trial counsel;

(2)    The need for the defense expert to review all depositions before preparing a final report;

(3)    The lack of investigative resources in the Central Capital Office of the Public Defender System to allow for locating and interviewing witnesses; and

(4)    The fact that one of the trial counsel was scheduled for another trial to begin February 10, 1997.

---

[378]Adair TT VI:979.

[379]Adair DALF III:358.

The motion enumerated eighteen depositions which had not yet been

taken.[380]  In a court appearance on January 30, 1997, one of the petitioner's

trial counsel discussed in detail the difficulties of the investigation and

discovery process in this complex case.  He noted that he had become

aware that day of two witnesses whom the prosecution had subpoenaed

but not yet endorsed.[381]  Notwithstanding these facts, the trial judge denied

the motion.[382]  Trial counsel raised the issue in the petitioner's motion for

new trial.[383]

They filed a second motion on February 3, 1997, which they argued at

a pretrial hearing on February 7, 1997.[384]  At that time, counsel informed

the court that on February 3 they had become aware for the first time of an

endorsement the prosecution had filed on January 28.[385]  The prosecution

was seeking to endorse sixteen additional guilt-phase witnesses and seven

---

[380]Adair DALF III:360-61.

[381]Adair TT IV:602.

[382]Adair TT IV:615, Adair DALF III:358.

[383]Adair DALF IV:642.

[384]Adair DALF III:378.

[385]Adair DALF III:372.

additional penalty-phase witnesses.  In their motion, trial counsel sought a continuance, or, in the alternative, the exclusion of the newly endorsed witnesses.  The elected trial judge denied both remedies.[386]

Trial counsel filed further motions for continuance on February 18 and 19, 1997.[387]  After incorporating the grounds previously presented, the February 18 motion presented the new grounds that a defense penalty-phase expert witness was unavailable for the month of March, that there had been a lack of continuity of counsel which limited the amount of time available for preparation, that a late-endorsed prosecution witness was incarcerated in Minnesota, that twenty-five named witnesses had not been interviewed, that some items of evidence had been disclosed by the prosecution as recently as February 13, 1997, and that trial counsel had not had time to "prepare instructions, read depositions . . . , prepare crossexamination or direct examination of witnesses, prepare opening or closing remarks, or prepare vain dire questions."[388]  The motion documented the diligence of counsel, including that fact that one attorney

---

[386]Adair TT IV:681.

[387]Adair DALF III:464 & 522.

[388]Adair DALF III:467.

had traveled approximately two thousand miles within the past two months in connection with trial preparation, and describing trial counsel's activities since the inception of the case.[389]

The February 19 motion requested the alternative remedies of a continuance on exclusion of the testimony of Billy Worley, Douglas Stallsworth, and Gerald Pankhurst, whom the prosecution had not endorsed in a timely manner.[390]

At the hearing on the February 18 motion, counsel added the information that a scheduled deposition could not be completed because of a conflict of interest of the witness's counsel.[391]  Counsel noted that the defense experts had not yet received all of the information they needed.[392] They informed the judge that one witness had failed to appear for a deposition the previous day, and that another had been avoiding service of a subpoena.[393]  There was also a discussion of certain audiotapes which had

---

[389]Adair DALF III:466 & 468-485.

[390]Adair DALF III:522.

[391]Adair TT IV:709.

[392]Adair TT IV:710.

[393]Adair TT IV:712.

not been disclosed.[394]  Trial counsel informed the judge of the difficulties

the defense had in meeting the prosecution's fiber analysis evidence.[395]

Trial counsel concluded:

> Mr. Middleton is going to be seriously prejudiced if
> we are forced to go to trial on the 24th.  His rights to
> confrontation are going to be badly denied, and his
> right to effective assistance of counsel is going to be
> badly denied.[396]

The trial judge again denied the motion.[397]

The judge made other rulings during trial that denied trial counsel's

renewed motion for continuance.  For example, he denied a continuance

because of lack of discovery concerning prosecution witnesses Stallsworth,

Worley and Parkhurst.[398]  He denied a continuance to investigate the effects

of pretrial publicity and the (then) possible prosecution inducements to

witness John Thomas—which would, if the state's agents had answered

---

[394]Adair TT IV:734-36.

[395]Adair TT IV:752-54.

[396]Adair TT IV:756.

[397]Adair TT IV:758-59.

[398]Adair TT V:898 & XII:2219-20 (Parkhurst).

truthfully, have disclosed to the trial judge the facts set forth in the state PCR action and this federal action.[399]

At the hearing on the motion for new trial, trial counsel documented, after the fact, the prejudice which had resulted from the denial of the continuance.  She noted that an unprepared attorney was forced to death qualify one panel of jurors, that counsel were hampered in their ability to crossexamine witnesses because they were forced to conduct depositions at night when they would otherwise be preparing for the next day's crossexamination.  Counsel further noted that the prosecutors chose not to participate in these depositions, so the prejudice to the defense was more evident.[400]  Having stalled the discovery before trial so that defense counsel had to do it after the beginning of trial, the prosecutors could concentrate on the next day's trial preparation because they already knew what the witnesses were supposed to say.

The Missouri appellate courts recognize and occasionally act on the reality that the federal constitutional rights to a fair trial and to the effective assistance of counsel may have as a consequence the right to a continuance

---

[399]Adair TT VI:1007.

[400]Adair TT XX:3801-06.

to allow counsel who are subjectively diligent the opportunity to do what they recognize as their duty even if the trial judge doesn't.  In *State v. Whitfield*[401] and *State v. Childers,*[402] the state supreme court and another Missouri appellate court held that it was error to refuse a continuance when the defense learned at the last minute that the prosecution intended to use an important piece of physical evidence.  These holdings were premised on the fact that in order to present an adequate defense, the defendant is entitled to an adequate opportunity to prepare.  In *State v. Blake*[403] the state supreme court reversed a ***driving while intoxicated*** conviction because of the denial of a continuance to remedy a late discovery violation.  Because this was a capital case, the petitioner's rights were entitled to stricter protection, not less.[404]  Less was what the petitioner got, and that is itself a federal constitutional violation.

The sheer volume of evidence, the distances involved, and the workloads of the petitioner's appointed counsel (hired and underfunded

---

[401]837 S.W.2d 503 (Mo. 1992) (en banc).

[402]852 S.W.2d 390 (Mo. Ct. App. E.D. 1993).

[403]620 S.W.2d 359 (Mo. 1981) (en banc).

[404]See pages 120-122,*supra*.

by the same state that seeks to kill him) were amply documented for the elected trial judge.  Trial counsel were hampered in planning their preparation by the fact that, although the prosecutors repeatedly asserted that the case had been pending for over a year, they chose to endorse some twenty witnesses just three weeks before trial.  Trial counsel were trying the case in Kirksville, 94 miles (none of it Interstate) from their home office in Columbia, where such resources and support staff as the state made available to them were kept.  Had they been in the location of their office, other personnel might have been available to assist with discovery and pretrial preparation.  In fact, the same attorneys who were trying the case were attempting pretrial discovery *during trial*.

While many of the cases cited above refer to discovery violations, the fundamental principle is the same.  A criminal defendant is entitled to more than a warm body with a law license to appear with him; he is entitled to the effective assistance of counsel.[405]  In *Burdine v. Johnson*[406] even the Fifth Circuit held that an accused citizen's "Sixth Amendment right to

---

[405]*See Wiggins, Williams, and Strickland, supra*; *see also Hadley v. Groose*, 97 F.3d 1131 (8th Cir. 1996) (ineffective assistance of counsel based on inadequate investigation and preparation).

[406]262 F.3d 336 (5th Cir.2001) (en banc), *cert. denied*, 535 U.S. 1120 (2002).

counsel is violated when [trial] counsel is repeatedly asleep through not insubstantial portions of the defendant's capital murder trial."  Even when, as in *Burdine*, counsel's failure to function as the "counsel" guaranteed by the Sixth and Fourteenth Amendment may be attributed to the bad habits of the attorney in question, the state assumes the risk that counsel will be constitutionally ineffective when it undertakes to punish a person through the criminal law.[407]  As shameful as it is for the agents of the state to preside at and participate in a trial when they can see that the accused citizen's lawyer is asleep, it is at least as egregious for them to render defense counsel ineffective by their own refusal to allow defense counsel to be as competent as they would be on their own accord.  The Supreme Court has held that ineffective assistance of counsel is still ineffective assistance of counsel when it is the fault of judges or prosecutors as opposed to defense attorneys. [408]  Although the prosecution's failure to disclose witnesses was

---

[407]*See Evitts v. Lucey*, 469 U.S. 387, 396 (1985) ("The constitutional mandate [guaranteeing effective assistance of counsel] is addressed to the action of the State in obtaining a criminal conviction through a procedure that fails to meet the standard of due process of law"), *cited and quoted*, *Coleman v. Thompson*, 501 U.S. 722, 754 (1991).  *See also Cuyler v. Sullivan*, 446 U.S. 335, 344-45 (1980) (principle applies even when, unlike here, the accused has counsel of their own choice rather than whomever the state chooses to appoint and underfund in light of the accused citizen's indigence).

[408]*See Geders v. United States*, 425 U.S. 80, 91 (1976); *Herring v. New York*, 422 U.S. 853, 865 (1975).

not quite as egregious as in the cases where evidence is disclosed at the beginning or during trial, the logistics of this case made it just as prejudicial.

Trial counsel did not rely exclusively on a request for a continuance to protect the petitioner's rights.  In the case of late-endorsed or disclosed witnesses and evidence, they suggested the alternative remedy of excluding the evidence from the prosecution's case.  In many instances, had the trial court granted this remedy, the prejudice would have been avoided.

At the hearing on the motion for new trial, a prosecutor made much of the fact that trial counsel had vigorously defended the petitioner. Despite these self-serving statements, the petitioner was entitled to effective assistance of counsel, not merely a certain quantum of activity.  In *State v. Johnson*[409] the Missouri Supreme Court held that one of this petitioner's trial counsel was ineffective for failing to seek a continuance in another case in order to obtain the testimony of a single expert witness. Missouri appellate courts have been willing to hold that appointed defense counsel risk contempt and jail sentences by refusing to participate in a trial

---

[409]968 S.W.2d 686, 699-702 (Mo. 1998) (en banc).

because they are unprepared.[410]  Holding that trial counsel must participate in a trial for which they know they are unprepared, and denying them continuances on the record they presented in this case, is using them as props for upholding death sentences.  That is not what the Sixth Amendment contemplates.

**IX.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted, over trial counsel's objection, evidence seized in the search of the petitioner's home (specifically "State's Exhibits" 11, 17, 29 & 59), in that the admission of this evidence violated the petitioner's right to be free of unreasonable searches and seizures and the exclusionary rule as guaranteed by the Fourth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point IV of the opening brief on direct appeal.

After Pinegar's body was discovered, officers obtained a warrant to search the petitioner's home.  The warrant was based on the affidavit of

---

[410]*State v. Harvey*, 692 S.W.2d 290 (Mo. 1985); *State ex rel. Picerno v. Mauer*, 920 S.W.2d 904 (Mo. Ct. App. W.D. 1996).

Gary Calvert, the Livingston County Sheriff.  The affidavit relied on information obtained from a "confidential informant":

> On June 27, 1995 the affiant spoke with a confidential informant who said on Sunday evening he was at John Middleton's residence in rural Spickard, Missouri. While at Middleton's residence he saw a pistol grip shotgun he new [sic] to belong to Alfred Pinagar [sic].  When he ask [sic] Middleton about the shotgun, Middleton said it was his now.  The informant also saw at Middleton's residence a white Chevy four wheel drive pick up. [sic] Middleton said the rear end had gone out of the truck near Ridgeway, Missouri on Friday, June 23, 1995 and he had been driving it by engaging the front axle. The informant said also present at Middleton's residence was his girlfriend Maggie, last name unknown. The informant said Middleton spoke of a thirty caliber carbine but he did not see it. The informant also saw illegal methamphetamine substance in a Casey's cup and Middleton had spoke [sic] of marijuana being hid outside.[411]

The affidavit includes other information about the Pinegar homicide and the activities of the petitioner and Maggie, but this paragraph is the only information suggesting that any evidence might be found at the petitioner's house.

The warrant issued described the premises to be searched as "A one story, single dwelling, wood frame home, cream in color, located west of

---

[411]State's Ex. 1 (Pretrial); Adair TT II:397.

Spickard, Missouri on Missouri Route C..."  It listed the items subject to

seizure as "one box 12 gauge paump [sic] shotgun with pistol grip; one box

of Federal Premium shotgun shells, size 12 ga., 00 buck, 2 ¾ inch, lot

number 233Ho38, bar code number 02946500193; four Federal Premium 12

ga., 00 buck shotgun shells; methamphetamine; and marijuana."  It directed

that "you are to search said residence."[412]  It did not direct the search of the

curtilage or any vehicles.

When the officers executed this warrant, they immediately arrested

the petitioner and Maggie Hodges.[413]  They then searched not only the

residence but also the curtilage.  While they were on the property to

execute the warrant, they observed a vehicle parked in the yard between

the driveway and the house which contained a leather jacket.[414]  They

removed and seized the jacket.[415]  They also discovered and seized a

broken sunglass lens in the driveway.[416]  Inside the house, they seized a bill

---

[412]State's Ex. 1 (Pretrial).

[413]Adair TT III:400.

[414]Adair TT III:404.

[415]Adair TT III:396.

[416]Adair TT III:446.

of sale for a pickup truck, and a list of local law enforcement officers and their radio frequencies were seized.[417]

Trial counsel filed a pretrial motion objecting to the admission of evidence seized in the search of the premises.[418]  After a pretrial hearing, the trial judge denied the motion as to all of the evidence discussed here.[419] At trial, the prosecution offered into evidence over renewed objection the leather jacket,[420] the sunglass lens,[421] and the bill of sale.[422]  (The list of frequencies, State's Ex. 59, was admitted without objection.[423]  "Plain error" review was, and remains, appropriate as to the admissibility of this evidence.[424])

---

[417]Adair TT III:423 & 434.

[418]Adair DALF II:315 & 323.

[419]Adair TT IV:582.

[420]State's Ex. 17, Adair TT XIV:2664-66.

[421]State's Ex. 11, Adair TT XIV:2675.

[422]State's Ex. 29, Adair TT XIV:2673.

[423]Adair TT XVI:3146.

[424]*See, e.g.*, *Burns v. Gammon*, 260 F.3d 892 897-98 (8th Cir. 2001) (*Burns II*) (where claim received "plain error" review in state appellate court due to trial counsel's failure to preserve it for plenary appellate review, it is subject to "plain error" review on federal habeas corpus).

The warrant to search the petitioner's home was invalid, and therefore the bill of sale, list of officer frequencies, sunglass lens, and jacket were inadmissible.  The Fourth Amendment, applied against the states through the Fourteenth, and even the Missouri statute enforcing this procedural right of the accused, require that before a search warrant may be issued, the magistrate must determine, based on the application and supporting affidavits, that probable cause for the search exists.  In determining probable cause, if the affidavit is based on information obtained by the affiant from another person, the affidavit must contain some indication that the information supplied by the third party is reliable. Where the informant is a named citizen, and the affidavit indicates the basis for that person's knowledge, the reliability is ordinarily held to be established.[425]  When, as here, the informant is unnamed, the Constitution requires more indicia of reliability.[426]  The test is whether, under all the circumstances including the credibility of the informer and the basis of his knowledge, there is probable cause.

---

[425]*Andresen v. Maryland*, 427 U.S. 463 (1976).

[426]*Illinois v. Gates*, 462 U.S. 213 (1983).

The affidavit does not meet this test.  The affidavit gives no evidence of the reliability of the confidential informer, and is vague as to the time of the observations he allegedly made.  The affidavit indicates that these observations were made on "Sunday," but does not specify which Sunday is meant.  Although some of the statements attributed by the informant to petitioner are corroborated elsewhere in the affidavit, this corroboration does not in any way connect to the petitioner's home.  Finally, there is no indication how the informant "new" the shotgun belonged to Pinegar.

Because of the sketchy nature of the information provided by the informant, the totality of the circumstances was insufficient for the magistrate to conclude that probable cause existed.  The information justifying the proposed search is so paltry that no reasonable law enforcement officer could have concluded it was sufficient.[427]  All evidence seized under the warrant or which is the fruit of the unlawful search must be suppressed.[428]

This includes the bill of sale for the white truck, State's Ex. 29, which was seized inside the house.  It also includes the leather jacket which was

---

[427]*See United States v. Leon*, 468 U.S. 897 (1984).

[428]*Wong Sun v. United States*, 371 U.S. 471 (1963).

seized from the vehicle in the yard, and the sunglass lens which was seized in the driveway.  These latter two items were only observed because the officers were on the property to conduct an unlawful search.[429]

Even if the search warrant were properly issued, the jacket and sunglass lens must be suppressed because the search exceeded the scope of the warrant.  It described the premises to be searched a "A one story, single dwelling, wood frame home" and directed the executing officer "to search said residence."  It also listed five specific items which were the object of the search.  No mention was made of any search of the yard of the property.

The Fourth Amendment applies to the "curtilage" of a person's residence.[430]  Thus, if the search exceeded the scope of the warrant, but involved the curtilage of the petitioner's residence, he is entitled to the protection of the Fourth Amendment for that curtilage.  In *United States v. Dunn*, the Supreme Court defined "curtilage" broadly enough to protect this petitioner in this instance:

---

[429]*See Payton v. New York*, 445 U.S. 573 (1980) (evidence seen in plain view after officers entered home unlawfully to effect a warrantless arrest inadmissible.)

[430]*United States v. Dunn*, 480 U.S. 294, 301 (1987).

> [C]urtilage questions should be resolved with
> particular reference to four factors: the proximity of
> the area claimed to be curtilage to the home,
> whether the area is included within an enclosure
> surrounding the home, the nature of the uses to
> which the area is put, and the steps taken by the
> resident to protect the area from observation by
> people passing by.

By this authoritative definition, the area where the jacket and sunglass lens
were found is a part of the curtilage of the petitioner's home.  The vehicle
where the jacket was found was parked between the driveway and the
house.  The lens was located in the driveway.  Although there is no fence,
the proximity of the area to the home clearly indicates that "it is so
intimately tied to the home itself that it should be placed under the home's
'umbrella' of Fourth Amendment protection."[431]  Even the law enforcement
officials involved in this case considered this to be a protected area:  several
days later, they obtained **another** warrant specifically directed to the
curtilage area and conducted another search of the premises.[432]

 Despite the fact that the officers were aware that the area around the
house was protected under the Fourth Amendment, and despite the  fact
that the search warrant did not authorize a search of that area, they

---

[431]*Id.*

[432]State's Ex. 7 (Pretrial).

- 140 -

searched it systematically.[433]  The sunglass lens and jacket were found as a result of this unlawful warrantless search, and therefore the trial court should have suppressed all of these materials, and a state appellate system which satisfies the demands of post-*Gregg* capital jurisprudence[434] would have reversed the conviction in light of the trial court's failure to exclude them.

Even if the search warrant was properly issued, the bill of sale and list of officer frequencies must be suppressed because they were not included in the items to be seized under the warrant.  To avoid generalized searches, a search warrant must describe or specify the items which are the subject of the search.[435]  The seizure of these documents exceeded the scope of the search warrant, the trial court should have suppressed them, and a state appellate system which satisfies the demands of post-*Gregg* capital

---

[433]Adair TT III:394.

[434]See pages 120-122.

[435]*See Arizona v. Hicks*, 480 U.S. 321 (1987) (improper for officers searching for victims or weapons to examine stereo components to record serial numbers).

jurisprudence[436] would have reversed the conviction in light of the trial

court's failure to exclude them.

Prejudice resulted from the admission of this evidence.

The leather jacket and sunglass lens were the main pieces of physical

evidence which connected the petitioner with the crime scene independent

of the testimony of any witness.  The jacket also corroborated the testimony

of Douglas Stallsworth that the petitioner told him he was missing fringe

from his leather jacket and feared he might have left it at the scene.[437]  The

bill of sale connected the petitioner with the pickup truck in an

unassailable way.  The list of frequencies bore heavily on the state's theory

of the petitioner's motive for the offense.  Because this case turned

primarily on circumstantial evidence, the prejudice from the erroneous

admission of this evidence was severe.  A state appellate system which

satisfies the demands of post-*Gregg* capital jurisprudence[438] would have

reversed the conviction in light of the trial court's failure to exclude them.

---

[436]See pages 120-122.

[437]Adair TT XV:2874.

[438]See pages 120-122.

**X.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted, over trial counsel's objections, "evidence" which state actors had "seized" in the search of the petitioner's pickup truck (specifically "State's Exhibit 21") and the testimony of Kathleen Green concerning this exhibit, because the admission of this thing violated the petitioner's right to be free of unreasonable searches and seizures and the exclusionary rule as guaranteed by the Fourth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point V of the opening brief on direct appeal.

During the course of the search of petitioner's home discussed in the previous ground for relief—which took several hours—some of the officers took a walk in the area.  In an open area across the road, they found petitioner's white Chevrolet 4x4 pickup truck.[439]  (The bill of sale discussed in the previous ground for relief showed that the truck had been transferred to the petitioner by Jack Lewis.)  The pickup was stuck in the mud, and had to be towed to be removed.[440]  Former Grundy County

---

[439]Adair TT III:448.

[440]Adair TT III:494.

Deputy Sheriff Michael Smith and Highway Patrol Corporal Bruce Clemonds testified that they noticed, looking through the window of the white pickup, an adhesive substance on the dashboard.[441]  They formed the impression that the adhesive might match a dashboard clock found near Pinegar's body.  Clemonds then opened the door of the truck and removed a section of the dash to which the adhesive was attached.[442]  Subsequently, a search warrant was obtained for the vehicle.[443]

The piece of dashboard from the pickup truck and a photograph of it were admitted into evidence.[444]  At trial, Kathleen Green, a trace evidence analyst, testified that the adhesive on the piece of dashboard and the clock appeared to match.[445]

The prosecution argued that the actions of the officer were proper because the adhesive was in plain view from the outside of the truck. Petitioner does not argue that the officers were not entitled to look into the

---

[441]Adair TT III:449 & 480.

[442]Adair TT III:481.

[443]Adair TT III:482.

[444]State's Ex. 21 & 54; Adair TT XIV:2685 & 1687.

[445]Adair TT XIV:2756-59.

truck from their position in the open field.  But they violated the Fourth

Amendment when they *entered* the truck without a search warrant.

Vehicles are covered by the Fourth Amendment.[446]  Courts have held that

exigent circumstances justifying a warrantless search are more likely to

exist with respect to automobiles than with respect to homes; but none of

those circumstances existed here.  Petitioner was under arrest, and the

truck was immovable.  There were no exigent circumstances excusing the

failure to obtain a warrant before seizing "evidence" from inside the truck.

The trial judge should have suppressed State's Ex. 21, the piece of

dashboard.  That would have rendered the resultant testimony of Kathleen

Green inadmissible.

Together with the items discussed in connection with the previous

ground for relief, the clock appeared to connect the petitioner with the

crime scene.  It was a primary part of the chain of evidence the prosecution

relied on to bolster its witnesses, whose credibility and even competence

were so shaky that even the prosecution must have considered them

inadequate to help them persuade the jury to kill the petitioner.  In light of

the weakness of the "human intelligence" facet of the prosecution's case,

---

[446]*South Dakota v. Opperman*, 428 U.S. 364 (1976).

this ersatz "circumstantial evidence" was prejudicial far beyond its

tendency in logic to "prove" anything but the prosecution's dissatisfaction

with Stallsworth, the witness from the mental hospital, and Thomas, the

witness whom it knew it had by the string.

**XI.      Respondent's custody over the petitioner violates the**

**Constitution of the United States in that the trial court overruled the**

**petitioner's motion to quash the petit jury panel because it excluded**

**persons under the age of twenty-one and over the age of eighteen, in that**

**the exclusion of these citizens from jury service deprived the petitioner**

**of a jury of his peers, in violation of the Sixth and Fourteenth**

**Amendments.**

Petitioner's counsel in the state courts presented this grievance in

Point XXIV of the opening brief on direct appeal.

Prior to trial, trial counsel filed, and the trial judge denied, a motion

seeking to quash the jury panel because—pursuant to Mo. Rev. Stat.

§ 494.425(1)—it excluded persons between the ages of eighteen and twenty-

one years.[447]

---

[447]Adair DALF I:42.

Young persons constitute a cognizable group, who have "cohesive, distinct attitudes on issues directly relevant to jury deliberations."[448]  A number of states have held that jurors cannot be systematically excluded on the basis of age.[449]

In *Duren v. Missouri*[450] the Supreme Court condemned the exclusion of females from the jury upon request without a showing of cause, holding that this violated the accused citizen's right to a fair cross-section of the community from which the jury is to be selected.  Because persons between the ages of 18 and 21 are functionally adults under Missouri law, their inclusion is required to provide him with a fair cross-section of the community.  These persons have the right as citizens of voting age to serve on juries, and the petitioner has the right to assert their interest under

---

[448]*See Hamling v. United States*, 418 U.S. 87 (1974); Zeigler, *Young Adults as a Cognizable Group in Jury Selection*, 76 MICH.L.REV. 1045 (1978), *cited with approval in Barber v. Ponte*, 772 F.2d 982, 988 (1st Cir. 1985).

[449]*See, e.g., Julian v. State*, 134 Ga. App. 92, 215 S.E.2d 496, 499 (1975); *People v. Fujita*, 43 Cal.App.3d 454, 117 Cal.Rptr. 757, 779 (1974), *cert. denied,* 421 U.S. 964 (1975); *Paciona v. Marshall*, 359 N.Y.S.2d 360, 362-63 (App. Div.), *aff'd,* 35 N.Y.2d 289 (1974)

[450]439 U.S. 357 (1979)

*Powers v. Ohio.*[451]  The right of young citizens to equal protection of the laws is denied when they are excluded from jury service.

The Missouri Supreme Court had previously ruled adversely to the petitioner's claim, most recently in *State v. Blankenship.*[452]  *Blankenship* relied on the earlier decision in *State ex rel. McNary v. Stussie*[453] to hold that that litigant's due-process rights were not violated by the exclusion of young persons from his jury.

That decision did not discuss the interest of young persons, as citizens, in being free from discrimination because of age.  That right is a matter of federal as well as state law.  Federal law prohibits age discrimination in education, housing, and employment.  Under Missouri law, the right against age discrimination is found in, among other places, Mo. Rev. Stat. § 213.055, which prohibits employment discrimination on the basis of age.  Thus, the citizens of Adair county between the ages of 18 and 21 had the right to be represented on jurors just as the petitioner had a right to a fair cross-section of the community for his jury.  Because the

---

[451]489 U.S. 400 (1991).

[452]830 S.W.2d 1 (Mo. 1992) (en banc)

[453]518 S.W.2d 650 (Mo. 1974)

petitioner's jury excluded these persons, the trial judge should have

granted trial counsel's timely motion, and the Missouri Supreme Court

should have reversed on the basis of direct-appeal counsel's point on

appeal.

**XII.       Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court sustained the prosecution's objection to trial counsel's questioning of prospective jurors, including venire members Gray and Bailey—who served on the jury—concerning their attitudes about the justice system and the death penalty, in violation of the petitioner's rights to a fair and impartial jury, to the effective assistance of counsel, and to due process of law as guaranteed by the Sixth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in

Point X of the opening brief on direct appeal.

The trial judge repeatedly denied trial counsel the right to ask the

panel in general, and specific prospective jurors, particular questions

concerning their feelings and attitudes.  Among the venire members whose

voir dire the trial judge limited by refusing trial counsel to ask questions

were Mr. Gray, who served as the foreman until the trial judge excused

him after the guilt phase (a separate ground for relief), and Mr. Bailey, who served on the jury throughout both phases.  Particular instances include whether venire member Maloney had feelings about the justice system,[454] whether venire member Gray had "feelings like Mr. Maloney,"[455] whether venire member Richardson thought "beyond a reasonable doubt" was the wrong standard,[456] whether venire member Lewis could imagine reasons other than guilt why a defendant would not testify,[457] whether the panel as a whole would prefer to have the defendant testify,[458] whether the panel as a whole thought beyond a reasonable doubt was too hard a burden for the state,[459] whether venire member Farmer had taken away any opinions about the justice system from prior jury service,[460] whether venire member

---

[454]Adair TT VI:1140-41

[455]Adair TT VI:1143-45

[456]Adair TT VI:1149.

[457]Adair TT VI:1160-61.

[458]Adair TT VI:1166-71.

[459]Adair TT VIII:1390.

[460]Adair TT VIII:1394.

Johnson had any opinions about people accused of crimes,[461] whether

venire member Bailey thought the death penalty was a just or potentially

just punishment,[462]  whether venire member Bailey's opinions about the

death penalty had changed over time,[463] whether venire member Gray

could give examples of instances where he thought the death penalty

would be just and where life without parole should not be considered,[464]

whether venire member Adams thought the death penalty was overused or

underused, and what evidence she would consider mitigating,[465] and

whether venire member Holt had held the same opinions about the death

penalty for a long time.[466]

    The state supreme court holds that errors in the limitation of voir dire

questions are cured if the questions were not directed to a prospective juror

---

[461]Adair TT VIII:1430.

[462]Adair TT VIII:1526-30.

[463]Adair TT VIII:1533.

[464]Adair TT VIII:1534-35.

[465]Adair TT VIII:1540-41.

[466]Adair TT VIII:1554.

who actually sat on the jury.[467]  Petitioner disagrees with this ruling, because the right to voir dire sufficient to allow the intelligent exercise of peremptory challenges exists apart from an objection to a particular venire member.  Refusal to consider claims that limitations on trial counsel's ability to conduct voir dire consistently with national norms for capital voir dire violate the Sixth, Eighth, and Fourteenth Amendments in the trial court is a separate constitutional violation, in that it abdicates the duty of state-court appellate review which the Supreme Court relied on in allowing the states to resume executions.[468]

In this case, this court does not necessarily need to consider this issue, because the trial judge sustained the prosecution's objections to the defense questions to juror Gray, who served as the foreman of the jury during the guilt phase, and to juror Bailey, who served on the jury in both phases. Trial counsel specifically raised the restrictions on questioning of juror Gray in the motion for new trial.[469]  The restriction of questioning of juror

---

[467]*State v. Skillicorn*, 944 S.W.2d 877 (Mo. 1997) (en banc).

[468]*See* pages 120-122.

[469]Adair DALF IV:644, ¶ 16.

Bailey was not raised in the motion for new trial, and should be reviewed for plain error on federal habeas corpus.[470]

The state supreme court held in *State v. Kreutzer*[471] that it is within the trial court's discretion to restrict open-ended questions to venire members. The court's reasoning in that opinion was flawed, because the opinion focused almost totally on the right of a defendant to a legally qualified panel of jurors.  The same court apparently softened the restrictions of *Kreutzer* **when the shoe was on the death prosecutor's foot** in *State v. Johnson*,[472] allowing the prosecutor to ask:  "[Is] there any member of this panel, just based on that, [who] would refuse to listen to and consider the testimony of these two witnesses because of *feelings* that the State should never make such agreements in return for testimony?"  In so holding, the court professed: "Voir dire is the 'most practical method for probing the minds of the prospective jurors to ascertain those who are fair and impartial and those who are biased and prejudiced.'  The State is entitled to

---

[470]*See Burns II, supra.*

[471]928 S.W.2d 854 (Mo. 1996) (en banc), *cert. denied*, 519 U.S. 1083 (1997).

[472]968 S.W.2d 686, 691 (Mo. 1998) (en banc).

elicit from prospective jurors any preconceived notions that they might have concerning the law."[473]

The right to remove categorically unqualified persons from the panel is important, but it is almost equally important to protect the right to exercise intelligently the peremptory challenges allowed by statute. *Kreutzer*'s restrictive language was a departure from previous holdings of the same court that uttered it, and that denied relief from the trial court's limitations on voir dire in this petitioner's case.  Especially when it has been inconsistently applied—especially in other than an even-handed manner—the state supreme court's limitations on the right to voir dire undercut any preclusive or even presumptive effects the the prosecution may later assert for its denial of relief in this case.  Like its refusal to recognize or enforce any right beyond the elimination of venire member even it would regard as unqualified, this limitation on voir dire is a separate constitutional violation.[474]

---

[473]*Id.*, quoting *State v. Hobby*, 706 S.W.2d 232, 233 (Mo. Ct. App. 1986) (emphasis supplied).

[474]*See* pages 120-122.

Petitioner as well as the prosecution is entitled to a fair opportunity to question prospective jurors about their preconceived notions about the law.  Here the trial judge engaged in some particularly disturbing practices that had the effect of limiting the openness of the venue.  In questioning the first panel, defense counsel elicited some thirty pages of responses from the panel concerning the issue of the defendant's failure to testify.[475]  For the next panel, the trial judge engaged in a long explanation of the defendant's right to remain silent and then asked:  "[R]ecognizing that you might have preference that somebody testify, even if you had that preference, could you set that aside and follow the law of the land?"[476]  No jurors responded.[477]  After doing this, he stopped trial counsel from asking: "Does anyone have any opinions or inferences that they would draw from the fact that the defendant did not testify?" or "Does anyone have an opinion that it would be difficult for them to judge a case on which the criminal defendant did not testify?" or "Do they have the opinion that they could not carry out their duty and sit as a juror and judge the case because

---

[475]Adair TT VI:1159-VII:1188.

[476]Adair TT VII:1335-37.

[477]Adair TT VII:1337.

of the fact that someone chose not to testify?"[478]  The trial judge did permit

trial counsel to ask whether anyone would think the defendant was guilty

because he did not testify, and then to follow up with a question about

whether the failure to testify would influence the panel member despite the

court's instruction.[479]  When the first question was asked, there were no

responses from the panel.[480]

Similarly, when the first group of jurors was questioned about the

death penalty by the defense, the panel's responses comprised some sixty

pages of transcript.[481]  After that panel was concluded, the trial court

announced, over objection by the defense, that he intended to explain the

death penalty law by asking five questions.[482]  When the court asked these

questions, there were no responses from the jury panel.[483]  Even when

---

[478]Adair TT VII:1459-60.

[479]Adair TT VII:1460.

[480]Adair TT VII:1461.

[481]Adair TT VIII:1510-69.

[482]Adair TT IX:1581.

[483]Adair TT IX:1589.

questioned by the defense, the panel's responses comprised only 16 pages.[484]

Far from encouraging the prospective jurors to be open and expansive about their attitudes, the trial judge's voir dire speeches were calculated to curtail their responses.  They certainly told them everything they needed to say to get to be on a death-qualified jury.  When such procedures are used, voir dire ceases to be the "most practical method for probing the minds of the prospective jurors" and becomes a method for restricting the ability of defense counsel to exercise their lawful function, when they—and not the beneficiary of the language quoted from *Johnson* or the de facto "hanging charge" during voir dire—are the only lawyers whose client has a constitutional right to fair and impartial jury, to the effective assistance of counsel, to be free from cruel and unusual punishments, or to due process of law.

---

[484]Adair TT IX:1608-24.

**XIII.        Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court sustained the prosecution's challenge for cause of venire members Vinyard and Schnirch because of their responses concerning the death penalty, in violation of the defendant's rights to a fair and impartial jury, to be from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point IX of the opening brief on direct appeal.

The pertinent parts of the questioning of these persons is as follows:

> Vinyard:    I'm not so sure there doesn't have to be extra weight besides beyond reasonable doubt of an aggravating circumstance for me to live with that— that I in my mind killed a man.

> Pros:  . . . do you think, knowing . . . , that you may be facing the possibility of the death penalty, do you think that during the guilt phase that that would affect the burden of proof that you place on the State regarding guilt or innocence?

> Vinyard:    It could.

> Pros: And if you were instructed that the State has to prove this aggravating circumstance beyond a reasonable doubt, you have feelings that you think those feelings might impair your ability to follow the letter of that law?

- 158 -

Def:   Mr. Vinyard, if you were asked to decide a murder in the first degree case and the first phase of that trial where the only question is the guilt or innocence of someone of murder in the first degree, and the Court instructed you that you have to apply the standard of beyond a reasonable doubt, do you think you could follow that instruction.

Vinyard:    After everything that we've gone through, I think I would have trouble with the reasonable doubt.[485]

Schnirch:    I really don't have an opinion, but if it was, like, on my shoulders, I'm not sure how well I would do to know that it was my decision one way or the other.

Schnirch:    I really couldn't say one way or the other.  I think I would have to go — Personally, if it were to go, you know, towards the death, I think I would—if I was the one, I think I would take it personally.  So, I think it would be difficult for me to make that decision.

Pros:  . . .  do you feel the impact on you would be so great, or you fear of the personal affect [sic] on you would be so great, that you would be substantially impaired when you have to go through that process—that it would kind of be so much luggage on you that you really would not be the best juror and could not do that?

Schnirch:    Probably, yes.

Schnirch:    I think I could go through the guilt or innocent phase . . .  I'm not really sure of the next phase, you know, as far as imprisonment for life or

---

[485]Adair TT VIII:1503 & 1525.

> death. It would be difficult for me either way, I
> believe.[486]

In *Wainwright v. Witt*[487] , the Supreme Court reiterated that an accused citizen facing the death penalty is entitled to have jurors on the panel who generally opposed the death penalty, provided that those jurors' views would not substantially prevent or impair the performance of their legal duties.

When the prosecution makes a challenge for cause based on a venire member's expressed opposition to the death penalty, the trial judge has "the difficult task of distinguishing between prospective jurors whose opposition to capital punishment will not allow them to apply the law or view the facts impartially and jurors who, though opposed to capital punishment, will nevertheless conscientiously apply the law to the facts adduced at trial."[488]  In this case, trial counsel moved to videotape voir dire, but the trial judge denied the motion—rolling the dice that any reviewing court would simply abdicate to his subjective perceptions about demeanor and other matter not written down in the transcript rather than allowing

---

[486]Adair TT IX:1640, 1646-47 & 1681.

[487]469 U.S. 412, 421 (1985).

[488]*Wainwright v. Witt*, 469 U.S. at 421.

for peer review with technology so elementary that every rural sheriff's office uses it to make movies of crime scenes when a few still photographs would do.[489]

The two jurors described above are clear examples of the danger that conscientious jurors will be excluded from the jury simply because they are forthright about their beliefs about the seriousness of the situation.  Under Missouri law, a juror may refuse to impose the death penalty for any reason or for no reason at all, as long as he or she is willing to consider it.[490] Thus, a prospective juror need not be able to conceive of circumstances in which he or she would impose death in order to serve, as long as he or she agrees to consider both possible punishments.  By the same token, Mr. Vinyard was not excludable because he would require more proof of aggravating circumstances to impose death.  Both Mr. Vinyard and Ms. Schnirch indicated that they would find considering the death penalty, and imposing it, very difficult.  But the totality of their answers indicates that their consciences would not substantially impair their ability to function as jurors.  The erroneous exclusion of a single prospective juror requires

---

[489]Adair TT I:155-160 & VI:1009.

[490]*State v. Petary*, 790 S.W.2d 243, 246 (Mo. banc 1970)(en banc).

reversal of the sentence.[491]   The trial judge's exclusion of either or both of these venire members violated the petitioner's rights to a fair and impartial jury, to be from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.[492]

---

[491]*Gray v. Mississippi*, 481 U.S. 648 (1987); *Davis v. Georgia*, 429 U.S. 122 (1976).

[492]Direct-appeal counsel invoked, as well, the Missouri Constitution.  (Adair DAOB 46.) Mo. Const. art. I, §§ 10, 18(a) & 21, purport to guarantee the same rights as the federal constitutional provisions that required reversal in the state supreme court and that require collateral relief here.  The State of Missouri thereby bound itself to provide these procedural protections to the rights of accused citizens, and its failure to accord them to the petitioner when they applied to his case was an independent federal constitutional violation.  *See, e.g., Wilkins v. Bowersox*, 933 F.Supp. 1496, 1516 (W.D.Mo.1996), *aff'd*, 145 F.3d 1006 (8th Cir. 1998), *cert. denied*, 512 U.S. 1094 (1999), *citing Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980); *Toney v. Gammon*, 79 F.3d 693, 699 (8th Cir. 1996).

**XIV.** **Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner was denied the effective assistance of counsel when trial counsel failed to move to strike for cause, or peremptorily strike, juror Holt, who testified she did not know whether she could consider mitigating evidence of substance abuse, because this omission denied the petitioner's rights to the effective assistance of counsel, freedom from cruel and unusual punishment, and due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent counsel would have so acted when their mitigation strategy was built around the petitioner's having suffered from a methamphetamine induced psychosis. Petitioner suffered obvious prejudice because the actual trial jury contained at least one person whom everyone in the courtroom knew could not take account of trial counsel's main theory of defense.**

Petitioner's counsel in the state courts presented this grievance in Point II of the opening brief on state PCR appeal. But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective

assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Ground 8(T)(m) of the amended state PCR motion pleaded that trial counsel were ineffective for failing to move to strike for cause or peremptorily remove juror Holt.[493]  The trial judge's junior colleague from the same circuit rejected this claim.

Trial counsel's voir dire of Ms. Holt referred to his previous voir dire of another venire member, Ms. Adams.  She had testified to her opinion that potentially mitigating evidence relating to someone's background could not be used to excuse conduct, and she would not attach a lot of weight to such evidence.[494]

The questioning of Ms. Holt then proceeded as follows:

> Q.    Is your views of the death penalty — do you have strong views on the death penalty?
>
> Q.    Ms. Adams?
>
> A.    Yeah.  We're talking in generalities right now, and we haven't discussed exactly what we're talking about. And I think sometimes we have to view what the circumstances are before we can say what we would choose to do.

---

[493]Adair PCRLF 80-82 & 161-62.

[494]Adair TT 1540-41.

Q.     We're not asking you to tell us what you would choose to do.  And I understand, it's frustrating. And I understand your frustration. And it's a difficult thing to question people about, but we need to have an idea of people's views on this issue.

A.     I understand.  You've had some really difficult questions and we're talking about something very serious.  It's a tremendous responsibility.  And to just say what I think I would do in that situation would be you can't really know until you view all of those things.  And there are certain situations, certain circumstances that don't warrant the death penalty and I think there are some that do.

Q.     Do you think — And I'll ask you some of the questions I've asked others about mitigating factors. Do you think if you were asked to evaluate mitigating factors, that mental health type of evidence is something you could consider?

A.     Yes.  I think I could, but I also think that sometimes it's used by lawyers to manipulate the system.  You know what I'm saying?  And I think that you have to really look at all the evidence and all of the things that are posed to you.  But I think, yes, there are some.  ***There are not as many as what we allow, I think.***

Q.     And it sounds like you're saying what you said earlier, that sometimes you need to really evaluate something before you can know how you can react?

A.     Yes.

- 165 -

Q.     Do you think if you were asked to consider, as mitigation, issues of drug and alcohol use, is that something you could consider?

A.     I can't say for sure.  I can't say — I can say "yes" but I just don't know.

Q.     Do you have an opinion now, as you sit here, about that type of evidence, if it were used to explain someone's actions?

MR. COSGROVE:     Object. May we approach?

THE COURT:     Yes, indeed.

[Proceedings at the bench:]

MR. COSGROVE:  This is seeking a commitment with regard to specific evidence in this case.  I can get up there and spend all day talking to them hypothetically, although, it really isn't hypothetical, about my evidence in aggravation and what they feel about that and what they'd consider.  And basically, we'd be taking a poll here, just as to who the best jurors are for our particular case.  And these jurors, I think, by their answers, are making my objections for me in explaining why these questions are improper.

THE COURT:     And explaining to each other, perhaps, as well.

MR. COSGROVE:     Yes.

MR. SLUSHER:   Judge, I think that the law gives us the right to explore the opinions of the venire people on these issues and that we have to be able to explore those opinions to exercise our strikes for cause and our pre-emptory [sic] challenges.

- 166 -

THE COURT:      What is the precise question here, Chris?

MR. SLUSHER:   Whether she can consider as a mitigating issue drug and alcohol use.  If a venire person cannot even consider —

THE COURT:      She's already answered that.  She said that she didn't know whether she could consider drug and alcohol.

MR. SLUSHER:   I think she's answered the question.

THE COURT:      The objection's sustained.  Repetitious.

MR. SLUSHER:   Well, I didn't ask it again.  I believe I asked it once.

THE COURT:      I thought you said that's what you were going to ask — what you're asking now.  What is the question you're asking now?

MR. SLUSHER:   That was the question I just asked.  I think we have a response from the juror.

THE COURT:      She answered.  She didn't know if she could consider that or not.[495]

Counsel did move to disqualify for cause Ms. Holt.[496]  Counsel

argued that Adams had said she would view mental-health evidence as an

_____

[495]Adair TT  1554-57 (emphasis supplied)..

[496]Adair TT 1574.

excuse.[497]  Counsel did not, however, move to strike Ms. Holt for cause.[498]

Ms. Holt served as a juror in both guilt and penalty phases.[499]

The penalty phase defense focused on presenting that as a result of

methamphetamine use the petitioner was suffering from a

methamphetamine psychosis.[500]  When PCR counsel Carter asked trial

counsel Slusher was asked why he had not stricken Ms. Holt, far from

coming up with some "strategic" excuse, he answered that *he was*

*surprised to see he had not*:

> Q.     My question to you is: Why — Why did you
> not move to strike Ms. Holt?
>
> A.     Again, you have to take the entire jury
> selection in context.  With respect to the answers
> that you referred me to here I would be surprised,
> and I guess I am surprised, that we would not have
> moved to strike this venire member, especially
> because of her agreement with Venire member
> Adams in light of the response that Venire member
> Adams gave that you've just referred me to.  I
> didn't see all of Adams['s] responses.

---

[497]Adair TT 1574.

[498]Adair TT 1572-77.

[499]Adair TT 2978-79 & 3793.

[500]Adair TT 3254-55, 3268-69, 3271, 3273-75, 3299, 3423-24, 3522-23, 3532-33, 3537-38, 3656-58, 3684-89, 3696-97 & 3705-09..

> She certainly provides answers that would concern
> me about her ability to act as a good defense venire
> member during the death penalty phase.[501]

On this claim the trial judge's junior colleague ruled that trial counsel were unable to recall why they failed to take the actions PCR counsel pleaded and trial counsel Slusher agreed he should have taken.[502]

The right to a jury trial guarantees a fair trial by a panel of impartial, "indifferent" jurors.[503]  Failure to strike a juror who cannot fairly serve constitutes ineffective assistance of counsel.[504]  When counsel fails to strike such a juror, the accused citizen is not required to show prejudice that there was a reasonable probability the outcome would have been different.[505]  It is one of the circumstances contemplated in *Strickland* in which prejudice is presumed.[506]

---

[501]Adair EHT 443.

[502]Adair PCRLF 298.

[503]*Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

[504]*Presley v. State*, 750 S.W.2d 602, 606-09 (Mo. Ct. App. S.D. 1988).

[505]*Id.* at 603-07.

[506]*Id.* at 607.  *See also McGurk v. Stenberg*, 163 F.3d 470, 474-75(8th Cir. 1998) (failure to inform defendant of his right to a jury trial constituted a structural error where prejudice was presumed and showing *Strickland* prejudice was not required).

Reasonably competent counsel under similar circumstances who were relying on a substance abuse mitigation theory would have moved to disqualify for cause or peremptorily struck Ms. Holt.  Ms. Holt did not know if she could consider the type of mitigation the petitioner offered. The totality of her answers indicated she could not.  She said there should not be as many mitigating circumstances as the law allows.[507]  She then said that she did not know if she could consider drug use,[508] implying that this was one of the factors she believed should not be allowed.  That reasonably competent counsel would have so acted is also highlighted by how counsel acted as to Ms. Adams who was on the same panel as Ms. Holt:[509]  trial counsel moved to disqualify Ms. Adams for cause.[510]  Because a juror who could not fairly serve was allowed to serve, the law presumes prejudice.

---

[507]Adair TT 1555.

[508]Adair TT 1555.

[509]Adair TT 1492.

[510]Adair TT 1574.

*Constitutional Violations in the Guilt Phase of the Trial*

XV.	Respondent's custody over the petitioner violates the Constitution of the United States in that the petitioner lacked the mental state required for a conviction for first-degree murder, and counsel failed to call in the guilt phase Drs. Murphy, Lipman, and Daniel to support the defense that the petitioner was not guilty by reason of mental disease or defect—or suffered from a diminished capacity—as each of these witnesses would have testified at trial in the guilt phase that he was psychotic at the time of the offenses so as to have supported these defenses.  This failure denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.  Reasonably competent counsel would have called these witnesses in the guilt phase to testify about his psychosis to support these defenses.  Petitioner suffered prejudice from the failure to call these witnesses because under the circumstances of the case there is a reasonable probability that but for this omission, he would not have been convicted of first degree murder or at minimum not sentenced to death.

Petitioner's counsel in the state courts presented this grievance in Point V of the opening brief on state PCR appeal. But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Ground 8(A) of the amended state PCR motion pleaded that trial counsel were ineffective for failing to investigate and to call Dr. Murphy to testify in the guilt phase that the petitioner was not guilty by reason of mental disease or defect.[511] Dr. Murphy would have provided evidence that would have allowed the jury to find that the petitioner was not responsible because he did not know and appreciate the nature, quality, or wrongfulness of his conduct as provided for in Mo. Rev. Stat. § 552.030.[512] Ground 8(F) pleaded that trial counsel failed to investigate and Dr. Murphy should have been called in the guilt phase to support a diminished capacity defense.[513]

---

[511]Adair PCRLF 40-42 & 137-39.

[512]Adair PCRLF 40-42 & 137-39.

[513]Adair PCRLF 46 & 146-47.

Ground 8(G) also pleaded that trial counsel failed to investigate and Dr. Lipman should have been called in guilt phase to support a diminished capacity defense.[514]

Ground 8(H) pleaded that trial counsel failed to investigate a psychiatrist, such as Dr. Daniel, who should have been called to testify in guilt.[515]  Dr. Daniel, or a similarly qualified psychiatrist, would have testified in guilt that the petitioner's mental diseases precluded him from knowing and appreciating the nature, quality, or wrongfulness of his actions under chapter 552.[516]

Trial counsel did not present any guilt-phase defense evidence.[517] The guilt-phase defense theory was the petitioner was not guilty, and the prosecution's evidence was not credible enough to satisfy its burden of proof.[518]

---

[514]Adair PCRLF 47-48 & 147-49.

[515]Adair PCRLF 48-49 & 149-53.

[516]Adair PCRLF 48-49 & 149-53.

[517]Adair TT 2891.

[518]Adair TT 2919-60.

In the penalty phase, counsel called neuropharmacologist Dr. Lipman.[519]  Dr. Lipman found that at the time of the alleged acts the petitioner was psychotic, delusional, and paranoid.[520]  Petitioner has organic brain damage.[521]  Petitioner 's symptomatology was a product of the combination of his brain damage and his methamphetamine use.[522]  Dr. Lipman recounted some of the behaviors that the petitioner had displayed which caused him to arrive at his conclusions about the petitioner's mental status.[523]  The types of symptoms the petitioner displayed were similar to those a schizophrenic would display and both should be treated with anti-psychotic drugs, but the petitioner's symptoms were caused by his methamphetamine use.[524]  Because of the petitioner's psychosis, delusions, and paranoia, he was substantially impaired as to his ability to appreciate

---

[519]Adair TT 3607.

[520]Adair TT 3656-58 & 3709.

[521]Adair TT 3655.

[522]Adair TT 3655-56 & 3709.

[523]Adair TT 3684-89, 3692-97 & 3703.

[524]Adair TT 3646 & 3705.

the criminality of his conduct and his ability to conform his conduct to the requirements of law.[525]

Dr. Murphy testified in the penalty phase that at the time of the alleged acts the petitioner was suffering from an organic paranoid thought disorder that causes him to be psychotic.[526]  That psychosis was caused by the petitioner's methamphetamine use.[527]  Petitioner is brain damaged.[528] Dr. Murphy believes that the petitioner suffers from an organic paranoid thought disorder independent of his methamphetamine use along with a mixed personality disorder that includes schizotypal behavior.[529] Petitioner has a thought disorder whose symptoms resemble those schizophrenics display.[530]  At the time Pinegar was killed, the petitioner was suffering from extreme mental or emotional disturbance.[531]  Petitioner

---

[525]Adair TT 3707-09.

[526]Adair TT 3423-24 & 3532-33.

[527]Adair TT 3423-24.

[528]Adair TT 3424-25.

[529]Adair TT 3425 & 3428-29.

[530]Adair TT 3504-05.

[531]Adair TT 3537-38.

was substantially impaired as to his ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law.[532]

Dr. Murphy is a clinical psychologist whose expertise includes evaluating for organic brain damage.[533]  Ms. Zembles contacted him to evaluate the petitioner.[534]  He evaluated the petitioner in November 1996, using psychological and neuropsychological testing.[535]

Dr. Murphy's testing found the petitioner suffers from an organic paranoid thought disorder.[536]  Petitioner has organic brain damage that is the product of chronic methamphetamine use.[537]  He is in a chronic methamphetamine paranoid state such that he is *continuously* and *chronically psychotic*.[538]  Dr. Murphy concluded the petitioner suffers from a mental disease or defect—organic paranoid thought disorder,

---

[532]Adair TT 3538.

[533]Ex.2 at 45-46.

[534]Ex.2 at 50.

[535]Ex.2 at 50.

[536]Ex.2 at 96-98.

[537]Ex.2 at 93-94.

[538]Ex.2 at 94-95.

methamphetamine induced, in a chronic fashion.[539]  At the time of this

offense, the petitioner was suffering from this mental disease or defect.[540]

At the time of the offense he could not form the requisite mental state for

first-degree murder; he was unable to coolly reflect.[541]  Petitioner acted

based on his delusions.[542]  His acts were fueled by his psychotic thought

disorder.[543]  Dr. Murphy concluded that the petitioner is not

schizophrenic.[544]  Individuals with test results similar to the petitioner's

often are successful with a not guilty by reason of insanity defense.[545]

Dr. Murphy also identified the petitioner as suffering from chronic

depression since he was a child.[546]  Dr. Murphy found the petitioner suffers

from a chronic anxiety disorder.[547]

---

[539]Ex.2 at 97-98.

[540]Ex.2 at 98.

[541]Ex.2 at 100-01.

[542]Ex.2 at 100-01.

[543]Ex.2 at 106-07.

[544]Ex.2 at 108.

[545]Ex.2 at 84-86.

[546]Ex.2 at 98-99.

Dr. Lipman explained that neuropharmacology deals with the effects of drugs on the brain and resulting behavior.[548]  Methamphetamine's effects on an individual varies according to whether usage was acute or chronic.[549]  Dr. Lipman testified that methamphetamine psychosis and schizophrenia are "behaviorally indistinguishable" but differ in their causes.[550]

Individuals who suffer from depression and who have used methamphetamine have an increased vulnerability for becoming a chronic user.[551]  Methamphetamine provides a temporary relief for depression and at one time was prescribed for depression.[552]  Dr. Lipman noted that the petitioner has experienced a life-long mood disorder, and thus, would have been predisposed to chronic methamphetamine abuse.[553]

---

[547]Ex.2 at 98-99.

[548]Ex.2 at 1.

[549]Ex.2 at 3-6.

[550]Ex.2 at 35-36.

[551]Ex.2 at 12-13.

[552]Ex.2 at 12.

[553]Ex.2 at 13.

Dr. Lipman indicated the symptoms that characterize paranoid schizophrenia are the same as those presented by someone suffering the effects of chronic methamphetamine use.[554]  Because the symptoms are the same for both, making a differential diagnosis can be difficult.[555] At the time of this offense, the petitioner was suffering from hallucinations and delusions.[556]

Dr. Lipman believed the petitioner could not have coolly reflected or deliberated because of his chronic state of methamphetamine psychosis, paranoia, and delusions.[557]  Dr. Lipman also believed the petitioner's ability to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired because of his noted mental infirmities.[558]

_____

[554]Ex.2 at 4-6.

[555]Ex.2 at 4-6 & 35-36.

[556]Ex.2 at 19-24.

[557]Ex.2 at 28-31.

[558]Ex.2 at 31-34.

Dr. Daniel is a psychiatrist who examined the petitioner during the 29.15 proceedings.[559]  He found that the petitioner suffers from a substance induced chronic psychosis or psychotic disorder with delusions and hallucinations caused by his methamphetamine use.[560]  At the time of this offense, the petitioner was suffering from that psychotic disorder and was experiencing delusions and hallucinations which constituted a mental disease or defect.[561]  Dr. Daniel would treat the petitioner with the same class of drugs prescribed to schizophrenics because his symptomatology is the same.[562]  Petitioner is not schizophrenic, but the clinical manifestations of his mental illness are the same as for schizophrenia.[563]  Petitioner's drug use has caused brain damage.[564]  His mental disease has multiple causes and is not solely the product of his drug use.[565]

---

[559]Adair EHT 26.

[560]Adair EHT 62-66.

[561]Adair EHT 62-66.

[562]Adair EHT 70 & 107.

[563]Adair EHT 92-93 & 107-08.

[564]Adair EHT 64.

[565]Adair EHT 71.

Petitioner has a family history that predisposed him to psychotic conditions.[566]  That family history included treatment his mother received for recurrent depression with psychotic features.[567]  He also concluded the petitioner suffers from a schizoid personality disorder.[568]  This disorder makes individuals more susceptible to psychotic disorder and substance abuse.[569]

At the time of the offense, the petitioner was suffering from a paranoid psychosis such that he was unable to coolly reflect and deliberate, and therefore, acted with a diminished capacity.[570]  Dr. Daniel was unable to form an opinion whether the petitioner was unable to know the nature, quality, and wrongfulness of his actions because he did not discuss the crime with Dr. Daniel.[571]  Dr. Daniel disagreed with Dr. Murphy's finding on the issue of the petitioner's ability to know the nature, quality, and

---

[566]Adair EHT 42-43.

[567]Adair EHT 42-43.

[568]Adair EHT 66, 68-69 & 105.

[569]Adair EHT 105.

[570]Adair EHT 71-72 & 96.

[571]Adair EHT 92 & 98-99.

wrongfulness of his actions, on the ground that Dr. Daniel did not have sufficient information to address that issue.[572]

Trial counsel Jan Zembles testified that Drs. Murphy and Lipman were not called in the guilt phase because doing so would have required admitting the petitioner committed the charged acts.[573]  She said these doctors were not called because the petitioner had opposed any defense that conceded he committed the acts alleged, and had indicated he would act out if such a defense was presented.[574]  Counsel deferred to the petitioner's wishes not to present a mental-health guilt-phase defense.[575]  Counsel was never confident that the petitioner understood that they were recommending a defense of not guilty by reason of mental disease or defect or diminished capacity.[576]  Ms. Zembles also testified that she felt calling Drs. Murphy and Lipman in guilt was not desirable because while Dr. Murphy believed the petitioner was not guilty by reason of mental disease

---

[572]Adair EHT 98-99.

[573]Adair EHT 562-63.

[574]Adair EHT 563.

[575]Adair EHT 564-65.

[576]Adair EHT 652 & 655-56.

or defect, Dr. Lipman was only able to find a diminished capacity.[577]

Counsel felt that while such a dichotomy was not inconsistent, it would not

be persuasive to the jury.[578]  Ms. Zembles did not believe it was necessary

to retain a psychiatrist because she had acquired all the information that

was needed as to the petitioner's mental status from Drs. Murphy and

Lipman and from the petitioner's acquaintances.[579]  One juror even asked

Ms. Zembles for Dr. Lipman's card because the juror had a child who had

drug problems and was so impressed by Dr. Lipman's testimony.[580]

   Mr. Slusher was aware that Drs. Murphy and Lipman believed that

the petitioner was psychotic at the time of the alleged acts.[581]  Mr. Slusher

was also aware that Drs. Lipman and Murphy had concluded the petitioner

was brain damaged.[582]  Drs. Murphy and Lipman would have supported a

---

[577]Adair EHT 563-64.

[578]Adair EHT 564.

[579]Adair EHT 566-67.

[580]Adair EHT 657.

[581]Adair EHT 362-64.

[582]Adair EHT 364 & 464.

diminished-capacity defense.[583]  Mr. Slusher agreed with the decision not to

call Drs. Lipman and Murphy during the guilt phase.[584]  Mr. Slusher did

not recall why a psychiatrist was not consulted.[585]  Mr. Slusher testified that

the team did not believe that testimony from Drs. Murphy and Lipman

could be adduced during guilt to support a chapter 552 defense because

the petitioner's mental-health problems resulted from voluntary

intoxication.[586]  Mr. Slusher felt that a not guilty by reason of mental

disease or defect defense was a difficult defense to present and to prove,

and was contrary to the petitioner's wishes.[587]  Mr. Slusher believed that a

defendant's requested choice of defense was to be considered, but was not

controlling.[588]  Mr. Slusher did believe that because the petitioner is brain-

---

[583]Adair EHT 366.

[584]Adair EHT 367.

[585]Adair EHT 367-68.

[586]Adair EHT 370-71, 455 & 457.

[587]Adair EHT 371.

[588]Adair EHT 371-72.

damaged, less weight should be given to his wishes on a theory of defense.[589]

Even the Missouri Supreme Court has recognized the importance of presenting defense theories that are consistent from guilt to penalty phases. In *State v. Harris*[590] defense counsel presented a guilt-phase defense of self-defense.  Mr. Harris's PCR motion pleaded that counsel was ineffective for failing to present mental-health evidence in the penalty phase that he had suffered from post-traumatic stress disorder (PTSD).[591]  In rejecting this claim, the state supreme court noted the guilt-phase defense theory presented can determine the evidence that can be "credibly" presented in the penalty phase.[592]  The state supreme court went on to reason:

> The injection of evidence of a mental disease or defect during the penalty phase risks alienating a jury that has consistently heard a different theory of the case during the guilt phase.  It is a reasonable strategic decision by trial counsel to avoid presenting a defense *du jour* to the jury.[593]

---

[589]Adair EHT 464.

[590]870 S.W.2d 798, 816 (Mo. 1994) (en banc).

[591]*Id.* at 815.

[592]*Id.* at 816.

[593]998 S.W.2d at 816.

Other courts have similarly emphasized the importance of counsel presenting consistent defense theories.[594]

Counsel failed to act as reasonably competent counsel under similar circumstances when they failed to present in guilt the mental-health evidence that could have been presented through Drs. Murphy, Lipman, and Daniel.  Presenting this evidence in the guilt phase was crucial to ensure there was consistency across the guilt and penalty phases.  Instead of consistency, the jury was presented with inherently contradictory theories in the guilt phase and the penalty phase.  The jury first heard the petitioner did not commit the Pinegar homicide, and then heard that his acts should be excused because of his mental impairments.  The jury never heard in the guilt phase the available evidence why the petitioner lacked the requisite mental state for first-degree murder, and was therefore not guilty of the offense.[595]

---

[594] *See, e.g.*, *Bland v. Califomia*, 20 F.3d 1469, 1479 (9th Cir. 1994), *overruled on other grounds*, *Schell v. Witek*, 218 F.3d 1017, 1024-25 (9th Cir. 2000) (accused citizen was denied his right to counsel in noncapital case when state court failed to furnish substitute counsel and prejudice occurred because counsel presented inconsistent theories on guilt issue); *Ross v. Kemp*, 393 S.E.2d 244, 245-46 (Ga. 1990) (counsel was ineffective in capital case where in guilt defendant was represented by two attorneys who each presented inconsistent defense theories—not guilty because the state failed to satisfy its burden, and a mental-illness defense).

[595] *See Dumas, supra.*

In light of all the facts and circumstances of the case, the petitioner suffered prejudice because there is a reasonable probability that the jury would not have found him guilty of first-degree murder if these witnesses had testified in the guilt phase.  Even if the jury had convicted the petitioner of first-degree murder, there is a reasonable probability that had the jurors heard this evidence in the guilt phase, at least one reasonable juror would have refused to sentence the petitioner to death because they would have heard a consistent, credible explanation for his behavior.[596]  By presenting inconsistent theories, counsel alienated the jurors so that they were unwilling to impose a life sentence.[597]

Trial counsel's strategy of denying the petitioner committed the offenses was not a reasonable strategy.[598]  Drs. Lipman and Murphy both believed the petitioner is subject to a chronic psychotic state.[599]  Because the petitioner is in a chronic psychotic state, it was counsel's responsibility to pursue a viable guilt-phase defense and not to acquiesce to the petitioner's

---

[596]*See Harris, supra.*

[597]*See Harris, supra.*

[598]*See McCarter, supra.*

[599]Ex.2 at 28-31 & 94-95.

insistence on a not-guilty theory.  That was particularly true where counsel were uncertain whether the petitioner understood counsel was recommending that he pursue a mental-health guilt defense.[600]  Mr. Slusher acknowledged that the petitioner's choice of defenses as to guilt were to be considered, but were not controlling,[601] and should be given less weight because he is brain damaged.[602]  Ms. Zembles's acting on her concern that Dr. Lipman was only able to find that the petitioner had acted with diminished capacity, when Dr. Murphy was able to go further and find the petitioner was not guilty by reason or mental disease or defect,[603] was unreasonable.  Both Drs. Lipman and Murphy would have supported a diminished-capacity defense.[604]  Even Ms. Zembies acknowledged that Drs. Murphy and Lipman's findings were not inconsistent.[605]  The finding of the trial-court judge who denied PCR on counsel's concern about contradictory

---

[600]Adair EHT 652 & 655-56.

[601]Adair EHT 37l-72.

[602]Adair EHT 464.

[603]Adair EHT 563-64.

[604]Adair EHT 366.

[605]Adair EHT 564.

opinions[606] was "clearly erroneous," and the petitioner was entitled to reversal even under the truncated appellate standard the Missouri courts apply when the constitutional rights of the accused are at stake.

The PCR judge in the trial court was "clearly erroneous" in relying on *State v. Nicklasson*[607] for the general proposition voluntary intoxication cannot excuse or negate a mental state.[608]  Mr. Slusher was also incorrect in believing a chapter 552 defense was unavailable because the petitioner had voluntarily ingested methamphetamine.[609]  Drs. Murphy and Lipman agreed that at the time of the offense the petitioner was in a psychotic state.[610]  What the PCR judge and Mr. Slusher ignored was that intoxication accompanied by ***psychosis*** can serve to excuse or negate a mental state.[611]  Because Drs. Murphy and Lipman would have testified the petitioner was

---

[606]Adair PCRLF 290.

[607]967 S.W.2d 596 (Mo 1998) (en banc)

[608]Adair PCRLF 289.

[609]Adair EHT 370-71, 455 & 457.

[610]Ex.2 at 19-24, 28-31, 97-98, 99-101 & 106-07.

[611]*See* Mo. Rev. Stat. § 552.010 (2000); *Joyce v. State*, 684 S.W.2d 553, 554-55 (Mo. Ct. App. E.D. 1984); *State v. Preston*, 673 S.W.2d 1, 8 (Mo.) (en banc), *cert. denied*, 469 U.S. 893 (1984); *State v. Williams*, 812 S.W.2d 518, 520 (Mo. Ct. App. E.D. 1991).

suffering from a psychosis at the time of the offense, this evidence would have been admissible.

Dr. Daniel did not diagnose the petitioner as suffering from schizophrenia.[612]  He did testify that he would treat the petitioner with the same class of drugs used to treat schizophrenics.[613]  Dr. Daniel, like Drs. Murphy and Lipman, found that the petitioner suffers chronic psychosis caused by methamphetamine use.[614]  Dr. Daniel did find that the petitioner suffers from an additional mental infirmity, schizoid personality disorder.[615]  Schizoid personality disorder is not the same as schizophrenia.[616]  In making this distinction, the mental-health experts were not making anything up, but following their professional norms as specifically and authoritatively set forth in the DSM IV.[617]  Dr. Daniel did

---

[612]Adair PCRLF 290.

[613]Adair EHT 70 & 107.

[614]Adair EHT 62-66.

[615]Adair EHT 66, 68-69 & 105.

[616]Adair EHT 92-93.

[617]American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 273-96 & 638-41 (4th ed. 1994) (DSM-IV).

not contradict Drs. Lipman and Murphy.[618]  Because Dr. Daniel's testimony

was consistent with Drs. Murphy's and Lipman's testimony, the credibility

of their testimony would have only been enhanced and the lack of mental

state defense made that much more credible.

Dr. Daniel did not contradict Drs. Lipman and Murphy on the issue

of whether the petitioner knew the wrongfulness of his conduct.[619]  Dr.

Daniel was only unable to form an opinion on that issue because the

petitioner did not discuss the crime with Dr. Daniel.[620]

There was no testimony by the petitioner's counsel to support the

finding that counsel was concerned that presenting a mental health defense

in guilt would have opened up introduction of evidence related to the

Callaway County homicide charges.[621]

The finding by the judge from the trial court who denied post-

conviction relief that presenting a mental health defense in the guilt phase

would not have been persuasive, and that because Dr. Lipman's testimony

---

[618]Adair PCRLF 290.

[619]Adair PCRLF 290-91.

[620]Adair EHT 92 & 98-99.

[621]Adair PCRLF 288-89.

did not persuade in the penalty phase, it would not have done so in the guilt phase is simply contrary to the evidence.  At least one juror who heard Dr. Lipman's testimony found it so compelling that the juror asked for Lipman's card.[622]  The test under *Wiggins v. Smith*, from the Supreme Court, is whether the evidence counsel did not present would have swayed one juror, not the whole jury.[623]  While the penalty verdict was unfavorable to the petitioner when the jury heard Dr. Lipman's testimony, that result may have been caused by counsel's presenting inherently contradictory defenses in the guilt and penalty phases.

Here, appointed counsel failed to act reasonably competently under the circumstances when they failed to present in the guilt phase the mental-health evidence that could have been presented through Drs. Murphy, Lipman, and Daniel.  Presenting this evidence in the guilt phase was crucial to insure there was consistency across the guilt and penalty phases. Instead of consistency, the jury was presented with inherently contradictory theories in the guilt and penalty phases:  "he's not my dog, he didn't bite you, and besides you kicked him first."  The jury first heard

---

[622]Adair EHT 657.

[623]123 S.Ct. at 2531.

- 192 -

that the petitioner did not do the shootings, and then heard that his acts should be excused because of his mental impairments.  The jury never heard in the guilt phase any evidence why the petitioner lacked the requisite mental state for first-degree murder.[624]  The failure to present this evidence was the result of lack of preparation.[625]

In light of all the facts and circumstances of the case, the petitioner suffered prejudice from the foregoing acts and omissions because there is a reasonable probability that the jury would not have found him guilty of first-degree murder if these witnesses had been called in the guilt phase. Even if the jury had convicted the petitioner of first-degree murder, there is a reasonable probability that if the jury had heard this evidence in the guilt phase, it would have returned a punishment verdict other than death because it would have heard a consistent, credible explanation for his behavior.  By presenting inconsistent theories, counsel alienated the jury so that it was unwilling to impose a sentence of life imprisonment without eligibility for parole.  That, at any rate, was the reasoning this state supreme court used in *Harris* to uphold a death sentence.

---

[624]*See Dumas, supra.*

[625]*Antwine v. Delo, supra.*

**XVI.        Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court allowed the prosecution to present the identification testimony of Wesley Booth over trial counsel's motion to suppress, because the pretrial identification procedures were so suggestive as to create an impermissible likelihood of misidentification, in violation of the Due Process Clause of the Fourteenth Amendment.**

Petitioner's counsel in the state courts presented this grievance as Point I of the opening brief on direct appeal.

At trial, the state presented testimony of Wesley Booth, a clerk at the Wal*Mart store in Bethany, Missouri, that petitioner, a woman, and another man had been in the store on the day of Pinegar's disappearance and had purchased ammunition.[626]  Evidence concerning Booth's identification of petitioner was presented in a pretrial hearing.  State's Exhibit 1a (Pretrial) is a transcript of Wesley Booth's testimony at petitioner's pretrial hearing.  Defendant's Exhibit A (Pretrial) is a transcript of Wesley Booth's pretrial deposition.

---

[626]Adair TT XI:2101.

- 194 -

The evidence at these hearings indicated that Booth was visited by officers on Tuesday, June 27, 1995, concerning a sale he had made on Friday, June 23, 1995.  He was asked whether he had sold any buckshot ammunition.[627]  On June 27, he was asked to describe the people to whom he had sold buckshot on the previous Friday.  He described one man as a white male, 5′11″ tall, 190 lb., with dark brown or black hair, wearing blue jeans and a white T-shirt.  The description was "very vague. I just really didn't know."[628]  He was shown an album of party photographs, but was unable to identify anyone as petitioner.[629]  Later that day, he was provided with more photographs.[630]  At the preliminary hearing, Booth testified that he told officers that one of the photos showed a person who looked somewhat like the person who had purchased the shells, but was not that person.[631]  At his deposition, he testified that he told the officers that he recognized someone as looking familiar and similar, but he did not think it

---

[627]State's Ex. 1A (Pretrial), p. 296; Defendant's Ex. A (Pretrial), p. 17.

[628]State's Ex. 1A (Pretrial), p. 308.

[629]State's Ex. 1A (Pretrial), p. 299.

[630]State's Ex. 1A (Pretrial), p. 300.

[631]State's Ex. 1A (Pretrial), p. 300.

was a photograph of his customer.[632]  Former Sheriff George Maitz testified

at trial that Booth was unable to identify petitioner from photographs.[633]

On the day of the preliminary hearing, some two months later, Booth

was told by prosecutors to go into the hall when petitioner, who was in

custody, was passing in handcuffs.[634]  He was asked to see if he could

identify the man who bought the shells.[635]  Only then did Booth say it was

the petitioner.[636]  He again identified the petitioner at trial.

Due process protects accused citizens against "evidence" derived

from unreliable identifications which are based on impermissibly

suggestive identification.[637]  When a state identification procedure is so

suggestive as to give rise to a "very substantial likelihood of irreparable

misidentification," it violates the Due Process Clause of the Fourteenth

---

[632]Defendant's Ex. A (Pretrial), pp. 52-54.

[633]Adair TT XI:2154.

[634]Adair TT III:464.

[635]Defendant's Ex. A (Pretrial), p. 69; Tr. Vol. III, p. 464.

[636]State's Ex. 1A (Pretrial), p. 304; Adair TT XI:2108.

[637]*United States v. Sanchez*, 988 F.2d 1384, 1389 (5th Cir. 1993).

Amendment and requires suppression of the "evidence."[638]  Petitioner is

entitled to relief if he establishes "(1) that the investigative procedures used

by the police were impermissibly suggestive, and then (2) that the

suggestive procedures made the identification at trial unreliable."[639]

Here, the pretrial identification procedure was obviously

impermissibly suggestive.  One-person "show-ups"—as opposed to

lineups or photospreads—are generally disfavored as identification

procedures.  Their use is sometimes justified when there is a need to

identify a suspect near the scene of a crime, but that situation does not exist

here.  It is hard to imagine a more suggestive confrontation than the one

here.  The showup here was an obvious attempt by the prosecution to

obtain an identification from a witness who had previously been unable to

identify the petitioner.

In a similar situation, the Eighth Circuit noted:

> By showing only Dailey's photograph to the
> witness, government counsel in effect said "This is

---

[638]*Kirby v. Illinois*, 406 U.S. 682 (1972); *State v. Hornbuckle*, 769 S.W.2d 89, 93 (Mo. 1989) (en banc).  *See also United States v. Ramsey*, 999 F.2d 348, 349 (8th Cir. 1993); *United States v. Triplett*, 104 F.3d 1074 (8th Cir. 1997).

[639]*State v. Vinson*, 800 S.W.2d 444, 446 (Mo. 1990) (en banc), *citing Manson v. Brathwaite*, 432 U.S. 98, 114 (1977).

the man." *Foster v. California*, 394 U.S. 440,
443 . . . (1969).  Our court has previously noted that
showing only a single suspect to the witness is "the
most suggestive and, therefore, the most
objectionable method of pretrial identification."
*United States v. Cook*, 464 F.2d 251, 253 (8th Cir.),
*cert. denied*, 409 U.S. 1011 . . . (1972).  The witness
also knew that the person pictured was awaiting
trial for the robbery attempt.  *United States v.
Gambrill*, . . . 449 F.2d 1148, 1153 (1971).  The
suggestiveness was exacerbated because the
photographic display was a month and a half after
the crime, and on the day of trial.  Therefore the
danger was great that the witness would remember
the person in the photograph more readily than the
appearance of the person who committed the crime.
*United States v. Cook, supra*, 464 F.2d at 254.  Nor was
there any necessity that the photograph of Dailey be
shown to the witness before trial.  See *Stovall v.
Denno*, 388 U.S. 293, 302 . . . (1967).[640]

As in *Dailey*, where the conviction was reversed because of the

cumulative effect of this and another error, the prosecutor in petitioner's

case displayed the petitioner before Booth prior to the preliminary hearing

in order to obtain an identification at that hearing.  The hearing itself

occurred some months after the event concerning which the witness

testified.

---

[640]*United States v. Dailey*, 524 F.2d 911, 914 (8th Cir. 1975).

This impermissibly suggestive procedure tainted the witness's

identification of petitioner at trial.

> Factors to be considered in determining whether
> identification testimony is sufficiently reliable that
> admittance at trial will not violate defendant's right
> to due process include: (1) the opportunity of the
> witness to view the criminal at the time of the
> crime; (2) the witness' degree of attention, (3) the
> accuracy of the witness' prior description of the
> criminal, (4) the degree of certainty demonstrated
> by the witness at the confrontation and (5) the
> length of time between the crime and the
> confrontation.  *Neil v. Biggers*, 409 U.S. 188,
> 199 . . . (1972) . . . [641]

An examination of these factors in this case leads to the inescapable

conclusion that the trial identification was tainted.  First, at the time of the

ammunition purchase, no crime was evident and Booth had no particular

reason to look at or remember the petitioner.  Thus, the first two factors

militate against an independent basis for the identification.  Booth's

description of the petitioner was not shown to be accurate, and was in any

event extremely general.  Prior to the confrontation, Booth had on two

occasions been shown photographs of the petitioner and had failed to

---

[641]*State v. Littleton*, 649 S.W.2d 225, 227 (Mo. 1983) (en banc).

make an identification.  The highly suggestive confrontation occurred two months after Booth's sale to the petitioner.

Applying the *Neil v. Biggers* factors requires a determination that Booth's trial testimony was tainted by the suggestive pretrial procedure and should have been excluded.  Its admission violated petitioner's rights under the Due Process Clause of the Fourteenth Amendment.  The state courts' failure to vindicate these rights "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."[642]

**XVII.     Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted a crime scene videotape and a still photograph showing the decedent's partially decomposed body, and actual fragments of his bone and teeth, because their probative value was marginal, and their prejudicial impact was extremely high—thus depriving the petitioner of his right to a fair trial in violation of the Sixth and Fourteenth Amendments.**

---

[642]123 S.Ct. at 2534-37.

Petitioner's counsel in the state courts divided components of this grievance between Points XI & XII of the opening brief on direct appeal.

Over petitioner's objection, the elected trial judge permitted the playing of a crime scene videotape showing the state of Alfred Pinegar's partially decomposed body and various items of evidence collected around it.[643]  He also overruled trial counsel's objection to State's Exhibit 62, a photograph of Pinegar's body.  Also over objection, he admitted into evidence States Ex. 44, 44A and 45, which were fragments of Pinegar's jaw and teeth found with his body.[644]

Gruesomeness of photographic and physical evidence is not an insurmountable obstacle to its admission **when it is relevant to an issue in the case**.  "Such photographs should not be admitted where their sole purpose is to arouse the emotions of the jury and to prejudice the defendant."  *State v. Wood*, 596 S.W.2d 394 at para. 50 (Mo. 1980) (en banc), *cert. denied*, 449 U.S. 876 (1981).  The situation here is similar to that in *State v. Floyd*, 360 S.W.2d 630 (Mo. 1962), where the admission of photographs of a decomposed body was held error.  As in *Floyd*, the videotape here proved

---

[643]Adair DALF III:409; Adair TT X:1939-44, XIII:2442-45.

[644]Adair TT XIII:2460-62.

nothing of any consequence.  A review of the tape reveals that it does not show the wounds inflicted on Pinegar in any way intelligible to the jury. Nor does it show the relative location of the body, landmarks around it, and other pieces of evidence.  The gruesomeness of the videotape is substantial.  Numerous insects can be seen crawling around the body.  In fact, the victim's head is so distorted by insects that it appears to be missing.  The effect of the gruesome videotape was reinforced by the photograph, State's Exhibit 62.  The photograph shows Pinegar's upper torso, with the head obscured by insects and the body black and decomposed.  No wounds are visible.

Reflection on one's own experience at viewing representations of gruesome scenes will suggest that the impact is greater when it is in motion, as it was in the videotape offered here.  Its probative value was marginal, and is outweighed by its prejudicial impact.

Similarly, the pieces of bone and teeth taught the jury nothing. Expert testimony indicated that some of Pinegar's teeth were knocked out as a result of a gunshot wound.[645]  But the doctor did not identify these exhibits or use them in her testimony.  The prosecution used these before

---

[645]Adair TT XIII:2417-18.

the jury simply as gruesome artifacts of the crime, and they served no purpose other than to inflame the wrath of the jurors.

A reviewing court is required to perform a balancing of the probative value and prejudicial impact of the evidence.[646]

Cases approving the admission of gruesome photographs typically indicate the contested issue to which the photographs are relevant.  For example, in *State v. Clements*[647] the court found the photographs admissible because the nature of the injuries inflicted by a baseball bat was probative on the issue of deliberation.[648]  In *State v. Day*[649] the court approved the admission of photographs of the assault victim taken at the hospital to prove that he had sustained serious physical injury.  Here, however, the videotape did not enhance the prosecution's proof of any relevant fact.

---

[646]*See, e.g., State v. Pinkus*, 550 S.W.2d 829, 837-38 (Mo. Ct. App. S.D. 1977) ("We agree that a photograph of the victim in a homicide case may be so gruesome and inflammatory that its probative value is out weighed by the prejudicial effect it has on the jury").  *See also Trejo v. Keller Industries, Inc.*, 829 S.W.2d 593 (Mo. Ct. App. W.D. 1992).

[647]849 S.W.2d 640 (Mo. Ct. App. 1993)

[648]*See also State v. Sempsrott*, 587 S.W.2d 630 (Mo. Ct. App. 1979).

[649]866 S.W.2d 491 (Mo. Ct. App. 1993)

In *State v. Stevenson*[650] the court found that autopsy photographs showing the bullet track within the body were unduly prejudicial and should not have been admitted.  The court declined to reverse for only two reasons:  the judge, not the jury, assessed punishment, and the evidence of guilt was overwhelming.  Neither of these factors militate against reversal here.  The jury not only assessed punishment, it assessed the ultimate penalty after being specifically instructed that it could consider any evidence offered in the first phase in assessing punishment.  The evidence of the petitioner's guilt was far from overwhelming, depending as it did on circumstantial evidence and a bipolar jailhouse snitch writted out from a mental hospital.  It is true that reversals for error in the admission of photographic evidence are rare.  This case crosses the line between gruesome photographs offered for a proper purpose and those offered simply to inflame the jury.  Because of the prejudicial effect of this improperly admitted evidence, habeas corpus relief is required.

Allowing prosecutors to place "evidence" such as this in front of juries in death-penalty cases would break the promise of rationality that the Supreme Court made when it authorized the states and the federal

---

[650]852 S.W.2d 858 (Mo. Ct. App. 1993)

government to resume executions after 1972.[651]  Could anyone seriously suggest that providing no effective check on the introduction of inflammatory matter which had nothing to do with the facts at issue in the case was providing this petitioner the "scrupulous fairness and rationality that the Constitution requires at every step in the capital sentencing process"?[652]  This ground for relief shows why federal habeas corpus scrutiny is necessary to make capital litigation anything but window-dressing for pandering politicians.

---

[651]See pages 120-122, *supra.*

[652]*Gregg v. Georgia*, 428 U.S. at 187, *citing Powell v. Alabama,* 287 U.S. at 71.

XVIII.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted "expert opinion" evidence to the effect that fragments of leather, fragments of sunglasses, and a dashboard clock matched other evidence, because these questions were not a proper subject for expert opinion testimony, and the attempt to qualify it as such impermissibly bolstered the testimony in violation of the petitioner's rights to a fair trial, to the confrontation of witnesses, and to due process of law as guaranteed by the Sixth and Fourteenth Amendments.

Petitioner's counsel in the state courts presented this grievance in Point XIII of the opening brief on direct appeal.

Over defense objection, Kathleen Green, a "trace evidence analyst," testified concerning certain pieces of physical evidence.  She testified that a leather fringe fragment found at the edge of the road in the area where Pinegar's body was found could have come from a leather coat found in a vehicle at petitioner's home.  She testified that fragments of sunglasses found near Pinegar's body matched other fragments found in a search of petitioner's home.  Finally, she testified that torn adhesive on a dashboard clock found in the area where Pinegar's body was found matched the

adhesive on the dashboard of a pickup truck found near petitioner's home.[653]

The Missouri Supreme Court set forth the correct general premise governing this ground for relief when it said:

> Generally, expert testimony is admissible if it is clear that the subject of such testimony is one upon which the jurors, for want of experience or knowledge, would otherwise be incapable of drawing a proper conclusion from the facts in evidence.[654]

In the instant case, however, the gist of this witness's testimony was to say that certain common items were like other common items.  Allowing the prosecution—which has at its disposal the resources of a state of approximately five million people—so to bolster its case invades the province of the jury, which is protected by state and federal constitutional provisions alike.  To do so in a capital case depreciates from the

---

[653]Adair TT XIV:2748-59.

[654]*State v. Lawhorn*, 762 S.W.2d 820, 822 (Mo. 1988) (en banc).

"scrupulous fairness and rationality that the Constitution requires at every step in the capital sentencing process" to which the petitioner is entitled.[655]

XIX.        **Respondent's custody over the petitioner violates the Constitution of the United States in that the prosecutor's closing argument, to which trial counsel objected, misstated the evidence and drew impermissible inferences in violation of the petitioner's right to due process of law.**

Petitioner's counsel in the state courts presented this grievance in Point III of the opening brief on direct appeal.

The prosecution had a difficult problem in this case. Evidence of exactly how Al Pinegar reached the place where he died was unavailable, and evidence of the circumstances of his death was limited to the sketchy testimony of Bipolar Doug Stallsworth.  Faced with the need to make the events vivid for the jury in closing argument, the prosecutor resorted to wholesale confabulation.  He argued:

> John Middleton is driving and there is someone in the middle seat.  *Al Pinegar is leaning down on the passenger side. ... And he is leaning down and he's in that truck,* and the reason he is leaning down is

---

[655]*Gregg v. Georgia*, 428 U.S. at 187, *citing Powell v. Alabama,* 287 U.S. at 71.

because he is breaking his promise that he made to Prissy . . .

*On their way to Ridgeway Lake, they are traveling down a gravel road, and at about that time... Maggie and the defendant decide it is the right time, a good time to get married—to get married and be bonded by the excitement and the adrenaline and the power of murder.  John is driving, Maggie is in the middle, Al is on the passenger side, and Maggie strikes Mr. Pine gar.  He is sitting as a passenger, his left lens if shattered.  She grabs his gun and as she drags it towards the driver, the barrel knocks off the clock.  Mr. Middleton slams on the brakes and as Maggie gives John Al's shot gun, Al gets out of the truck, bringing the clock and the french fries with him, and he starts high-tailing it.* He's running *and the defendant gets out of his vehicle,* and he shoots him in the back with a shot gun.  *He's running and* it's a transiential wound to the upper right shoulder, it's the bird shot, the number five—*ammunition that Al previously had in his gun... The defendant pumps the gun again, Mr. Pinegar is staggering, he pulls the trigger and there's no more in it. So he grabs the box of Federal double ought buck, opens it up, he's outside the truck, takes it all out, drops the box, and loads the weapon.* And he goes to Mr. Pinegar and shoots him straight on... *and Mr. Pinegar goes down.*

*Mr. Middleton puts down the shot gun and drags Mr. Pine gar under the fence. And he realizes that Mr. Pine gar is still alive, so he steps back through between the wires of the barbed wire fence, and as he raises up from having done that, he snags his jacket, the leather fringe of his coat, and... that piece of leather falls right on the side of the road* where you saw it in the photographs.

> *He retrieves the shot gun and he goes back and he shoots*
> *Mr. Pine gar at pointblank range in the left side of his*
> *face.*[656]

There was no direct evidence at trial as to any of the statements in italics above.  What sounds like an attempt at lyrics to a country song was deemed a "reasonable inference" from the facts.  Testimony was offered that Prissy Hobbs saw the petitioner and Maggie in a truck as she drove towards her house,[657] that Maggie told Gerald Parkhurst that she and the petitioner had gotten married jumping out of a plane,[658] that a piece of leather fringe was found at the side of the road,[659] and that the petitioner told Stallsworth "[w]hen [the petitioner] raised the shot gun, [Pinegar] started running, and he shot him twice in the back, and once in the face and dumped him over a fence."[660]

A Missouri appellate court set forth the applicable law on this ground in *State v. Nelson*:

---

[656]Adair TT XV:2904-06.

[657]Adair TT XI:2056.

[658]Adair TT XII:2255.

[659]Adair TT XIII:2387.

[660]Adair TT XV:2888.

> A prosecutor's arguing facts outside the record is improper and highly prejudicial.  *State v. Storey*, 901 S.W.2d 886, 900 (Mo. banc 1995).  Assertions of fact not proven amount to unsworn testimony by the prosecutor.  Id. at 901.  "Efforts to inflame the passions and prejudices of the jury by reference to facts outside the record are condemned by ABA standards and constitute unprofessional conduct.  The prosecutor may prosecute with vigor and strike blows but he is not at liberty to strike foul ones." *State v. Burnfin*, 771 S.W.2d 908, 912 (Mo.App.1989).[661]

In *Nelson*, the court reversed the conviction because the prosecutor's argument misstated the evidence and was prejudicial.  A similar conclusion is required here to protect the petitioner's federal constitutional right to due process of law.

**XX.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court refused to modify the reasonable doubt instruction because the instruction, as given, depreciated the prosecution's burden of proof in violation of the petitioner's right to due process of law as guaranteed by the Due Process Clause of the Fourteenth Amendment.**

---

[661]957 S.W.2d 327, 329 (Mo. Ct. App. E.D. 1997).

Petitioner's counsel in the state courts presented this grievance in

Point XXVI of the opening brief on direct appeal.

The petitioner moved, prior to trial for a modification of the

instruction on reasonable doubt, MAI-CR3D 300.02 and 302.04.[662]  The trial

court denied the motion, and gave the unmodified version of the

instructions as Instruction 4:

> The charge of any offense is not evidence, and it
> creates no inference that any offense was committed
> or that the defendant is guilty of an offense.
>
> The defendant is presumed to be innocent, unless
> and until, during your deliberations upon your
> verdict, you find him guilty. This presumption of
> innocence places upon the state the burden of
> proving beyond a reasonable doubt that the
> defendant is guilty.
>
> A reasonable doubt is a doubt based upon reason
> and common sense after careful and impartial
> consideration of all the evidence in the case.
>
> Proof beyond a reasonable doubt is proof that
> leaves you firmly convinced of the defendant's
> guilt. The law does not require proof that
> overcomes every possible doubt. If, after your
> consideration of all the evidence, you are firmly
> convinced that the defendant is guilty of the crime
> charged, you will find him guilty. If you are not so

---

[662]Adair DALF I:67.

> convinced, you must give him the benefit of the
> doubt and find him not guilty.[663]

Petitioner's objection to this instruction was overruled.[664]

The requirement that a defendant be proven guilty beyond a reasonable doubt is of constitutional dimension.[665]  In *Cage v. Louisiana*, 498 U.S. 39 (1990), the Supreme Court held that instructions which equated "reasonable doubt" with "grave uncertainty" and "actual substantial doubt," and held that the burden of proof was a moral, rather than an evidentiary, certainty suggested a higher degree of doubt than was constitutionally permissible and were therefore improper.  On the other hand, in *Victor v. Nebraska*[666] the Court approved the use of instructions which used the term "moral certainty" because, ***in context***, they did not lessen the state's burden of proof.

The Missouri Approved Instruction does not share the infirmity of *Cage* in that it does not directly define the term "reasonable doubt." However, by defining "proof beyond a reasonable doubt" as proof which

---

[663]Adair DALF IV:601.

[664]Adair TT XV:2900-01.

[665]*In Re Winship*, 397 U.S. 358 (1970).

[666]511 U.S. 1 (1994).

leaves the juror "firmly convinced," the instruction shares the same deficiency.  This is because the instruction does not provide guidance to the jurors as to what sort of doubt might prevent them from being "firmly convinced."

The *Victor* instruction, unlike that used here, also provided the information that a "reasonable doubt" is a doubt "that would cause a reasonable person to hesitate to act."  Another acceptable alternative, cited with approval in *Victor*, adds to the "firmly convinced" language the statement, "If, on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty."[667]

The Missouri Supreme Court, which promulgated its state's pattern instructions, had previously considered and approved this instruction.[668] The state supreme court's analysis does not adequately account for the requirement of *Victor v. Nebraska* that the context of the instruction be sufficient to inform the jury of the burden of proof.  For these reasons, its

---

[667]FEDERAL JUDICIAL CENTER, PATTERN CRIMINAL JURY INSTRUCTIONS 17-18 (1987) (Instruction 21).

[668]*E.g.*, *State v. Silvey*, 894 S.W.2d 662 (Mo. 1995) (en banc).

decision on the issue in this petitioner's case "was contrary to, or involved

an unreasonable application of, clearly established Federal law, as

determined by the Supreme Court of the United States."[669]

### *Constitutional Violations in the Death Phase*

XXI.        **Respondent's custody over the petitioner violates the**

**Constitution of the United States in that the trial court allowed the**

**prosecution to question defense penalty-phase mental-health witness Dr.**

**Murphy—over objection—about whether he** *believed* **the petitioner's**

**denials of the murders of Stacey Hodge and Randy Hamilton (decedents**

**in the Callaway County trial), because these questions were improper**

**opinion evidence on credibility, in violation of the petitioner's right to**

**due process of law as guaranteed by the Due Process Clause of the**

**Fourteenth Amendment.**

Petitioner's counsel in the state courts presented this grievance in

Point VI of the opening brief on direct appeal.

During the penalty phase, Dr. Philip Murphy testified concerning

petitioner's mental state and psychological history.  Over defense objection,

the state was permitted to ask him whether petitioner had denied killing

---

[669]123 S.Ct. at 2534-37.

Hamilton and Hodge, and whether the doctor believed his denial. He testified that petitioner had denied the murders, but that he (the doctor) did not believe the denial.[670]

One of the aggravating circumstances submitted was that the murder showed a callous disregard for human life because it was part of a plan to kill two other persons.[671]  In order to find this aggravating circumstance, the jury was therefore required to find that petitioner had committed these other murders.

It is improper for a witness to give his opinion as to the credibility of another.[672]  This is because "[e]xpert testimony presents the danger that jurors may be over-awed by the evidence, or may defer too quickly to the expert's opinion."[673]  Particularly when the expert opinion relates to the truthfulness of a statement as to the ultimate issue before the jury, such opinions invade the province of the jury.  As the Missouri Supreme Court noted in *State v. Taylor*:  "We may assume that it would not be proper for

---

[670]Adair TT XVIII:3589-94.

[671]Adair DALF IV:615.

[672]*State v. Whitmill*, 780 S.W.2d 45 (Mo. 1989) (en banc); *State v. Taylor*, 663 S.W.2d 235 (Mo. 1984) (en banc).

[673]*State v. Williams*, 858 S.W.2d 796, 800 (Mo. Ct. App. 1993).

an expert witness to express his opinion on the ultimate issue of whether petitioner was guilty of the offense charged . . . ."[674]

Here, the petitioner's statements to the doctor were admitted into evidence, both because they were relevant to his mental state and because they were relevant to the submitted special issue. When Dr. Murphy testified that he did not believe petitioner's denials of the murders of Hamilton and Hodge, he was in effect testifying that he believed petitioner had killed them.

The improper admission of this testimony bore directly on a statutory aggravating circumstance that the jury found in deciding to proceed to sentence the petitioner to death. The admission of this improper evidence thus violated petitioner's rights to due process and to a jury assessment of his punishment. Vacatur of the death sentence and remand for a new penalty hearing is therefore required. *Tuggle v. Netherland*, *supra*.

---

[674]663 S.W.2d at 239.

XXII.        Respondent's custody over the petitioner violates the

Constitution of the United States in that (A) trial counsel failed to object

to Paul Oglesbee's testimony that he thought the phrase "sell this

address" in a letter from the petitioner meant that the petitioner was

placing "a hit" on Oglesbee and his wife.  This nonexpert's opinion,

which was not corroborated in any way, gave the jury the false

impression that the petitioner would be a lethal threat to citizens outside

the Department of Corrections if he were not executed.  (B) The trial

court allowed the prosecution to introduce this exceptionally prejudicial

and, as presented, *false*, evidence in violation of his right to notice of

nonstatutory aggravating circumstances, because the prosecution did not

disclose the letter until the day Oglesbee testified.  This misconduct

violated the petitioner's rights to be free from cruel and unusual

punishment and to due process of law as guaranteed by the Eighth and

Fourteenth Amendments, in that had timely disclosure been made

counsel could have called Fifer to testify accurately about the meaning of

the phrase, which would have created a reasonable probability that the

jury would have returned a punishment verdict other than death.  The

failure to object to Oglesbee's testimony or put the quoted phrase in

context denied the petitioner the rights to the effective assistance of counsel, to be free from cruel and unusual punishment, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.  Reasonably competent counsel would have objected to this erroneously speculative nonexpert opinion, and the petitioner suffered prejudice from it, because the phrase is not a threat, and there is a reasonable probability if the jurors had not heard this testimony (or heard it without explanation or refutation), they would have returned a punishment verdict other than death.  (C) In addition or in the alternative, trial counsel failed to call an available witness, Brian Fifer, to testify that a prisoner using this expression means that the prisoner no longer intends to write a person because that person had not written back to him, and that it does not constitute a threat.  Assuming the trial court would not have heeded a proper objection to Oglesbee's testimony, reasonably competent counsel would have presented such evidence from Fifer.  Petitioner suffered prejudice from this second omission by trial counsel, because there is a reasonable probability that if the jurors had heard this evidence explaining the phrase in the context which it appeared, they would have imposed a punishment other than death.  (D)

**In the alternative, direct-appeal counsel was constitutionally ineffective for failing to raise on appeal the objections trial counsel *did* make to the prosecution's use of the letter, because reasonably competent appellate counsel would have raised this matter, and there is a reasonable probability the state supreme court would have reversed the petitioner's death sentence.**

Petitioner's counsel in the state courts presented this grievance in Point VI of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Ground 8(V) 3(bb) of the amended state PCR motion pleaded that counsel was ineffective for failing to object to Oglesbee testifying to his interpretation of the phrase's meaning on the grounds that it was false, irrelevant, speculative, without foundation, and opinion.[675]  Ground 8(M) pleaded that Brian Fifer, who had been confined in the Iowa Penitentiary with the petitioner, could have explained that the phrase is not a threat to

---

[675]Adair PCRLF 121.

harm anyone.[676]  Ground 8(W)1 pleaded that direct-appeal counsel was ineffective for failing to raise on appeal the objections that were made to the prosecution's use of Exhibit 106.[677]  Last, Grounds 8(V) 3(bb) & 8(W) 1 pleaded that the petitioner's right to notice of non-statutory aggravators was violated and thereby prevented him from preparing to rebut the prosecution's evidence.[678]

The trial-court judge who denied post-conviction relief rejected multiple grievances related to the prosecution's use of a letter the petitioner wrote to Paul Oglesbee and his wife, the petitioner's sister, Rose.  Those rulings denied the petitioner a state-court remedy for federal constitutional violations because these grievances reflected denial of the effective assistance of counsel, freedom from cruel and unusual punishments, and due process of law.

The failure to interview witnesses or discover mitigating evidence relates to trial preparation and not strategy.[679]  In *State v. Thompson*[680] the

---

[676]Adair PCRLF 58-59.

[677]Adair PCRLF 126-27.

[678]Adair PCRLF 121-22 & 126-27.

[679]*Kenley v. Armontrout*, 937 F.2d 1298, 1304 (8th Cir. 1991).

Missouri Supreme Court has held that evidence of unconvicted misconduct is inadmissible when the prosecution fails to provide notice of its intent to rely on such evidence.  In *Thompson*, the state supreme court found the non-disclosure to be "plain error" that required reversal of a death sentence.[681]

During the penalty phase, trial counsel called the petitioner's brother-in-law, Paul Oglesbee, who was married to the petitioner's sister, Rose.[682] That testimony focused on Oglesbee having seen the petitioner display symptoms associated with his methamphetamine use such as paranoia, delusions, and changes in his physical appearance.[683]

During prosecution's cross-examination, it relied on Exhibit 106, a letter the petitioner had written to his sister.[684]  Prosecution disclosed the letter for the first time on the morning of Oglesbee's testimony.[685]  In

---

[680]985 S.W.2d 779, 792 (Mo. 1999) (en banc).

[681]*Id.* at 792-93.

[682]Adair TT 3257-75.

[683]Adair TT 3268-75.

[684]Adair TT 3280-92.

[685]Adair TT 3280.

objecting to the letter, trial counsel Chris Slusher indicated that they had not had the opportunity to conduct investigation about the letter's contents because of the failure to disclose.[686]

Mr. Slusher indicated that he believed prosecution intended to introduce the "P.S." as evidence of a threat directed at the petitioner's sister.[687]  The prosecution sought to excuse its non-disclosure on the grounds that Oglesbee had found the letter the day before his testimony.[688] The prosecutor told the judge that he intended to rely on the "P.S." portion of the letter because it included a threat directed at the petitioner's sister.[689] The prosecutor claimed there was no prejudice because the "P.S." was "explicitly discussed" during Oglesbee's deposition.[690]  The "P.S." in the letter stated that if she did not write then the petitioner would "sell [her] address."[691]

---

[686]Adair TT 3280.

[687]Adair TT 3284.

[688]Adair TT 3280-81.

[689]Adair TT 3281.

[690]Adair TT 3281 & 3283-84.

[691]Adair TT 3285 & 3288.

Initially, the trial judge sustained the objection on the grounds that prosecution had failed to provide timely discovery, and therefore, counsel were unable to investigate the "P.S."[692]  The judge considered it a failure of prosecution to disclose a statement of the petitioner.[693]  But he reconsidered his ruling and held instead that because the letter was not previously available, the prosecution should be allowed to present it.[694]  When the judge reversed his ruling, defense counsel apprised him that the defense had deposed Oglesbee because he was a witness the prosecution had endorsed for guilt phase.[695]

When the prosecution sought to rely on Exhibit 106 during Oglesbee's testimony, counsel renewed their objections.[696]  Oglesbee testified that the P.S. stated:  "She'll write or I'll sell this address."[697]  When Oglesbee was asked how he had interpreted that language he responded:

---

[692]Adair TT 3286 & 3288.

[693]Adair TT 3288.

[694]Adair TT 3288-89.

[695]Adair TT 3289.

[696]Adair TT 3289 & 3291.

[697]Adair TT 3292.

"That he was putting a contract on us for a hit."[698]  Counsel did not object to Oglesbee's construction of the meaning of the "P.S."[699]

Trial counsel Zembles testified that there are times when she has a strategy reason for not objecting, but because of the passage of time she could not remember whether she did or did not have reason at the time of trial for not making objections.[700]  Brian Fifer was not investigated and counsel Zembles would have wanted to present evidence to refute Oglesbee's erroneous speculation on the meaning of "sell your address."[701] Mr. Slusher would have liked to have had the opportunity to investigate the meaning of this phrase.[702]  Mr. Slusher did not contact anyone as to the phrase's meaning.[703]  Direct-appeal counsel testified that she did not raise

---

[698]Adair TT 3292.

[699]Adair TT 3292.

[700]Adair EHT 648.

[701]Adair EHT 569-70 & 583-84.

[702]Adair EHT 446-47.

[703]Adair EHT 378.

the objections that trial counsel had made because she thought they lacked merit.[704]

On the issue of trial counsel's failure to object, the PCR trial-court judge made general findings that counsel made a reasonable strategic decision not to object to all objectionable matters during penalty.[705]  On Ground 8(V) 3(bb), the PCR trial-court judge noted that counsel testified that counsel could not recall why an objection was not made.[706]  Although the PCR trial-court judge made findings on portions of Ground 8(M), he never expressly addressed the issue that Fifer should have been called to refute Oglesbee's interpretation of the "sell your address" language.[707]  The PCR trial-court judge found appellate counsel was not ineffective because she testified that she raised those issues which she felt had merit and did not raise those she felt lacked merit.[708]  The PCR trial-court judge did not

---

[704]Adair EHT 154-55.

[705]Adair PCRLF 300.

[706]Adair PCRLF 301.

[707]Adair PCRLF 293-94.

[708]Adair PCRLF 303-04.

address the claims that the prosecution failed to provide notice of this evidence as a non-statutory aggravator.

During the prosecution's initial penalty argument, the prosecutor urged the jury to read the letters the petitioner wrote to his sister.[709]  The jury was told that the letters reflected "fairly sophisticated manipulations".[710]  According to the prosecutor, that same manipulation was what caused Drs. Murphy and Lipman to formulate opinions about the petitioner's mental state, which could not be trusted.[711]

Counsel's failure to make timely proper objections can constitute a basis for finding counsel was ineffective.[712]  Oglesbee's testimony as to the meaning of "sell your address" should have been objected to on the grounds alleged in the amended motion, that it was false, irrelevant, speculative, without foundation, and opinion.  Reasonably competent counsel who had vigorously opposed this evidence, and who initially persuaded the trial court to rule in their favor, would have made these

---

[709]Adair TT 3758.

[710]Adair TT 3758.

[711]Adair TT 3758.

[712]*State v. Storey*,901 S.W.2d 886, 900-03 (Mo. l995) (en banc) (counsel found ineffective for failing to object to penalty arguments).

objections.  Petitioner suffered severe prejudice, because this phrase does not constitute a threat, as the Fifer testimony to be set out shortly will demonstrate.  The prosecutor used this matter to argue the petitioner was manipulative and had similarly succeeded in manipulating the doctors who had testified for him in penalty.  Most of all, the petitioner was prejudiced by the prosecutor's advancement of this false idea because there is a reasonable probability that he would not have been sentenced to death if the jury had not heard he had threatened to have "hits" placed on his sister and her husband from within the Department of Corrections.

Brian Fifer and the petitioner were cellmates at Iowa's Anamosa Penitentiary for approximately two years.[713]  Mr. Fifer recalled that inmates looked forward to receiving mail because it is a link to the outside world.[714] Because inmates do not earn much money, they cannot afford to send mail to people who do not write back.[715]  The phrase "sell your address" is an expression inmates use to mean they are not going to spend their money to

---

[713]Ex.30 at 3-5.

[714]Ex.30 at 12.

[715]Ex.30 at 12-13.

write to people who do not write back.[716]  The phrase is "a prison slang"

that does not in any way constitute a threat to physically harm anyone.[717]

People in the penitentiary understand the meaning of this phrase, but

people outside do not.[718]

Mr. Fifer's testimony would have been persuasive to the jury when it

is viewed in conjunction with the text of Exhibit 106, the letter.  It make

sense.  The letter's first page contains a margin entry that states: "Mom

says Hi.  So does my Wi[unreadable]."[719]  Page Two and the last paragraph

of the letter included:

> Can we ever talk or you write back.  I am your
> brother, are you allowed to talk or write your own
> brother.
>
>       *     *     *     *
>
> P.S.  She'll write or I'll sell this address.
>
> Love you wheather [sic] you believe it or not.
>
> John[720]

---

[716]Ex.30 at 13-14.

[717]Ex.30 at 13-14.

[718]Ex.30 at 13-14.

[719]See PCROB Appendix 6.

[720]Adair PCROB Appendix 7.

The reproduced portions of the letter are consistent with Mr. Fifer's testimony that the petitioner was expressing his unhappiness with his sister not writing back to him when he wrote to her and that no threat was intended with the postscript.  The letter states that the petitioner's mother, who is also his sister Rose's mother, sends her greetings along with the petitioner's wife doing the same.  Those sentiments would not reasonably be expected to appear in a letter which also allegedly threatened to have a "hit" placed on the petitioner's sister.

The letter's last paragraph expressly states that the petitioner is dismayed that his sister has not written letters back to him when he has written to her.[721]  That text is entirely consistent with Mr. Fifer's testimony.

Finally, the postscript appeared alongside of the sentiments: "Love you wheather [sic] you believe it or not /s/ John."  If the petitioner had intended to threaten his sister, with the postscript, then he would not have alongside such a threat also expressed his love for his sister?

Reasonably competent counsel under similar circumstances would have investigated and called Mr. Fifer to refute Oglesbee's mistaken interpretation "sell your address" meant the petitioner intended to have a

---

[721]Adair PCROB Appendix 7.

"hit" placed on him and his wife because of Oglesbee's highly

inflammatory construction, and thereby, minimized the adverse impact of

the prosecution's argument.  Reasonably competent counsel would have

investigated Fifer, because, as the prosecution's counsel argued, from the

defense attorneys' deposition of Oglesbee, they had been put on notice of

the substance of the postscript.[722]   Petitioner suffered prejudice because

there is a reasonable probability the jury would have sentenced him to life

if they had heard Mr. Fifer.

Reasonably competent appellate counsel would have advanced on

appeal trial counsel's objection to the prosecution's non-disclosure of the

letter, Exhibit 106, which served as the basis for a non-statutory

aggravator.[723]  Reasonably competent appellate counsel would have raised

this issue on appeal because in *State v. Thompson*, the state supreme court

concluded that such non-disclosure constitutes plain error manifest

injustice.  Because such nondisclosure constitutes a manifest injustice,

appellate counsel's failure to raise this matter itself rises to the level of a

---

[722]Adair TT 3281 & 3283-84.

[723]See *State v. Thompson, supra.*

manifest injustice or a miscarriage of justice.[724]  Petitioner suffered

prejudice because there is a reasonable probability the petitioner's death

sentence would have been reversed if this grievance had been advance on

direct appeal.

**XXIII.     Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court allowed the prosecution to introduce in the penalty phase of the Adair County trial a videotape of the crime scene where the bodies of the decedents in the Callaway County trial, Stacey Hodge and Randy Hamilton, were found, and a picture of Hodges' body, in that this video and this still photograph were so gruesome as to inflame the passions of the jury, and—because the prosecution offered this "evidence" in connection with a collateral crime—their prejudicial effect greatly outweighed any pretended probative value.**

Petitioner's counsel in the state courts presented this grievance in

Point XV of the opening brief on direct appeal.

---

[724]*See Moss v. State*, 10 S.W.3d 508 (Mo. 2000) (en banc).

In connection with its theory that the petitioner killed Pinegar as part of a plan to murder three other persons, the prosecution offered the testimony of no fewer than eight witnesses.[725]  Sheriff Coon and Corporal Clemonds described finding the bodies of Hamilton and Hodge in a car trunk. In addition, the prosecution offered, over defense objection, the videotaped testimony of Dr. Jay Dix, who performed the autopsy on the bodies.[726]  The videotape was shown to the jury without allowing them to view certain still photographs used by Dr. Dix to illustrate his testimony.[727] The prosecution also offered into evidence State's Ex. 105, the videotape of the crime scene.[728]

These two exhibits, individually and particularly in combination, and added to the plethora of other testimony about these allegedly ancillary but certainly collateral crimes, created an improper inflammatory climate

---

[725]Greg Coon, Ti. Vol. XVI, p. 3043, 3127; Jackie Mans, Tr. Vol. XVI, p. 3044; Tom Constable, Ti. Vol. XVI, p. 3045; William Worley, Ti. Vol. XVI, p. 3058; Michael Purdun, Ti. Vol. XVI, p. 3117; Bruce Clemonds, Ti. Vol. XVI, p. 3150; John Thomas, Ti. Vol. XVI, p. 3160; and Douglas Stallsworth, Tr. Vol. XVI, p. 3178.

[726]Adair TT XVI:3157.

[727]*See* Defendant's Ex. FF.

[728]Adair TT XVI:3155.

during the penalty phase.  The jury heard ample evidence to connect the petitioner to the extraneous murders.  The actual circumstances of the murders were not relevant to the statutory aggravating circumstance for which this evidence was offered.

Dr. Dix describes in detail the skeletonized nature of the bodies, which had been left in the abandoned car trunk for approximately a month before they were found.  The videotape loiters over the visible bones of the victims' hands and skulls.  Because of the nature of the bodies, the crime-scene tape provides no relevant evidence as to what happened to the victims.  It simply provides a horrifying spectacle.  The Dix testimony does provide information about the deaths of the two, but, as previously noted, these matters were not in dispute and were not relevant.

The general authorities concerning the admissibility of gruesome evidence have been discussed in connection with Ground XVII (pages 200-205, *supra*), and the petitioner respectfully refers the Court to that discussion. In that the evidence here was introduced at the penalty phase, an additional argument applies.  The state supreme court is mandated to vacate a death sentence if the sentence was imposed under the influence of

passion, prejudice, or any other arbitrary factor.[729]  The admission of this evidence created an unacceptable likelihood that the death sentence here was based on passion rather than on the proper analysis of the evidence— that is its only purpose and its foreseeable effect.  The Missouri Supreme Court should have reversed the death sentence.  It did not.  Vacatur of the death sentence is required if the federal constitutional guaranties of rational capital sentencing and meaningful capital appellate review are to have any substance.

---

[729]Mo. Rev. Stat. §565.035.3(1).

**XXIV.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted into evidence the speech and conduct of the decedent's mother in the penalty phase when she broke down crying on the stand, and eight of the decedent's other relatives were crying in the gallery, because this display was inflammatory and prejudicial to the petitioner—sweeping beyond the "quick glimpse" of the decedent's life that the Supreme Court of the United States has allowed death prosecutors to present consistently with the Eighth Amendment, and violating the petitioner's right to due process of law as guaranteed by the Fourteenth Amendment.**

Petitioner's counsel in the state courts presented this grievance in Point XVI of the opening brief on direct appeal.

Donna Tellier, Pinegar's mother, testified at the penalty phase that the death of her son left a big hole in her heart.[730]  She then broke down, and the prosecutor escorted her from the witness stand.[731]  Eight other people in the courtroom were also crying.[732]  Prior to trial, the petitioner's

---

[730]Adair TT XVII:3219.

[731]Adair TT XVII:3221.

[732]Adair TT XVII:3220.

counsel had moved to exclude victim-impact evidence, but they did not make a specific, additional objection at the time of Tellier's testimony. Assuming that the state supreme court could only review this display for "plain error," the petitioner is entitled at least to that on federal habeas corpus.[733]

In *Payne v. Tennessee*[734] the Supreme Court held that there was no categorical prohibition of the presentation of "victim impact" testimony in criminal cases involving the death penalty. It went on to hold, however, that "[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." The evidence here presents such a case.

In addition to being subject to the petitioner's federal constitutional right to a death sentence imposed on the basis of reason rather than passion,[735] Missouri has itself created a statutory protection for the rights of

---

[733]*Burns II, supra* (citing cases).

[734]501 U.S. 808, 824 (1991)

[735]*Gardner v. Florida*, 430 U.S. 349, 358 (1977); *Lankford v. Idaho*, 500 U.S. 110, 124-26 (1991); *Zant v. Stephens*, 462 U.S. 862 (1983); *California v. Brown*, 475 U.S. 1301, 1304 (1986)

the accused in capital cases under which the state supreme court must

consider whether the sentence of death in this case was imposed under the

influence of passion or other arbitrary factor.[736]  By binding itself to afford a

person this procedural protection, the State of Missouri created a liberty

interest that its agents cannot deny an accused citizen without thereby also

violating the Due Process Clause of the Fourteenth Amendment.[737]

The presentation of this evidence was extremely prejudicial to

petitioner.  Although brief, the spectacle of the victim's mother and eight of

her relatives and friends weeping in the courtroom could not help but

inflame the passions of the jury.  The Missouri Supreme Court failed to

carry out its duty under *Gregg* and its progeny, which the state statute

codified.  For these reasons, the sentence of death must be vacated and the

cause remanded for a new penalty hearing.

---

[736]Mo. Rev. Stat. §565.035.3(1).

[737]*Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980).

**XXV.      Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court admitted at the penalty phase a photograph of the decedent with his young daughter, in that this exhibit was irrelevant to any issue before the jury, and had a high potential to inflame the passions of the jury, sweeping beyond the "quick glimpse" of the decedent's life that the Supreme Court of the United States has allowed death prosecutors to present consistently with the Eighth Amendment, and violating the petitioner's right to due process of law as guaranteed by the Fourteenth Amendment.**

Petitioner's counsel in the state courts presented this grievance in Point XVII of the opening brief on direct appeal.

During the testimony of Donna Tellier, Pinegar's mother, the prosecution offered into evidence State's Ex. 42A, a photograph of Pinegar with his young daughter.  he evidence was offered over the petitioner's objection that it was inflammatory and was an improper attempt to place Pinegar's daughter before the jury.[738]

As the petitioner has explained in the previous ground, *Payne v. Tennessee* did not give the death prosecutors open season to use any and all

---

[738]Adair TT XVII:3216-19.

manner of prejudicial gimmicks to get a death-qualified jury to give them a death verdict once they have won a guilt phase.  The exploitation of the decedent drug-dealer's minor child begs for a judicial holding that the Supreme Court meant what it said in *Payne*, and not what pandering prosecutors wish it had said.

XXVI.        Respondent's custody over the petitioner violates the

Constitution of the United States in that trial counsel failed to object

and/or otherwise request appropriate relief in response to evidence,

argument, and instruction during penalty when the prosecution (A)

relied on matters relating to the deaths of the decedents in the Callaway

County trial; (B) argued matters outside the evidence; (C) asked defense

mental-health expert, Dr. Lipman, to express an opinion on whether the

petitioner was truthful in his denial of having committed the homicide

offenses he was charged with committing; (D) submitted Instruction 15

without the mental state of "knowingly" as an aggravating factor.  These

failures denied the petitioner the rights to the effective assistance of

counsel, to be free from cruel and unusual punishment, and to due

process of law, as guaranteed by the Sixth, Eighth, and Fourteenth

Amendments, in that reasonably competent counsel would have raised

and preserved the grievances, and the petitioner suffered prejudice from

the failure to do so, because under the circumstances of the case there is a

reasonable probability if the trial court had granted relief on any or all of

them, the jurors would have returned a punishment verdict other than

**death, or, failing that, the state supreme court would have reversed the death sentence.**

Petitioner's counsel in the state courts presented this grievance in Point VII of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

The circuit court denied the petitioner's claims that trial counsel was ineffective for failing to object and/or otherwise request the necessary relief when the prosecution (A) relied on matters dealing with the deaths of Hamilton and Stacey Hodge; (B) relied on matters outside the evidence; (C) questioned Dr. Lipman whether he believed the petitioner's denial of responsibility for the charged homicides; and (D) omitted "knowingly" from Instruction 15.  The state supreme court affirmed the denial of relief. By this process, the petitioner suffered the violation of his federal constitutional rights to the effective assistance, freedom from cruel and unusual punishments, and due process of law, and the state courts failed to provide an adequate remedy.

In evaluating the acts or omissions of counsel—whether included in this ground or throughout the entire petition—one must bear in mind that *Williams v. Taylor*, has once and for all repudiated the idea that every single instance of ineffective assistance of counsel must be sufficient, by itself, to support a grant of relief in order for any of them to count toward the reviewing court's decision.  In *Williams*, the Supreme Court commended a state habeas corpus judge for evaluating prejudice to the accused citizen cumulatively, rather than allowing the constitutional violators to "divide and conquer" by forcing the accused citizen to show that any single constitutional violation was independently sufficient to justify a grant of relief when the prejudice created by the mass of them was overwhelming.[739]

**(A)  <u>Hamilton and Hodge</u>**

Ground 8(U) 4(i) of the amended state PCR motion pleaded that counsel was ineffective for failing to object to the prosecution's statements during opening statement in penalty that urged the jury to impose death

---

[739]529 U.S. at 397.  See generally discussion and authorities on pages 43,45 *supra*.

for not only the death of Mr. Pinegar, but also the deaths of Hamilton and

Stacey Hodge.[740]  In particular, the objectionable matters were:

> And at the conclusion of this penalty phase, after
> you have heard the evidence — both the evidence
> last week as well as the evidence this week —
> regarding the deaths of Al Pinegar, Randall
> Hamilton, Stacey Hodge, the State will ask you to
> return a verdict of death.  Thank you.[741]

Ground 8(U)(4)(i) also alleged that trial counsel was ineffective for

failing to object to the prosecutor's initial penalty phase closing arguments

which included: (a) ". . . he murdered three people";[742] (b) that the

petitioner shot Hamilton and Stacey Hodge, loaded their bodies into a

trunk, and disposed of them;[743] (c) three people were dead because the

petitioner feared going back to prison;[744] (d) the petitioner killed three

people and therefore death was warranted;[745] (e) Hamilton and Stacey

---

[740]Adair PCRLF 91-92.

[741]Adair TT 3021.

[742]Adair TT 3755.

[743]Adair TT 3755.

[744]Adair TT 3760-61.

[745]Adair TT 3761-62.

Hodge would have "taken life without in a heartbeat";[746] (f) death was warranted for killing three people because the petitioner voluntarily used methamphetamine.[747]

Ground 8(U)(4)(i) also pleaded that trial counsel was ineffective for failing to object to the prosecutor's rebuttal penalty phase closing arguments which included: (a) the murders of Hamilton and Stacey Hodge were circumstances warranting death;[748] and (b) there was no trial on June 11th, the date when Hamilton and Stacey Hodge were allegedly killed.[749] All of the Ground 8(U)(4)(i) matters were improper because the petitioner was not then on trial for Hamilton's and Stacey Hodge's deaths.[750] Ms. Zembles testified that she did not see how all these matters were objectionable.[751]

---

[746]Adair TT 3764.

[747]Adair TT 3767.

[748]Adair TT 3786-87.

[749]Adair TT 3789.

[750]Adair PCRLF 91-92.

[751]Adair EHT 603-08.

Ground 8(U)(4)(r) pleaded that trial counsel was ineffective for failing to object to initial penalty argument that the mitigating evidence was to be weighed against the lives of Hamilton, and Stacey Hodge as well as Pinegar and that this aggravating evidence outweighed the mitigation because it was improper to tell the jury[752] to weigh the value of the victims' lives.[753]  Ms. Zembles did not consider these matters objectionable.[754]

Ground 8(U)(4)(s) alleged that trial counsel was ineffective for failing to object to initial penalty argument that all three victims would have taken life without in a heartbeat, but all three got the death penalty[755].[756]  Ms. Zembles did not consider these arguments objectionable.[757]

Ground 8(V)(3)(b) pleaded that trial counsel was ineffective for failing to object to penalty testimony and evidence that the petitioner killed Hamilton and Stacey Hodge as presented through the following: (a) Officer

---

[752]Adair TT 3763-64.

[753]Adair PCRLF 96.

[754]Adair EHT 615.

[755]Adair TT 3764.

[756]Adair PCRLF 96.

[757]Adair EHT 615-16.

Coon—the petitioner was charged with killing Hamilton and Stacey Hodge;[758] (b) Ms. Marrs, mother of Stacey Hodge, testified she was 21 years old, she had been dating Hamilton, and she was last seen June 9, 1995;[759] (c) Mr. Constable—the petitioner told him there were snitches that needed to be taken care of, including Hamilton;[760] (d) Mr. Worley—the petitioner made statements that he needed to kill Hamilton;[761] (e) Mr. Purdun—the petitioner said Hamilton was no longer on his hit list because Hamilton was no longer a problem and Purdun could take auto parts belonging to Hamilton because he no longer needed them;[762] (f) Mr. Clemonds— described his investigation of the crime scene where the bodies of Hamilton and Stacey Hodge were found;[763] (g) videotaped testimony of Dr. Dix[764] regarding autopsies he performed on Hamilton and Stacey Hodge;

---

[758]Adair TT 3043-44.

[759]Adair TT 3044-45.

[760]Adair TT 3049.

[761]Adair TT 3060-62.

[762]Adair TT 3118-20.

[763]Adair TT 3151-55.

[764]Ex.202.

(h) Ex. 105—crime scene videotape where bodies of Hamilton and Stacey Hodge were found;[765] (*i*) Thomas's testimony that he had seen a small black box belonging to Hamilton at the petitioner's house and the petitioner had said Hamilton would no longer need that box;[766] (j) Mr. Rickert—testified that the petitioner made statements that he had killed Hamilton and the petitioner having possessed SKS's allegedly used to kill Hamilton and Stacey Hodge;[767] (k) Stallsworth—statements the petitioner allegedly made that he killed Hamilton and Stacey Hodge, put their bodies in the trunk of a car, and that SKS's were used to do commit those acts;[768] (*l*) Exs. 100 and 101—the death certificates for Hamilton and Stacey Hodge.[769]  These matters were objectionable because they lacked the reliability of prior convictions and turned the penalty phase into a mini-trial on the homicide charges that had not been tried.[770]

---

[765]Adair TT 3154-55.

[766]Adair TT 3160.

[767]Adair TT 3171-74.

[768]Adair TT 3178-82.

[769]Adair EHT 615-16.

[770]Adair PCRLF 103-04.

Ms. Holden, who was responsible for the issues dealing with Hamilton and Stacey Hodge,[771] did not know why she failed to object but thought that she may not have objected because the evidence went to some of the aggravators the prosecution was attempting to show.[772]

Ground 8(V)(3)(m) pleaded that trial counsel was ineffective for failing to object to evidence from Mr. Purdun that: (1) the petitioner asked to buy from Purdun shells for an SKS; (2) the petitioner said Hamilton was no longer on his hit list because he was no longer a problem; (3) the petitioner told Purdun he could have auto parts belonging to Hamilton because Hamilton no longer needed them[773].[774] This evidence was objectionable because it lacked the reliability of a prior conviction and turned the petitioner's trial into a mini-trial on the petitioner's alleged

---

[771]Adair EHT 477 & 503.

[772]Adair EHT 503-04.

[773]Adair TT 3 117-20.

[774]Adair PCRLF 109-10.

responsibility for Hamilton's death.[775]  Ms. Holden did not know why she failed to object.[776]

Ground 8(V)(3)(q) pleaded that trial counsel was ineffective for failing to object to evidence from Thomas that he had seen a little black box belonging to Hamilton at the petitioner's house and the petitioner said the person the box belonged to would not need it anymore[777].[778]  This evidence was objectionable because it did not have the reliability of a prior conviction and turned the petitioner's trial into a mini-trial on Hamilton's death.[779]  Ms. Holden did not know why she failed to object.[780]

Ground 8(V)(3)(t) pleaded that trial counsel was ineffective for failing to object to evidence from Mr. Rickert that the petitioner had said that he killed Hamilton[781].[782] This evidence was prejudicial because it lacked the

---

[775]Adair PCRLF 109-10.

[776]Adair EHT 509.

[777]Adair TT 3159-60.

[778]Adair PCRLF 112-13.

[779]Adair PCRLF 112-13.

[780]Adair EHT 510-11.

[781]Adair TT 3174.

reliability of a prior conviction and turned the penalty phase into a mini-trial on Hamilton's death.[783]  Ms. Holden did not know why she failed to object.[784]

Ground 8(V)(3)(v) pleaded that trial counsel was ineffective for failing to object to testimony from Stallsworth that the petitioner allegedly admitting killing Hamilton and Stacey Hodge[785].[786]  These matters should have been objected to because they lacked the reliability of prior convictions and turned the trial into a mini-trial on the death of Hamilton and Stacey Hodge.[787]  Ms. Holden did not know why she failed to object.[788]

Ground 8(V)(3)(aa) pleaded that trial counsel was ineffective for failing to object to the prosecution's cross-examination of Mr. Oglesbee that

---

[782]Adair PCRLF 114-15.

[783]Adair PCRLF 114-15.

[784]Adair EHT 512.

[785]Adair TT 3179-82.

[786]Adair PCRLF 115-17.

[787]Adair PCRLF 115-17.

[788]Adair EHT 513-14.

there was a rumor that Hamilton was a drug snitch[789].[790]  This evidence

should have been objected to because it created an inference that the

petitioner killed Hamilton for that reason.[791]

On the 8(U) claims the PCR trial-court judge ruled that counsel

exercised reasonable strategy.[792]  The PCR trial-court judge also found that

the proposed objections were without merit or would have only

highlighted arguments.[793]

Before trial, Ms. Zembles filed a motion to exclude evidence of

nonstatutory aggravators.[794]  That motion argued that unadjudicated

conduct should be excluded because it would inject arbitrariness and

would produce a mini-trial or a trial within a trial.[795]  The Due Process

Clause requires that a criminal charge be proven beyond a reasonable

---

[789]Adair TT 3278.

[790]Adair PCRLF 121.

[791]Adair PCRLF 121.

[792]Adair PCRLF 299.

[793]Adair PCRLF 299.

[794]Adair DALF:505-21; Adair EHT  503-04.

[795]Adair DALF 505-21.

doubt.[796]  The state supreme court has indicated that the prosecution

cannot employ the penalty phase as "a mini trial" of a defendant's prior

convictions.[797]  The Adair County case was tried before the Callaway

County case.[798]

Reasonably competent counsel under similar circumstances would

have objected to all these occurrences where the jury heard that the

petitioner was then accused of killing Hamilton and Stacey Hodge.

Competent counsel would have objected because the petitioner had not

been convicted and found guilty beyond a reasonable doubt of committing

the homicides involving Hamilton and Stacey Hodge.[799]  Reasonably

competent counsel would have objected at trial for the reasons identified

here, because counsel had filed a pretrial motion seeking to exclude all

references to the events surrounding Hamilton's and Stacey Hodge's

deaths for the same reasons cited in the state PCR action and now here in

federal habeas corpus.  Competent counsel would have objected because

---

[796]*In re Winship*, 397 U. S. 358, 361-64 (1970).

[797]*State v. Whitfield*, 837 S.W.2d 503, 511-12 (Mo 1992) (en banc).

[798]*State v. Middleton*, 995 S.W.2d at 452 (Adair - Feb. 24, 1997); Callaway TT:I iii
(Callaway - March 30, 1998).

[799]*See In re Winship, supra.*

these matters injected arbitrariness, and resulted in a trial within a trial or a

mini trial, on the charges relating to Hamilton and Stacey Hodge.  These

matters injected arbitrariness because they urged the jury to impose death

for reasons other than for the individualized sentencing considerations

related to Pinegar's death.  In particular, the jury was urged to impose

death for the deaths of Hamilton and Stacey Hodge as well as the death of

Pinegar.  In light of all the facts and circumstances of the case, the

petitioner suffered prejudice because there is a reasonable probability that

but for the omissions cited here (counsel's failure to object to the matters

set out in this section of this ground), throughout this ground, and

throughout the petition, he would have received a punishment other than

death.

### (B)  <u>Matters Outside the Evidence</u>

Ground 8(U)(4)(k) pleaded that counsel was ineffective for failing to

object to the prosecutor's initial penalty argument that included:[800]

> Paranoia is fear; it is fear.  And did this defendant
> have or act paranoid, think paranoid things?  Yes.
> Was he as paranoid as he led these doctors to

---

[800]Adair PCRLF 92-93.

> believe?  I doubt it, and I think you should doubt
> it.[801]

This argument constituted improper personalization and implied the prosecutor had special knowledge the petitioner's mental-health evidence was untrue.[802]  Ms. Zembles agreed that this argument should have been objected to on grounds of improper personalization and amounted to testimony by the prosecutor.[803]

Ground 8(U)(4)(n) pleaded that trial counsel was ineffective for failing to object to the prosecution's initial penalty argument that Stacey Hodge was "moaning in agony" before the codefendant fired a shot that killed her[804].[805]  Trial counsel should have objected to this argument on the ground that there was no evidence to support it; it was highly inflammatory, and implied the prosecutor had knowledge outside the evidence.[806]  Ms. Zembles testified that if there was no evidence to support

--------

[801]Adair TT 3758.

[802]Adair PCRLF 92-93.

[803]Adair EHT 608.

[804]Adair TT 3760.

[805]Adair PCRLF 93.

[806]Adair PCRLF 93.

the argument, then it constituted speculation that was intended to inflame the passions of the jury to decide the case on something other than the facts and the law.[807]

In *State v. Storey*[808] the prosecutor argued that case was among the most brutal in St. Charles County's history.  The Missouri Supreme Court held that the argument was improper because it relied on facts outside the record.[809]  The argument was improper because "[a]ssertions of fact not proven amount to unsworn testimony by the prosecutor."  Because there was no evidence about the brutality of other St. Charles County murders, the argument was improper.  The state supreme court noted that a prosecutor arguing facts outside the record is highly prejudicial "because the jury is aware of the prosecutor's duty to serve justice, not just win the case."[810]  The state supreme court concluded counsel was ineffective for failing to object to this argument and other prosecutorial arguments.[811]

---

[807]Adair EHT 6l0-11.

[808]901 S.W.2d 886 (Mo 1995) (en banc)

[809]*Id.* 900-01.

[810]*Cf. Berger v. United States*, 295 U.S. 78, 88 (1935).

[811]901 S.W.2d at 900-03.

Reasonably competent counsel under similar circumstances would have objected to these improper arguments which injected arbitrariness through the prosecutor's injecting his opinion and matters not supported by evidence.  In light of all the facts and circumstances of the case, the petitioner suffered prejudice because there is a reasonable probability that but for the omissions cited here, throughout this ground, and throughout the petition, he would have received a punishment other than death.

### (C)  <u>Prosecution's Questioning of Dr. Lipman</u>

Ground 8(V)(3)(ii) of the state amended PCR motion pleaded that trial counsel was ineffective for failing to object to the prosecution's cross-examination of Dr. Lipman as to whether he believed the petitioner's denials of having committed the three homicides.[812]  Dr. Lipman testified he did not believe the petitioner's denials.[813]  This questioning was objectionable on the grounds that an expert cannot express an opinion on

---

[812]Adair PCRLF 123-24.

[813]Adair TT 3724-25.

guilt or innocence.[814]  Ms. Zembles testified that she did not know why she failed to object.[815]

The PCR trial-court judge's findings were limited to noting that counsel could not recall why she failed to object.[816]  Under portion 8(U) of the PCR trial-court judge's findings, however, it did rule that the prosecution's questioning of Dr. Lipman was proper and therefore any objection lacked merit.[817]

At the time of the petitioner's trials, Missouri law recognized that an expert is not permitted to express an opinion on the guilt or innocence of the defendant.[818]  It is also improper for a witness to comment directly on someone else's truthfulness.[819]  These rules of law operated as a protection of the procedural right of the accused to have his or her guilt determined

---

[814]Adair PCRLF 123-24.

[815]Adair EHT 639-40.

[816]Adair PCRLF 301.

[817]Adair PCRLF 299-300.

[818]*State v. Candela*, 929 S.W.2d 852, 867 (Mo. Ct. App. E.D. 1996).

[819]*State v. Link*, 25 S.W.3d 136, 143 (Mo 2000) (en banc).

by a jury of their peers and not by collusion between the prosecution, the State Treasury, and some talking heads.

Reasonably competent counsel under similar circumstances would have objected to the prosecution's questioning of Dr. Lipman because an expert is not allowed to express an opinion on a defendant's guilt or innocence and because it is improper for a witness to comment on someone else's truthfulness.  In light of all the facts and circumstances of the case, the petitioner suffered prejudice because there is a reasonable probability that but for the omissions cited here, throughout this ground, and throughout the petition, he would have received a punishment other than death.

**(D)  Omission of "Knowingly" from Aggravator**

Ground 8(W)(37) alleged trial counsel were ineffective for failing to object to the mental element of "knowingly" having been omitted from the penalty verdict director on aggravating circumstances, Instruction No. 15:[820]

> In determining the punishment to be assessed against the defendant for the murder of Alfred Pinegar, you must first unanimously determine

---

[820]Adair PCRLF 135-36.

whether one or more of the following statutory aggravating circumstances exists:

1.  Whether the murder of Alfred Pinegar involved depravity of mind and whether, as a result thereof, the murder was outrageously and wantonly vile, horrible, and inhuman.  You can make a determination of depravity of mind only if you find that the defendant killed Alfred Pinegar as a part of defendant's plan to kill more than one person and thereby exhibited a callous disregard for the sanctity of human life.

2.  Whether the defendant murdered Alfred Pinegar for the purpose of concealing or attempting to conceal the defendant's delivery of methamphetamine, a controlled substance.

A person commits the crime of delivery of a controlled substance when he delivers a controlled substance knowing that the substance is a controlled substance.

You are further instructed that the burden rests upon the state to prove at least one of the foregoing circumstances beyond a reasonable doubt.  On each circumstance that you find beyond a reasonable doubt, all twelve of you must agree as to the existence of that circumstance.

Therefore, if you do not unanimously find from the evidence beyond a reasonable doubt that at least one of the foregoing statutory aggravating circumstances exists, you must return a verdict fixing the punishment of the defendant at imprisonment for life by the Department of

Corrections without eligibility of probation or parole.[821]

The jury found both aggravating circumstances.[822]

MAI-CR3D 325.04.1 requires that the jury find a defendant "knowingly" delivered a controlled substance.  That "knowingly" requirement was absent from this verdict director.

The failure of counsel to ensure the jury is properly instructed in the penalty phase has resulted in finding counsel was ineffective.[823] Reasonably competent counsel under similar circumstances would have objected to the absence of "knowingly" from the verdict director.  Under all of the facts and circumstances of the case, including the cumulative effect of the acts and omissions of trial counsel, the prosecution, and the trial judge, the petitioner suffered cognizable prejudice because there is a reasonable probability that if the jury had been properly instructed, he would have received a sentence other than death.

---

[821]Adair DALF 615.

[822]Adair DALF 626.

[823]*See Deck v. State*, 68 S.W.3d 418, 429 (Mo. 2002) (counsel was ineffective for failing to include mitigation paragraphs or failing to object to their absence).

**XXVII.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court denied trial counsel's motion for a directed verdict of life without parole when juror Gray was excused from the jury after the guilt verdict but before the end of the penalty phase, in that this action deprived the petitioner of his right to have his punishment assessed by the same jury which determined guilt.**

Petitioner's counsel in the state courts presented this grievance in Point VII of the opening brief on direct appeal.

Juror Gray was the foreman of the jury at the guilt phase.  During the penalty phase, the juror became aware of some family difficulties which he said would make it impossible for him to perform his duties as a juror.[824] The trial judge excused him.[825]  Trial counsel moved, unsuccessfully of course, for a mistrial or, in the alternative, for a directed verdict of life imprisonment without parole.[826]

---

[824]Adair TT XVIII:3394.

[825]Adair TT XVIII:3405.

[826]Adair TT XVIII:3398.

Mo. Rev. Stat. § 565.030.2 provides, "Where murder in the first degree is submitted to the trier without a waiver of the death penalty, the trial shall proceed in two stages *before the same trier.*"  (Emphasis supplied.)  The only statutory exception to this procedure is found in Mo. Rev. Stat. § 565.035.5(3), which provides that *the state supreme court* may set aside a death sentence and remand for a new punishment hearing, in which evemt a completely new jury should be impaneled.

In *State v. Johnson* the state supreme court approved the replacement of a juror with an alternate in the penalty phase, construing Mo. Rev. Stat. § 494.485 as allowing such a substitution.  The court also characterized such a replacement as "consistent" with the practice prescribed in Mo. Rev. Stat. § 565.035.5(3).  *Johnson* did not deal with the conflict between the replacement of a juror with an alternate and the requirement of Mo. Rev. Stat. § 565.030.2 of a single trier at both stages.

The "consistency" between the procedure prescribed in Mo. Rev. Stat. § 565.035.5(3) and the events here is illusory.  Mo. Rev. Stat. § 565.035.5(3) provides for the procedure when the state supreme court has, at the petitioner's request, provided *relief* from a death sentence. Under those circumstances, it is obvious that the petitioner will not be prejudiced

by the impaneling of a new jury.  As a matter of law, any right he had to the same jury on guilt and punishment would be waived by appeal.[827]  The theory is that although it is not wrong to file an appeal, doing so is attributable to the accused citizen.

Here, however, the necessity for replacing the juror with an alternate did not result from any action of the petitioner, or from his assertion of any right.  Because Mo. Rev. Stat. § 494.485 provides that alternate jurors may replace regular jurors only before deliberations commence, these are the only proper remedies.

By binding itself to afford a person the procedural protection of having the same trier for punishment as they have for guilt, the State of Missouri created a liberty interest that its agents cannot deny an accused citizen without thereby also violating the Due Process Clause of the Fourteenth Amendment.[828]

---

[827]*See, e.g., Illinois v. Somerville,* 410 U.S. 458 (1973) (prohibition on double jeopardy is waived by a successful appeal on the grounds of defective indictment).

[828]*Hicks v. Oklahoma,* 447 U.S. 343, 346 (1980)..

**XXVIII.    Respondent's custody over the petitioner violates the Constitution of the United States in that the trial court refused to submit trial counsel's requested penalty phase instructions A, B, D, E, and E, in that these instructions were necessary to give the petitioner the opportunity to have the jury consider fully the mitigating evidence before it; the trial court's failure to give these instructions violated the petitioner's right to be free of cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point XVIII of the opening brief on direct appeal.

Instructions A, B, C, D, and E were calculated and likely to inform the jury of their right to consider mitigating evidence and to refrain from imposing the death penalty:

INSTRUCTION A

> You are to assume that the punishment of life imprisonment without the possibility of probation or parole means precisely what it says, and if you sentence John Middleton to life imprisonment without the possibility of probation or parole, he will spend the rest of his life in prison, Likewise, you are to presume that if you sentence John Middleton to death, he will be executed by means of lethal injection. You are to make no other presumptions.

## INSTRUCTION B

At the first phase of the trial, you were instructed you were not to be swayed by sympathy. In this phase-of the trial you-are bound bylaw and your oath as jurors to consider mitigating factors. Mitigating factors are facts and circumstances that, while they do not justify or excuse the crime, nevertheless in fairness, sympathy, and mercy to John Middleton, must be considered by you as extenuating or reducing the degree of the defendant's blame or punishment. You many not, however, be swayed by prejudice or public opinion.

These mitigating factors must be considered and weighed against any aggravating circumstances you may find beyond a reasonable doubt. Only if you find beyond a reasonable doubt that any aggravating circumstance(s) outweighs these mitigating factors may you impose the death penalty. You may, of course, always choose to spare Mi. Middleton's life.

## INSTRUCTION C

Any mitigating circumstance, standing alone, may be sufficient to support a sentence of life imprisonment, provided that the mitigating circumstance outweighs any aggravating circumstance or circumstances.

It is the quality of the evidence that must be given primary consideration by you. The quality or importance of the evidence may or may not be equal to the quantity of the evidence, that is, the number of witnesses or exhibits presented in this case.

## INSTRUCTION D

If you see fit, whether mitigating circumstances exist or not, you may recommend mercy for the defendant. This recommendation is soley [*sic*] in your discretion and not controlled by any rule of law. You may make such recommendation with or without a reason.

INSTRUCTION E

Mitigating factors include any compassionate, merciful, or other aspect of the petitioner's background, character, record, or social, psychological or medical history that, based upon the evidence, the defendant offered as a basis for a sentence less than death, whether or not related to the offense for which he has been found guilty. You must disregard any jury instruction given to you in the first phase of this trial which conflicts with this principle.

These instructions were necessary in order to carry out the mandates of *Penry v. Lynaugh*,[829] *Lockett v. Ohio*,[830] and *Eddings v. Oklahoma*,[831] which require that the jury be given the opportunity fully to consider all mitigating evidence.  Because the trial court failed to afford the jury a full opportunity to consider mitigating evidence, the death sentence violated the Eighth Amendment and must be set aside.

---

[829]492 U.S. 302, 319 (1989).

[830], 438 U.S. 586 (1978).

[831]455 U.S. 104 (1982).

XXIX.     Respondent's custody over the petitioner violates the Constitution of the United States in that trial counsel failed to present evidence to challenge the penalty-phase jury instructions on the grounds that they fail to properly guide the jury; those instructions denied the petitioner the right to an impartial jury, to be free from cruel and unusual punishments, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that the evidence presented to the trial court in the state PCR proceeding established that jurors do not understand the instructions; trial counsel unreasonably failed to present evidence to support a challenge; and the petitioner suffered prejudiced because the less jurors understand about what the law from the Supreme Court of the United States expects of jurors in a capital case, the more likely they are to return a punishment verdict of death.

Petitioner's counsel in the state courts presented this grievance in Point X of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective

assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Ground 8(Q) pleaded that trial counsel was ineffective for failing to object to the Missouri form penalty-phase instructions and to present evidence of the studies Dr. Richard Wiener has conducted of those penalty phase instructions.[832]  Besides alleging that counsel was ineffective, the pleadings alleged that the petitioner's substantive rights to due process, a fair trial, a fair and impartial jury, and to be free from cruel and unusual punishment were violated in violation of U.S. Const. amends. V, VI, VIII, and XIV.[833]  Evidence would show that jurors do not understand the penalty phase instructions and that such jurors are more likely to impose death.[834]  The penalty phase instructions precluded the jury from giving mitigating circumstance evidence the consideration that is required under such decisions as *Godfrey v. Georgia*,[835] *Lockett v. Ohio*,[836] and *Mills v. Maryland*[837].[838]

---

[832]Adair PCRLF 64-65 & 158-60.

[833]Adair PCRLF 64-65 & 158-60.

[834]Adair PCRLF 64-65 & 158-60.

[835]446 U.S. 420 (1980).

Prior to trial, counsel filed a motion challenging the MAI penalty phase instructions.[839]  No evidence, however, was presented in support of the challenges that were made.[840]

Ms. Zembles was uncertain whether she was aware of the result of Dr. Wiener's study when the petitioner's case was tried in 1997.[841] Although Ms. Zembles did not consider the motion that was filed challenging the penalty instructions to be self-proving, no evidence was presented to support that motion.[842]  Mr. Slusher believed he was aware of Dr. Wiener's study before the petitioner's case was tried.[843]  He did not know why Dr. Wiener's study was not presented as evidence in support of

---

[836]  438 U.S. 586 (1978)

[837]486 U.S. 367 (1988).

[838]Adair PCRLF 159.

[839]Adair EHT 376 & 578-80.

[840]Adair EHT 376-77 & 578-80.

[841]Adair EHT 578-80.

[842]Adair EHT 579-80.

[843]Adair EHT 376-77.

establishing the invalidity of the Missouri penalty instructions.[844]  Mr.

Slusher believed it would have been better to have evidence of Dr.

Wiener's findings to support the motion that was filed.[845]

The trial-level judge who decided the PCR action ruled that Dr.

Wiener's findings and conclusions failed to establish the penalty phase

instructions were misleading or confusing.[846]  He also relied on the state

supreme court's published criticisms of Dr. Wiener's 1994 study.[847]  He

ruled that Dr. Wiener's most recent study's findings on the same subject

done for the National Science Foundation were irrelevant to the petitioner's

claims that trial counsel was ineffective for failing to present them.[848]

Based on Professor Wiener's review of the penalty phase jury

instructions in the petitioner's case, he concluded, to a reasonable degree of

---

[844]Adair EHT 377.

[845]Adair EHT 377.

[846]Adair PCRLF 296.

[847]Adair PCRLF 296.

[848]Adair PCRLF 296.

scientific certainty, that juror comprehension would have been no better than found in his study.[849]

Professor Wiener was not contacted, prior to the petitioner's trial, by his attorneys and he was willing and able to testify about his study's findings.[850]

The trial court's rejection of Dr. Wiener's study on PCR was clearly erroneous.  Dr. Wiener's 1994 study and more recent National Science Foundation study both concluded there is poor juror comprehension and that poor juror comprehension increases the likelihood of a death verdict.[851] The state supreme court's prior criticisms simply are not scientifically valid for the reasons Dr. Wiener explained at the hearing.  Dr. Wiener's replication of his 1994 study findings in his later National Science Foundation study is relevant to counsel's ineffectiveness because the later study arrived at the same conclusions and disproved the criticisms the state supreme court had made of the 1994 Study.  The later study

---

[849]Adair EHT 273.

[850]Adair EHT 279-80.

[851]Adair EHT 267-73 & 276-77.

establishes that counsel's failure to rely on the 1994 study was unreasonable.

Reasonably competent counsel who filed a motion challenging the penalty phase instructions and who were aware of Professor Wiener's study would have presented evidence of that study to support their motion.  Petitioner was prejudiced because the jurors did not understand the penalty phase instructions submitted in his case.  Not only was the petitioner denied effective assistance of counsel, but also he was denied his rights to due process, a fair trial, a fair and impartial jury, and to be free from cruel and unusual punishment.  This Court should grant relief at least to the extent of vacating the death sentence.

The penalty phase instructions failed to properly guide the jury.  Yet counsel did not challenge them with any supporting evidence. the petitioner was prejudiced because jurors who do not understand those instructions are more likely to impose death. the petitioner was denied his rights to effective assistance of counsel, due process, a fair trial, a fair and impartial jury, and to be free from cruel and unusual punishment.

Dr. Wiener studied and analyzed the MAI form penalty phase instructions and the specific instructions that were given in the petitioner's

case.[852]  He studied jurors' understanding of the Missouri penalty phase

instructions.[853]  That study was done in conjunction with the Missouri

Public Defender System and made available to the Missouri State Public

Defender System on February 1, 1994.[854]  That study found that jurors

overall do not understand the Missouri penalty phase instructions and

those jurors who do not understand the instructions are more likely to

impose death than those who comprehend the instructions.[855]  Professor

Wiener also found that it was possible to improve juror comprehension

through rewriting the penalty phase instructions in language that lay

people understand.[856]  The study was published in the JOURNAL OF APPLIED

PSYCHOLOGY.[857]

---

[852]Adair EHT 267-73.

[853]Adair EHT 267-73.

[854]Adair EHT 215-16.

[855]Adair EHT 267-73.

[856]Adair EHT 267-73.

[857]Adair EHT 269-70 (Ex. 69), R. Wiener, *Comprehensibility of Approved Jury Instructions in Capital Murder Cases*, JOURNAL OF APPLIED PSYCHOLOGY, 455-67 (1995).

In *United States ex rel. Free v. Peters*,[858] a study of the Illinois penalty phase instructions was conducted and concluded that jurors did not understand those instructions.  The Seventh Circuit reversed the granting of relief to the petitioner based on its view that the study was deficient in certain respects.  Professor Wiener's study was free of the problems that the Seventh Circuit had found in the study in *United States ex rel. Free v. Peters*.[859]

Based on Professor Wiener's review of the penalty phase jury instructions in the petitioner's case, he concluded, to a reasonable degree of scientific certainty, that juror comprehension would have been no better than found in his study.[860]

Dr. Wiener also addressed the criticisms the state supreme court directed at his study in *State v. Deck.*[861]  In *Deck*, the state supreme court criticized Dr. Wiener's study because those who participated in his study

---

[858]806 F.Supp. 705 (N.D.Ill.1992), *rev'd*, 12 F.3d 700 (7th Cir. 1993)

[859]Adair EHT 273-74.

[860]Adair EHT 273.

[861]994 S.W.2d 527, 542-43 (Mo.) (en banc), *cert. denied*, 528 U.S. 1009 (1999).

were not jurors who deliberated on the facts of Deck's case.[862]  Dr. Wiener

testified that the state supreme court's criticism is not a valid one because

researchers who have studied the same issues in other states have

consistently found that penalty instructions presently in use are difficult

for jurors to comprehend and generate substantial confusion.[863]  Dr. Wiener

noted that the research literature in the field has shown that deliberation

does not improve jurors' understanding of penalty instructions.[864]  Dr.

Wiener recently completed a new study that was funded by the National

Science Foundation.[865]  That study had 711 death qualified Missouri

residents participate.[866] In Dr. Wiener's most recent study, these

individuals watched a condensed videotape reproduction from a recently

tried Missouri death penalty case.[867]  The study participants deliberated as

---

[862]*Id.* at 542-43..

[863]Adair EHT 272-73.

[864]Adair EHT 274-75.

[865]Adair EHT 275.

[866]Adair EHT 275.

[867]Adair EHT 275-76.

jurors.[868] The study found that deliberation had little impact on jurors'

comprehension of penalty instructions.[869]  This most recent study came to

the same conclusion as the 1994 study:  there is low comprehension of the

Missouri penalty instructions.[870]  Once again Dr. Wiener found that for

those juries for which comprehension was low there was an increased

likelihood the death penalty would be imposed.[871]  Dr. Wiener found that

comprehension would be improved through simplifying the instructions'

language.[872]  Dr. Wiener's National Science Foundation study was accepted

for publication in the JOURNAL OF PSYCHOLOGY, PUBLIC POLICY AND LAW.[873]

Professor Wiener was not contacted, prior to the petitioner's trial, by

his attorneys and he was willing and able to testify about his study's

findings.[874]

---

[868]Adair EHT 276.

[869]Adair EHT 276-77.

[870]Adair EHT 276-77.

[871]Adair EHT 277.

[872]Adair EHT 278.

[873]Adair EHT 279.

[874]Adair EHT 279-80.

The PCR trial-court judge's findings are clearly erroneous.  Dr. Wiener's 1994 study and more recent National Science Foundation study both concluded there is poor juror comprehension and that poor juror comprehension increases the likelihood of a death verdict.[875]  The state supreme court's prior criticisms simply are not scientifically valid for the reasons Dr. Wiener explained at the hearing.  Dr. Wiener's replication of his 1994 study findings in his later National Science Foundation study is relevant to counsel's ineffectiveness because the later study arrived at the same conclusions and disproved the criticisms the state supreme court had made of the 1994 Study.  The later study establishes that counsel's failure to rely on the 1994 study was unreasonable.

Petitioner suffered prejudice from the failure to attack the penalty-phrase instructions immediately following Instruction 15, which is reproduced in Ground XXVI at pages 259-261, *supra*.  Whether or not deliberately, it tipped the scales toward death[876] by requiring the jurors to

---

[875]Adair EHT 267-73 & 276-77.

[876]*Cf. Witherspoon v. Illinois*, 391 U.S. 510, 522-23 n. 20 (1968) ("the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death").

decide whether the accused citizen deserves the death penalty before

allowing them to consider matters in mitigation:

INSTRUCTION NO. 16

If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 15 exists, then you must decide whether there are facts and circumstances in aggravation of punishment which, taken as a whole, warrant the imposition of a sentence of death upon the defendant.

In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial, including evidence presented in support of the statutory aggravating circumstances submitted in Instruction No. 15 If each juror finds facts and circumstances in aggravation of punishment that are sufficient to warrant a. sentence of death, then you may consider imposing a sentence of death upon the defendant.

If you do not unanimously find from the evidence that the facts and circumstances in aggravation of punishment warrant the imposition of death as defendant's punishment, you must return a verdict fixing his punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

MAI-CR 3d 313.41A

Submitted by the State

## INSTRUCTION NO. 17

If you unanimously find that the facts and circumstances in aggravation of punishment, taken as a whole, warrant the imposition of a sentence of death upon the defendant, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh the facts and circumstances in aggravation of punishment. In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial.

As circumstances that may be in mitigation of punishment, you shall consider:

1.      Whether the murder of Alfred Pinegar was committed while the defendant was under the influence of extreme mental or emotional disturbance.

2.      Whether the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.

You shall also consider any other facts or circumstances which you find from the evidence in mitigation of punishment.

It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the evidence in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for

life by the Department of Corrections without
eligibility for probation or parole.


MAI—CR3d 313.44A

Submitted by Defendant

The plain meaning of this instruction is that the jurors should discuss

and decide at this point in their deliberations—before considering any

further instructions—whether they think that the defendant should get the

death penalty. This instruction does not provide for the consideration of

mitigating circumstances in determining whether a sentence of death is

appropriate.  The death decision is made in isolation, solely on the basis of

aggravating circumstances.  The jury is not told until the next instruction,

after they have already decided that death is the appropriate punishment,

that they should consider whether mitigating circumstances exist and

whether said circumstances outweigh the aggravating circumstances.

In *Lockett v. Ohio*[877] the U.S. Supreme Court held that the Eighth

Amendment mandated consideration by the sentencer of "any aspect of a

---

[877]438 U.S. 586, 604 (1978)

defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."[878]

While the Constitution does not require a specific jury instruction on the concept of mitigation, the state may not structure its instructions so as to preclude the jury from giving effect to any relevant mitigating evidence.[879]  The standard for determining whether a jury instruction satisfies the *Lockett* principles is "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."[880]  The jury instructions given in the petitioner's case violate this constitutional principle.

---

[878]*See Bell v. Ohio*, 438 U.S. 637 (1978) (death penalty reversed because the statute precluded consideration of facts and circumstances proffered as mitigating circumstances); *Eddings v. Oklahoma*, 455 U.S. 104 (1982) (sentencing court's conclusion that it could not consider the defendant's turbulent family history as a mitigating factor in deciding punishment was constitutional error requiring reversal of death sentence); *Penry v. Lynaugh*, 492 U.S. 302 (1989) (death sentence vacated because the statutory scheme did not allow the jury to consider fully the defendant's mental retardation as a mitigating factor); *Skipper v. South Carolina*, 476 U.S. 1 (1986) (exclusion of evidence that the defendant has adjusted well to incarceration between arrest and trial violates the Eighth Amendment).

[879]*Buchanan v. Angelone*, 522 U.S. 269, 276 (1998).

[880]*Boyde v. California*, 494 U.S. 370, 380 (1990).

Petitioner's jury was instructed to determine that the death penalty was warranted before considering any mitigating evidence.  This instruction scheme placed the burden on the petitioner to prove to jurors, who had already decided that the facts of the case warranted a death sentence, that he did not deserve the death penalty after all.  This burden shifting created an unjustifiable risk that his sentence of death was imposed arbitrarily and capriciously in violation of *Furman v. Georgia*[881] and *Gregg v. Georgia*,[882] and without the consideration of mitigation evidence required by the Eighth Amendment to the United States Constitution.  It is a classic violation of the principle that "the decision whether a man deserves to live or die must be made on scales that are not deliberately tipped toward death."[883]

Reasonably competent counsel who filed a motion challenging the penalty phase instructions and who was aware of Professor Wiener's study would have presented evidence of that study to support their motion. the petitioner was prejudiced because the jurors did not understand the

---

[881]408 U.S. 238 (1972).

[882]428 U.S. 153 (1976)

[883]*Witherspoon v. Illinois*, 391 U.S. 510, 522-23 n. 20 (1968)

- 283 -

penalty phase instructions submitted in his case. Not only was the

petitioner denied effective assistance of counsel, but also he was denied his

rights to due process, a fair trial, a fair and impartial jury, and to be free

from cruel and unusual punishment.  This Court should order a new

penalty phase.

*Inadequacies in the Post-Trial Review Processes by the State of Missouri*

**XXX.** **Respondent's custody over the petitioner violates the Constitution of the United States in that the death sentence against this petitioner must be set aside because it is disproportionate to the punishment imposed in other similar cases.**

Petitioner's counsel in the state courts presented this grievance in

Point XIX of the opening brief on direct appeal.

Under Mo. Rev. Stat. § 565.035.3(3), the state supreme court must

consider whether the petitioner's death sentence is disproportionate to the

sentences imposed in similar cases. This decision is to be made

"considering both [sic] the crime, the strength of the evidence, and the

defendant."  Under these criteria, the sentence of death is disproportionate

in this case.

Viewed in the prosecution's favor, the evidence was that the crime in this case consisted of killing Pinegar because he was a fellow drug-dealer and the petitioner feared that he would inform authorities about the petitioner's drug activities.  The prosecution's theory was that the decedents in the Callaway County trial were also involved in drug-dealing, and were killed for the same reason.

In *State v. Hicklin*[884] the defendant and another killed a man over a drug deal, shooting him once in the face and three times in back.  Mr. Hicklin was convicted of first degree murder and sentenced to life imprisonment.  In *State v. Beal*[885] the defendant shot a man who approached his car, and said he was afraid of the man.  Three shots were fired.  Previously, the defendant shot and wounded another man under similar circumstances.  Beal, too, was sentenced to life without parole for first-degree murder—by the Hon. K. Preston Dean.[886]  In *State v. Jones*

---

[884]969 S.W.2d 303 (Mo. Ct. App. 1998)

[885]966 S.W.2d 9 (Mo. Ct. App. W.D. 1997)

[886]Cf. *Haynes v. State*, 937 S.W.2d 199, 202 (Mo. 1996) (en banc) (Judge Dean told defendant not charged with or convicted of noncapital offense that if he could do to him what he wanted to him, defendant would have to be "removed from the courtroom in pieces").  This state supreme court held that Judge Dean was fit to hear the same person's post-conviction relief action.  *Id.* at 204-05.

*(Alphonso)*[887] a man was shot six times while driving his car.  Mr. Jones was

sentenced to life.  In *State v. Jones (Craig)*[888] the defendant shot and killed

two people in parking lot of bar after an argument.  He received a life

sentence.  In *State v. Smith*[889] the defendant shot a man in head for failing to

pay a debt, perhaps fearing that the victim would report the defendant's

participation in two burglaries.  He received a life sentence.  Finally, in

*State v. Williams (Gale)*[890] the defendant killed the victim after leaving the

scene of an argument and returning with a gun.  He too received a life

sentence.

  Other cases in which life imprisonment was imposed despite

evidence of multiple murders include *State v. Kelley,*[891] in which the

defendant was sentenced to life imprisonment for killing two women to

whom he was married at different times.  The cases were consolidated for

---

[887]959 S.W.2d 829 (Mo. Ct. App. E.D. 1997)

[888]955 S.W.2d 5 (Mo. Ct. App. W.D. 1997).

[889]966 S.W.2d 1 (Mo. Ct. App. W.D. 1997)

[890]951 S.W.2d 332 (Mo. Ct. App. S.D. 1997)

[891]953 S.W.2d 73 (Mo. Ct. App. S.D. 1997)

trial.  In *State v. McNeal*[892] the defendant killed two people in a dispute over a debt.  In *State v. Davidson*[893] the defendant killed a total of three people in a dispute over paternity.  In *State v. Terry*[894] the defendant killed two persons in a drug dispute.  In *State v. Futo*[895] the defendant killed both of his parents and two of his siblings.  Finally, in *State v. Williams*[896] the defendant killed his own wife plus the husband of his paramour.  Under these circumstances, the petitioner submits that a death sentence is a disproportional response to the crime here.

The legal sufficiency of the evidence is not challenged in light of the testimony of Douglas Stallsworth.  That testimony, if believed by the jury, is sufficient to convict the petitioner.  Under *Jackson v. Virginia*[897] the evidence is **legally** sufficient. As the state supreme court noted in *State v.*

---

[892]945 S.W.2d 470 (Mo. Ct. App. W.D. 1997).

[893]941 S.W.2d 732 (Mo. Ct. App. E.D. 1997)

[894]928 S.W.2d 879 (Mo. Ct. App. E.D. 1996)

[895]932 S.W.2d 808 (Mo. Ct. App. E.D. 1996).

[896]897 S.W.2d 631 (Mo. Ct. App. E.D. 1995)

[897]443 U.S. 307 (1979)

*Chaney*,[898] however, ***that*** does not necessarily mean a punishment of death is appropriate:

> [T]he legislature intended for this Court, when reviewing the imposition of the death penalty, to go beyond a mere inquiry into whether the evidence is sufficient to support a conviction.  To perform this duty necessarily requires a comparison of the weight of the evidence in other cases in which the death penalty was given.

The evidence here consisted of various oblique references allegedly made by the petitioner, and the testimony of a jailhouse informant with a long history of mental illness that the petitioner had confessed to him while in jail.  Only a small amount of physical evidence connected the petitioner with the scene.  The informant's testimony was significantly impeached.  Under these circumstances, the analysis required under *Chaney* compels the conclusion that the weight of the evidence renders the death penalty disproportionate.

Petitioner had one prior conviction for a non-violent offense.  He was shown to have serious mental difficulties as a result of a long-standing drug addiction.  It is difficult to provide life imprisonment cases with these facts, because mitigating factors are not typically reported in such cases.

---

[898]*State v. Chaney*, 967 S.W.2d 47 (Mo. 1998) (en banc).

These factors are seldom found in cases where death is imposed. Therefore, the sentence of death is disproportionate for this reason also.

For the foregoing reasons, the sentence of death should be vacated.  It should have been vacated by the Missouri Supreme Court.  The statute under which that body addressed the proportionality issue is part and parcel of the Eighth-Fourteenth Amendment jurisprudence of the Supreme Court stemming from its *Furman* and *Gregg* decisions.  The statutory process is a state-created procedural protection of the rights of accused citizens in capital cases, the failure to abide by which violates the Due Process Claus of the Fourteenth Amendment.[899]  That is what happened here.

---

[899]*Hicks v. Oklahoma,* 447 U.S. 343, 346 (1980)..

**XXXI.      Respondent's custody over the petitioner violates the Constitution of the United States in that the death sentence in this case is unconstitutional and must be vacated because Mo. Rev. Stat. § 565.035.3(3) and the state supreme court's cases construing it provide no guidance to the petitioner for directing the same court's attention to its duty to conduct proportionality review, in violation of the petitioner's rights to the effective assistance of counsel and to due process of law, as guaranteed by the Sixth and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in Point XX of the opening brief on direct appeal.

Respondent's custody over the petitioner violates the Constitution of the United States in that Mo. Rev. Stat. § 565.035.3(3) and the Missouri Supreme Court's decisions provided no guidance to the petitioner for directing the Missouri Supreme Court's attention to its duty to conduct proportionality review, in violation of the petitioner's right to effective assistance of counsel, to be free from cruel and unusual punishments, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.

For nearly a century, the United States Supreme Court has recognized "that punishment for crime should be graduated and proportioned to the offense."[900]  To insure against the "wanton" and "freakish" imposition of the death penalty condemned in *Furman v. Georgia*,[901] the Missouri legislature required proportionality review in all cases in which the death sentence is imposed, and directed the compiling of a database of cases to facilitate such review.[902]  This statute created a due process and equal protection right in the petitioner and other defendants sentenced to death because in integrating an appellate process into Missouri's criminal justice system, the state's appellate procedures must comply with the Due Process Clause.[903]  This statutory provision is a state-created, federally-protected liberty interest, which state agents may not

---

[900]*Weems v. United States*, 217 U.S. 349, 367 (1910).

[901], 408 U.S. 238 (1972).

[902]Mo. Rev. Stat. § 565.035.3.

[903]*See also Evitts v. Lucey*, 469 U.S. 387, 400 (1985); *Easter v. Endell*, 37 F.3d 1343, 1345 (8th Cir. 1994); *Rust v. Hopkins*, 984 F.2d 1486, 1493 (8th Cir. 1993); *Hewitt v. Helms*, 459 U.S. 460, 471-72 (1982).

violate without also violating the Due Process Clause of the Fourteenth Amendment.[904]

In *Harris v. Blodgett*[905] another United States District Court held unconstitutional Washington State's proportionality review statute,[906] which is substantially similar to that of Missouri.  The statute was subject to "a heightened degree of scrutiny of procedural due process before the deliberate extinguishment of human life."

> Harris' due process rights were violated in the sentence review.  While he had notice of the proceedings, he did not have adequate, meaningful, notice of the procedure to be followed . . .  Harris had no adequate notice of what "similar cases" are, how they are to be selected, or the factors to be compared.  He had no notice of what would happen if no "similar cases" were found.  He had no adequate notice of the court's standard for review of "similar cases . . . ."  Because of the lack of appropriate notice regarding the procedure to be followed, Harris did not have a meaningful opportunity to be heard.

As in Washington State, this state supreme court's approach to proportionality review has not provided criminal defendants with the

---

[904]*Wilkins v. Bowersox*, 933 F.Supp. 1496, 1525-26 (W.D. Mo. 1996), *aff'd*, 145 F.3d 1006 (8th Cir. 1998), *cert. denied*, 512 U.S. 1094 (1999)

[905]853 F.Supp. 1239, 1286 (W.D. Wash 1994), *aff'd*, 64 F.3d 1432 (9th Cir. 1995)

[906]RCW 10.95.130(2).

procedural protections the State of Missouri promised them in Mo. Rev. Stat. § 565.035.3 and its state constitution, and which the Constitution therefore guarantees them twice over.

This state supreme court's approach is flawed in three ways.  First, the pool of cases which the state supreme court reviews to determine proportionality is selected in such a way as to skew the analysis.  According to the court's own decisions, the pool includes *either*:

(1)     only appealed cases, *State v. Bolder*, 635 S.W.2d 673, 685 (Mo. 1982) (en banc); *or*

(2)     only cases in which the prosecution sought death, *State v. Sloan*, 756 S.W.2d 503 (Mo. 1988) (en banc); *State v. White*, 813 S.W.2d 862 (Mo. banc 1991) (en banc); *or*

(3)     only cases with jury sentencing, *State v. Byrd*, 676 S.W.2d 494 (Mo. 1984) (en banc); *State v. Zeitvogel*, 707 S.W.2d 365 (Mo. 1986) (en banc); *or*

(4)     only cases in which death was imposed, *State v. Ramsey*, 864 S.W.2d 320 (Mo. 1993) (en banc).

Even a superficial analysis of this crazy-quilt of criteria for selection shows that many cases in which a defendant was sentenced to life imprisonment are eliminated.  For example, a case in which the sentence was life is less likely to be appealed than a death sentence, which is

appealed automatically.  None of the cases in which the death penalty was waived will appear in the analysis.  None of the cases in which death sentences were commuted by executive clemency are included. And, by comparing the case at issue only with those cases in which death was imposed, the court turns the concept of "proportionality" on its head. Such a comparison may allow the court to find *similar* cases in which death has been imposed, but that is not the same as ***proportionality***.  A previous mistake in the imposition of the death sentence should not pave the way for a repetition of the same mistake.

The second flaw in the state supreme court's analysis has to do with the selection of cases for comparison from the pool of cases considered. The state supreme court has never articulated its approach to this process.[907]  At most, there is a citation to cases with similar statutory aggravating circumstances, excluding non-statutory aggravators and mitigators.[908]

The state supreme court's lack of consistency in reviewing the penalty imposed in capital cases became even more evident in *State v.*

---

[907]*See, e.g., State v. Bannister*, 680 S.W.2d 141 (Mo. 1984) (en banc).

[908]*See State v. Davis*, 814 S.W.2d 593, 607 (Mo. 1991) (en banc) (Blackmar, J. dissenting).

*Chaney*.[909]  In *Chaney*, the state supreme court affirmed the conviction but

reversed the sentence of death imposed on Timothy S. Chaney.  In so

doing, the court conducted its proportionality review in a way that

contrasted sharply with the review conducted in previous cases.  In *Chaney*,

the state supreme court held that in conducting its mandatory

proportionality review of a sentence,

> This court must also consider "the strength of the
> evidence."  [Mo. Rev. Stat. §565.035.3(3).]  This
> aspect of proportionality review is uncommon
> among states having statutes mandating
> proportionality review.  It is clear from this
> mandate that the legislature intended for this Court,
> when reviewing the imposition of the death
> penalty, to go beyond a mere inquiry into whether
> the evidence is sufficient to support a conviction.
> To perform this duty necessarily requires a
> comparison of the weight of the evidence in other
> cases in which the death penalty was given.

The court thus suggested a criterion, "a comparison of the weight of

the evidence in other cases in which the death penalty was given."  In

order to determine whether the death penalty is ***disproportionate***, it is also

necessarily to compare the weight of the evidence in this case with the

---

[909], 967 S.W.2d 47 (Mo. 1998) (en banc)

weight of the evidence in cases in which the sentencer did ***not*** return a

death verdict.

Finally, the court fails to use adequate methods to compare the cases.

Wallace and Sorensen suggest, in *The Missouri Capital Punishment Process:*

*Appellate Review* of *Proportionality and Racial Discrimination,* unpublished

article, at 30, the use of a "frequency" approach

> where the reviewing court determines the elements
> which led to a death sentence in the case and
> identif[ies] the comparison cases using a case
> selection method.  Using the identified relevant
> factors, the court estimates the number of death
> sentences which have been imposed in this
> identified pool of cases.  Then a determination is
> made as to whether the death penalty is being
> imposed sufficiently often to justify affirming the
> sentence under review.

The article states, "This type of review would appear necessary to

meet the concerns regarding comparative excessiveness expressed in the

plurality opinion in *Gregg v. Georgia*."[910]  Almost ten years earlier, looking

more broadly at proportionality review, another team of writers came to

the same conclusion.

---

[910]*The Missouri Capital Punishment Process:  Appellate Review of Proportionality and Racial Discrimination,* unpublished article, at 31.

In Acker and Lanier, *Statutory Measures for More Effective Appellate Review of Capital Cases*,[911] the authors suggest that the lack of standards in proportionality review statutes "helps explain why, in practice, comparative proportionality review has been an empty promise." In Missouri, only two cases had been so reversed at the time of the petitioner's direct appeal.[912]

Acker and Lanier suggest that the best way to clarify proportionality review is to have legislatively enacted standards requiring the frequency method described above.  Although the state supreme court does not control the action of the legislature, it does control its own procedures.  By adopting a method of proportionality review which considers all relevant cases, extracts proper factors for comparison, and determines the frequency of death sentences in the relevant group, the state supreme court could obviate the need for further legislation on the issue while protecting the rights of persons sentenced to death to due process and equal protection of the laws.

---

[911]8 STATE COURT JOURNAL 211, 238 (1984).

[912]*State v. McIlvoy*, 629 S.W.2d 333 (Mo. 1982) (en banc); *State v. Chaney*, 967 S.W.2d 47 (Mo. 1998) (en banc).

In the absence of such a judicially or legislatively adopted standard, Missouri's proportionality review statute is unconstitutional. Among the fundamental prerequisites of due process is the right to notice and an opportunity to be heard in a meaningful manner.[913]  Because neither the state supreme court's decisions nor the statute itself provide any guidance as to how proportionality review is to be conducted, persons condemned to death are denied the right to the effective assistance of counsel as guaranteed by U.S. Const. amend. VI and Mo. Const. art. I, § 18(a) (state constitutional guaranty of assistance of counsel), to say nothing of due process.

The state supreme court has used a variety of proportionality analyses.  These include the consideration of various "pools" of cases and various criteria for determining similarity.

Some of these approaches are described above.  Such a multiplicity of methodology makes it impossible for any petitioner and their counsel to demonstrate to the state supreme court that any death sentence is disproportionate.  To solve this problem, the state supreme court should be required—if it chooses to be part of the death-penalty system—to articulate

---

[913]*Fuentes v. Shevin*, 407 U.S. 67, 80 (1972); *Armstrong v. Manzo*, 380 U.S. 545 (1965)

standards for review which comport with due process.  Then, to provide

for adequate notice to the petitioner in this case, the death sentence in this

case must be vacated.

**XXXII.     Respondent's custody over the petitioner violates the Constitution of the United States in that the state did not provide the petitioner with a record of the trial court proceedings which was sufficient to permit him to exercise his right to appellate review of his conviction, in violation of his rights to the effective assistance of counsel, to be free from cruel and unusual punishments, and to due process of law as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.**

Petitioner's counsel in the state courts presented this grievance in

Point XXII of the opening brief on direct appeal.

Direct-appeal counsel filed the transcript of the petitioner's trial with

the state supreme court, and the respondent is under a duty to provide it to

this Court.[914]  An examination of that transcript reveals that it is riddled

with omissions and confusion.  Even before filing the petitioner's opening

brief before the state supreme court, the petitioner's counsel located at least

---

[914]Special Rules Following 28 U.S.C. § 2254 (Habeas Rules) 5.

thirty-four instances in which the record indicates that the court reporter failed to hear what was said in the courtroom.[915]  In some instances, she requested and received clarification; in other instances the record is simply unclear or nonexistent.

Direct-appeal counsel for petitioner contacted the court reporter, the trial judge, the prosecutors, and trial counsel on June 29, 1998, to determine whether any of these lacunae could be remedied before she had to file the petitioner's brief.  She attached specimen copy of this letter to her brief in an addendum at p. Al.  She received the following responses:

1.  Court reporter:  "I have prepared and provided you with as complete a transcript as I can honestly certify is accurate." (Addendum, A2.)

2.  Trial Counsel: "We are simply unable to remember or reconstruct by the surrounding context what words were spoken in those blank areas."  (Addendum, A3.)

3.  Prosecutor R. Cnistine Stallings:  "I have reviewed this and am unable to fill in the blanks on any of these pages from my memory at this time."  (Addendum, A4.)

---

[915]Tn. Vol. IV, pp. 731, 732, 741; Tn. Vol. VI, **p~.** iiTa, ¶1 39; Tn~ Vol. Vii; p~ 1323; Vol. VIII, pp. 1404, 1449, 1451, 1467; Tr. Vol. IX, pp. 1610, 1619, 1620, 1664, 1672, 1674, 1676; Tn. Vol. X, pp. 1781, 1802, 1816; Ti. Vol. XII, pp. 2362, 2374; Tn. Vol. XIII, pp. 2436, 2490, 2541, 2575, Tn. Vol. XV, pp. 2846, 2969; Tn. Vol. XVIII, p. 3465; Tn. Vol. **XIX,** pp. 3643, 3645, 3647, 3706, 3735.

4. <u>Assistant Attorney General David B. Cosgrove</u> requested that counsel identify omissions believed to be "material;" counsel advised by letter that without knowing what was missing, materiality was impossible to determine; no further response received by deadline.  (Addendum, A5 & A6.)

5. <u>Assistant Attorney Kurt U. Shaefer</u> relied on the response of Mr. Cosgrove (Addendum, A7.)

6. <u>Judge Bruce Normile:</u>  In a telephone conversation on July 13, 1998, Judge Normile informed direct-appeal counsel that he was unable to supply any missing parts of the transcript.  He pointed out that no testimony appeared to be missing, and that sometimes it is difficult for a court reporter to hear when several people are talking at once.

Based on these responses, it seems clear that the missing portions of the record cannot be reconstructed.  The response of the court reporter (DAOB Addendum at A2) is particularly disturbing in its implications for the integrity of the record.  She states, "You must also know that it is not always prudent to interrupt a lawyer in the courtroom in a timely enough fashion to make it beneficial . . . .  It is the attorney's duty to make the record; the reporter only 'takes' it, and can only certify a record that is clearly made."  Mo. Rev. Stat. § 485.050 provides that the official court reporter shall "take full stenographic notes of" court proceedings and shall

furnish a transcript upon proper payment.  A person speaking in the courtroom simply cannot be held responsible for the court reporter's failure to hear or understand what was said.  In order to take "full stenographic notes," the court reporter must insure that he or she hears all of the proceedings.  Although the court reporter here made attempts at some points to draw the participants' attention to her difficulty in hearing the proceedings, in many instances she did not.

At the time of the petitioner's direct appeal, his direct-appeal counsel had reviewed transcripts for over twenty years, and  could not recall seeing another transcript which contained lacunae such as these.  Thus, the reporter's statement, "I'm sure everyone with court experience understands that this happens and would doubt the authenticity of a transcript that contained none [inaudibles]" did not describe the experience of the petitioner's direct-appeal counsel, at least, nor does it describe the experience of the petitioner's appointed counsel before this Court.

The following instances are particularly serious in their potential impact on the petitioner's ability to raise issues on appeal:  Vol. VI, pp. 1118 & 1139, Vol. VII, p. 1323, 1404 & 1467 (responses of prospective jurors concerning their qualifications are missing); Vol. VII, pp. 1449 & 1451 (it is

not clear which prospective jurors were responding); Vol. IX, p. 1610 &

1620 (a portion of the defense attorney's voir dire question is missing); Vol.

IX, p. 1664 (the basis for defense counsel's objection, which is overruled, is

missing); Vol. IX, p. 1672 (a portion of the responses venire member Crisp,

who was excused over objection, is missing); Vol. X, p. 1781 (a response of

a venire member concerning a death penalty issue is missing); Vol. XIX, p.

3735 (portion of argument which is the subject of an objection is missing).

Direct-appeal counsel could not raise issues concerning these statements

before the state supreme court because the record was not sufficient for her

to determine whether a meritorious point was being raised.  If she had

attempted to raise an issue in which one of these lacunae were involved,

the same office that provided the line attorneys for the prosecution would

have argued that "the appellant" had waived it by not making a record,

when he would have been choked by deputies if he had gotten within a

few yards of the court reporter.

    In theory, a state can do away with criminal appeals.[916]  But when a

state creates a right of appeal, the appellate procedure must afford due

---

[916]*Goeke v. Branch*, 514 U.S. 115, 120 (1995) (per curiam) (citing cases).

process.[917]  In *Handy v. United States*[918] the Supreme Court held that such

procedures include the right to a complete record on appeal in any criminal

case, at least where appellate counsel did not represent the defendant at

trial.  This is both because the absence of a complete record makes it

difficult to argue preserved errors, and also because a part of the right of

appeal is the right to bring to the attention of the court plain errors

affecting substantial rights.  Under Missouri law, "A losing party is

entitled to appellate review based upon a full, fair and complete transcript

on appeal."[919]  By binding itself to afford a person this procedural

protection, the State of Missouri created a liberty interest that its agents

cannot deny an accused citizen without thereby also violating the Due

Process Clause of the Fourteenth Amendment.[920]

If an petitioner does not have the benefit of a full record through no

fault of his own, and is prejudiced thereby, reversal is required.  "Where, as

---

[917]*Williams v. Oklahoma City*, 395 U.S. 458, 459 (1969) ("it is now fundamental that, once established, these avenues [for criminal appeals, here from a 90-day jail sentence and a $50 fine in a municipal drunk-driving case] must be kept free of unreasoned distinctions . . . ") (citing cases).

[918]375 U.S. 277, 279-80 (1964).

[919]*Jackson v. State*, 514 S.W.2d 532, 533 (Mo. 1974).

[920]*Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980)..

here, the missing portions of the transcript concern material witness testimony, the appealing party should not be penalized by the state's failure to furnish a proper record."[921]  In *State v. Finsten*[922] the unavailable portion of the transcript was of a pretrial hearing, and the court held that the error could be corrected by holding a new hearing.  Here, however, the omissions occurred during trial, and no such reconstruction is possible.

Prejudice from these omission is apparent because the record is so uncertain that petitioner has been denied his rights to full review and to effective assistance of counsel on appeal because appellate counsel cannot fully evaluate and argue the errors at trial.  For the foregoing reasons, the Sixth and Fourteenth Amendments required reversal.

In a capital case, the State of Missouri does not have the option of doing away with appeals.  As the petitioner has already documented,[923] appellate review was a condition the Supreme Court placed on the states' and the federal government's reintroduction of the death penalty after

---

[921]*Morris v. State*, 772 S.W.2d 11, 12 (Mo. Ct. App. 1989).  *See also State v. Brown*, 690 S.W.2d 161 (Mo. Ct. App. 1985); *Koehn v. Director of Revenue*, 813 S.W.2d 363 (Mo. Ct. App. 1991).

[922]963 S.W.2d 414 (Mo. Ct. App. 1998).

[923]See pages 120-122, *supra*.

*Furman v. Georgia*.[924]  The Supreme Court did not simply demand the existence of a right to appeal, but "*meaningful* appellate review."[925] Without a reliable, thorough transcript there can be no rational appellate review, and barely any review at all.  An appeal in which appellate counsel can't decide what to put in the brief because there are holes in the transcript is a kangaroo-court procedure which would be an embarrassment to the legal system in a traffic case and a breach of the mandatory constitutional norms at least since 1976 in a capital case.

---

[924]408 U.S. 238 (1972).

[925]*Parker v. Dugger*, 498 U.S. 308, 321 (1991).

**XXXIII.    Respondent's custody over the petitioner violates the Constitution of the United States in that direct appeal counsel was ineffective for failing to raise two grievances:  (A) the trial court erred in denying the motion that sought dismissal or alternatively exclusion of certain witnesses because attorneys who had represented the petitioner also had represented prosecution witnesses on charges against them; and (B) the claim that instruction 15, the penalty verdict director, omitted the "knowingly" mental state requirement from one aggravator the jury found, because the petitioner was thereby denied his rights to effective assistance of counsel, to freedom from cruel and unusual punishments, and to due process of law, as guaranteed by the Sixth, Eighth, and Fourteenth Amendments, in that reasonably competent appellate counsel would have raised these claims, and there is a reasonable probability the petitioner's conviction or sentence would have been reversed.**

Petitioner's counsel in the state courts presented this grievance in Point VIII of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective

assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

A judge in the same trial court which sentenced the petitioner to deat denied the petitioner's claims that direct-appeal counsel was constitutionally ineffective for failing to raise as error (A) the trial judge's denial of the motion to dismiss because of prosecutorial misconduct or alternatively to exclude certain witnesses because attorneys who had represented the petitioner also had represented prosecution witnesses on charges against them, and (B) Instruction 15, the penalty verdict director; omitted the "knowingly" mens rea requirement from one aggravator which the jury found.  Failure to advance these points on direct appeal denied the petitioner the rights to the effective assistance of appellate counsel, freedom from cruel and unusual punishment, and due process of law.

An accused citizen who has been convicted in the trial court is entitled to effective assistance of appellate counsel.[926]  As a matter of federal constitutional law, the test is the same as that in *Strickland*, but the

---

[926]*Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985).

"reasonable probability" of a different outcome simply refers to the appeal rather than a trial verdict or a plea disposition.

The PCR trial-court judge found that appellate counsel had raised the issues she believed had merit and did not appeal those she believed lacked merit.[927]  Having made that finding of subjective good faith—which goes without saying—this judge held that the petitioner had not met the state supreme court's criteria for ineffective assistance of effective counsel set forth in *Moss v. State*,[928] under which the error appellate counsel failed to raise must have been so substantial as to rise to the level of a manifest injustice or a miscarriage of justice.[929]  Under the latter standard, of course, the appellate court could have granted relief on the claim sua sponte,[930] so giving relief for ineffective assistance of counsel fails to enforce the constitutional guaranty applying to such representation.

### (A)   Attorney Conflict

---

[927]Adair PCRLF 303-04.

[928]10 S.W.3d 508, 514-15 (Mo. 2000) (en banc)

[929]Adair PCRLF 303-04.

[930]Mo. S. Ct. R. 30.20.

Trial counsel filed a motion on February 19, 1997, to dismiss based on prosecutorial misconduct or alternatively to exclude the prosecution's witnesses, Stallsworth, Spurling, and Henderson.[931]  The motion's denial was included as an allegation of error in the motion for new trial.[932]  The relief sought was premised on attorneys from the public defender's office in Chillicothe having represented both the petitioner and these other named individuals who the prosecution intended to call as witnesses against the petitioner.[933]  At the petitioner's Adair County trial, Stallsworth, but not the other two, testified against the petitioner.

On PCR, the trial court noted that the petitioner was arrested on June 28, 1995.[934]  On June 28, 1995, Assistant Public Defender Wallace of the Chillicothe office of the Missouri State Public Defender System approved the petitioner's application for services.[935]  On June 29, 1995, Mr. Wallace and another Assistant Public Defender from Chillicothe, Mr. Stephens,

---

[931]Adair DALF 541-49.

[932]Adair DALF 654-55.

[933]Adair DALF 541-49.

[934]Adair DALF 541-42.

[935]Adair DALF 542.

interviewed the petitioner; the District Defender in Chillicothe, Mr. Miller, entered his appearance in the petitioner's case.[936]  On July 27, 1995, Mr. Miller moved to withdraw, and the court made a docket entry that same day authorizing withdrawal.[937]  The Public Defender System's Capital Division did not file an entry of appearance for the petitioner until September 19, 1995.[938]

Henderson, represented by Mr. Miller, appeared on Harrison County charges for the first time on June 13, 1995.[939]  On or about September 18, 1995, Henderson provided Mr. Miller with a statement of alleged admissions the petitioner made.[940]

In June 1995, Mr. Wallace represented Stallsworth.[941]  On September 19, 1995, Stallsworth told law enforcement that the petitioner had made alleged admissions.[942]

---

[936]Adair DALF 542.

[937]Adair DALF 542.

[938]Adair DALF 542.

[939]Adair DALF 542-43.

[940]Adair DALF 543.

[941]Adair DALF 543.

In August 1995, Spurling provided statements implicating the petitioner in the deaths of Hamilton and Stacey Hodge.[943]  Subsequently, Spurling was charged with crimes in Harrison County and represented by Mr. Stephens.[944]  Mr. Stephens represented Spurling until February 14, 1997, when concerns were raised about Mr. Stephens's conflict.[945]

On February 21, 1997, the trial court heard argument.[946]  Mr. Miller represented Henderson at the same time he represented the petitioner.[947]  Mr. Miller helped Henderson prepare a September 1995 statement that incriminated the petitioner.[948]  Henderson gave his statement in hopes of obtaining favorable treatment on his own charges.[949]  Mr. Wallace brought

---

[942]Adair DALF 543.

[943]Adair DALF 544.

[944]Adair DALF 544.

[945]Adair DALF 544.

[946]Adair TT 899-919.

[947]Adair TT 901.

[948]Adair TT 901.

[949]Adair TT 901.

Stallsworth to the prosecution as someone who could testify against the petitioner.[950]

The trial court judicially noticed that Mr. Miller entered his appearance on behalf of the petitioner on June 29, 1995, moved to withdraw on July 27, 1995, and was permitted to withdraw on July 27, 1995.[951]  The trial court also judicially noticed that counsel from the Public Defender Capital Trial Division did not enter until September 19, 1995.[952]

The prosecution conceded that the three public defenders from the Chillicothe office had violated ethical rules governing representing someone who has an adverse interest to a former client.[953]  The trial court found that Mr. Miller violated his "fiduciary duty" to the petitioner through securing from another client an incriminating statement against

---

[950]Adair TT 902.

[951]Adair TT 914-16.

[952]Adair TT 914-16.

[953]Adair TT 909.

the petitioner.[954]  After hearing arguments, the trial court denied the motion

on February 21, 1997.[955]

On February 27 and 28, 1997, the trial court took up the motion again

and heard evidence. In the summer of 1995, the Chillicothe office included

Mr. Miller, Mr. Stephens, and Mr. Wallace.[956]  Mr. Wallace and Mr.

Stephens met with the petitioner on June 28, 1995.[957]  On June 29, 1995, Mr.

Miller's office entered its appearance on behalf of the petitioner.[958]  Mr.

Miller met with the petitioner on June 29, 1995 following his initial court

appearance.[959]  Mr. Stephens met with the petitioner on June 30, 1995.[960] Mr.

Stephens, along with Mr. Wallace, met with the petitioner on June 29, 1995

or June 30, 1995.[961]  Mr. Stephens met with the petitioner on at least one

---

[954]Adair TT 917-18.

[955]Adair TT 919.

[956]Adair TT 1832.

[957]Adair TT l832-33.

[958]Adair TT 1833.

[959]Adair TT 1833.

[960]Adair TT 1836.

[961]Adair TT 1872-73.

more occasion and possibly as many as three or four more times.[962] Mr. Miller filed a motion to withdraw on July 27, 1995.[963]

Mr. Miller's representation of Henderson began on June 15, 1995.[964] Mr. Wallace obtained Henderson's statement incriminating the petitioner.[965]  Mr. Miller helped Henderson to edit it and Mr. Miller turned the statement over to the State while seeking favorable treatment for Henderson.[966]

After hearing additional argument,[967] the trial court denied the motion again.[968]

The Chillicothe office must have continued to represent the petitioner after leave was granted to withdraw on July 27, 1995, until a representative of the Capital Division entered an appearance on September 19, 1995;

---

[962]Adair TT 1873.

[963]Adair TT 1834-35.

[964]Adair TT 1837.

[965]Adair TT 1839-40.

[966]Adair TT 1839-44.

[967]Adair TT 1907-15.

[968]Adair TT 19l5-16.

otherwise, the petitioner would not have been represented by any attorney.[969]  On that same day, while Mr. Wallace represented Stallsworth, Stallsworth furnished law enforcement with inculpatory statements the petitioner allegedly made.[970]  On September 18, 1995—while Mr. Miller still represented the petitioner—Henderson furnished a statement that incriminated the petitioner.

Appellate counsel did not brief this issue because she did not believe it had merit.[971]

In this case Stallsworth, dubious as his competence and credibility were, was all the prosecution had to substitute for an eyewitness or a confession to someone really believable.  Stallsworth testified in the guilt phase that the petitioner admitted killing Pinegar.[972]  In the penalty phase, Stallsworth testified the petitioner admitted killing Hamilton and Stacey Hodge.[973]  Under these circumstances, for the petitioner's lawyer to

---

[969]Adair TT 914-16.

[970]Adair DALF 543;Adair TT 902.

[971]Adair EHT 173-74.

[972]Adair TT 2871-74.

[973]Adair TT 3 178-82.

represent Stallsworth and get a deal for Stallsworth to hang the petitioner violated the petitioner's federal constitutional right to counsel by reason of conflict of interest.[974]  Once one shows the existence of such a conflict, one need make no further showing of prejudice in order to obligate the courts to grant relief.[975]

Reasonably competent appellate counsel under similar circumstances would have raised as error the trial court's denial of the motion to exclude testimony from Stallsworth.  Reasonably competent appellate counsel would have presented the conflict of Mr. Wallace's representation of both the petitioner and Stallsworth at the time Stallsworth furnished the prosecution incriminating evidence as a grounds for excluding Stallsworth. Petitioner was prejudiced because there is a reasonable probability that his conviction or at minimum his sentence would have been reversed on appeal had appellate counsel presented this matter.

In rejecting this claim of ineffective assistance of direct-appeal counsel, the Missouri Supreme Court held that "appellate counsel *would*

---

[974]*State v. Risinger*, 546 S.W.2d 563, 565 (Mo. Ct. App. S.D. 1977), *citing Gideon v. Wainwright*, 372 U.S. 335 (1963).

[975]*State v. Risinger*, 546 S.W.2d at 565, *citing Glasser v. United States*, 315 U.S. 60, 76, 62 (1942); *United States ex rel. Miller v. Myers*, 253 F.Supp. 55, 57 (E.D.Pa. 1966).

not have been successful in arguing that the trial court erred in admitting

the testimony of Mr. Stallsworth."[976]  This holding reflects the fact that at

least in order to affirm death sentences, the Missouri Supreme Court

applies a more restrictive concatenation of tests for ineffective assistance of

appellate counsel than the federal constitutional standard.  Another capital

case, *Franklin v. State*—quoting the same *Moss* opinion that the PCR judge

in the trial court relied on in denying relief—it makes clear that this is an

outcome-determinative test:

> In order to prove that he was deprived of the
> effective assistance of counsel on appeal, [the
> person asserting the federal constitutional right]
> must first show (1) that the actions of his appellate
> attorney were "outside the wide range of
> professionally competent assistance," and (2) that
> his counsel's errors were so severe that "counsel
> was not functioning as the 'counsel' guaranteed the
> defendant by the Sixth Amendment" and (3) that
> counsel's deficient performance resulted in
> prejudice.  To support a claim of ineffectiveness
> regarding an attorney representing the defendant
> on direct appeal from his conviction, "strong
> grounds must exist showing that counsel failed to
> assert a claim of error which would have required
> reversal had it been asserted and which was so
> obvious from the record that a competent and

---

[976]103 S.W.3d at 737 (emphasis supplied).

effective lawyer would have recognized and
asserted it."[977]

By contrast, *Strickland* rejects outcome-determinative tests in favor of
the "reasonable probability" that the outcome would have been different.
In addition to stacking several tests on top of each other to make sure that
everyone knows such claims are unwelcome, the state supreme court
requires that the omitted point "would" have resulted in reversal.  Because
that requirement goes beyond the federal constitutional standard, the
decision based on it "was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States."[978]  In the alternative, the Missouri
Supreme Court has not reached the federal constitutional issue on this or
any other claim of ineffective assistance of appellate counsel, and this
Court may adjudicated these claims de novo.

### B.   <u>Verdict Director "Knowingly" Missing</u>

---

[977]*Franklin v. State*, 24 S.W.3d 686, 690-91 (Mo. 2000) (en banc) (footnotes citing cases
omitted).

[978]123 S.Ct. at 2534-37.

As discussed in Point VII, the penalty verdict director lacked the mental e1ement of "knowingly" and the jury found the aggravator that was missing this requirement.[979]

Ground 8(W)(37) of the state PCR amended motion pleaded that appellate counsel was ineffective for failing to raise this grievance on appeal.[980]  Appellate counsel testified she did not realize that "knowingly" was missing from the verdict director, and therefore, did not consider presenting this issue on appeal.[981]

In *Roe v. Delo*[982] the Eighth Circuit found appellate counsel was ineffective for failing to raise as a matter of plain error that the verdict director misstated the required mental state for first degree murder. Reasonably competent appellate counsel under similar circumstances would have raised the failure to include the required mental element of "knowingly" in Instruction No. 15.[983]  Petitioner was prejudiced because

---

[979]Adair DALF 626.

[980]Adair PCRLF 135-36.

[981]Adair EHT l90-91.

[982]160 F.3d 416, 418-20 (8th Cir. 1998).

[983]*See Roe.*

- 320 -

there is a reasonable probability his death sentence would have been reversed.

**XXXIV.     Respondent's custody over the petitioner violates the Constitution of the United States in that Missouri's clemency process violates the Eighth Amendment's guarantee against cruel and unusual punishments and the Fourteenth Amendment's guaranties of due process of law and the equal protection of the laws, in that the clemency process is wholly arbitrary and capricious because triple murderer Darrell Mease was granted clemency not on the merits of his case, but because of the Pope's "direct and personal" appeal.**

Petitioner's counsel in the state courts presented this grievance in Point IX of the opening brief on state PCR appeal.  But see *supra*, pages 51-53 (limitation on state appellate review renders affirmance on questions of law or mixed questions of law and fact, such as claims of ineffective assistance of counsel, insignificant except as showing state's failure to enforce federal constitutional rights).

Ground 8(P) of the amended state PCR motion pleaded that the petitioner's rights to due process, freedom from cruel and unusual punishment, and equal protection were violated because of the

circumstances surrounding Governor Carnahan commuting Darrell Mease's death sentence.[984]  In particular, Governor Carnahan commuted Mease's death sentence because the Pope was in Missouri when Mease was scheduled to be executed and he personally appealed to Governor Carnahan to commute Mease's death sentence.[985]

The PCR trial-court judge denied this claim on the grounds it is not ripe and clemency decisions are committed to the Governor's discretion.[986]

Under the régime of *Gregg v. Georgia*, the Eighth and Fourteenth Amendments require heightened reliability in assessing death.[987]  It is of vital importance that a death sentence be, and appear to be, based on reason rather than caprice or emotion.[988]  Discretion given to sentencers in capital cases must be suitably directed, limited, and channeled to minimize the risk of wholly arbitrary and capricious action.[989]  These limitations

---

[984]Adair PCRLF 62-64 & 158.

[985]Adair PCRLF 62-64.

[986]Adair PCRLF 295-96.

[987]*Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (plurality opinion).

[988]*Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).

[989]*Gregg v. Georgia*, 428 U.S. 153, 189 (1976) (plurality opinion).

extend beyond the trial:  a death-sentenced person is entitled the "scrupulous  fairness and rationality that the Constitution requires at every step in the capital sentencing process."[990]  The process of review must be meaningful and rational.[991]

Although clemency procedures are largely committed to the discretion of the executive branch, the Due Process Clause provides some constitutional safeguard to wholly arbitrary and capricious action.[992]  Due process requires that the procedures used in rendering a clemency decision "will not be wholly arbitrary, capricious or based upon whim, for example, flipping a coin."[993]  The use of criteria such as favoring one religion over another in deciding whether to grant or deny clemency violates the commands of the Equal Protection Clause.[994]

---

[990]*Gregg v. Georgia*, 428 U.S. at 187, *citing Powell v. Alabama*, 287 U.S. 45, 71 (1932).

[991]*See* text and authorities at pages **Error! Bookmark not defined.-Error! Bookmark not defined.** *supra*.

[992]*Ohio Adult Parole Authority v. Woodard*, 523 U.S. 272, 288-90 (l998) (O'CONNOR, J., concurring).

[993]*Duvall v. Keating*, 162 F.3d 1058, 1061 (10th Cir.), *cert. denied*, 525 U.S. 1061 (1998), *citing Woodard*, 523 U.S. at 289 (O'CONNOR, J., concurring).

[994]*Woodard*, 523 U.S. at 292 (STEVENS, J., concurring and dissenting).

Issues of arbitrariness and in the clemency take on sharper focus when the sentence from which one seeks clemency is a death sentence.  The Supreme Court has relied on clemency as a reason not to allow federal habeas corpus relief on the basis that the petitioner is not guilty of the offense for which he or she has been sentenced to death.[995]

Darrell Mease was convicted and sentenced to death for acts resulting in a triple homicide.[996]  The late Governor Carnahan commuted Mease's death sentence to life without parole.  The commutation[997] makes clear that the action had to do with the character of the Pope and of "all that he represents" rather than the character of Darrell Mease and of the acts for which he had been convicted:

COMMUTATION OF SENTENCE

I, MEL CARNAHAN, GOVERNOR OF THE STATE OF MISSOURI, have had presented personally and directly to me by Pope John Paul II, a request for mercy in the case of Darrell Mease who was convicted of First Degree Murder on April 25, 1990 and sentenced to death on June 1, 1990.  After careful consideration of the extraordinary circumstance of the Pontiff's direct and personal

---

[995]*Herrera v. Collins*, 506 U.S. 390, 412-17 (1993).

[996]*State v. Mease*, 842 S.W.2d 98, 102 (Mo. 1992) (en banc), *cert. denied*, 508 U.S. 918 (1993).

[997]Exh. 3.

> appeal for mercy and because of the deep and
> abiding respect I have for him and all that he
> represents, I hereby grant to Darrell Mease a
> commutation of the above sentence in the following
> respect:  This commutation eliminates from the
> sentence the penalty of death and further causes
> Darrell Mease to remain incarcerated for the
> remainder of his life without the possibility of
> parole.

The grant of clemency to Mease establishes the arbitrary and capricious nature of Missouri's clemency process.  The Governor commuted Mease's death sentence because of the Pope's personal appeal. The death-sentencing court's retort in denying PCR that the state supreme court found the petitioner's sentence is not disproportionate under Mo. Rev. Stat. § 565.035 does not reflect a serious effort to address the well-pleaded claim concerning the arbitrariness of Missouri's clemency process.

Petitioner does not begrudge Mease the benefit of the Pope's intervention.  When clemency is part of the process for reviewing not only the human factors in a capital case, but is also legally recognized as a fail-safe for errors the judicial system does not catch,[998] the petitioner has the right to clemency consideration that does not depend on the travel plans of a single man—when the church which hundreds of thousands of Missouri

---

[998]*Herrera v. Collins*, 506 U.S. at 415.

voters belong to teaches that this man is the Vicar of Christ and infallible source of doctrine on matters of faith and morals, and when he is admired by hundreds of thousands of other Missourians as well.[999]

---

[999]*See* Catholic Church in United States of America, Statistics by Province, available August 18, 2003, at *http://www.catholic-hierarchy.org/country/spcus4.html*.

## **Conclusion**

WHEREFORE, the petitioner prays the Court for its writ of habeas corpus, and that the petitioner be discharged within sixty days unless the State of Missouri takes steps to afford him a constitutional trial or another appropriate resolution of its case against him, or, in the alternative, that he be discharged from the sentence of death that the Circuit Court of Adair County, Missouri, pronounced against him, and that the same be vacated and for naught held.

Respectfully submitted,

JOHN WILLIAM SIMON                    WYRSCH HOBBS & MIRAKIAN

s/John William Simon                         Charles M. Rogers
P.O. Box 16005                                    1101 Walnut Street, Suite 1300
Clayton, Missouri  63105                    Kansas City, Missouri  64106-2122
   (314) 645-1776                                   (816) 474-8100
   FAX  (314) 645-2125                          FAX (816) 474-3216

*Attorneys for Petitioner*

## Affidavit of Verification

COMES NOW John Middleton, being duly deposed and sworn, and states on his oath or affirmation all as follows:

1. My name is John Middleton.

2. I am the petitioner in the foregoing petition for a writ of habeas corpus before the United States District Court for the Eastern District of Missouri.

3. I have reviewed this petition with my attorney John William Simon.

4. All of the propositions of fact in the foregoing petition are true and correct according to my knowledge and belief.

5. The Missouri Supreme Court did not deny the motion for rehearing in my state post-conviction relief appeal until May 27, 2003. Until that date I had a properly filed application for state post-conviction or other collateral review pending. I do not now know what additional grounds for relief, or evidence in support of these grounds or the grounds my attorneys have included in this petition, I could have provided if this Court had allowed me the time Congress allowed all federal habeas corpus petitioners in which to file their petitions, rather than requiring me to file it nearly two months early.

- 328 -

Further, the affiant saith naught.

I swear or affirm that the foregoing is true and correct.

JOHN MIDDLETON

STATE OF MISSOURI )
) SS.
COUNTY OF _Washington_ )

Subscribed and sworn to before me, a Notary Public, this _31st_ day

of March, 2004.

NOTARY PUBLIC

My commission expires on _____.

- 329 -

## <u>Certificate of Service</u>

I hereby certify a true and correct copy of the foregoing was

forwarded for transmission via Electronic Case Filing (ECF) this second

day of April, 2004, to the offices of:

> Michael Joseph Spillane, Esq.
> Assistant Attorney General
> P.O. Box 899
> Jefferson City, Missouri  65102

> > <u>s/John William Simon</u>
> > Attorney for Petitioner