UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN MIDDLETON,            )
                                    )
         Petitioner,       )
                                    )
    vs.                     )       Case No. 4:03CV543 CDP
                                    )
DON ROPER,              )
                                    )
        Respondent.    )

## MEMORANDUM AND ORDER

Petitioner John Middleton is currently on death row at the Potosi Correctional Center in Mineral Point, Missouri for the murders of Alfred Pinegar, Randy Hamilton, and Stacey Hodge. Petitioner was convicted by a jury and sentenced to death in Adair County, Missouri for the murder of Pinegar. Shortly thereafter, Petitioner was convicted by a jury and sentenced to death in Callaway County, Missouri for the murders of Hamilton and Hodge.

Before me is Petitioner's request for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in connection with the Adair County conviction for Pinegar's murder. He raises numerous claims of constitutional violations. Several of these claims are procedurally barred. All other claims fail on the merits. Accordingly, I will deny Petitioner's request for a writ of habeas corpus. I will, however, grant a certificate of appealability on several issues.

# I.    FACTUAL BACKGROUND

The following recitation of facts comes from the Missouri Supreme Court's opinion affirming the conviction and sentence in this case:[1]

John Middleton was a user and a dealer of methamphetamine. On June 10, 1995, police arrested several people in Harrison County, Missouri, for possession and sale of the drug. Middleton was not one of the people arrested. About ten days after the Harrison County arrests, Middleton told a friend that "the snitches around here are going to start going down." Middleton stated that he had a "hit list" and that Alfred Pinegar was on it. Two days after making these statements, Middleton told the same friend that he was "on his way to Ridgeway, Missouri, to take Alfred Pinegar fishing."

Alfred Pinegar was also a dealer of methamphetamine and was associated with Middleton as a fellow drug dealer. Pinegar lived with his fiancee Priscilla Hobbs in Davis City, Iowa, just north of Harrison County, Missouri. On June 23, 1995, the day of Pinegar's murder, Hobbs was driving toward her home in Davis City when she saw Middleton and his girlfriend Maggie Hodges in a white Chevrolet 4x4 pickup traveling in the opposite direction. Hobbs noticed that Hodges was sitting in the middle of the truck seat instead of in the right passenger's seat. When Hobbs reached her home, Pinegar was not there and the yard had been partly mowed, as if Pinegar stopped in the middle of the job. Pinegar habitually carried a twelve-gauge shotgun, and that shotgun and about two hundred dollars were missing from the home.

---

[1] Under 28 U.S.C. § 2254, a "state court's factual findings carry a presumption of correctness that will be rebutted only by clear and convincing evidence." Hall v. Leubbers, 341 F.3d 706, 712 (8th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1); Lombolt v. Iowa, 327 F.3d 748, 752 (8th Cir. 2003)).

Around noon that same day, Wesley Booth was working in the sporting goods department of a Wal-Mart store in Bethany, Missouri. He was approached by Hodges, Middleton, and another man, presumably Pinegar. Middleton asked Booth for six boxes of nine-millimeter shells and two boxes of twelve-gauge "double-ought" buckshot. Middleton paid cash for the ammunition. During the entire transaction Middleton was standing at the counter across from Booth.

Middleton, Hodges, and Pinegar left Wal-Mart and drove several miles northeast of Bethany near the town of Ridgeway where they parked in a field. Pinegar got out of the truck and began to run when he saw Middleton raise the twelve-gauge shotgun. Middleton shot Pinegar twice in the back. Middleton then delivered the fatal wound to Pinegar, shooting him in the face. Middleton dumped Pinegar's body over a fence. After committing the murder, Middleton and Hodges went back to the Wal-Mart store in Bethany to return the nine-millimeter ammunition. They did not return the twelve-gauge "double-ought" shotgun shells. Booth walked with Middleton to the sporting goods department, where he exchanged the nine-millimeter shells for ammunition of another caliber. The two men then walked back to the service desk to complete the exchange.

Later that afternoon, Gerald Parkhurst saw Middleton and Hodges standing next to their pickup on the side of a road north of Bethany. Claiming their pickup had broken down, Hodges asked Parkhurst if he would give them a ride. When Parkhurst agreed to give them a ride, Hodges and Middleton transferred five or six firearms to the trunk of Parkhurst's car, including the twelve-gauge shotgun Middleton had used to kill Pinegar. Parkhurst took Hodges and Middleton to Spickard, Missouri, where they unloaded the weapons.

Two days after the murder, John Thomas visited Middleton at his home. Middleton and Thomas discussed possible undercover drug informants, and Middleton stated that "something had to be done about them." Middleton also told Thomas that he had acquired Pinegar's twelve-gauge shotgun and that Pinegar "wouldn't be needing it no more." Thomas drove Middleton to the place where the pickup truck

had broken down, helped him remove a defective part, and then Middleton drove the truck away. The next day, on June 26, Pinegar's body was found. At the murder scene, police found a piece of leather fringe, an empty box of twelve-gauge shotgun shells, two expended twelve-gauge shells, a pair of sunglasses with a missing lens, and a small plastic clock with an adhesive square on the back of it.

Later, on September 11, while Middleton was in jail, Middleton told Stallsworth, a fellow inmate, that he killed Pinegar because he was afraid that Pinegar was going to "snitch" on him about his methamphetamine dealing. Middleton described the details of Pinegar's murder. He also told Stallsworth that some fringe was missing from his leather jacket and he was worried that it had been left at the murder scene.

Middleton was charged by information with first-degree murder and armed criminal action on October 18, 1995, in the Circuit Court of Harrison County. The prosecutor later voluntarily withdrew the charge of armed criminal action. Following a change of venue to the Circuit Court of Adair County, the case went to trial on February 24, 1997. Middleton did not testify at his trial and offered no evidence in his defense. The jury found him guilty of first-degree murder. In the punishment phase of the trial the state presented, among other things, evidence that Middleton also murdered two others, Randy Hamilton and Stacey Hodge, as part of his plan to eliminate "snitches." The jury recommended a death sentence.

State v. Middleton, 995 S.W.2d 443, 451-52 (Mo. 1999) (en banc), cert. denied, 528 U.S. 1054 (1999).

## II.    **PROCEDURAL BACKGROUND**

On June 29, 1999, the Missouri Supreme Court rejected the twenty-six claims brought by Petitioner in his direct appeal and affirmed Petitioner's conviction and

sentence.  <u>Middleton</u>, 995 S.W.2d. 443.  Petitioner then brought a motion in the Circuit Court of Adair County, Missouri for post-conviction relief (PCR) pursuant to Mo. Sup. Ct. R. 29.15.  Following a lengthy evidentiary hearing lasting several days in February and March of 2001, the trial court denied the 29.15 motion.  The Missouri Supreme Court affirmed the denial of post-conviction relief on April 1, 2003.  <u>Middleton v. State</u>, 103 S.W.3d 726 (Mo. 2003) (en banc).

Petitioner now seeks federal habeas corpus relief pursuant to 28 U.S.C. § 2254, asserting that his conviction and sentence violate his Fourth, Fifth, Sixth, Eighth and Fourteenth Amendment rights.  Counsel have extensively briefed all the issues.

## III.  <u>GROUNDS RAISED</u>

Petitioner seeks habeas relief on the following grounds:

1.    Petitioner was denied effective assistance of trial counsel in the investigation and preparation of his case because counsel failed to call mitigation witnesses Charles Webb, Vern Webb, Virginia Webb, Ruby Smith, Sylvia Purdin, and Glenn Williams during the penalty phase.

2.    Petitioner was denied effective assistance of trial counsel because counsel failed to call Iowa corrections counselor Jake Noonan to testify that Petitioner had been a well-behaved and well-adjusted prisoner in Iowa.

3.    The trial court violated Petitioner's Sixth and Fourteenth Amendment rights by denying defense counsel's attempts to

secure the mental health records of Douglas Stallsworth and by admitting expert testimony to vouch for Stallsworth's credibility.

4.      The prosecution failed to disclose a deal made with witness John Thomas in exchange for his testimony.

5.      The element of deliberation is so poorly defined in the offense of first degree murder that Petitioner's due process rights were violated.

6.      Prosecutorial discretion in determining whether to seek the death penalty renders Petitioner's sentence unconstitutional under the Eighth and Fourteenth Amendments.

7.      Petitioner was denied an impartial jury due to a newspaper article published the day before Petitioner's trial began.

8.      The trial court violated Petitioner's right to effective assistance of counsel and due process in not granting a continuance where defense counsel demonstrated that they were not prepared to handle the witnesses and evidence that the prosecution disclosed shortly before trial.

9.      The trial court admitted evidence that had been seized during an illegal search of Petitioner's home.

10.     The trial court admitted evidence and testimony that was the product of an illegal search of Petitioner's pick-up truck.

10A.   The prosecution's use of a dashboard clock as evidence violated Petitioner's due process and other constitutional rights.

11.     The exclusion of qualified jurors between the ages of eighteen and twenty-one years of age deprived Petitioner of his right to a jury of his peers, in violation of the Sixth and Fourteenth Amendments.

12. The trial court's limitation of Petitioner's counsel's questioning of prospective jurors Gray and Bailey during voir dire violated Petitioner's Sixth and Fourteenth Amendment rights.

13. The trial court violated Petitioner's rights under the Sixth, Eighth and Fourteenth Amendments by striking prospective jurors Vinyard and Schnirch for cause.

14. Petitioner was denied effective assistance of trial counsel when counsel failed to move to strike for cause, or peremptorily strike, juror Holt, after she expressed doubt as to whether she could consider counsel's principal theory of defense.

15. Petitioner's trial counsel was ineffective for failing to present the testimony of Drs. Murphy, Lipman, and Daniel in the guilt phase to support a diminished capacity or not guilty by reason of mental disease or defect defense.

16. The trial court admitted the identification testimony of Wesley Booth despite impermissibly suggestive pretrial identification procedures.

17. The trial court admitted a gruesome photograph and videotape depicting the crime scene as well as bone and tooth fragments recovered at the scene despite their extremely high prejudicial impact.

17A. The prosecution failed to disclose, or defense counsel failed to discover, a discrepancy in the expert's determination of Pinegar's time of death, which would have supported an alibi defense.

18. Expert witness Kathleen Green's testimony concerning leather fragments, broken sunglasses, and the dashboard clock found at the crime scene was not the proper subject of expert testimony.

19. The prosecutor drew improper inferences from the evidence

during his guilt-phase closing argument.

20. The phrase "firmly convinced" in Missouri's pattern jury instruction on reasonable doubt fails to adequately define the burden of proof and so violates the due process clause.

21. Defense expert Dr. Murphy was permitted to comment on Petitioner's truthfulness during penalty phase cross-examination.

22. Petitioner's trial counsel and direct appeal counsel were ineffective for failing to investigate and present evidence to challenge the prosecution's use of a letter to demonstrate that Petitioner would be a threat to those outside prison if he were not executed.

23. Admission of a gruesome videotape and photograph depicting the crime scene of the Callaway County murders fatally infected the fairness of the penalty phase.

24. The trial court failed to insulate the jury from the prejudicial and inflammatory display of emotion by the victim's mother and relatives sitting in the gallery.

25. The trial court's admission of a photograph of the victim's daughter was unfairly prejudicial and went outside the scope of permissible victim impact evidence.

26. Petitioner was denied effective assistance of counsel when counsel failed to object to the following errors by the prosecution during the penalty phase:

    A. The introduction of evidence related to the Callaway County crimes;

    B. References to matters outside the evidence;

    C. Questioning of Dr. Lipman on cross-examination as to

whether he believed Petitioner's denials of having committed the three murders;

D.   The omission of the mental element "knowingly" from Instruction 15.

27.   The trial court violated Petitioner's Eighth Amendment rights by failing to grant counsel's motion for a directed verdict of life without parole or a mistrial when juror Gray was excused from the jury after the guilt verdict but before the end of the penalty phase.

28.   The trial court's refusal to submit counsel's proposed penalty phase instructions A, B, C, D, and E left the jury with no clear guidance on how to analyze and weigh nonstatutory mitigating factors.

29.   Petitioner's trial counsel was ineffective for failing to present evidence that the jury could not understand the instructions and thus were more likely to impose a penalty of death.

30.   Petitioner's penalty was disproportionate to sentences imposed in similar cases.

31.   Missouri's statutory scheme for proportionality review fails to provide the guidance necessary to ensure Petitioner's rights to effective assistance of counsel and due process of law.

32.   The state of Missouri's failure to provide a trial transcript free of omissions denied Petitioner the right to meaningful appellate review in violation of his Sixth, Eighth, and Fourteenth Amendment rights.

33.   Petitioner's counsel on direct appeal was ineffective for failing to raise two grievances:

A.   The trial court erred in denying the motion to exclude the

testimony of Douglas Stallsworth because Stallsworth's former attorney had also represented Petitioner.

     B.     Instruction 15 failed to include the mental element "knowingly."

34.     Missouri's clemency review process is arbitrary and capricious.

## IV.    **DISCUSSION**

Under 28 U.S.C. § 2254(d), when a claim has been adjudicated on the merits in state court, an application for a writ of habeas corpus shall not be granted unless the state court adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In Shafer v. Bowersox, the Eighth Circuit articulated the standards for subsection (1) as follows:

> The "contrary to" clause is satisfied if a state court has arrived "at a conclusion opposite to that reached by [the Supreme Court] on a question of law" or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent" but arrives at the opposite result. A state court "unreasonably applies" clearly established federal law when it "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." A case cannot be overturned merely because it incorrectly applies federal law,

for the application must also be "unreasonable."

329 F.3d 637, 646-47 (8th Cir. 2003) (quoting Williams v. Taylor, 529 U.S. 362, 405, 411, 413 (2000)).

Under subsection (2), "a state court decision involves 'an unreasonable determination of the facts in light of the evidence presented in state court proceedings,' 28 U.S.C. § 2254(d)(2), only if it is shown by clear and convincing evidence that the state court's presumptively correct factual findings do not enjoy support in the record." Lombolt, 327 F.3d at 752 (citing 28 U.S.C. § 2254(e)(1) and Boyd v. Minnesota, 274 F.3d 497, 501 n.4 (8th Cir. 2001)).

The statute's deferential standard of review, however, applies to state court resolutions of law and fact only if the state court adjudicated the prisoner's claims on the merits. Taylor v. Bowersox, 329 F.3d 963, 967-68 (8th Cir. 2003) (citing 28 U.S.C. § 2254(d) and Kenley v. Bowersox, 275 F.3d 709, 711 (8th Cir. 2002)). The Eighth Circuit has acknowledged that there are "no bright line rules about how much a state court must say or the language it must use to compel a § 2254 court's conclusion that the state court has adjudicated a claim on the merits." Brown v. Luebbers, 371 F.3d 458, 461 (8th Cir. 2004). Rather, a court "must simply look at what a state court has said, case by case, and determine whether the federal constitutional claim was considered and rejected by that court." Id.

Where a federal constitutional question is not adjudicated on its merits in state court proceedings, the pre-AEDPA standard of review should apply. Robinson v. Crist, 278 F.3d 862, 865 (8th Cir. 2002).

## Claim 1: Ineffective Assistance of Counsel - Failure to Investigate and Call Family and Employers in Penalty Phase

In his first claim, Petitioner alleges that his trial counsel provided ineffective assistance by failing to investigate and call employer and family mitigation witnesses during the penalty phase of the trial. To establish such a claim, the Petitioner must show that his trial counsel did not perform to the degree of skill of a reasonably competent attorney, and as a result, the Petitioner was prejudiced. Strickland v. Washington, 466 U.S. 668, 687 (1984). Under Strickland, the Petitioner must first identify specific acts or omissions made by counsel that "were outside the wide range of professionally competent assistance." Id. at 690. Second, the Petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Failure to satisfy either of these prongs is fatal to the claim. See Pryor v. Norris, 103 F.3d 710, 713 (8th Cir. 1997).

The Court in Strickland cautioned that "judicial scrutiny of counsel's performance must be highly deferential." Further, when measuring the

reasonableness of an attorney's acts or omissions at trial, "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S. at 689. The Court concluded that the degree of deference afforded to a trial counsel's performance directly correlates to the adequacy of the trial counsel's investigation:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

Id. at 690-91.

Petitioner contends that his trial attorneys' investigation was constitutionally deficient because they did not personally contact six witnesses whose testimony could have allegedly altered the outcome of the penalty phase of the trial. The Petitioner identified four of his former employers – Charles Webb, Vern Webb, Virginia Webb, and Ruby Smith – who each would have testified that Petitioner was a hard, diligent worker who displayed limited intellect on the job. The Petitioner's

aunt, Sylvia Purdin, would have testified that the Petitioner was quiet and reserved as a child and often acted like he was "in a daze." Glenn Williams, the Petitioner's uncle, would have testified that the Petitioner was mentally slow as a child. Both Purdin and Williams would have testified that the Petitioner's mother had a habit of inhaling gasoline fumes as a child.

Applying Strickland, the Missouri Supreme Court rejected this claim and held that Petitioner's trial counsel "conducted a reasonable investigation that culminated in a reasonable penalty phase defense." 103 S.W.3d at 738. The court noted that counsel's investigation consisted of discussions with the Petitioner, Petitioner's mother, recent friends and acquaintances of the Petitioner, two mental health experts, and the sheriff of the county in which the Petitioner was held during the course of the trial.

Based on this investigation, counsel crafted a penalty phase strategy designed to elicit testimony that would demonstrate that the Petitioner was under a methamphetamine-induced psychosis at the time of the killing. Counsel executed this strategy by presenting the testimony of two mental health experts, the Petitioner's mother, his brother-in-law, and a friend. Additionally, counsel presented the testimony of the sheriff who supervised the Petitioner during the course of the trial to show that Petitioner could adjust to incarceration.

The Missouri Supreme Court concluded counsel's failure to present the six additional witnesses did not constitute ineffective assistance of counsel for two reasons.  First, counsel testified that they were not interested in the "good employee" testimony proffered by the Webbs and Ruby Smith.  Instead, counsel focused their penalty phase efforts on amassing evidence of the Petitioner's drug habits to support Petitioner's claim of methamphetamine-induced psychosis.  Second, the testimony of Petitioner's aunt and uncle would have largely duplicated the testimony of Petitioner's mother and Dr. Lipman regarding Petitioner's difficult childhood and mental slowness.

The record supports both of these conclusions, and thus the Missouri Supreme Court's application of Strickland to the facts of the Petitioner's case was reasonable.  The Petitioner's attempt to compare this case to Williams v. Taylor, 529 U.S. 362 (2000), or Wiggins v. Smith, 539 U.S. 510 (2003), fails for several reasons.  First, in Williams, the trial counsel's limited investigation was not based on any sort of strategy, but rather the trial attorneys' lack of preparedness and their incorrect understanding of what state law permitted them to investigate.  529 U.S. at 395.  That is not the case here.  As the record shows, trial counsel tailored their investigation to closely fit a clear penalty phase strategy.

Second, in both Williams and Wiggins, trial counsel failed to uncover highly

persuasive mitigation evidence. In <u>Williams</u>, the attorneys did not uncover existing records of the petitioner's nightmarish childhood, his mental status as borderline mentally retarded, and his positive reaction to past periods of incarceration. 529 U.S. at 395. In <u>Wiggins</u>, the attorneys failed to discover evidence of the horrific sexual abuse the petitioner endured as a child. 539 U.S. at 525. In contrast, the trial counsel's failure to present the six witnesses identified by the Petitioner did not leave a gaping hole in the mitigation evidence. As the record demonstrates, the bulk of the information that the Petitioner alleges these six witnesses would have offered was already introduced through the testimony of the Adair County sheriff, Petitioner's mother, and the two mental health experts who testified to the psychological implications of the Petitioner's difficult childhood. Petitioner's first claim is denied.

### Claim 2: Ineffective Assistance of Counsel - Failure to Present Evidence of Petitioner's Good Conduct during Prior Confinement

Petitioner also argues that his trial counsel provided ineffective assistance during the penalty phase by failing to investigate and present evidence of the petitioner's good institutional adjustment history from the Iowa Department of Corrections. Petitioner claims that the testimony of his Iowa corrections officer, Jake Noonan, as well as his Iowa corrections file should have been introduced to

establish that he had been a well-behaved and well-adjusted prisoner in Iowa, and therefore would be equally successful if sentenced to life imprisonment without parole rather than death.

The Missouri Supreme Court rejected this claim for several reasons. First, the court held that the proffered evidence was cumulative of other testimony that was presented during the penalty phase. Specifically, Petitioner's trial counsel presented the testimony of Randall Forquer, the sheriff of Adair County, who discussed the Petitioner's good behavior while at the Adair County jail awaiting trial. Second, the court noted that any evidence regarding Petitioner's conduct in Iowa correctional facilities would have emphasized his prior convictions. For these reasons, the court held that Petitioner's counsel was not ineffective for failing to introduce evidence of the Petitioner's behavior while in the Iowa prison system. 103 S.W.3d at 739.

Petitioner claims that the Missouri Supreme Court's denial of relief was an unreasonable application of federal law. Petitioner relies on a concurring opinion authored by Justice Powell in Skipper v. South Carolina, 476 U.S. 1, 9 (1986) (Powell, J., concurring). In Skipper, Justice Powell suggested that evidence of a person's good behavior in prison while awaiting a capital trial is much less predictive of that person's ability to adjust to incarceration compared to evidence of

that person's conduct during prior periods of imprisonment.  Justice Powell noted that a capital defendant "has every incentive to behave flawlessly in prison if good behavior might cause the sentencing authority to spare his life."  476 U.S. at 14.

Similarly, Petitioner contends that evidence of his good conduct during prior confinement in Iowa would have been more persuasive than the evidence of Petitioner's good behavior in a Missouri prison while awaiting his capital trial and sentencing.  Petitioner also argues that the jury was already aware of his prior convictions in Iowa.

Justice Powell's concurrence does not constitute "clearly established Federal law" under § 2254(d)(1).  <u>Williams</u>, 529 U.S. at 412 (noting that this statutory phrase only refers to the Supreme Court's holdings, not dicta).  Thus, the Missouri Supreme Court's holding – even if contrary to Justice Powell's concurrence – does not warrant relief under § 2254.  Further, even if the Court's conclusion was contrary to clearly established Federal law, there is no indication that it was unreasonable under the circumstances of this case.  <u>See</u> <u>Shafer</u>, 329 F.3d at 646-47.  As the record demonstrates, Petitioner's trial counsel did not fail to investigate or present evidence relating to the Petitioner's ability to adjust well to incarceration.  Randall Forquer's testimony was offered precisely for this reason.  Additionally, the prosecutor's attempts to characterize an incident with Petitioner at the Harrison

County jail as an "escape" were thoroughly refuted by Petitioner's trial counsel on cross-examination.  In sum, trial counsel's failure to introduce evidence of Petitioner's conduct in Iowa correctional facilities was not objectively unreasonable, nor did it prejudice the Petitioner under Strickland.  Petitioner's claim is denied.

## Claim 3: Failure to Order Disclosure of Mental Health Records of Douglas Stallsworth

Petitioner claims that the trial court violated his constitutional right to due process by denying his request for the disclosure of all the mental health records of Douglas Stallsworth.  Petitioner argues that without access to these records his trial counsel could not effectively cross-examine the prosecution's two expert witnesses who testified at the hearing regarding Stallsworth's competency.

Petitioner contends that if the trial court had ordered the disclosure of the mental health records of Douglas Stallsworth, the trial court would have found Stallsworth incompetent and the outcome of the Petitioner's trial would have been different.  Stallsworth was a key witness for the prosecution during both the guilt and penalty phases of Petitioner's trial.  Stallsworth testified during the guilt phase that Petitioner had confessed to the murder of Pinegar while the two men were inmates together at the Harrison County Jail.  He then was recalled to testify during the penalty phase that Petitioner had also confessed to the murders of Hamilton and

Hodge. Stallsworth had a history of mental disorders, and after Petitioner's trial he was found not guilty by reason of mental disease or defect on the charge on which he was incarcerated. Not surprisingly, Stallsworth's competency as a witness was at issue throughout Petitioner's trial.

The Due Process Clause of the Fourteenth Amendment demands that evidence that is both favorable to the accused and "material either to guilt or to punishment" must be disclosed to a criminal defendant. Brady v. Maryland, 373 U.S. 83, 87 (1965). This holding applies to impeachment evidence as well as exculpatory evidence. United States v. Bagley, 473 U.S. 667, 676 (1985). The suppression of evidence amounts to a constitutional violation only if "there is a reasonable probability that, had [the evidence been disclosed], the result of the trial would have been different." Id. at 684.

Before his trial began, Petitioner requested that the state disclose all of Stallsworth's mental health records. The trial court denied this request, but did review in camera the medical records in the possession of the prosecuting attorney who took Stallsworth's insanity plea. Additionally, the trial court ordered the disclosure of the state's psychiatric evaluation of Stallsworth conducted pursuant to Mo. Rev. Stat. § 552. The trial court held a hearing on Stallsworth's competency during the trial, outside the presence of the jury. The state presented the expert

testimony of two psychiatrists, Dr. Sam Parwatikar and Dr. Deja Suthikant, who concluded that Stallsworth was competent to testify. The trial court agreed, and Stallsworth was permitted to testify.

On direct appeal, Petitioner argued that the trial court's failure to order disclosure of Stallsworth's medical records prevented Petitioner from effectively cross-examining the state's experts at the competency hearing, thus rendering the competency hearing process flawed. While the appeal was pending, Petitioner filed a motion for a temporary remand to permit an in camera review of Stallsworth's mental health records. The Missouri Supreme Court granted Petitioner's motion, and ordered the Circuit Court to conduct an in camera review of all the mental health records in the state's possession. The Circuit Court reviewed these records and determined that they contained no evidence which was favorable to the Petitioner within the meaning of United States v. Bagley.

After conducting its own in camera review of the state's records, the Missouri Supreme Court came to the same conclusion and therefore rejected the Petitioner's constitutional claims. The court held that "[t]he trial court did not err by refusing to order the disclosure of Stallsworth's mental health records. Nor was [Petitioner] prejudiced by the failure to have access to these records." 995 S.W.2d at 455.

In the Petitioner's § 2254 brief, he argues that counsel's inability to fully

cross-examine the experts violated his due process rights in the guilty phase,

because, he argues, if the records had been produced Stallsworth would have been

found incompetent and would not have been allowed to testify. Absent

Stallsworth's testimony, Petitioner argues, the jury would not have found him guilty.

He argues that the failure to produce the records also requires a new penalty phase

trial, because in the absence of an opportunity for proper cross-examination of the

experts, the death penalty violates the Eighth Amendment. This argument fails,

however, because both the trial court and the Missouri Supreme Court did review

the records – although admittedly while the case was on appeal instead of before

Stallsworth's testimony. Both the Circuit Court and the Missouri Supreme Court

concluded that the records did not help Petitioner and were not required to be

disclosed under <u>Bagley</u>.[2] They also concluded that Petitioner was not prejudiced by

---

[2]In his supplemental brief to the Missouri Supreme Court, Petitioner suggested that the Circuit Court's <u>in camera</u> review of Stallsworth's medical records was inadequate because it was limited to those records in the custody of the state Department of Mental Health. Petitioner noted that there were also mental health records on Stallsworth from two private facilities, Swope Parkway Health Center and North Central Missouri Health Center (NCMHC). Petitioner does not raise this specific issue in his § 2254 brief, but even if he had, this would not alter my conclusion.

     <u>Brady</u> requires disclosure of evidence that is "known to the state but unknown to the defense." <u>United States v. Agurs</u>, 427 U.S. 97, 103 (1976). Under this standard, neither the Swope Parkway nor the NCMHC records qualify as <u>Brady</u> material. The state did not have possession of the records from these two facilities. Further, the full extent of state's knowledge of these records was disclosed to the Petitioner in Stallsworth's 552 report. This report disclosed the existence of the Swope Parkway records, yet Petitioner made no attempt to acquire these on his own. <u>See</u> <u>United States v. Wolf</u>, 839 F.2d 1387, 1391-92 (10th Cir. 1988) (no <u>Brady</u> violation when defendant had notice evidence existed and could have contacted person in

the trial court's refusal to disclose Stallsworth's mental health records. The

Missouri Supreme Court's denial of Petitioner's challenge to the trial court's failure

to disclose the mental health records of Stallsworth was not contrary to clearly

established federal law, and Petitioner's rights were not violated by the court's

allowing Stallsworth's testimony.

## Claim 4: Failure to Disclose Deal with Witness John Thomas

In his fourth claim, Petitioner contends that the government violated its

obligation to disclose evidence under Brady. Petitioner claims that the prosecution

had brokered an undisclosed and unwritten deal with a prosecution witness, John

Thomas, in which Thomas would receive a reduced sentence on his pending drug

charges in Harrison County, Missouri, in exchange for testimony implicating the

Petitioner. The state courts found no evidence of any such deal, and Petitioner now

argues that this finding was unreasonable in light of the evidence.

On June 8, 1995, Thomas was charged with selling methamphetamine, a class

B felony, in Harrison County. Thomas testified at Petitioner's trial as a witness for

---

possession of evidence directly to obtain it). Although the report did not mention the NCMHC records, these were not even known to the prosecution until the Missouri Department of Mental Health responded to the Circuit Court's request for the records on remand. The Petitioner has cited no authority which suggests that the prosecution must disclose evidence in these circumstances. In sum, the Missouri Supreme Court's in camera review of Stallsworth's mental health records was adequate under Brady.

the prosecution on March 4 and 11, 1997. At trial, Petitioner's counsel cross-examined Thomas about the charges pending against him. Thomas repeatedly denied the existence of any deal with the prosecution or any expectation of favorable treatment in return for his testimony.

In his motion for post-conviction relief, the Petitioner offered the following additional evidence to suggest the existence of an undisclosed deal. On February 27, 1998, Thomas appeared in court and the prosecution advised the judge that the proceedings were delayed because of Thomas' participation as a witness in a companion case. On March 17, 1998, Thomas pled not guilty to the charges against him, including the class B felony charge. Shortly thereafter, Thomas testified on behalf of the state at the Petitioner's Callaway County trial for the murders of Randy Hamilton and Stacey Hodge. On April 27, 1998, Thomas pled guilty to a lesser charge of attempting to sell drugs, a class C felony. Finally, on September 10, 1998, the court suspended the imposition of Thomas' sentence and placed him on supervised probation for five years. Petitioner also provided evidence that the Harrison County prosecutor's office failed to explain why Thomas' case was stalled in associate circuit court for over two years.

With this evidence in hand, the post-conviction review court rejected Petitioner's assertion that an undisclosed deal between the prosecution and Thomas

existed. The court relied on the absence of any direct evidence supporting the existence of a deal along with the repeated denials of Thomas on cross-examination. The Missouri Supreme Court upheld this factual determination:

> [A]ssuming that [Petitioner] could have drawn [the inference that a deal existed] from this evidence, [Petitioner] has failed to show that the motion court erred in drawing a contrary inference that the evidence, while showing that [Thomas] received a light sentence and that the Harrison County prosecutor might have been more forthcoming, did not reach the level of showing an undisclosed deal existed.

103 S.W.3d at 734.

Likewise, I find that Petitioner has failed to present clear and convincing evidence that the motion court's presumptively correct factual findings are not supported by the record. 28 U.S.C. § 2254(e)(1); Lombolt, 327 F.3d at 752. Petitioner has offered no evidence, other than speculation, that a deal or understanding existed between Thomas and the prosecution. In the end, the motion court determined that this speculation was outweighed by the express denials of the existence of a deal by both the prosecution and Thomas. The state court's determination that there was no undisclosed deal between Thomas and the prosecution was reasonable, and thus Petitioner's fourth claim is denied.

## Claim 5: Missouri's Distinction Between First and Second Degree Murder

Petitioner claims that the trial court should have dismissed the charge of first

degree murder because Missouri law does not adequately differentiate between the charges of first and second degree murder. He asserts that this failure prevented him from obtaining proper notice of the charge against him, in violation of his Sixth and Fourteenth Amendment rights. A person commits first degree murder under Missouri law when that person "knowingly causes the death of another person after deliberation upon the matter." Mo. Rev. Stat. § 565.020(1). Second degree murder occurs when a person, inter alia, "[k]nowingly causes the death of another person." Mo. Rev. Stat. § 565.021(1). The principal distinction between the two charges is the element of deliberation. State v. Johnson, 505 S.W.2d 94 (Mo. 1974).

"Deliberation" is defined as "cool reflection for any length of time no matter how brief."[3] Mo. Rev. Stat. § 565.002(3). A person "knowingly" performs an act "when he is aware of the nature of his conduct" or "when he is aware that his conduct is practically certain to cause" a particular result. Mo. Rev. Stat. § 562.016(3). Petitioner contends that the definition of "knowingly" subsumes the definition of "deliberation" such that no meaningful distinction can be made

---

[3]Petitioner suggests that the Missouri Supreme Court's decision in State v. Gray has weakened this definition to require only "some evidence that the defendant made a decision to kill the victim prior to the murder." 887 S.W.2d 369, 376 (Mo. 1994) (en banc). This suggestion was expressly rejected by the Supreme Court in State v. Rousan, 961 S.W.3d 831, 851-52 (Mo. 1998) (en banc). In Rousan, the Court noted that "the conviction was affirmed in Gray only after finding 'sufficient evidence to permit an inference ... that the homicides occurred after [the defendant] coolly deliberated on the deaths for some amount of time, however short.'" Id. (quoting Gray, 887 S.W.2d at 377).

between the two charges. I disagree.

The element of deliberation separates an act committed in the heat of passion from an act that involves "unimpassioned premeditation," or "cool reflection." State v. Rousan, 961 S.W.2d 831, 851-52 (Mo. 1998) (en banc). The Supreme Court has recognized this distinction, and the Petitioner offers no authority to the contrary. See United States v. Frady, 456 U.S. 152, 170 n. 18 (1982).

Likewise, I find no support for the Petitioner's argument that the qualifying phrase "no matter how brief" erodes the significance of Missouri's deliberation element. The threshold determination is whether the actor's mind was free of any sudden impulse at the time the murder was committed. Whether that state of mind existed a minute, hour, or day before the commission of the crime is superfluous to the underlying issue. Accordingly, the Missouri Supreme Court's decision that Missouri law adequately distinguishes between first and second degree murder does not constitute an unreasonable application of clearly established federal law.

### Claim 6: Prosecutorial Discretion to Seek the Death Penalty

Petitioner contends that Missouri's capital punishment system violates Furman v. Georgia, 408 U.S. 238 (1972), by granting prosecutors unfettered discretion to decide whether or not to seek the death penalty. The Supreme Court has already rejected the argument that prosecutorial discretion renders state death

penalty statutes arbitrary and capricious.  <u>Gregg v. Georgia</u>, 428 U.S. 153, 199-204

(1976) (Justice Stewart, joined by Justices Powell and Stevens); 428 U.S. at 224-26

(Justice White, joined by Chief Justice Burger and then-Justice Rehnquist); <u>see</u> <u>also</u>

<u>Joubert v. Hopkins</u>, 75 F.3d 1232, 1248 (8th Cir. 1996).

 Additionally, the Supreme Court has rejected the use of statistics similar to

the Petitioner's to demonstrate that a state's capital punishment system is arbitrary

and capricious in application.  Petitioner's statistical studies suggest that the race of

the accused and the victim are strong predictors of whether a Missouri prosecutor

will seek the death penalty.  Michael Lenza, et al., The Prevailing Injustices in the

Application of the Death Penalty in Missouri (1978-1996) (2002), <u>available</u> <u>at</u>

http://www.umsl.edu/~phillips/dp/Lenza1.html.  Specifically, the results indicate

that black defendants who kill white victims have the greatest likelihood of

receiving the death penalty.  <u>Id</u>. at 8.  Petitioner argues that because Missouri has

disproportionately sought the death penalty against blacks: "Statewide death

prosecutors, like the ones in this case, would be especially cognizant of the political

need to find white faces for Death Row . . ."  Thus, he argues, even though both

Petitioner and the victim in this case were white, the decision to seek the death

penalty in Missouri is always impermissibly tainted by racial considerations.

 The statistical study presented by the petitioner in <u>McCleskey v. Helms</u>, 481

U.S. 279, 287 (1987), suggested that the exact same racial disparities existed in Georgia's capital punishment system. The Supreme Court found the Georgia statistics unavailing:

> At most, the [statistical] study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system ... Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious. In light of the safeguards designed to minimize racial bias in the process, the fundamental value of jury trial in our criminal justice system, and the benefits that discretion provides to criminal defendants, we hold that the [statistical] study does not demonstrate a constitutionally significant risk of racial bias affecting the Georgia capital sentencing process.

Id. at 312-313. The Missouri Supreme Court denied this claim, and as Gregg and McClesky demonstrate, the court's holding was not contrary to clearly established federal law.

### Claim 7: Change of Venue Due to Pretrial Publicity

Petitioner claims that the trial court erred by denying his motion for a second change of venue prior to trial. Petitioner contends that two articles published in a local newspaper at the beginning of jury selection created a substantial risk that the jury could not be impartial. A thorough review of the record demonstrates that the Missouri Supreme Court's rejection of this claim was not an unreasonable application of clearly established federal law. See 995 S.W.2d at 463.

The Sixth Amendment right to a jury trial in state criminal proceedings includes the right to trial before a fair and impartial jury. Pruett v. Norris, 153 F.3d 579, 584 (8th Cir. 1998). To establish juror partiality, a defendant must show that pretrial publicity actually prejudiced individual jurors, or was so pervasive and inflammatory that it raised a presumption of inherent prejudice. United States v. Blom, 242 F.3d 799, 803 (8th Cir. 2001). In this case, Petitioner contends that the timing and content of the two newspaper articles created a presumption of prejudice that warranted a change of venue.

Pretrial publicity is presumptively prejudicial only in "extreme situations." Snell v. Lockhart, 14 F.3d 1289, 1293 (8th Cir. 1994). For example, in Rideau v. State of Louisiana, 373 U.S. 723 (1963), the Supreme Court presumed the jury was prejudiced after a 20-minute film depicting the defendant's confession to the murder aired several times throughout the local community prior to trial. In the film, viewers saw the defendant, "in jail, flanked by the sheriff and two state troopers, admitting in detail the commission of the robbery, kidnaping, and murder, in response to leading questions by the sheriff." Id. at 725. The Court concluded that the defendant had already been "tried" by the community in "kangaroo court proceedings ... presided over by a sheriff, where there was no lawyer to advise [the defendant] of his right to stand mute." Id. at 726-27. In these rare circumstances,

the Court held that due process of law demanded a change in venue.

In Coleman v. Kemp, the Eleventh Circuit held that a year-long barrage of radio and print coverage of the defendant's case by the local and regional press created a presumption of prejudice. 778 F.2d 1487 (11th Cir. 1985). The court reviewed countless newspaper articles, editorials, and radio broadcasts and came to the inescapable conclusion that the community "was deeply prejudiced as to both guilt and sentence." Id. at 1538.

The record of this case presents a sharp contrast to the pervasive and corrupting publicity that occurred in Rideau and Coleman. In this case, the publicity amounted to two articles in the local newspaper. As the Petitioner concedes, this publicity is insignificant compared to the months of radio and print media coverage the jury was exposed to in Coleman. Likewise, the Petitioner has failed to demonstrate how the content of these two articles was comparable to the inflammatory material the Supreme Court addressed in Rideau. While the timing and wide circulation of the two articles suggest that the majority of the prospective jurors may have been familiar with the basic facts of Petitioner's case, the Constitution does not require jurors to be completely ignorant of the facts and issues in a case. Irvin v. Dowd, 366 U.S. 717, 722 (1961). Indeed, the Supreme Court has expressly rejected "the proposition that juror exposure to information about a

state defendant's prior convictions or to news accounts of the crime with which he is charged alone presumptively deprives the defendant of due process." <u>Murphy v. Florida</u>, 421 U.S. 794, 799 (1975).

More importantly, the record demonstrates that the trial judge took immediate action in response to the two newspaper articles to ensure that the publicity had not, and would not, compromise the impartiality of the jury. The trial judge spoke directly with the reporter responsible for the front page article and was assured that nothing more would be published on Petitioner's case until the jury had been selected and sequestered. Additionally, the judge permitted extensive voir dire of individual jurors by Petitioner's trial counsel to determine whether the pretrial publicity would affect their ability to render an impartial verdict.

In sum, the totality of the circumstances in this case support the Missouri Supreme Court's conclusion that the trial court did not abuse its discretion in denying Petitioner's second change of venue. Likewise, the Court's holding that the pretrial publicity in Petitioner's case did not raise a presumption of prejudice was not contrary to clearly established federal law.

### Claim 8: Trial Court's Denial of a Request for an Additional Continuance

In his eighth claim, Petitioner contends that the trial court deprived him of the

right to effective assistance of counsel by denying repeated requests for a second continuance to allow his trial counsel more time to prepare. The decision whether to grant or deny a continuance rests within the discretion of the trial judge. Ungar v. Sarafite, 376 U.S. 575, 589 (1964); Loggins v. Frey, 786 F.2d 364, 366 (8th Cir. 1986). "[O]nly an unreasoning and arbitrary 'insistence upon expeditiousness in the face of a justifiable request for delay' violates the right to the assistance of counsel." Morris v. Slappy, 461 U.S. 1, 11-12 (1983) (quoting Ungar, 376 U.S. at 589). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." Ungar, 376 U.S. at 589.

In the month preceding Petitioner's trial, the trial judge considered four separate motions by the Petitioner for a second continuance. Petitioner's trial counsel presented a well-documented account of the logistical, personnel and time constraints they were facing. The veracity of counsel's assertions was never questioned, nor did the trial judge fail to notice that their elevated stress level was due in part to the prosecution's belated endorsement of witnesses. Despite these circumstances, the trial court reasoned that "this is the kind of case that never would be ready for trial."

The trial judge concluded that maintaining the February 24, 1997 trial date would not prejudice Petitioner, and the reasons he offered are supported by the record. Petitioner's trial had been pending for more than a year. A six-month continuance had already been granted. Each of the three members of Petitioner's trial team had been working on his case for at least five months. Counsel's failure or inability to interview or depose every witness that they listed in their motions did not raise the risk of prejudice. The Missouri Supreme Court noted that "many of these were simply 'chain-of-custody' witnesses verifying the proper handling of physical evidence. Others had already been deposed by the defense or had testified in pretrial proceedings. Still others had previously been endorsed by the state or the defense or their identities were revealed in police reports." 995 S.W.2d at 465. Additionally, many of the witnesses listed in Petitioner's motion were not even called by the prosecution.

Although I conclude that defense counsel made a very good case for a continuance, and that many judges in similar circumstances would have granted at least a short continuance, I cannot conclude that the denial here violated Petitioner's constitutional rights. Because many of the witnesses were not actually called at trial, Petitioner suffered no prejudice from his counsel's inability to depose them. To the extent Petitioner argues that counsel were unable to defend him adequately

because they were too busy doing discovery during the trial, the record does not support this claim. Looking at the trial as a whole shows that counsel vigorously and competently represented Petitioner.

In these circumstances, the Missouri Supreme Court's determination that Petitioner's constitutional right to effective assistance of counsel was not violated by the trial court's denial of a second continuance was not contrary to clearly established federal law. I will deny Petitioner's eighth claim, but because I believe reasonable jurists could differ, I will grant a Certificate of Appealability on this claim.

## Claims 9 & 10: Illegal Search and Seizure of Evidence from Petitioner's Home and Automobile

Petitioner claims that the trial judge erred by admitting evidence seized during unconstitutional searches of the Petitioner's home and truck. Petitioner contests both the validity of the search warrant as well as the seizures of evidence from his property and a nearby field. The Missouri Supreme Court held that the search warrant was supported by probable cause, and that the items seized fell within the plain view and automobile exceptions to the Fourth Amendment's warrant requirement. 995 S.W.2d at 456-58.

Judicial review of Fourth Amendment claims asserted in a state prisoner's

federal habeas corpus petition is limited to determining whether "a State has provided an opportunity for full and fair litigation" of the Fourth Amendment claims. Stone v. Powell, 428 U.S. 465, 494 (1976). If the State has provided this opportunity, "a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." Id. Under this standard, "a Fourth Amendment claim is ... unreviewable by a federal habeas court, unless either the state provided no procedure by which the prisoner could raise his Fourth Amendment claim, or the prisoner was foreclosed from using that procedure because of an unconscionable breakdown in the system." Willett v. Lockhart, 37 F.3d 1265, 1273 (8th Cir. 1994) (en banc).

Petitioner makes no attempt to show that the State of Missouri denied him an opportunity to fully and fairly litigate his Fourth Amendment claims, nor do I find support for such an argument in the record. Instead, he argues that Stone v. Powell should not apply in a death penalty case. This is not the law. Petitioner took full advantage of the opportunity to challenge the constitutionality of the contested searches and seizures both before and after trial as well as on appeal to the Missouri Supreme Court. Accordingly, Petitioner's request for habeas corpus relief on this claim is denied.

## Claim 10A: Dashboard Clock Evidence

Petitioner's amendment by interlineation added claim 10-A, which relates to one of the items (a piece of dashboard with adhesive) seized in the search he challenged in claim ten. He asserts a variety of constitutional claims arising out of the prosecution's use of this evidence. A clock with adhesive on the back was found at the murder scene and the state presented evidence to support its contention that the clock had previously been affixed to Petitioner's dashboard. Petitioner believes many arguments could have been made to challenge whether the dashboard clock found at the scene of the crime actually came from the dashboard of Petitioner's pick-up truck. According to the Petitioner, the failure to expose the alleged weakness in the prosecution's reliance on the dashboard clock constituted violations of his Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendment rights. Petitioner concedes that the legal and factual premises of this claim were not presented in any of his state court proceedings. Nevertheless, Petitioner maintains that this claim is not procedurally barred due to the ineffectiveness of his state post-conviction relief counsel and the inadequacies of Missouri's post-conviction scheme.

It is well-settled that a habeas petitioner must raise both the legal and factual bases for his or her claim in the state courts in order to preserve the claim for federal review. Flieger v. Delo, 16 F.3d 878, 885 (8th Cir. 1994). In cases of procedural

default, "federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." Coleman v. Thompson, 501 U.S. 722, 750 (1991).

As Petitioner readily admits, this Circuit has held that ineffective assistance of counsel during state post-conviction proceedings is not "cause" for overcoming procedurally defaulted claims. Nolan v. Armontrout, 973 F.2d 615, 617 (8th Cir. 1992). Subsequent efforts to challenge Nolan have been rejected by this Circuit. See Burns v. Gammon, 173 F.3d 1089, 1092 (8th Cir. 1999); Battle v. Delo, 19 F.3d 1547, 1553 (8th Cir. 1994). I decline Petitioner's invitation to re-examine an issue that the Eighth Circuit has clearly resolved.

Likewise, Petitioner's attempt to overcome the procedural bar to this claim by attacking the alleged inadequacies of Missouri's post-conviction scheme is unavailing. Petitioner contends that the Missouri scheme is so wrought with systemic flaws that it is not an adequate post-conviction remedy. While courts do recognize that § 2254's exhaustion requirements may be disregarded as futile after some clear manifestation on the record that the state court will refuse to entertain a habeas petitioner's claim, Petitioner has failed to meet this burden in the present

case. <u>Snethen v. Nix</u>, 736 F.2d 1241, 1245 (8th Cir. 1984) (citations omitted).

Petitioner has failed to even suggest that the alleged inadequacies of Missouri's

system would have applied to Petitioner's attempt to obtain post-conviction relief on

this claim. Petitioner's claim is denied.

## <u>Claim 11: Age of Jurors</u>

Petitioner claims he was deprived of a jury of his peers, in violation of the

Sixth and Fourteenth Amendments, when the trial court overruled Petitioner's

motion to quash the petit jury panel because it excluded eighteen to twenty-one-

year-olds.[4] The Missouri Supreme Court rejected this claim on the merits, and an

examination of federal precedent demonstrates that this holding was not contrary to

clearly established federal law. 995 S.W.2d at 465.

Age is not a suspect classification under the constitution. <u>Massacheusetts Bd.</u>

<u>of Retirement v. Murgia</u>, 427 U.S. 307, 313-14 (1976). Thus, the exclusion of

individuals from juries on the basis of age does not violate equal protection. <u>Weber</u>

<u>v. Strippit, Inc.</u>, 186 F.3d 907, 911 (8th Cir. 1999). Additionally, "persons aged

eighteen to twenty are not an identifiable group the exclusion of which renders a

jury list nonrepresentative of the community and violative of the Fifth and Sixth

---

[4]Mo. Rev. Stat. § 494.425(1) disqualifies "[a]ny person who is less than twenty-one years of age" from serving as a petit or grand juror.

Amendments." United States v. Olson, 473 F.2d 686, 688 (8th Cir. 1973). In sum, the Missouri Supreme Court's determination that the trial court did not err by permitting the exclusion of eighteen to twenty-one-year-olds from the petit jury panel was not contrary to clearly establish federal law.

## Claim 12: Questioning of Prospective Jurors

Petitioner contends that the trial court erred by sustaining the prosecution's objections to trial counsel's voir dire questioning of several venirepersons regarding their attitudes about the justice system and the death penalty. Petitioner claims that these restrictions denied him the right to adequately ensure the jury's impartiality, in violation of the Sixth and Fourteenth Amendments.

The Supreme Court affords state trial courts considerable discretion to supervise voir dire questioning. Ristaino v. Ross, 424 U.S. 589, 594 (1976); Ham v. South Carolina, 409 U.S. 524 (1973). While the Constitution "does not dictate a catechism for voir dire," questioning must be sufficient to guarantee a defendant's right to an impartial jury. Morgan v. Illinois, 504 U.S. 719, 729 (1992). To demonstrate that the exclusion of certain questions violated a petitioner's constitutional rights, "it is not enough that such questions might be helpful. Rather, the trial court's failure to ask these questions must render the defendant's trial

fundamentally unfair."  Mu'Min v. Virginia, 500 U.S. 415, 425-26 (1991).

Petitioner claims that his trial was fundamentally unfair because the trial court prevented inquiries into the attitudes and feelings of two venirepersons, Gray and Bailey, who ultimately served on the jury.  Petitioner lists four separate questions that the trial court did not permit counsel to ask venirepersons Gray and Bailey.[5] The Missouri Supreme Court held that the trial court did not abuse its discretion by sustaining the prosecution's objections to these questions because the questions "were open-ended and were not relevant to the question of whether a venireperson can serve as a fair and impartial juror."  995 S.W.2d at 461.

The record supports the Missouri Supreme Court's conclusion.  When viewed in context, the trial judge was simply exercising his discretion to curtail the length and form of questioning by sustaining the prosecution's objections.  See Turner v. Murray, 476 U.S. 28, 37 (1986) (holding that even where the Constitution requires

---

[5]The Missouri Supreme Court summarized these four instances as follows:

First, Venireperson Maloney states that he believed the criminal justice system could be manipulated.  Counsel then asked Venireperson Gray whether he had "any feelings like Mr. Maloney about the court system and the criminal justice system," and whether there are "particular instances that [he] feel[s] like the death penalty should be the punishment."  Counsel also asked Venireperson Bailey, "Are you someone who feels that the death penalty is a just punishment?" and "Have your opinions about the death penalty changed over the years?"

995 S.W.2d at 461.

the trial court to make specific inquiries during voir dire, the court "retains the discretion as to the form and number of questions on the subject, including the decision whether to question the venire individually or collectively."). For example, the trial court did not permit counsel to ask Bailey whether he felt the death penalty was just punishment, but the court did permit counsel to ask whether Bailey felt the death penalty was necessary and what opinion Bailey had of the death penalty. Similarly, the court sustained the prosecution's objection when counsel asked Gray, "Are there particular instances that you feel like the death penalty should be the punishment?" However, counsel was able to ask, "Are there particular instances that you can imagine, without saying what, where you feel like the death penalty should be the punishment if you found someone guilty of murder in the first degree, under those instances where life without parole really shouldn't even be considered?"

A thorough review of the voir dire of both Gray and Bailey demonstrates that the prosecution's objections did not prevent counsel from inquiring into prospective jurors' views on the death penalty, as required by the Constitution. Morgan, 504 U.S. at 733-34. In sum, the Missouri Supreme Court's determination that the trial court did not abuse his discretion was based on a reasonable determination of the facts and did not result in a decision that was contrary to clearly established federal

law.

### Claim 13: Striking Venirepersons Vinyard and Schnirch for Cause

Petitioner claims that the trial court erred by sustaining the prosecution's challenge for cause of venire members Vinyard and Schnirch because of their responses concerning the death penalty. Petitioner contends that the voir dire of Vinyard and Schnirch does not clearly indicate that they would have been unable to apply the law to the facts, but only that the decision to sentence Petitioner to death would have weighed heavily on their consciences. The Missouri Supreme Court rejected this claim. 995 S.W.2d at 460-61.

A trial court may not exclude prospective jurors "simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." Witherspoon v. Illinois, 391 U.S. 510, 522 (1968). Rather, a venireperson may be excluded for cause only if his or her views on capital punishment "would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985) (quoting Adams v. Texas, 448 U.S. 38, 45 (1980)). This standard does not require "unmistakable clarity." Id. at 424-25. "Reviewing courts defer to the trial judge's decision regarding bias because the judge's 'predominant function in determining juror bias involves credibility findings whose basis cannot

be easily discerned from an appellate record.'" <u>Kinder v. Bowersox</u>, 272 F.2d 532, 543 (8th Cir. 2001) (quoting <u>Wainwright</u>, 469 U.S. at 429). This determination is a factual issue, and thus the trial court's decision is subject to a "presumption of correctness" under § 2254(e)(1). <u>Wainwright</u>, 469 U.S. at 429.

In this case, the trial court concluded that neither Vinyard nor Schnirch could faithfully and impartially apply Missouri law. The trial court weighed the credibility and demeanor of Vinyard and concluded that he could not follow the law requiring that the state prove guilt and statutory aggravating circumstances beyond a reasonable doubt. The record demonstrates that Mr. Vinyard unequivocally stated that he would not be able to follow the judge's instructions on the burden of proof.

Likewise, Ms. Schnirch stated that she felt the same way as venireperson Payton, who said, "I don't feel that I can give a verdict of death." Upon further questioning, Ms. Schnirch responded in the affirmative when defense counsel asked whether she would be "substantially impaired" such that she could not vote for a death sentence. She also stated that getting through the guilt phase of the trial was "as good as I can do," implying that she would not be able to perform her duties during the penalty phase.

A review of the record fails to provide the clear and convincing evidence that Petitioner needs to rebut the trial court's determination that venirepersons Vinyard

and Schnirch were not qualified to serve on Petitioner's jury panel.  <u>See</u> §

2254(d)(2).  Accordingly, Petitioner's claim is denied.

## **Claim 14: Ineffective Assistance of Counsel: Failure to Move to Strike or Peremptorily Remove Juror Holt**

Petitioner claims that he was denied effective assistance of counsel when his

trial counsel failed to move to strike for cause or peremptorily remove Juror Holt.

Petitioner contends that Juror Holt's responses during voir dire indicated that she

could not fairly serve on the jury because she was biased against the use of

substance abuse as mitigating evidence.  According to Petitioner, any reasonably

competent counsel would have foreseen the conflict between Juror Holt's bias and

Petitioner's methamphetamine-induced psychosis defense, and would have moved

to strike Juror Holt from the panel.  Because Petitioner has failed to show that the

result of his trial would have been different had Juror Holt been struck from the

panel, I will deny this claim.

### *(A) Strike for Cause*

As with all claims of ineffective assistance of counsel, Petitioner's claim that

his trial counsel was ineffective in jury selection is subject to the two-prong analysis

of <u>Strickland</u>.  In <u>Strickland</u>, the Court held that "[i]f it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect

will often be so, that course should be followed." 466 U.S. at 697. That was the course followed by the Missouri Supreme Court in this case, and thus marks the starting point of my analysis. 103 S.W.3d at 735-36.

Under the prejudice prong, the "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. Petitioner contends that prejudice may be presumed in this case because a biased juror was allowed to serve. While the law may provide for such a presumption, Petitioner must first demonstrate "that the juror was actually biased against him." Goeders v. Hundley, 59 F.3d 73, 75 (8th Cir. 1995). The state trial court and the Missouri Supreme Court both concluded that Petitioner failed to satisfy this burden, and there is no clear and convincing evidence before me that would render the state courts' decision an unreasonable determination of the facts. See § 2254(d)(2).

The following exchange took place during defense counsel's voir dire examination of Juror Holt:

Q.    Ms. Holt, do you have an opinion about the death penalty?

A.    I think it is appropriate in certain circumstances.

...

Q.     Is your view of the death penalty – do you have strong views on the death penalty?

A.     Yes.  I think that I agree with this lady in the green pants.

Q.     Ms. Adams?[6]

A.     Yeah.  We're talking in generalities right now, and we haven't discussed exactly what we're talking about.  And I think sometimes we have to view what the circumstances are before we can say what we would choose to do.

Q.     We're not asking you to tell us what you would choose to do.  And I understand, it's frustrating.  And I understand your frustration.  And it's a difficult thing to question people about, but we need to have an idea of people's views on this issue.

A.     I understand.  You've had some really difficult questions and we're talking about something very serious.  It's a tremendous responsibility.  And to just say what I think I would do in that situation would be you can't really know until you view all of those things.  And there are certain situations, certain circumstances that don't warrant the death penalty and I think there are some that do.

Q.     Do you think — And I'll ask you some of the questions I've asked others about mitigating factors.  Do you think if you were asked to evaluate mitigating factors, that mental health type of evidence is something you could consider?

A.     Yes.  I think I could, but I also think that sometimes it's used by lawyers to manipulate the system.  You know what I'm saying?  And I think that you have to really look at all the evidence and all of the things that are posed to you.  But I think, yes, there are some.  There are not as many as what we allow, I think.

---

[6]Ms. Adams stated that "there are circumstances when the death penalty is appropriate."

> Q.   And it sounds like you're saying what you said earlier, that sometimes you really need to evaluate something before you can know how you can react?
>
> A.   Yes.
>
> Q.   Do you think if you were asked to consider, as mitigation, issues of drug and alcohol use, is that something you could consider?
>
> A.   I can't say for sure.  I can't say – I can say "yes" but I just don't know.

Petitioner contends that Juror Holt's responses indicate that she could not fairly consider the methamphetamine-induced psychosis defense that Petitioner's trial counsel presented during the penalty phase of his trial.

The Missouri Supreme Court disagreed and held that Holt was qualified to serve on Petitioner's panel.  103 S.W.3d at 735-36.  The Court noted that although Holt indicated that she was uncertain whether she could consider general drug or alcohol use as mitigating evidence, Missouri law does not require her to be certain.[7]

---

[7]Mo. Rev. Stat. §565.032(3) requires jurors to consider the following statutory mitigating circumstances in capital murder cases:

> (1) The defendant has no significant history of prior criminal activity;
> (2) The murder in the first degree was committed while the defendant was under the influence of extreme mental or emotional disturbance;
> (3) The victim was a participant in the defendant's conduct or consented to the act;
> (4) The defendant was an accomplice in the murder in the first degree committed by another person and his participation was relatively minor;
> (5) The defendant acted under extreme duress or under the substantial domination of another person;

Missouri law does require jurors to consider drug or alcohol use if it rises to the level of causing a psychosis, and the Court concluded that none of Holt's responses indicated she would not be able to follow such an instruction. The trial court was similarly satisfied with Holt's impartiality, and seated her on the jury without comment. See Goeders, 59 F.3d at 76 (noting that the trial court's act of seating a prospective juror without comment defeated petitioner's claim that the juror was biased). In sum, both the trial court and the Missouri Supreme Court found that Juror Holt could fairly serve on Petitioner's jury panel and render a verdict in accordance with the law. In the absence of clear and convincing evidence to the contrary, I find the Missouri Supreme Court's holding to be based on a reasonable determination of the facts. See § 2254(e)(1).

### (B) Peremptory Strike

Even if Juror Holt was qualified, Petitioner claims that any reasonably competent counsel who planned to present mitigating evidence of substance abuse would have exercised a peremptory strike to remove Juror Holt from the panel. Regardless of the reasonableness of trial counsel's strategy, or lack thereof, Petitioner still is unable to show that he was prejudiced as a result of counsel's

---

(6) The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired;
(7) The age of the defendant at the time of the crime.

failure to strike Juror Holt. This claim requires some showing that Juror Holt's replacement would have been more favorable to trial counsel's penalty phase strategy, and that the result of the trial would have been different. "[N]o prejudice can possibly be shown" in these circumstances because there is no way of knowing who would have replaced Juror Holt if she had been struck or whether this replacement would have been more favorable to Petitioner. Johnson v. Norris, 207 F.3d 515, 520 (8th Cir. 2000). In sum, the Missouri Supreme Court's denial of this claim was not the result of an unreasonable determination of the facts or contrary to clearly established federal law. Petitioner's claim is denied.

## Claim 15: Ineffective Assistance of Counsel: Failure to Challenge Required Mental State for First-Degree Murder during Guilt Phase

Petitioner claims that his trial attorneys provided ineffective assistance of counsel at trial by failing to present evidence that he lacked the mental state required for first-degree murder. During the guilt phase, Petitioner's counsel did not present any evidence and instead argued that the prosecution's evidence failed to prove Petitioner's guilt beyond a reasonable doubt. After Petitioner was convicted, his counsel presented as mitigation evidence that Petitioner suffered from a methamphetamine-induced psychosis. Counsel presented this psychosis defense through the testimony of Dr. Lipman, a neuropharmacologist, and Dr. Murphy, a

psychologist.  Dr. Lipman testified that as a result of chronic methamphetamine use and brain damage, Petitioner was substantially impaired in his ability to appreciate the criminality of his conduct.  Dr. Murphy testified that Petitioner's methamphetamine use caused an organic paranoid thought disorder that caused him to be psychotic.  Both testified that Petitioner suffered from other mental problems that pre-existed his methamphetamine abuse.

Petitioner does not contest his trial counsel's penalty phase strategy.  Instead, Petitioner claims that his trial counsel should have presented a defense during the guilt phase of not guilty by reason of insanity or diminished capacity.  Petitioner argues that the testimony of Drs. Lipman and Murphy, if joined with testimony from a psychiatrist such as Dr. A. E. Daniels who testified at the post-conviction hearing, would have supported this defense.[8]  A review of the both the trial and post-conviction proceeding transcripts reveals that trial counsel's decision to forego a 552 defense during the guilt phase and instead vigorously challenge the government's ability to satisfy its burden of proof did not fall below an objective standard of reasonableness.  See Strickland, 466 U.S. at 690.

Counsel were well aware that the testimony of both Drs. Lipman and Murphy

---

[8]Hereinafter 552 defense, in reference to the statutory source of this defense, Mo. Rev. Stat. § 552.010, et seq.

could support a diminished capacity defense in the guilt phase.  However, counsel were also aware that several obstacles stood in the way of pursuing that option. Most notably, the Petitioner himself opposed any guilt phase strategy that required him to assume responsibility for Pinegar's murder.   According to counsel, they spent a great deal of time discussing the possibility of a 552 defense with Petitioner, but he remained steadfast in his claim of innocence.[9]  Petitioner was so adamant in his opposition to any 552 defense that he threatened to act up if his counsel ever admitted his responsibility to the jury.  Counsel's decision to follow the Petitioner's express instructions was not unreasonable.  See LaRette v. Delo, 44 F.3d 681, 686 (8th Cir. 1995) (holding that counsel did not provide ineffective assistance of counsel by failing to present evidence of mental illness during the guilt phase when the defendant instructed counsel otherwise).

Counsel also weighed the difficulties inherent in the presentation of a 552 defense.  First, counsel reasoned that this strategy would have forced the defense to draw attention to the Calloway County murders and "front-load" their mitigation evidence.  Second, counsel believed the inconsistencies in the diagnoses of Drs. Lipman and Murphy would diminish the persuasiveness of their testimony to the

---

[9]While Petitioner could not have been more clear with his desired defense of innocence, counsel testified that they did consider his brain damage and methamphetamine use when deciding what weight to place on his instructions.

jury. While both doctors agreed that Petitioner was substantially impaired in his ability to appreciate the criminality of his conduct, they disagreed on whether Petitioner suffered from a mental disease or defect. Both of these considerations were reasonable interpretations of the facts at the time counsel formulated their strategy.

Petitioner now argues that it is per se ineffective assistance of counsel to claim innocence in the guilt phase of the capital trial and then present psychiatric mitigating evidence during the penalty phase. The case law cited by Petitioner falls considerably short of endorsing such a broad rule.[10] While there were certainly risks associated with counsel's trial strategy, the record demonstrates that trial counsel thoroughly weighed the available options before settling on their strategy. In light of the circumstances counsel faced at the time the guilt phase strategy was formulated, their decision to forego a 552 defense and instead vigorously challenge the government's ability to satisfy its burden of proof did not fall below an objective standard of reasonableness. Indeed, it was probably the correct strategy: Since the

---

[10]The two cases cited by Petitioner both concern egregious examples of ineffective assistance of counsel. In Bland v. California, counsel was terribly unprepared, and as a result, his client took the stand and made statements that directly contradicted assertions made by counsel. 20 F.3d 1469, 1479 n.10 (9th Cir. 1994), overruled on other grounds, Schell v. Witek, 218 F.3d 1017, 1024-25 (9th Cir. 2000). Similarly, in Ross v. Kemp, the defendant's two defense lawyers were unable to reconcile their conflicting strategies, and thus presented two mutually exclusive defenses during the guilt phase of the trial. 393 S.E.2d 244, 245-46 (Ga. 1990).

jury did not even consider the mental health evidence sufficient to spare Petitioner

from the death penalty, it is highly unlikely that they would have found him not

guilty because of this same evidence.  Thus, the Missouri Supreme Court's denial of

this claim was not contrary to clearly established federal law.  <u>See</u> 103 S.W.3d at

737.  Petitioner's claim is denied.

### Claim 16: Identification Testimony of Wesley Booth

Petitioner contends that the trial court erred in failing to grant his motion to

suppress the identification testimony of Wesley Booth.  He claims that Booth's

identification was the result of a suggestive identification procedure that created an

impermissible likelihood of misidentification.  The Missouri Supreme Court rejected

this claim and held that Petitioner failed to demonstrate that Booth's identification

was unreliable.  995 S.W.2d at 453.  While I agree that the identification procedure

was highly suggestive, when considering all the factors I conclude that the court's

decision was not contrary to clearly established federal law.

Booth worked at a Wal-Mart store in Bethany, Missouri.  He testified that

Petitioner, a woman, and a man had purchased ammunition the day of Pinegar's

murder.  Three days after Pinegar's murder police interviewed Booth about his

encounters with Petitioner at the Wal-Mart.  Booth provided a physical description

that generally matched Petitioner's, but was unable to positively identify anyone

from a photo array containing fifteen to twenty photographs. He did point to

Petitioner's photo as the one that best resembled the man who purchased

ammunition from him. Booth did not believe it was Petitioner, however, because

the man in the photograph had shorter hair and was heavier than Petitioner had

appeared at Wal-Mart. Several months later, Booth identified Petitioner at a

preliminary hearing. As Booth describes the confrontation, the prosecutors led

Booth into a hallway filled with ten to fifteen people. Petitioner was led into the

hallway several minutes later in handcuffs. Booth immediately identified Petitioner

as the customer he served at Wal-Mart.

    Assuming, as the Missouri Supreme Court did, that the circumstances

surrounding Booth's live confrontation with Petitioner were improperly suggestive,

Booth's testimony may nonetheless be admissible, as long as it is reliable. Manson

v. Brathwaite, 432 U.S. 98, 114 (1977); Graham v. Solem, 728 F.2d 1533, 1541

(8th Cir. 1984). In fact, "reliability is the linchpin in determining the admissibility

of identification testimony." Manson, 432 U.S. at 114. The Supreme Court

articulated several factors to guide this reliability determination, including "(1) the

opportunity of the witness to view the criminal at the time of the crime, (2) the

witness' degree of attention, (3) the accuracy of his prior description of the criminal,

(4) the level of certainty demonstrated at the confrontation, and (5) the time between

the crime and the confrontation." Id.

The Missouri Supreme Court determined that the majority of these five factors indicated that Booth's identification was reliable despite the suggestive identification procedure. 995 S.W.2d at 453-55. A detailed review of the record demonstrates that this conclusion was not an unreasonable determination of the facts. See Graham, 728 F.2d at 1542 (a state court's application of the Manson factors involves factual determinations that are entitled to the statutory presumption of correctness under § 2254).

First, Booth had two opportunities on the day of the crime to clearly view Petitioner at close range. Booth stood face-to-face with Petitioner at the Wal-Mart sales desk as Petitioner made his ammunition purchase, and then later the same day when Petitioner returned several boxes of shells to the same counter. See Clark v. Caspari, 274 F.3d 507, 512 (8th Cir. 2001) (witness' opportunity to view defendants face-to-face at sales counter and the cash register supported the reliability of the identification). The unique nature of Petitioner's purchase as well as his subsequent return later that afternoon increased the level of attention that Booth was able to give to Petitioner's appearance.[11] Further, although Booth was unable to identify

_____

[11] Booth testified that Petitioner purchased an unusually large quantity of ammunition in addition to a type of shotgun ammunition that was rarely requested at that time of year.

Petitioner's photograph immediately after the murder, the description he provided throughout the investigation remained consistent, and ultimately proved to be accurate.  Cf. United States v. Dailey, 524 F.2d 911, 914 (8th Cir. 1975) (inconsistencies between the witness' statement to police and his testimony on the stand indicated that the witness' testimony was tainted by the suggestive identification procedure).  Finally, when Booth was confronted with Petitioner at the Harrison County courthouse, he identified the Petitioner without hesitation.

Even though the three-month delay between the crime and the confrontation suggests that Booth's identification may have been unreliable, the Missouri Supreme Court was not unreasonable for placing greater weight on the four other factors.  See Clark, 274 F.3d at 512 (concluding that the witness' identification testimony was reliable even though two out of the five Manson factors indicated the identification was unreliable).  In sum, the Missouri Supreme Court's denial of this claim was not contrary to clearly established federal law.  Petitioner's claim is denied.

### Claim 17: Admission of Crime Scene Evidence during Guilt Phase

In his seventeenth claim, Petitioner claims that the trial court erred by admitting a crime scene videotape, photographs, and bone and jaw fragments from the victim during the guilt phase of Petitioner's trial.  Petitioner contends that the

prejudicial impact of this gruesome evidence so greatly outweighed its probative value as to deprive the Petitioner of his right to a fair trial in violation of the Sixth and Fourteenth Amendments.[12]

To the extent that Petitioner's claim challenges the trial court's application of Missouri evidence law, I cannot reverse the Missouri Supreme Court's denial of this claim. 995 S.W.2d at 462; Walle v. Sigler, 456 F.2d 1153, 1156 (8th Cir. 1972). As a state law matter, a federal habeas court may review the trial court's determination "only to determine if the alleged evidentiary error infringed a specific constitutional right or was so prejudicial that it fatally infected a trial's fairness." Murray v. Groose, 106 F.3d 812, 815 (8th Cir. 1997). Petitioner argues that the admission of this evidence violates his constitutional right to a fair trial by serving no purpose other than to inflame the jury.

"Certainly it can be said without extended discussion that the introduction of photographic evidence calculated to stir up passion or unduly excite prejudice, and so lead the jury to act upon outrage, instead of competent proof, is to be thwarted and promptly suppressed." Walle, 456 F.2d at 1154. However, where evidence can be shown to have some probative value, its gruesome nature will not render a trial

---

[12]Neither the videotape nor the photographs have been provided to the court, so I will assume Petitioner's description of them is accurate.

fundamentally unfair. For example, in <u>Walle</u>, the Eighth Circuit held that the trial

court did not violate the petitioner's constitutional rights by admitting graphic

photos of the victim's body at the crime scene. <u>Id</u>. at 1156. The Court reasoned

that the photos served as the best evidence to show the scene, physical situation,

identity of the deceased, appearance of the deceased, and the location, nature, and

number of gunshot wounds that were delivered. <u>Id</u>. at 1155. Similarly, in <u>United

States v. Ortiz</u>, 315 F.3d 873, 897 (8th Cir. 2002), the Court upheld the trial court's

admission of graphic photographs of the victim's body because they corroborated

the testimony of a key government witness and supported the government's position

that the crime was "particularly heinous and depraved."

The record in this case demonstrates that prosecution used the challenged

evidence in much the same fashion as the lawyers in <u>Walle</u> and <u>Ortiz</u>. This

evidence corroborated witness testimony concerning the location and position of

Pinegar's body, the evidence found in the vicinity of the body, and the location and

nature of Pinegar's wounds. While there is no doubt as to the gruesome nature of

this evidence, that condition was "an inherent and inseparable part of the crime"

with which Petitioner was charged. <u>Walle</u>, 456 F.2d at 1155. Under these

circumstances, the Missouri Supreme Court's denial of Petitioner's claim was not

contrary to clearly established federal law or the result of an unreasonable

determination of the facts. § 2254(d). Petitioner's claim is denied.

### Claim 17A: Failure to Disclose and/or Failure to Investigate Entomological Evidence Concerning Time of Death

Petitioner contends that the state failed to disclose and/or trial counsel failed to investigate evidence concerning the time of Pinegar's death. The state presented testimony of an expert witness who testified, based on the insect development on the corpse, a probable range of times of death. Petitioner claims that this entomologist relied on inaccurate temperature data recorded more than thirty miles from the crime scene to calculate the time of Pinegar's death. According to Petitioner, the failure of the prosecution to disclose or trial counsel's failure to investigate this alleged inaccuracy deprived Petitioner of an alibi.[13] Petitioner alleges these acts and/or omissions violated his Sixth, Eighth, and Fourteenth Amendment rights and he should therefore be allowed an evidentiary hearing to determine why this evidence was not presented to the jury.

As with claim 10A, Petitioner concedes that the legal and factual premises of

---

[13]The prosecution's theory placed Pinegar's time of death sometime between sunset on June 23, 1995, and noon on June 24, 1995. Petitioner argues that he was arrested and taken to Iowa on an unrelated charge on June 24 around 10:00 a.m., although I found no evidence of this in the record. Assuming he was arrested on June 24, he must have been released that same day, as there was testimony about his movements and conversations beginning the next day. In any event, Petitioner contends that with more accurate temperature data, the entomologist could have determined Pinegar's time of death to be after Petitioner had already been arrested, thus undermining the prosecution's ability to convict him.

this claim were never presented in any of his state court proceedings, yet he maintains that this claim is not procedurally barred.  See infra pages 37-39. Petitioner contends that the ineffective assistance of his state post-conviction counsel, the inadequacies of Missouri's post-conviction relief scheme, and the potential of this evidence to show his actual innocence all justify consideration of this claim.

A petitioner's procedurally defaulted claim is barred from federal habeas review unless he or she can show cause for the default and resulting prejudice, or that the court's "failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman v. Thompson, 501 U.S. at 750.  For reasons set forth more fully in my discussion of Petitioner's claim 10A, I decline to set aside § 2254's procedural bar for cause and prejudice on account of ineffective state post-conviction counsel or the general inadequacies of Missouri's post-conviction scheme.  The sole issue before me on this claim, therefore, is whether my failure to consider this procedurally defaulted claim will result in a fundamental miscarriage of justice.

"To fit within the fundamental miscarriage of justice exception, a petitioner must make a showing of actual innocence."  Weeks v. Bowersox, 119 F.3d 1342, 1350 (8th Cir. 1997) (citing Schlup v. Delo, 513 U.S. 298, 321 (1995)).  The

Supreme Court explained as follows:

> if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error, the petitioner should be allowed to pass through the gateway and argue the merits of his underlying claims.

Schlup, 513 U.S. at 316. "Due to important comity and finality interests, the actual innocence gateway is very limited." Weeks, 119 F.3d at 1351. A petitioner's gateway claim of actual innocence must satisfy a two-part test:

> First, the petitioner's allegation of constitutional error must be supported with new reliable evidence that was not presented at trial. Second, the petitioner must establish that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.

Bowman v. Gammon, 85 F.3d 1139, 1346 (8th Cir. 1996).

Petitioner has failed to satisfy this test. His claim of actual innocence hinges on an alleged discrepancy between the temperature relied on by the entomologist to estimate Pinegar's time of death and the actual temperature. Yet Petitioner has offered no proof, not even in the form of an affidavit, to suggest that such a discrepancy actually existed. Without a scintilla of evidence to support his claim of innocence, Petitioner cannot "pass through the actual innocence gateway" and evade the procedural default on this claim. Weeks 119 F.3d at 1351-52. Thus, Petitioner's claim is denied.

Even if this claim were not procedurally defaulted, Petitioner would not be entitled to an evidentiary hearing.

> When a habeas petitioner 'has failed to develop the factual basis of a claim' in the state courts, the federal district court <u>may</u> <u>not</u> hold an evidentiary hearing <u>unless</u> the applicant shows that the claim relies on 'a factual predicate that could not have been previously discovered through the exercise of due diligence' <u>and</u> that 'the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.'

<u>Osborne v. Purkett</u>, 411 F.3d 911, 915 (8th Cir. 2005) (quoting § 2254(e)(2)).

Petitioner's claim relies on a factual predicate – a temperature discrepancy – that could previously have been discovered. The entomologist's deposition testimony put Petitioner's trial counsel on notice that temperature at the same time at a certain location can differ from a location as close as five miles away, and in fact counsel cross-examined the expert on this point. This is not new information. Because Petitioner has failed to satisfy the first requirement for an evidentiary hearing under § 2254(e)(2), I will deny his request.

## **<u>Claim 18: The Scope of Expert Kathleen Green's Testimony</u>**

Petitioner claims that the trial court erred by permitting the state's expert witness, Kathleen Green, to testify about several pieces of physical evidence. Green, a criminalist with the Missouri State Highway Patrol's Forensic Laboratory,

conducted "physical match comparisons" to conclude that (1) a leather fragment from the crime scene matched a leather jacket seized at Petitioner's home; (2) the pieces of glasses lens recovered at the crime scene matched a pair of sunglasses found at Petitioner's home; and (3) the adhesive strip from the plastic dashboard clock found at the crime scene matched a piece of adhesive found in Petitioner's pick-up truck. Petitioner does not contest Green's qualifications or the foundation of her testimony. Rather, Petitioner contends that this was not the proper subject of expert opinion and served no purpose other than to impermissibly bolster the prosecution's case. The Missouri Supreme Court rejected this claim. 995 S.W.2d at 462-63.

On federal habeas review, a state law evidentiary ruling may be reversed only if it "infringed a specific constitutional right or was so prejudicial that it fatally infected a trial's fairness." Murray v. Groose, 106 F.3d at 815. Under this standard, a petitioner must demonstrate that "absent the alleged impropriety, the verdict probably would have been different." Hamilton v. Nix, 809 F.2d 463, 470 (8th Cir. 1987). This standard applies for the admission or exclusion of expert testimony as well. Hall v. State of Iowa, 705 F.2d 283, 287 (8th Cir. 1983).

After a thorough review of the record in this case, I find that the trial court's admission of this testimony did not violate the requirements of the Due Process

Clause. Green utilized her expertise to explain to the jury how she arrived at her conclusions. This expertise involved the use of microscopic visual examinations, physical match identification, and class characterization. Moreover, the thrust of Petitioner's argument – that the connection between these fragments and their original sources was obvious to a juror – belies any finding of prejudice in the present case, and only confirms that without Green's testimony, the jury would have reached the same conclusion and thus the same verdict. For these reasons, the Missouri Supreme Court's denial of this claim did not result in a decision contrary to clearly established federal law.

### Claim 19: Prosecutor's Guilt Phase Closing Argument

Petitioner contends that the prosecutor's guilt phase closing argument misstated the evidence and drew impermissible inferences in violation of Petitioner's right to due process of law. Petitioner offers a lengthy quote from the prosecutor's description of the events immediately preceding Pinegar's death to support this claim. The Missouri Supreme Court rejected Petitioner's claim and held that the prosecutor's argument was based primarily on reasonable inferences that could be drawn from the facts. 995 S.W.2d at 455-56. I agree.

"A prosecutor's argument violates due process if the prosecutor's remarks 'infected the trial with unfairness.'" Hall v. Luebbers, 341 F.3d at 716 (quoting

<u>Darden v. Wainwright</u>, 477 U.S. 168, 181 (1986)).  To make this showing,

Petitioner must first show that the prosecutor's statements were improper.  <u>United</u>

<u>States v. White</u>, 241 F.3d 1015, 1023 (8th Cir. 2001).  If they were, then the

Petitioner must demonstrate that the statements "prejudicially affected the

defendant's substantial rights by depriving him of a fair trial."  <u>Id</u>.

During closing argument, "an attorney's role is to assist the jury in analyzing,

evaluating and applying the evidence.  Arguments that transcend such boundaries

are improper."  <u>United States v. Beckman</u>, 222 F.3d 512, 527 (8th Cir. 2000).  "A

prosecutor may not express a personal opinion about a defendant's veracity."

<u>White</u>, 241 F.3d at 1023.  Instead, a prosecutor must base his comments on "the

evidence and the reasonable inferences that may be drawn from it."  <u>Id</u>.  These

limitations, however, do permit the prosecutor to state his or her argument regarding

the conclusions that the jury should draw from the evidence.  <u>United States v. Segal</u>,

649 F.2d 599, 604 (8th Cir. 1981) (internal citations omitted).

Petitioner focuses his challenge to the prosecutor's closing argument on the

italicized portions[14] of the following passage:

---

[14]It should be noted that the scope of Petitioner's present challenge to the prosecutor's closing argument is significantly broader than the objections his counsel made at trial.  At trial, Petitioner's counsel made three objections during this portion of the prosecutor's closing argument.  First, counsel objected to prosecutor's statement that Hobbs passed Middleton in the white Chevy pick-up "only a mile away" from her and Pinegar's residence.  The prosecutor

John Middleton is driving and there is someone in the middle seat. *Al Pinegar is leaning down on the passenger side. ... And he is leaning down and he's in that truck*, and the reason he is leaning down is because he is breaking his promise that he made to Prissy ...

*On their way to Ridgeway Lake, they are traveling down a gravel road, and at about that time... Maggie and the defendant decide it is the right time, a good time to get married – to get married and be bonded by the excitement and the adrenaline and the power of murder. John is driving, Maggie is in the middle, Al is on the passenger side, and Maggie strikes Mr. Pinegar. He is sitting as a passenger, his left lens is shattered. She grabs his gun and as she drags it towards the driver, the barrel knocks off the clock. Mr. Middleton slams on the brakes and as Maggie gives John Al's shot gun, Al gets out of the truck, bringing the clock and the french fries with him, and he starts high-tailing it.* He's running *and the defendant gets out of his vehicle*, and he shoots him in the back with a shot gun. *He's running and* it's a transiential wounds to the upper right shoulder, it's the bird shot, the number five – *ammunition that Al previously had in his gun...The defendant pumps the gun again, Mr. Pinegar is staggering, he pulls the trigger and there's no more in it. So he grabs the box of Federal double ought buck, opens it up, he's outside the truck, takes it all out, drops the box, and loads the weapon.* And he goes to Mr. Pinegar and shoots him straight on... *and Mr. Pinegar goes down.*

---

corrected himself by qualifying the exact location of Hobbs' encounter with the white Chevy truck with the word "approximately." Counsel did not object.

Second, counsel objected to prosecutor's statement that Pinegar was leaning down in the passenger side of the white Chevy when Middleton passed Hobbs. Counsel objected on the ground that there was no evidence to support the fact that Pinegar was in the truck. The trial court overruled this objection and stated that the prosecutor's statement could be argued as an inference from the facts.

Third, counsel objected when the prosecutor argued that Middleton first shot Pinegar in the upper right shoulder with a number five shotgun shell that Pinegar previously had loaded in his gun. Counsel stated that there was no evidence that Pinegar previously had a number five shotgun shell in his gun. The trial court responded to counsel's objection by stating "[t]he jury will recall the evidence on this issue." Counsel did not press this objection any further.

*Mr. Middleton puts down the shot gun and drags Mr. Pinegar under the fence. And he realizes that Mr. Pinegar is still alive, so he steps back through between the wires of the barbed wire fence, and as he raises up from having done that, he snags his jacket, the leather fringe of his coat, and... that piece of leather falls right on the side of the road* where you see it in the photographs.

*He retrieves the shot gun and he goes back and he shoots Mr. Pinegar at pointblank range in the left side of his face.*

A thorough review of the record demonstrates that the italicized portions of the prosecutor's argument constitute a proper application of the facts and the reasonable inferences that could be drawn from them. Line-by-line, fact-by-fact, the record provides support for the assertions offered during this portion of the prosecutor's argument. For example, Hobbs testified that she saw Petitioner and Maggie Hodges driving away from Pinegar's house the day of the murder. She testified that Petitioner was driving and Hodges was riding in the middle seat of the white Chevy pick-up, thus leaving an unaccounted for space on the passenger side of the pick-up's front seat. The state of the house that Hobbs observed upon her return suggested that Pinegar had just left. Additionally, as the Missouri Supreme Court noted, it was reasonable to infer that Pinegar had a reason to conceal himself in Middleton's truck as Hobbs drove past "because Hobbs had told Pinegar that he would have to choose between family and drugs and she associated Middleton with drugs." 995 S.W.2d at 456. Thus, the prosecutor's suggestion that Pinegar was

leaning down in the cab of the white Chevy truck as it passed Hobbs was not an unreasonable inference from the facts.

The prosecutor's story also offered the jury a reasonable way to connect the dots with the various pieces of evidence that law enforcement observed and recovered around Pinegar's body. The dashboard clock and broken sunglasses were found at the scene, and did not appear to be left there for any particular purpose. The prosecutor's suggestion that they were both left behind as the result of a physical struggle between Hodges, Pinegar, and Petitioner is a reasonable inference given the violent result of the events that took place at the crime scene.

Further, the actions that the prosecutor alleged took place – Pinegar running away from the truck, the three shots, the pumping of the shotgun, the sequence in which the different types of ammunition were fired, Petitioner tearing his leather jacket on the barbed wire fence while dragging Pinegar's body – are consistent with the testimony provided by the experts and officers that analyzed the crime scene. Dr. Peterson, the pathologist who performed the autopsy on Pinegar's corpse, concluded that Pinegar was shot twice in the back with a shotgun, once with number five shot and once with buckshot. She testified that neither of the first two shots would have instantly killed Pinegar. The extended position of Pinegar's right arm suggests that his body had been dragged to its final resting place under the barbed

wire fence. Finally, Dr. Peterson's testimony, coupled with the location of bone fragments recovered at the crime scene, suggest that the final, and most lethal shot, came from a second buckshot round fired at close range to Pinegar's face while his body lay under the fence.

If there is anything that stands out as an improper extension of the facts, it would be the prosecutor's statements regarding Maggie and Middleton's marriage and their excitement over the murder. There was testimony that Maggie told a witness she and Petitioner had just gotten married that day, but there was nothing to suggest that they decided to get married just before killing Pinegar. However, even if the prosecutor's argument on this point was an unreasonable inference, it did not infect the whole trial with unfairness. The jury was instructed at the outset of Petitioner's trial that the attorneys' statements, remarks, and arguments must not be considered as evidence. See United States v. Robinson, 110 F.3d 1320, 1326 (8th Cir. 1997). Such an instruction "alleviate[s] the risk of any prejudicial impact." Id. As a whole, the quoted passage from the prosecutor's closing argument offers the state's own interpretation of the evidence from the case. Any deviation from the facts was merely incidental in light of the strong factual support that the record provides for the prosecutor's argument. Accordingly, the Missouri Supreme Court's denial of this claim was not contrary to any clearly established federal law.

# Claim 20: Reasonable Doubt Jury Instruction

Petitioner claims that Missouri's pattern jury instructions on reasonable doubt, MAI-CR3d 300.02 and 302.04,[15] are unconstitutional. Specifically, Petitioner contends that the phrase "firmly convinced" does not adequately define the reasonable doubt burden of proof. The Missouri Supreme Court rejected this claim, citing several of its prior decisions which have upheld the appropriateness of these instructions. 995 S.W.2d at 465-66.

The Eight Circuit has upheld the constitutionality of Missouri's reasonable doubt instruction. Harris v. Bowersox, 184 F.3d 744, 751-52 (8th Cir. 1999). In

---

[15]These instructions read as follows:

The charge of any offense is not evidence, and it creates no inference that any offense was committed or that the defendant is guilty of an offense.

The defendant is presumed to be innocent, unless and until, during your deliberations upon your verdict, you find him guilty. This presumption of innocence places upon the state the burden of proving beyond a reasonable doubt that the defendant is guilty.

A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. The law does not require proof that overcomes every possible doubt. If, after your consideration of all the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you will find him guilty. If you are not so convinced, you must give him the benefit of the doubt and find him not guilty.

(Emphasis added).

Harris, the Court noted the similarities between Missouri's reasonable doubt instruction and the widely accepted reasonable doubt instruction promulgated by the Federal Judicial Center. Additionally, the court held that when Missouri's instruction was read as a whole, it adequately explained the concept of reasonable doubt in accordance with Victor v. Nebraska, 511 U.S. 1 (1994). Id. at 751-2. I find Harris controlling in the present case and thus conclude that the Missouri Supreme Court's denial of this claim did not result in a decision that was contrary to clearly established federal law.

### Claim 21: The Prosecution's Cross-Examination of Dr. Murphy

In his twenty-first claim, Petitioner contends that the trial court erred by permitting the prosecution to ask Dr. Murphy, one of the defense's penalty phase witnesses, questions relating to Petitioner's credibility. On the state's cross-examination of Dr. Murphy, the following exchange took place:

Q.   Did you ask [Petitioner] what was going through his mind at the time he murdered [Stacey Hodge and Randall Hamilton]?

A.   Right. I did.

Q.   And what did he say?

A.   He denied that he did it.

Q.   Would you agree that the majority or most of the disorders you have spoken of today, that the defendant allegedly suffered from

in your opinion, are primarily due to his abuse of methamphetamine?

A.     For the most part, yes.

Q.     And throughout the course of your evaluating him, the credibility of what the defendant is telling you and whether or not he is malingering, did you also evaluate the credibility of his denial of these three murders?

A.     I certainly did.

Q.     And what was your judgment?

[At this point, Petitioner's counsel objected.  Counsel argued that Petitioner's guilt with respect to the murder of Hodge and Hamilton was an ultimate question for the jury to decide.  The trial court overruled this objection, and permitted the prosecution to ask the following questions:]

Q.     When the defendant denied killing Randy Hamilton, did you believe he was being truthful at that time?

A.     No.

Q.     When the defendant denied killing Stacey Hodge, did you believe the defendant was being truthful at that time?

A.     No.

Petitioner contends that these last two questions exceeded the permissible

scope of expert testimony and invaded the province of the jury.  Because this claim

contests a state law evidentiary ruling, Petitioner is entitled to habeas relief only by

showing that "the alleged evidentiary error infringed a specific constitutional right or

was so prejudicial that it fatally infected a trial's fairness." Murray v. Groose, 106 F.3d at 815. Petitioner argues that the admission of this evidence violated his constitutional right to due process.

It is well-accepted under Missouri and federal law that an expert may not opine as to the credibility of another witness. State v. Whitmill, 780 S.W.2d 45 (Mo. 1989) (en banc); United States v. Azure, 801 F.2d 336, 340 (8th Cir. 1986). "Opinions of this type create a serious danger of confusing or misleading the jury, ... causing it to substitute the expert's credibility assessment for its own common sense determination." Nichols v. American Nat'l Ins. Co., 154 F.3d 875, 883 (8th Cir. 1998).

Despite these restrictions, the Missouri Supreme Court held that the trial court did not err by admitting this testimony. First, the court noted that Dr. Murphy could not have opined on Petitioner's credibility as a witness, because Petitioner did not testify at the trial. Second, the truthfulness of Petitioner's statements to Dr. Murphy were designed to test the factual basis of Dr. Murphy's own testimony, which is a particularly important subject of the cross-examination of expert witnesses. Finally, the Court reasoned that Petitioner's trial counsel opened the door to this credibility issue on direct examination. Specifically, on several occasions during Dr. Murphy's direct examination, he claimed that he could trust

the truthfulness of Petitioner's responses to his questions.[16]  995 S.W.2d at 458-459.

I agree with the Missouri Supreme Court and conclude that the trial court did not violate Petitioner's right to due process so as to fatally infect the fairness of his trial.  In addition to the reasons set forth by the Missouri Supreme Court, Dr. Murphy's testimony on cross-examination served to challenge his own credibility. Several times on direct examination, Dr. Murphy testified that he was confident as to the veracity of Petitioner's responses to questions on the various tests he administered.  Yet his testimony on cross-examination demonstrates that Dr. Murphy did not believe everything Petitioner told him during his interviews.  For all these reasons, the Missouri Supreme Court's denial of this claim was not contrary to

---

For example, the following exchange took place during Petitioner's direct examination:

> Q.     In terms of this Adult Neuropsychological Questionnaire, how do we know that when [Petitioner], or anybody else for that matter, is answering those questions that they are answering truthfully?

> A.     You really don't know.  You have to – Once you investigate what the items are that are significant, then you certainly get a sense for that, is there any coherence to what they are saying.  On the other tests we will get to, they have validity scales which check specifically to see if in fact the person is trying to think in a particular direction or not.  In all of the tests there was no indication that [Petitioner] was trying to fake anything.  In fact, if anything, he rationalizes the problems that he does have into realistic solutions to himself – even though they are inaccurate.  So if he's got a problem, he makes it into something else that's more normal, and that happens in a lot of organic people.

(Emphasis added).

clearly established federal law.

## Claim 22: Ineffective Assistance of Counsel - Failure to Investigate and Present Evidence to Contest Prosecution's Interpretation of "P.S. She'll Write or I'll Sell This Address."

During the penalty phase, Petitioner's trial counsel called Petitioner's brother-in-law, Paul Oglesbee, the husband of Petitioner's sister Rose, to describe the physical and mental effects that methamphetamine use had on Petitioner. During Oglesbee's cross-examination, the prosecution questioned him about a letter that he and his wife received from Petitioner that contained the postscript, "She'll write or I'll sell this address." Oglesbee testified that he believed that this phrase was a threat, and that Petitioner was "putting a contract on us for a hit." The prosecution relied on this testimony to argue that Petitioner maintained his aggressiveness even after he stopped using methamphetamine.

Petitioner contends that the prosecution's use of this letter violated Petitioner's constitutional rights in a variety of ways. First, Petitioner argues that his trial counsel was ineffective for failing to object to the testimony of Oglesbee that the phrase "sell your address" in the letter meant that Petitioner was placing a hit on Oglesbee and his wife. The Missouri Supreme Court rejected this claim, stating:

> Much of [Petitioner's] argument presupposes that the phrase did not constitute a threat. Clearly, however, Mr. Oglesbee believed it was a threat. In considering capital punishment, the jury is entitled to a wide

> range of helpful information. ... Evidence that [Petitioner] made such a threat was relevant and admissible on the issue of defendant's character.

103 S.W.3d at 739.

I agree that Petitioner's trial counsel was not ineffective for failing to object to this testimony. Even if Oglesbee was mistaken in his interpretation of Petitioner's letter, Petitioner has offered no reason why his trial counsel should have known the real meaning of this phrase. As the author of the letter, Petitioner was in the best position to reveal the intended meaning of his postscript, but there is no evidence that he ever brought this discrepancy to his trial counsel's attention. Petitioner's trial counsel was not ineffective for failing to discover information that Petitioner himself never disclosed. See Cox v. Wyrick, 642 F.2d 222, 226 (8th Cir. 1981) (counsel was not ineffective where "no evidence that defendant gave counsel information which would have led him reasonably to conclude that further investigation was necessary"); Strickland, 466 U.S. at 691 (concluding that "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions").

Second, Petitioner claims the trial court's admission of this letter violated Petitioner's right to have notice of all evidence of aggravating circumstances that would be used against him. Oglesbee did not produce the letter until the morning he

testified in Petitioner's trial, although he had mentioned it in his deposition. The Missouri Supreme Court dismissed this argument, holding that because this claim challenged the trial court's admission of a document, it was not cognizable in Petitioner's post-conviction motion and must be raised on direct appeal. 103 S.W.3d at 740.

Petitioner did not raise this claim on direct appeal, but claims that his direct appeal counsel's ineffective assistance should excuse this procedural bar. A defendant is entitled to effective assistance of counsel during a direct appeal. Taylor v. Bowersox, 329 F.3d at 971. A constitutionally defective performance by direct appeal counsel can constitute cause to excuse an otherwise procedurally defaulted claim. However, "the exhaustion doctrine requires that a claim for ineffective assistance of counsel be initially 'presented to the state courts as an independent claim before it may be used to establish cause for a procedural default.'" Id. (quoting Murray v. Carrier, 477 U.S. 478, 489 (1986)). There is no indication that Petitioner has satisfied this precondition. Accordingly, the exhaustion doctrine prevents me from determining whether Petitioner's direct appeal counsel's performance should excuse the procedural bar on this claim.

Even if this claim had been properly preserved for appeal, I find it meritless. Contrary to Petitioner's claims, his trial counsel did have notice of the letter's

content.  As the trial court weighed the admissibility of the letter, both parties informed the judge that the letter, and specifically Oglesbee's interpretation of the postscript, was discussed during Oglesbee's deposition.  Although the letter was not available until the morning of Oglesbee's testimony, this delay was not due to any suppression by the prosecution.  In fact, the prosecution turned the letter over to defense counsel as soon as Oglesbee produced it.  Appellate counsel was not ineffective for failing to raise this claim on direct appeal.

Third, Petitioner argues that his trial counsel was ineffective for failing to call Brian Fifer, a fellow inmate of Petitioner's while Petitioner was incarcerated in Iowa.  Fifer allegedly would have testified that "I'll sell this address" is not a threat, but rather jailhouse slang for "if you don't write me back, I will not continue to write you."  The Missouri Supreme Court rejected this claim, and I find their holding to be a reasonable application of Strickland.  103 S.W.3d at 739-40.  Petitioner has produced no evidence that suggests that his trial counsel knew of, or should have known of, the alternative interpretation of this postscript.  Further, there is no evidence to suggest that trial counsel knew of the existence of Brian Fifer and the testimony that he could have offered.  Removing the distorting effects of hindsight, I have no reason to question trial counsel's omissions at the time they were made.  Strickland, 466 U.S. at 690.  For the foregoing reasons, Petitioner's

challenge to the testimony of Paul Oglesbee is denied.

## **Claim 23: Admission of Crime Scene Evidence of Other Crimes during Penalty Phase**

Petitioner claims that the trial court erred by allowing the prosecution to introduce a photograph of Hodge's body and a videotape of the crime scene where the bodies of Stacey Hodge and Richard Hamilton were found. The prosecution presented this evidence during the penalty phase of Petitioner's trial to bolster its theory that Petitioner killed Pinegar as part of a plan to murder several informants. Petitioner argues that this evidence was cumulative of other testimony, and therefore served no purpose except to inflame the passions of the jury.[17]

As discussed above in Petitioner's seventeenth claim, if evidence can be shown to have some probative value, its gruesome or inflammatory nature alone will not render a trial unconstitutional. See Walle, 456 F.2d at 1154-56. As with Petitioner's other claims of state-law evidentiary error, Petitioner must show that the evidence was "so prejudicial that it fatally infected the trial's fairness," Murray, 106 F.3d 815, and that "absent the alleged impropriety, the verdict probably would have been different." Hamilton, 809 F.2d at 470. The Missouri Supreme Court found that the probative value of the photograph and videotape was sufficient to justify the

---

[17]Like the videotape discussed in claim 17, this videotape is not part of the record produced to this court. My analysis accepts Petitioner's description of it.

admission of this evidence. It reasoned that because Petitioner had not been tried for the murders of Hodge and Hamilton at the time this evidence was introduced, the prosecution was entitled to offer the most convincing evidence it had available to ensure that Petitioner would be held accountable for these prior acts. See 995 S.W.2d at 463.

Although the prosecution presented the testimony of several witnesses who offered circumstantial evidence that linked Petitioner to the murder of Hamilton and Hodge, the only witness who offered an actual account of how Hodge and Hamilton were murdered was Douglas Stallsworth. According to Stallsworth, Petitioner confessed to shooting both Hodge and Hamilton and then placing their bodies in the trunk of Hodge's car. The videotape, produced by Officer Bruce Clemonds, depicted the location of the two bodies in the trunk of Hodge's car, and so it corroborated Stallsworth's testimony as it related to the bodies being left in the trunk. This testimony, however, had already been corroborated by the testimony of Officers Coon and Clemonds. The videotape was cumulative of their testimony. It was admittedly gruesome, showing the two victims' skeletized remains found a month after they had been killed. The videotape did not show the victim's injuries, so it did not corroborate anything except the location where the bodies were found. The photograph of Hodge's body, on the other hand, was used by Dr. Jay Dix

during his videotaped deposition, and corroborates Stallsworth's testimony regarding what he said Petitioner told him about the nature of the wounds inflicted on Hodge. The Missouri Supreme Court held that these considerations justified the admission of the videotape and photograph. Although I might have ruled differently, at least as to the videotape, I cannot say that this evidence fatally infected the fairness of the penalty phase of the trial, or that the jury probably would have rejected the death penalty absent this evidence. The Missouri Supreme Court's decision is not an unreasonable interpretation of the applicable facts and the law. I will, however, grant a certificate of appealability on this issue, as I believe other courts might reach a different conclusion.

## Claims 24 & 25: Victim Impact Evidence in the Penalty Phase

Petitioner brings two challenges to the admission of victim impact evidence

through the testimony of Pinegar's mother, Donna Tellier.  As its last penalty phase

witness, the prosecution presented the testimony of Tellier to identify several

photographs of Pinegar and discuss the impact that Pinegar's death had on her and

her family.  Petitioner contends that the emotions displayed during Tellier's

testimony and the photograph of Pinegar with his daughter, Bailey, were part of a

"show" designed by the prosecution to inflame the jury in violation of Petitioner's

Eighth and Fourteenth Amendment rights.  The Missouri Supreme Court disagreed

with this characterization of Tellier's testimony and held that her testimony and the

photograph were permissible forms of victim impact evidence.  995 S.W.2d at 464.

I agree.

In <u>Payne v. Tennessee</u>, the Supreme Court held that victim impact evidence is

not per se inadmissible under the Eighth Amendment.  501 U.S. 808, 827 (1991).

The Court held that this type of evidence was relevant to determine the specific

harm caused by a particular crime, and thus enabled the jury to "assess meaningfully

the defendant's moral culpability and blameworthiness."  <u>Id</u>. at 825.  The Court

concluded that victim impact evidence should be excluded only when it "is so

unduly prejudicial that it renders the trial fundamentally unfair."  <u>Id</u>. (citing <u>Darden</u>

v. Wainwright, 477 U.S. at 179-83). Since Payne, courts have granted prosecutors considerable leeway with victim impact evidence. For example, in United States v. Nelson, the prosecution presented six witnesses who discussed the victim's character and the emotional impact that the victim's death had on them. 347 F.3d 701, 712-14 (8th Cir. 2003). This body of evidence consumed over 100 pages of the trial transcript and included tearful testimony as well as religious references. The Court rejected the defendant's challenge to this evidence and concluded that neither the quality nor quantity of the evidence rendered the petitioner's penalty phase trial fundamentally unfair. Id. at 714. See also Gray v. Bowersox, 281 F.3d 749, 755-56 (8th Cir. 2002) (upholding the admission of testimony concerning the victim's civic activities and involvement in community activities).

In this case, the prosecution's victim impact evidence falls within the parameters established in Payne and its progeny. The prosecution's evidence consisted of a single witness, Tellier, whose testimony covers a total of four pages of the trial transcript. The content of her testimony directly addressed the impact of Pinegar's death. When asked how Pinegar's death affected her and her family, she responded that his death "left a very big hole in our hearts. Our holidays, there's an empty chair at the table. We spent 20 months trying to..." At this point, Tellier began weeping and had to be escorted from the witness stand. The fact that Tellier

became emotional during this testimony does not invalidate the constitutionally permissible purpose that her testimony served. See Nelson, 347 F.3d at 713 (upholding the admission of "emotional and, on occasion, tearful testimony" from six family members and friends of the victim). Further, the trial court took steps to insulate the jury from the emotional atmosphere that had developed in the courtroom. After defense counsel informed the court that several people seated in the back of the courtroom had also begun to weep, the court took an immediate recess.

The admission of the photograph of Pinegar with Bailey did not unduly prejudice Petitioner so as to render his trial fundamentally unfair. The prosecution may introduce evidence of the existence of a victim's surviving minor children as well as the impact that the victim's death had on them. Indeed, in Payne, the testimony at issue consisted of the victim's mother discussing how the victim's surviving minor son "cries for his mom" and "doesn't seem to understand why she doesn't come home." 501 U.S. at 814. In this case, the admitted photograph simply alerted the jury to the existence of Bailey. For the foregoing reasons, Tellier's testimony and the admission of the photograph of Pinegar and Bailey were not unduly prejudicial. Accordingly, the Missouri Supreme Court's rejection of these two claims was not contrary to clearly established federal law.

## Claim 26: Ineffective Assistance of Counsel - Failure to Make Variety of Objections during Penalty Phase

Petitioner alleges that his trial counsel was ineffective to failing to make a variety of objections during the penalty phase of Petitioner's trial. Petitioner claims that his trial counsel should have objected when the prosecution: (A) introduced evidence and made arguments that linked Petitioner to the Calloway County murders of Hodge and Hamilton; (B) relied on matters outside the evidence; (C) asked Dr. Lipman whether he believed Petitioner's denial of responsibility for the charged homicides; and (D) failed to include the mental state "knowingly" in Instruction 15.

### *(A) Evidence of Other Murders*

During the penalty phase of Petitioner's trial, the prosecution presented testimony and evidence concerning Petitioner's responsibility for the murders of Hodge and Hamilton. At the time, Petitioner had not yet been convicted of these crimes. Petitioner contends that the prosecution's arguments and evidence concerning these two murders injected arbitrariness into his sentencing and resulted in a mini-trial within a trial. According to Petitioner, a reasonably competent counsel facing the same circumstances would have objected each time the prosecution attempted to attribute the murders of Hodge and Hamilton to the

Petitioner.

The Missouri Supreme Court held that Petitioner's trial counsel was not ineffective for failing to object to argument and evidence concerning the Hamilton and Hodge murders. The Court held that this evidence was admissible to assist the jury in understanding Petitioner's prior acts and determining his punishment for Pinegar's murder. The Court concluded that "[c]ounsel cannot be deemed ineffective for failing to make a meritless objection." 103 S.W.3d at 740-41.

I agree with the Missouri Supreme Court. It is not objectively unreasonable under Strickland to fail to object to admissible evidence, and there is no question that evidence of the murders of Hodge and Hamilton was admissible during the penalty phase of Petitioner's trial. See Clark v. Groose, 16 F.3d 960, 964 (8th Cir. 1994) (holding that it was not unreasonable, under Strickland, for the petitioner's trial counsel to fail to object to admissible evidence). Under Missouri law, prior unadjudicated criminal conduct may properly be heard by a jury during the penalty phase of a capital case. State v. Ervin, 979 S.W.2d 149, 158 (Mo. 1998) (en banc). While the penalty phase should not become a mini-trial of prior offenses, the trial court does have the discretion to control the quantity of evidence presented to prove these prior acts. State v. Whitfield, 837 S.W.2d 503, 511-12 (Mo. 1992) (en banc). In this case, evidence of the murders of Hodge and Hamilton was offered to prove a

statutory aggravating factor, depravity of mind.  See Mo. Rev. Stat. § 565.032.2(7).

The jury was instructed that they had to find, beyond a reasonable doubt, that

Petitioner killed Pinegar as part of a plan to kill more than one person "and thereby

exhibited a callous disregard for the sanctity of human life."  Evidence and argument

linking Petitioner to the murders of Hodge and Hamilton was therefore relevant and

admissible.

Additionally, Petitioner's trial counsel made a strategic decision not to

continue objecting to the prosecution's evidence and argument concerning the

Hamilton and Hodge murders.  When asked during the state post-conviction

evidentiary hearing about these objections, Petitioner's trial counsel responded:

> The whole deal about the penalty phase defense, if you want to call it
> that, and the mitigators that we submitted and got – the statutory
> mitigators that we submitted and got.  The whole thrust of that was –
> apologizes to [Petitioner] – was that he was nuts at the time this
> happened.  And we had probably elicited as much testimony through
> our expert witnesses about the deaths of Stacey Hodge and Randy
> Hamilton as the State had elicited from their witnesses.  Because it was
> important to our experts that there were three homicides.
>
> So, if we had ever been in a position to preserve the pre-trial objection
> about uncharged conduct, in my opinion – without having the benefit of
> going back and reading this entire transcript but in my opinion – we
> had long ago waived that by examining Dr. Lipman and Dr. Murphy
> about the deaths of Stacey Hodge and Randy Hamilton.  That's my
> recollection.

In sum, Petitioner's trial counsel failure to make a series of objections that

were meritless under Missouri law and their strategic decision to focus on the

psychosis mitigation evidence was not objectively unreasonable under Strickland.

Therefore, the Missouri Supreme Court's denial of this claim was not contrary to

clearly established federal law.

### (B) References to Matters outside the Evidence

Petitioner claims that his trial counsel was ineffective for failing to object to

two specific references the prosecution made to matters that were allegedly outside

the evidence.  First, during the prosecutor's initial penalty phase argument, the

prosecution stated, "Paranoia is fear; it is fear.  And did this defendant have or act

paranoid, think paranoid things?  Yes.  Was he as paranoid as he led these doctors

to believe?  I doubt it, and I think you should doubt it."  Petitioner claims this

argument constituted an improper personalization and implied that the prosecutor

had special knowledge that the Petitioner's mental health evidence was false.

Second, in the same argument, the prosecutor stated that Stacey Hodge was

"moaning in agony" before the codefendant, Maggie Hodges, fired a shot that killed

her.  Petitioner contends that his trial counsel should have objected to this statement

as unfounded, highly inflammatory, and suggesting that the prosecutor had

knowledge outside the evidence.

"Closing arguments should be based upon the facts in evidence and

reasonable inferences therefrom, and should not assert factual propositions for which there is no evidentiary support." United States v. Boyce, 797 F.2d 691, 694 (8th Cir. 1986). In the first passage, the prosecutor asked the jury to consider whether Petitioner could have exaggerated the extent of his paranoia during his mental health evaluations. Although the prosecutor used the phrase "I doubt it," this by itself does not render the argument improper. The prosecutor supported his argument by citing several pieces of evidence that could reasonably be construed to display Petitioner's manipulative tendencies:

> I think you should read the letters, recall the letters that he wrote to his sister from jail – fairly sophisticated manipulations, fairly sophisticated manipulations. "People are trying to frame me"; "I don't know why you won't come to see me"; "I found Jesus Christ now." That is manipulation.

Similarly, the prosecutor's reference to the "moaning" of Stacey Hodge was directly supported by the testimony of Douglas Stallsworth. During the penalty phase, Stallsworth testified that "[Petitioner] shot Stacey. Then when she fell down and was kind of suffering, and moaning, and stuff they walked over and Maggie shot her in the head." (emphasis added). The Missouri Supreme Court found both these statements to be proper, and thus trial counsel's failure to object was inconsequential and did not prejudice Petitioner. 103 S.W.3d at 741-42. After reviewing the record, I cannot say that the Missouri Supreme Court's rejection of

Petitioner's claim resulted from an unreasonable interpretation of the facts or an

unreasonable application of Strickland.  Petitioner's claim is denied.

### (C) Cross-Examination of Dr. Lipman

Petitioner also claims his trial counsel was ineffective during the penalty

phase by failing to object during the prosecution's cross-examination of Dr. Lipman.

Petitioner argues that the prosecutor's questions allowed Dr. Lipman to express his

opinion on Petitioner's guilt or innocence.  The specific exchange proceeded as

follows:

> Q. Now as far as the interview with the defendant, it is my understanding that you did some things, for example, having him recite this story or a story backwards in order for you to make a determination as to whether or not he was being truthful, is that right?

> A. Right.  And I determined that there were some things he was lying about.

> Q. You determined that there were some things that he was lying about?

> A. Yes.

> Q. During the course of your interview with him, did you determine whether or not he was being truthful with you in regard to his denial of committing the murders we are here about today?

> A. He was lying about – in my opinion – the things that he was doing at the times those killings occurred.

The Missouri Supreme Court held that trial counsel was not ineffective for failing to object to this line of questioning because it was the proper subject of cross-examination. 103 S.W.3d at 741. In my discussion of Petitioner's twenty-first claim, I held that another expert witness, Dr. Murphy, was permitted to state his opinion of whether Petitioner was being truthful during his interview. See infra pages 74-77. That same rationale applies here. As with Dr. Murphy, Dr. Lipman's testimony concerned his professional appraisal of Petitioner's truthfulness during his mental health evaluation, not Petitioner's credibility as a witness. Further, defense counsel opened the door to this line of questioning during Dr. Lipman's direct examination.[18] Because this line of questioning was the proper subject of cross-

_____

[18]Specifically, Petitioner's trial counsel initiated the following exchange during Dr. Lipman's direct examination:

Q.    And how do we know that when [Petitioner] was responding to you questioning ... that he wasn't lying to you?

A.    Because of the context in which the answers are qualified by him. ...

Q.    And throughout your clinical interview of [Petitioner], as with any other person, do you take measures to check from time to time, or consistently, whether in fact this person is being truthful with you? I mean, how do you know? ...

...

Q.    And when you were interviewing him and talking about this time period of his 23-day crank run and the blackouts and things, did he admit to you that he felt any paranoia at this time in 1990?

A.    He denied it.

examination, Petitioner's trial counsel was not ineffective for failing to object.

### (D) Omission of "Knowingly" from Instruction 15

Petitioner's trial counsel also failed to object to the omission of the mental element of "knowingly" from one of the two statutory aggravating factors listed in Jury Instruction No. 15. The relevant parts of Instruction No. 15 read:

> In determining the punishment to be assessed against the defendant for the murder of Alfred Pinegar, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:
> ...
> 2. Whether the defendant murdered Alfred Pinegar for the purpose of concealing or attempting to conceal the defendant's delivery of methamphetamine, a controlled substance.
> A person commits the crime of delivery of a controlled substance when he delivers a controlled substance knowing that the substance is a controlled substance.

Both parties, as well as the Missouri Supreme Court, concede that the instruction should have included the word "knowingly" before the words "delivers a controlled substance." However, the Missouri Supreme Court held that Petitioner was not prejudiced by his trial counsel's failure to object to this omission.

> Here, the fact that [Petitioner] used and sold methamphetamine was conceded in the penalty phase and evidence to this effect was even

---

Q.    And what did you make of that, if anything?

A.    Well, he kept a Rambo knife in his car. He kept a bayonet on his person. He was clearly behaving in an irrationally fearful way. I didn't believe him.

elicited by defense counsel to support the claim of methamphetamine psychosis.  Accordingly, prejudice did not result from omission of the word "knowingly" and Petitioner's claim is without merit.

103 S.W.3d at 742.

After reviewing the record, I find the Missouri Supreme Court's denial of this claim to be a reasonable application of the prejudice prong of <u>Strickland</u>.  It was undisputed during the penalty phase of Petitioner's trial that he had used and dealt methamphetamine, a controlled substance.  Moreover, even if the omission of "knowingly" infected the jury's finding on the second statutory aggravating factor, the jury held that the evidence satisfied the first aggravating circumstance as well.  Under Missouri law, a finding of a single valid aggravating circumstance is sufficient to support a death penalty, and thus eliminates any prejudice that could arise from the erroneous application of additional aggravators.  See <u>Sloan v. Delo</u>, 54 F.3d 1371, 1385-86 (8th Cir. 1995) (upholding a jury's death penalty verdict where one of several aggravating circumstances was unconstitutionally vague).  Petitioner's claim is denied.

### Claim 27: Juror Gray's Dismissal

Juror Gray, the foreman of the jury during the guilt phase, was excused from the jury after the guilt phase but before the end of the penalty phase.  Petitioner's trial counsel then moved for a directed verdict of life without parole as well as a

mistrial.  The trial court denied both motions.  Petitioner contends that Missouri's

statutory procedure for first degree murder cases provides defendants with the right

to have the same jury decide both the guilt and penalty phases of a trial.  Because

this alleged right was denied by the substitution of an alternate juror for Juror Gray,

Petitioner contends the trial court violated his right to due process under the

Fourteenth Amendment.

Petitioner's argument is premised upon an erroneous interpretation of

Missouri law regarding the procedural protections afforded to first degree murder

defendants.  Petitioner principally relies on Mo. Rev. Stat. § 565.030.2 which

provides "[w]here murder in the first degree is submitted to the trier without waiver

of the death penalty, the trial shall proceed in two stages before the same trier."

(emphasis added).  Petitioner argues that this language precludes the replacement of

guilt phase jurors with alternate jurors in the penalty phase.

The Missouri Supreme Court has twice held that Missouri law does not

preclude the substitution of an alternate juror during the penalty phase of a capital

trial.  995 S.W.2d at 459-60; State v. Johnson, 968 S.W.2d 123, 132 (Mo. 1998)

(en banc).  The court reasoned that the use of alternate jurors is governed by Mo.

Rev. Stat. § 494.485, which allows the trial court to substitute alternate jurors "prior

to the time the jury retires to consider its verdict."  995 S.W.2d at 459.  In State v.

<u>Johnson</u>, the Missouri Supreme Court held:

> The overriding intent of section 494.485 is to prevent mistrials caused by the loss of a regular juror. The only statutory exception to the use of alternate jurors applies when deliberations have already begun. Allowing juror replacement during the penalty phase, but before the jury retires to deliberate, is entirely consistent with both the legislative purpose of preventing mistrials and the statutory exception. This court concludes that the legislature intended to afford the same protection against mistrials in bifurcated trials that it afforded in non-bifurcated cases; therefore alternate jurors may properly serve in penalty phase deliberations only. This conclusion, of course, is also entirely consistent with the practice of conducting penalty phase trials with completely new juries whenever the imposition of the death penalty is overturned on appeal.

969 S.W.2d at 132.

The trial court's denial of Petitioner's motion for a directed verdict or mistrial was consistent with the Missouri Supreme Court's interpretation of state statutes. "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68 (1991). As the substitution was consistent with the prevailing Missouri law, Petitioner cannot show that his federal due process rights were violated.

**Claim 28: The Denial of Petitioner's Proposed Penalty Phase Instructions and
Claim 29: Ineffective Assistance of Counsel - Failure to Challenge Jurors'
Ability to Understand the Penalty Phase Instructions**

Petitioner claims that the trial court erred by refusing his requested penalty

phase instructions A, B, C, D, and E. As a whole, these proposed instructions were

designed to inform the jury on specific nonstatutory mitigation factors. Petitioner

argues that without these instructions the jury was not given the opportunity to fully

consider all mitigating evidence in accordance with the Eighth Amendment.

In his 29th claim Petitioner asserts that his trial counsel was ineffective for

failing to challenge the penalty phase instructions on the ground that the jury did not

understand them. Petitioner argues that counsel should have introduced into

evidence research by Dr. Richard Wiener which allegedly demonstrates that juries

have difficulty understanding Missouri's pattern instructions on the death penalty.[19]

The Missouri Supreme Court rejected both of these claims. The Missouri

Approved Jury Instructions that were given during the penalty phase of Petitioner's

trial have consistently been upheld by the Eighth Circuit. See, e.g., Ramsey, 149

---

[19]Dr. Wiener conducted two studies, one in 1994 that was published in the Journal of
Applied Psychology, and a more recent study funded by the National Science Foundation. Both
of these studies analyzed jurors' abilities to comprehend and apply Missouri's penalty phase jury
instructions. According to Dr. Wiener, these instructions generate substantial confusion among
jurors. Further, Dr. Wiener concluded that confused jurors are more likely to impose the death
penalty than jurors who comprehend their instructions.

F.3d at 757; Bolder v. Armontrout, 921 F.2d 1359, 1367 (8th Cir. 1990). The United States Supreme Court has also endorsed an instructional scheme similar to the one employed in Petitioner's trial. See Buchanan v. Angelone, 522 U.S. 269, 272-77 (1998).

Like the instructions in Buchanan, the instructions in Petitioner's case first asked the jury whether any statutory aggravating factors had been proven beyond a reasonable doubt. If the jury responded in the affirmative, only then would Petitioner even be eligible for the death penalty. Once eligibility had been determined, the jury was then required to consider mitigating factors, both statutory and nonstatutory, before deciding whether the death penalty was proper. At this second stage the state may shape and structure the jury's consideration of mitigation so long as it does not preclude the jury from giving effect to the relevant mitigating evidence. Buchanan, 522 U.S. at 276-77. Missouri's instructional scheme has been held to adequately afford a jury the opportunity to fully consider and weigh any and all mitigating circumstances. See Ramsey, 149 F.3d at 757.

Whether the instructions are understandable to a lay juror, however, is questionable. The Missouri Supreme Court rejected Petitioner's claim based o the studies of Dr. Weiner, noting that on three previous occasions the Missouri Supreme Court has discounted the significance of Dr. Wiener's studies. 103 S.W.3d at 743.

In State v. Deck, the Court dismissed any application that Dr. Wiener's 1994 study could have:

> [P]eople interviewed for [Dr. Wiener's] study did not act as jurors. They were given hypothetical facts that were different than the facts in this case, and they did not hear the testimony of witnesses, observe physical evidence or deliberate with eleven other jurors. More importantly, in the context of the instructions as a whole, the term "mitigating" is always contrasted with the term "aggravating" so that no reasonable juror could fail to understand that "mitigating" is the opposite of "aggravating."

994 S.W.2d 527, 542-43 (Mo. 1999) (en banc). The Court has relied on its reasoning in Deck to reject subsequent claims of ineffective assistance of counsel for trial counsel's failure to introduce Dr. Wiener's studies. See Lyons v. State, 39 S.W.3d 32, 43-44 (Mo. 2001) (en banc); State v. Jones, 979 S.W.2d 171, 181 (Mo. 1998) (en banc).

While I agree that the Missouri Supreme Court's rejection of these two claims did not result in an unreasonable application of prevailing state and federal law, I think a strong case can be made that Missouri's death penalty instructions are extremely hard to understand, and Dr. Weiner's studies show that this lack of clarity may lead more jurors to vote for death. Although I am denying Petitioner's claims, I will grant a certificate of appealability on these claims, because I remain concerned that jurors confusion may result in a constitutional violation.

**Claims 30 & 31: Missouri's Prorportionality Review**

Petitioner brings two separate, but related, claims challenging the proportionality review of the Missouri Supreme Court. In claim thirty Petitioner argues that the Court erred by holding that his sentence is proportionate to sentences imposed by Missouri courts under similar circumstances. In claim thirty-one, Petitioner contends that Missouri's system of proportionality review fails to provide petitioners with any guidance on the scope of cases that may serve as a basis for a court's comparison. Both of these claims fail under the Eighth Circuit's limited review of state court proportionality determinations, although I will grant a certificate of appealability on both.

Petitioner's right to proportionality review stems from Missouri law, not from the United States Constitution. See McKleskey v. Kemp, 481 U.S. 279, 306 (1987); Pulley v. Harris, 465 U.S. 37, 43 (1984); Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994). The Due Process Clause of the Constitution, however, entitles a defendant to procedures which ensure that a state-created "right is not arbitrarily defined." Foster, 39 F.3d at 882 (citations omitted).

The Eighth Circuit has unequivocally held that "Missouri's proportionality review does not violate the Eighth Amendment, due process, or equal protection of the laws." Ramsey, 149 F.3d at 754. Thus, a federal habeas court must only

determine whether the Missouri Supreme Court performed a proportionality review pursuant to § 565.035.3(3) and concluded that a petitioner's sentence is not disproportionate to that imposed in similar cases. The Eighth Circuit has determined that the Constitution requires nothing more, and thus challenges to the manner in which proportionality review was conducted or to the state court's interpretation of §565.035.3(3) are beyond the scope of habeas review. See Kilgore v. Bowersox, 124 F.3d 985, 996 (8th Cir. 1997); Sweet v. Delo, 125 F.3d 1144, 1159 (8th Cir. 1997); LaRette, 44 F.3d at 688; Foster, 39 F.3d at 882; Murray v. Delo, 34 F.3d at 1377.

In this case, the record reveals that the Missouri Supreme Court conducted a proportionality review and concluded that Petitioner's death sentence was not disproportionate to other cases:

> In determining whether the sentence of death is excessive or disproportionate, we are to consider "the crime, the strength of the evidence and the defendant." [citing § 565.035.3(3)]. We have found a sentence of death appropriate where the murder was committed to prevent the victim from serving as a potential witness against the murderer. See e.g., State v. Taylor, 929 S.W.2d 209, 223 (Mo. banc 1996); State v. Parker, 886 S.W.2d 908, 924 (Mo. banc 1994); State v. Shurn, 866 S.W.2d 447, 467 (Mo. banc 1993). We have also found the death sentence appropriate when the fatal blow is dealt to the victim while the victim is lying injured and helpless, which the facts seem to indicate here. See e.g., State v. Tokar, 918 S.W.2d 753, 773 (Mo. banc 1996).

The strength of the evidence and [Petitioner's] violent behavior support a sentence of death. Physical evidence found at the crime scene, such as the leather fringe, the broken sunglasses, and the plastic clock, link [Petitioner] to Pinegar's murder. Booth's testimony concerning [Petitioner's] purchase of certain types of ammunition also link [Petitioner] to the murder. Hobbs' testimony that she saw [Petitioner] driving away from Pinegar's home on the day of the murder further implicate[s] [Petitioner]. The testimony of Stallsworth and Thomas indicate that [Petitioner] admitted to them that he killed Pinegar.

Penalty phase evidence also established that [Petitioner] committed a virtually identical pair of murders ten days prior to killing Pinegar. This means that within two weeks' time [Petitioner] killed three people because he believed that two of them might give evidence to the police about his drug dealing. The third victim, Stacey Hodge, was killed simply because of her association with one of the potential informants. The circumstances surrounding [Petitioner's] murder of Pinegar reveal [Petitioner's] depraved character. [Petitioner] walked into Wal-Mart, with the man he planned to murder, and bought the ammunition used to murder him. Only two hours after the murder, he returned to the Wal-Mart to exchange the unused portion of the ammunition. These facts reveal that [Petitioner] rationally and methodically planned and executed the murder of Pinegar. [Petitioner's] sentence is neither excessive nor disproportionate.

995 S.W.2d at 467-68.

The Missouri statute requires the Supreme Court to consider "whether the sentence of death is excessive or disproportionate to the penalty in similar cases, considering both the crime, the strength of the evidence and the defendant." § 565.035.3(3). The statute gives no direction on how to perform the proportionality review, and it appears that rather than engaging in any statistical or

scientific comparison, the Missouri Court simply finds a few cases where death was imposed on similar or comparable facts. A true comparison, of course, would require the Court to look also at similar cases where the death penalty was rejected or was not sought. While I recognize that the prevailing law of this Circuit has not accepted this view, I believe reasonable jurists could differ, and I believe the prevailing jurisprudence should be reconsidered by the Eighth Circuit. Where the state law creates a right, the Fourteenth Amendment requires that the state not arbitrarily deprive Petitioner of that right. Missouri's proportionality review, as conducted in this and other cases, appears to me to be entirely arbitrary in its application. I will therefore grant a certificate of appealability on both of these claims, but I will deny Petitioner's thirtieth and thirty-first claims as required by the prevailing law.

## Claim 32: Defects in the Trial Transcript

Petitioner claims that the state failed to furnish him with a complete trial transcript for use during his state court appeal. Petitioner identifies several instances in the trial transcript where there are blanks or where the court reporter failed to transcribe precisely what was said by individuals in the courtroom. According to Petitioner, these omissions constitute a violation of Petitioner's right to due process under the Constitution.

The Missouri Supreme Court disagreed with Petitioner and rejected this claim. 995 S.W.2d at 466-67. Under Missouri law, "a losing party is entitled to appellate review based upon a full, fair and complete transcript on appeal." Jackson v. State, 514 S.W.2d 532, 533 (Mo. 1974). The right to a complete transcript is not absolute, however, and Petitioner is entitled to relief for the omissions in his trial transcript only if he demonstrated due diligence in trying to correct the deficiencies and if the omissions within the record prejudiced his appeal. Id.

The Missouri Supreme Court concluded that Petitioner failed to demonstrate either the due diligence or prejudice necessary for relief on this claim. Considering the prejudice prong of the inquiry, the court stated:

> [Petitioner's] trial lasted three weeks and his transcript is nearly four thousand pages long. [Petitioner] cites thirty-four instances of omission in the transcript. During the pretrial proceedings and the trial, participants made statements that were inaudible to the court reporter. Often, the court reporter immediately stopped the proceedings and asked for a clarification for the record. We will not address every omission cited by [Petitioner] as many of them were corrected by the court reporter at the time of trial and even more of them are trivial and clearly immaterial to his appeal. In a few instances, during voir dire and pretrial proceedings, the reporter did not request clarification and no correction was made. One incident involved questioning of a venireperson who sat on the jury. Three incidents involved trial testimony. An examination of those instances reveals that they did not prejudice [Petitioner's appeal].

995 S.W.2d at 466.

After a thorough review of the omissions cited by Petitioner, I cannot say that the Missouri Supreme Court's holding was based on an unreasonable interpretation of the facts or resulted in a decision contrary to clearly established federal law. Petitioner essentially concedes his inability to show prejudice by arguing that it is impossible to make such a showing with an incomplete record. Contrary to Petitioner's assertions, nearly every federal circuit, including the Eighth Circuit, has adopted a prejudice requirement in the context of missing or inaccurate trial transcripts. United States v. Kelly, 167 F.3d 436, 437-38 (8th Cir. 1999). See also United State v. Weisser, 417 F.3d 336, 342 (2nd Cir. 2005) (identifying prejudice requirements in the First, Second, Third, Fourth, Sixth, Eighth, Ninth, and Tenth Circuits) (citations omitted). Petitioner's claim is denied.

## Claim 33: Ineffective Assistance of Appellate Counsel - Failure to Contest Conflict of Interest and Instruction 15

Petitioner contends that his appellate counsel was ineffective for failing to raise two grievances on direct appeal. First, Petitioner claims that his direct appeal counsel should have challenged the trial court's failure to exclude the testimony of Douglas Stallsworth due to a previous conflict of interest. Second, Petitioner alleges that his direct appeal counsel was ineffective for failing to challenge the omission of "knowingly" in Instruction 15. For reasons set forth below, the

Missouri Supreme Court's rejection of both these claims resulted in a reasonable application of clearly established federal law.

### *(A) Conflict of Interest*

At trial, Petitioner's counsel moved to dismiss the case, or in the alternative, to exclude the testimony of Stallsworth because of an alleged conflict of interest involving the Chillicothe Public Defender's office.[20]  According to Petitioner, Darren Wallace, an Assistant Public Defender at the Chillicothe office, represented both Petitioner and Stallsworth at the time Stallsworth provided law enforcement with Petitioner's incriminating jailhouse confession.  Petitioner contends that this conflict of interest should have precluded Stallsworth from testifying at Petitioner's trial.  The trial court denied this motion, and Petitioner's appellate counsel elected not to challenge the trial court's denial on direct appeal because she believed the claim lacked merit.  The Missouri Supreme Court held that appellate counsel was not ineffective for raising this issue on direct appeal, and I agree.  103 S.W.3d at 737.

The right to effective assistance of counsel on direct appeal does not require

---

[20]Although Petitioner's brief also discusses conflicts involving prosecution witnesses Danny Spurling and Bobby Henderson, those two witnesses did not testify at Petitioner's trial.  As a result, the Missouri Supreme Court and Petitioner focus their attention on the trial court's failure to exclude the testimony of Stallsworth.  103 S.W.3d at 737, n. 4.  See also State v. Johnson, 549 S.W.2d 348, 350 (dismissing conflict of interests challenges to a prosecution witness that was never called to testify).

appellate counsel to raise every nonfrivolous argument on appeal. Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir. 1995) (citing Jones v. Barnes, 463 U.S. 745, 754 (1983))  In fact, the "process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751-52). "'Absent contrary evidence,' we assume that appellate counsel's failure to raise a claim was an exercise of 'sound appellate strategy.'" Roe v. Delo, 160 F.3d 416, 418 (8th Cir. 1998) (quoting Sidebottom, 46 F.3d at 759).

The record reveals that appellate counsel's decision not to raise the conflict of interest claim on direct appeal constitutes an informed, strategic decision of the type that the Supreme Court deemed "virtually unchallengeable" in an ineffective assistance of counsel claim. Strickland, 466 U.S. at 690.  From the sizable pool of claims that could have been brought on direct appeal, appellate counsel chose what she believed to be the strongest twenty-six claims.  She specifically chose not to raise this particular claim because she felt it lacked merit. Compare Evans v. Luebbers, 371 F.3d 438, 445-46 (8th Cir. 2004) (appellate counsel was not ineffective for failing to raise a claim after admitting to "considering the relative strength of all issues"), with Roe, 160 F.3d at 419 (appellate counsel was ineffective

because his failure to raise claim was an oversight and was not the product of deliberate strategy). The record demonstrates that appellate counsel's decision not to raise this claim was based on sound strategy, and I cannot allow the distorting effects of hindsight suggest otherwise.

Even if Petitioner's appellate counsel was objectively unreasonable in failing to raise this claim, however, Petitioner has failed to demonstrate that there is a reasonable probability that the argument would have been successful on appeal. Petitioner contends that any conflict of interest creates a presumption of prejudice which warrants the exclusion of Stallsworth's testimony. That is not the law. Missouri law, as well as federal law, presumes that a defendant is prejudiced only when the defendant's trial counsel is simultaneously representing a prosecution witness. See State v. Risinger, 546 S.W.2d 563 (Mo. Ct. App. 1977); State v. Cox, 539 S.W.2d 684 (Mo. Ct. App. 1976); United States ex. rel. Miller v. Myers, 253 F. Supp. 55 (E.D. Pa. 1966). Under those circumstances, trial counsel would not be able to effectively cross-examine a prosecution witness if that same trial counsel owed a duty of loyalty to the witness. Risinger, 546 S.W.2d at 566.

This presumption of prejudice does not apply in the present case. Whatever conflict may have arisen at the Chillicothe Public Defender's officer, that conflict was cured well in advance of Petitioner's trial. The Chillicothe office withdrew as

counsel for Petitioner on July 27, 1995. On September 18, 1995, public defenders from the state's capital division in Columbia, Missouri took over Petitioner's case and represented Petitioner from that point through the completion of his trial. None of Petitioner's trial counsel ever represented Stallsworth, and thus Petitioner's trial team faced no ethical restrictions in the scope and manner in which they were able to challenge Stallsworth's testimony during cross-examination.

Additionally, there is no evidence in the record to suggest that Petitioner was actually prejudiced by the Chillicothe Public Defenders' office's actions. The Chillicothe public defenders gained little knowledge of Petitioner's case during their brief conversations with Petitioner in the summer of 1995. More importantly, the knowledge that they did gain from having the confidence of Petitioner was not used to procure the incriminating statements from Stallsworth. Stallsworth offered his statement to his parole officer and Sheriff George Martz without any guidance or encouragement from public defenders in the Chillicothe office. For the foregoing reasons, the Missouri Supreme Court's denial of Petitioner's claim did not result in an unreasonable application of clearly established federal law.

### (B) Instruction 15

Petitioner also claims his direct appeal counsel was ineffective for failing to contest the omission of "knowingly" from Instruction 15. As discussed above in

section (D) of Petitioner's twenty-sixth claim, Instruction 15 failed to conform to

Missouri's pattern instructions by omitting the mental state "knowingly" before the

phrase "delivers a controlled substance."  All parties agree that the trial court erred

in this regard.  Petitioner's direct appeal counsel admitted her failure to raise this on

appeal resulted from her oversight rather than any strategic decision.  This oversight

does not constitute ineffective assistance of counsel, however, because there is no

reasonable probability that this claim would have been successful on appeal for the

same reasons that trial counsel's objections on this instruction would have been

overruled at trial.  See infra pages 94-95.  Petitioner's claim is denied.

## Claim 34: Missouri's Clemency Review

In Petitioner's final claim, he alleges that Missouri's clemency process is

arbitrary and capricious.  Petitioner relies solely on the example of Darrell Mease

for this proposition.  The execution date for Mease, a triple murderer, coincided

with the late Pope John Paul II's visit to Missouri in January 1999.  The late

Governor Mel Carnahan commuted Mease's death sentence to life with parole in

response to a personal appeal from the Pope.  Petitioner cites Mease's commutation

as an example of the arbitrary manner in which Missouri administers its clemency

process.

Petitioner's claim fails for several reasons.  First, Petitioner has yet to go

through the clemency process, so his claim is not ripe for review. 103 S.W.3d at 743. Second, even if it were ripe for review, his claim is not cognizable in a petition for writ of habeas corpus. Otey v. Hoplins, 5 F.3d 1125, 1132 (8th Cir. 1993) (holding that a challenge to the sufficiency of the clemency process seeks relief that a habeas court is not entitled to provide). Finally, ignoring these jurisdictional bars to review, his claim is meritless. While the Due Process Clause does apply to clemency proceedings, clemency remains a matter of mercy, not right. Roll v. Carnahan, 225 F.3d 1016, 1018 (8th Cir. 2000) (per curiam). Petitioner has a right to pursue clemency without official interference, but this right does not hinder the Governor's unlimited discretion to grant or deny clemency. Young v. Hayes, 218 F.3d 850, 852-53 (8th Cir. 2000). Accordingly, Governor Carnahan's decision to heed the personal appeal of the Pope was entirely within the scope of his constitutional discretion and does not render Missouri's clemency process unconstitutional. Petitioner's claim is denied.

## V.    CONCLUSION AND CERTIFICATE OF APPEALABILITY

After a thorough review of the record in this case, I find that all of Petitioner's claims for habeas relief are either procedurally barred or fail on the merits, and must be denied.

Under 28 U.S.C. § 2253, an appeal may not be taken to the court of appeals from the final order in a § 2254 proceeding unless a circuit justice or judge issues a Certificate of Appealability. 28 U.S.C. § 2253(c)(1)(A). To grant such a certificate, the justice or judge must find a substantial showing of the denial of a federal constitutional right. Id. at § 2253(c)(2); see Tiedeman v. Benson, 122 F.3d 518, 522 (8th Cir. 1997). A substantial showing is a showing that issues are debatable among reasonable jurists, a court could resolve the issues differently, or the issues deserve further proceedings. Cox v. Norris, 133 F.3d 565, 569 (8th Cir. 1997) (citing Flieger, 16 F.3d at 882-83).

I find that Petitioner is entitled to a Certificate of Appealability on the claims listed here as numbers 8, 23, 28, 29, 30, and 31. I do not find that reasonable jurists could differ on his remaining claims, so I will deny a Certificate of Appealability on those.

Accordingly,

**IT IS HEREBY ORDERED** that the petition for writ of habeas corpus filed

by John Middleton is denied.

**IT IS FURTHER ORDERED** that Middleton is entitled to a Certificate of

Appealability on the claims listed here as numbers 8, 23, 28, 29, 30, and 31.  He is

not entitled to a Certificate of Appealability on his remaining claims.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 21st day of September, 2005.